Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DERON MCCOY, JR.,           )
                             )
            Plaintiff,        )
                             )
v.                            )     Case No. 16-3027-CM-KGG
                             )
ARAMARK CORRECTIONAL   )
SERVICES, et al,             )
                             )
            Defendants.     )
_____)

## MEMORANDOM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Patricia Berry, by and through counsel, Assistant Attorneys General Natasha M. Carter and M.J. Willoughby, and in accordance with D. Kan. 7.1(a) and D. Kan. 7.6, submits this Memorandum in Support of her Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. The Notice required by D. Kan. 56.1(f) is also being provided herewith. Because there is no genuine issue of material fact that the meals served at Lansing, Hutchinson and El Dorado Correctional Facilities are kosher and because Defendant Berry is entitled to judgment as a matter of law, Defendant Berry respectfully requests that her motion be granted, stating the following in support.

### NATURE OF THE CASE

The Plaintiff is an inmate currently housed at El Dorado Correctional Facility ("EDCF"). (Doc. 108-1 at 2). Plaintiff filed his Third Amended Complaint on June 14, 2017, styling it as a civil rights complaint pursuant to 42 U.S.C. § 1983, but also invoking jurisdiction on the basis of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (Doc. 56). The Court dismissed the § 1983 claim against Berry in her official capacity and for any retroactive relief and dismissed the RLUIPA claims. (Doc. 90). The general requirements of kosher food service

require the use of food products that are kosher certified, utensils, pots, and pans that are designated for kosher food preparation only, and the cleaning of items separately from non-kosher food items. Kosher food items must also be stored, prepared, and served separately from non-kosher food items. Plaintiff alleges that Defendant Berry, a contract manager for the Kansas Department of Corrections ("KDOC"), violated his right to exercise his religious beliefs under the First Amendment by implementing a certified religious meal ("CRD") menu he alleges does not comply with Jewish dietary laws regarding source, storage, preparation, and service. Plaintiff further alleges he has a right to have his kosher food served as a sealed, TV-style dinner.

## STATEMENT OF FACTS

As per D. Kan. 56.1(a), the following is a concise statement of material facts as to which no genuine issue exists:

1.      Plaintiff is currently housed at EDCF. (Doc. 108-1 at 2).

2.      Aramark Correctional Services is a food service contractor for KDOC and is responsible for developing and implementing menus for the foods that inmates are served at KDOC. (Declaration of Pat Berry, ¶ 4, Exhibit A hereto ("Berry Dec."); Copy of Aramark Contract attached as Berry Exhibit 1 at 5, ¶ 7).

3.      The relevant provision as to CRD in the Aramark Contract states: : "…[Aramark] shall provide other special diets as mutually agreed upon by [Aramark] and the [KDOC] to include, but not limited to a certified religious diet and certain standardized medical diets. [Aramark] shall be responsible for obtaining review of the certified religious diet by appropriate religious advisor to insure that the diet meets the requirements of a certified religious diet as defined by the [KDOC], and shall provide proof of the review to the [KDOC]. (Berry Dec., at ¶¶ 4, 9, Aramark Contract. Berry Exh. 1 at 5, ¶ 7).

4.      Aramark is responsible for all aspects of food preparation and service at all KDOC facilities, including staffing and supervising food service, including inmate labor. (Berry Dec., at ¶ 4; Berry Exh. 1 at 1, ¶ 1, 12, ¶ 37).

5.      Aramark has policies in place to ensure the CRD is correctly implemented. These policies are periodically reviewed and approved by Aramark's religious authority, Rabbi Fellig. (Berry Dec., at ¶¶ 9, 20, Copy of Aramark's Preparing a Kosher Environment attached as Berry Exh. 6).

### Facts regarding Lansing Correctional Facility ("LCF")

6.      Plaintiff was housed at LCF from October 2, 2012, to June 16, 2016. (Doc. 41 at 2).

7.      On January 22, 2014, Plaintiff changed his religious preference from Protestant to Assembly of Yahweh. (Affidavit of Don Almond, Doc. 41-2, Ex. B at ¶ 3). Plaintiff was added to the religious meals roster at that time. *Id.*

8.      On August 24, 2014, Plaintiff changed his religious preference from Assembly of Yahweh to Judaism. (*Id.* at ¶ 5).

9.      Plaintiff has eaten non-kosher food/consumed non-kosher commissary items continuously throughout his incarceration. (Docs. 98-7, 98-8).

10.     Evan Hitchcock is employed by Aramark as the General Manager/Regional Safety Leader at LCF. His job duties include, in part, training, managing performance, and directing and overseeing operations related to food service. (Affidavit of Evan Hitchcock, at ¶¶ 2-3 (hereinafter, "Hitchcock Aff."), attached hereto as Exhibit B).

11.     The CRD menus used for male inmates in 2014 and 2015 provided kosher items. (Doc. 41-3, Ex. C at 3-7). The CRD menus contain a signature of approval by Aramark's religious

authority, Rabbi Fellig. *Id.* Under Rabbi Fellig's signature it states: "This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such cannot confirm that each meal being served is Kosher." *Id.*

12.     All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes and Aramark maintains certificates for these food items verifying they are kosher-certified. (Hitchcock Aff., at ¶¶ 18-19; Berry Dec., at ¶ 16(a); Ex. 2 to Berry Dec. to be filed conventionally with leave of Court).

13.     All entrée items used in the CRD arrive at LCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (Hitchcock Aff., at ¶¶ 20-21; Ex. 1-2 to Hitchcock Aff.).

14.     CRD entree items have kosher symbols on the outer bulk packaging. (Hitchcock Aff,, at ¶ 20; Ex.61-62 to Hitchcock Affidavit; Declaration of Rabbi Ben Friedman, at ¶ 7 (hereinafter, "Friedman Dec."), attached hereto as Exhibit C).

15.     The sliced bread and milk do not maintain kosher symbols on the individual packaging. (Friedman Dec.at ¶ 7). Aramark maintains certificates verifying they are in fact kosher. *Id*. The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id*.

16.     CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark supervisors. (Hitchcock Aff. at ¶¶ 45-46; Friedman Dec., at ¶ 20; Ex. 2 to Friedman Dec.).

17.     LCF maintains a separate CRD-designated room for the preparation, service, and cleaning of CRD menu items. Only authorized staff are allowed into the locked CRD-designated room. (Hitchcock Aff., at ¶¶ 6-9; Ex. 10-13, 15-28 to Hitchcock Aff.*; Friedman Dec., at ¶ 12).

18.     The CRD-designated room contains a sink in which all CRD-related items are cleaned and sanitized. (Hitchcock Aff., at ¶¶ 6-9; Ex. 20, 27 to Hitchcock Aff.; Friedman Dec.at ¶ 12).

19.     Following the service of the CRD meals, CRD trays are collected, disposable utensils are discarded, and there is one tub used for collection of the dirty CRD trays after the meal. (Hitchcock Aff., at ¶¶ 33-34).

20.     It is not a violation of kosher dietary laws for CRD designated and non-CRD designated trays to pass through the same tray slot after use, or to be dumped in the same trash. Friedman Dec., at ¶ 19.

21.     LCF utilizes a steam kettle and oven for the preparation of warm CRD food. (Hitchcock Aff., at ¶ 27; Ex. 35-36, 39 to Hitchcock Aff.).

22.     No stovetops are used in the preparation of CRD food. (Hitchcock Aff. at ¶ 25).

23.     CRD-designated trays are used for serving the CRD menu, differentiated by color. (Hitchcock Aff.at ¶ 29; Ex. 24 to Hitchcock Aff.*; Friedman Dec. at ¶ 8).

24.     CRD meal trays for general population inmates are purple and not insulated. General population trays for all diets other than CRD are tan and not insulated. (Hitchcock Aff., at ¶ 30; Ex. 24 to Hitchcock Aff.).

25.     Disposable sporks are used for CRD meals. (Hitchcock Aff.at ¶ 32; Ex. 66-67 to Hitchcock Aff.; Friedman Dec. at ¶ 8).

26.    CRD-designated utensils are used for the service of the CRD menu. These utensils are distinguishable by two holes in the handle and are kept in a locked cabinet accessible only by Aramark supervisors. (Hitchcock Aff., at ¶¶ 10-12; Ex. 14-15 to Hitchcock Aff.; Friedman Dec., at ¶ 10).

27.    CRD-designated cookware is distinguishable by a black Teflon coating on the inside of the pan. Pans used for the regular menu food do not have the black Teflon coating. (Hitchcock Aff., at ¶¶ 13-14; Ex. 32, 37 to Hitchcock Aff.; Friedman Dec., at ¶ 8).

28.    When not in use, the cookware used in preparation of the CRD is stored in the CRD-designated room. (Hitchock Aff., at ¶ 15; Friedman Dec., at ¶ 8).

29.    The cookware and other CRD-designated tools are not used to prepare regular meal items. (Hitchcock Aff., at ¶ 13; Friedman Dec. at ¶ 8)

30.    The CRD for general population inmates is plated on a separate area of the kitchen line. CRD food is plated and served prior to regular menu items. CRD food does not come into contact with non-CRD menu items. (Hitchcock Aff., at ¶¶ 25-29; Ex. 58-60 to Hitchcock Aff.; Friedman Dec. at ¶ 18).

31.    Following service of the CRD meal, CRD-designated trays are collected and the disposable utensils are discarded. (Hitchcock Aff., at ¶ 33).

32.    CRD trays are collected in a plastic tub and are taken to the CRD-designated sinks to be washed and sanitized. (Hitchcock Aff., at ¶¶ 34-35).

33.    CRD meal trays for inmates in segregation are differentiated by color and stored separately from trays used for serving regular menu meals. (Hitchcock Aff., at ¶ 37).

34.    Segregation meal trays for the CRD are tan/yellow and are insulated. Segregation meal trays used for the other menus are brown or gray. (Hitchcock Aff., at ¶ 38).

35.     CRD meals for inmates in segregation are prepared on the CRD-designated table and stacked in a separate area of the food warmer. (Hitchcock Aff., at ¶¶ 39-40).

36.     The CRD has a dedicated steam table only used for service of the CRD meals. (*Martinez* Report, Doc. 41 at 4; Affidavit of Randall Singletary, Doc. 41-6, Ex. F at ¶ 6).

37.     Menu items used in the CRD are stored separately from non-CRD food items, in separate areas of the warehouse or dry storage room. (*Martinez* Report, Doc. 41 at 4; Hitchcock Aff.at ¶¶ 21-22; Ex. 1-2, 61 to Hitchcock Aff.*;* Affidavit of Randall Singletary, Doc. 41-6, Ex. F at ¶ 3; Friedman Dec., at ¶ 6).

38.     CRD-designated trays, cooking utensils, and pots and pans are washed and stored separately from non-CRD items. (Hitchcock Aff., at ¶¶ 29, 37, 43-44; Friedman Dec., at ¶ 8).

39.     Once an inmate food service worker is assigned to assist in CRD meal preparation, he is trained in proper preparation of kosher meals. (Hitchcock Aff., at ¶ 45).

40.     The training document is signed by both the inmate food service worker and the Aramark trainer. (Hitchcock Aff., at ¶ 15).

41.     Defendant Pat Berry is contract manager for KDOC. In that capacity, Ms. Berry reviews each approved menu, monitors contract requirements, prepares and processes contract amendments, and conducts food service operation inspections. (Declaration of Pat Berry, Ex. A at ¶¶ 2-3).

42.     Ms. Berry is not present for day-to-day food preparation and service at LCF. None of the food service employees at LCF are KDOC employees. (Berry Dec., at ¶¶ 6-7).

43.     Ms. Berry periodically conducts inspections of Aramark's delivery of food services at LCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶¶ 13-14).

44.     Ms. Berry periodically conducts inspections of Aramark's delivery of food services at LCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶ 10).

45.     Ms. Berry's February 24, 2014, July 22, 2014, December 18, 2014, and September 30, 2015 audit inspections of LCF's food services found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices, and that pest control was evident and pest control procedure was maintained. (Berry Dec., at ¶ 13).

46.     On July 3, 2014 Ms. Berry conducted an unannounced cite visit at LCF as a result of concerns expressed by facility management by a facility lockdown. During this inspection, she found additional food stored in the CRD cooler as the pass through cooler on the front line was not working. No other issues regarding the preparation, serving or storage of the CRD were observed. (Berry Dec. at ¶ 14).

### Facts regarding Hutchinson Correctional Facility ("HCF")

47.     Plaintiff was housed at HCF from March 22, 2017 to January 29, 2018. (Doc. 94-1 at 3).

48.     Plaintiff was not eligible to receive the CRD while housed at HCF because he was on a medical diet. (Declaration of Sue Stoecklein, at ¶ 5, attached hereto as Ex. D).

49.     Michael Buch is employed by Aramark as the Assistant Food Service Director at HCF. His job duties include, in part, training, managing performance, and directing and overseeing operations related to food service. (Affidavit of Michael Buch, at ¶ 3, attached hereto as Ex. E, hereinafter "Buch Aff.").

50.     The CRD menus for 2017 provided kosher items. (*Martinez* Report filed in *Jefferson v. Aramark Corr. Serv.,* No. 17-CV-3161-SAC-DJW, Doc. 34-4, Ex. 4 at 1-5, subject to judicial notice as per Fed. R. Evid. 201, cited items to be provided to Plaintiff). The CRD menu

contains a signature of approval by Aramark's religious authority, Rabbi Fellig. *Id.* Under Rabbi Fellig's signature it states: "This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such cannot confirm that each meal being served is Kosher." *Id.*

51.     The CRD menus for 2018 provide Kosher items. (Berry Dec., at ₱₱ 16, 19 Copy of 2018 Aramark menus attached as Berry Exhibit 5). The CRD menu contains a signature of approval by Aramark's religious authority, Rabbi Fellig. *Id.* Under Rabbi Fellig's signature it states: "This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such cannot confirm that each meal being served is Kosher." *Id.*

52.     The following provisions appear on each menu: "Follow all kosher preparation instructions in recipes for Entrees, Starches, and Salads. Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. Serve meal on disposable or designated kosher tray with disposable or kosher only tableware." *Id.*

53.     All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes and Aramark maintains certificates for these food items verifying they are kosher-certified. (Buch Aff., at ¶¶ 18-19).

54.     All entrée items used in the CRD arrive at HCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (Buch Aff., at ¶ 20; *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 109-110, 113-116).

55.     CRD entree items have kosher symbols on the outer bulk packaging. (Friedman Dec., at ¶ 7; *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 78-83).

56.     The sliced bread and milk do not have kosher symbols on the individual packaging. (Friedman Dec., at ¶ 7). Aramark maintains certificates verifying they are in fact kosher. *Id.* The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id.*

57.     CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark supervisors. (Buch Aff., at ¶ 3; Berry Dec., at ¶ 20).

58.     HCF maintains a separate CRD-designated room for the preparation, service, and cleaning of CRD menu items. Only authorized staff are allowed into the locked CRD-designated room. (Buch Aff., at ¶¶ 6-8; *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 74-75).

59.     The CRD-designated room contains several sinks in which all CRD-related items are cleaned and sanitized. (Buch Aff.at ¶ 8; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 68-71, 73).

60.     HCF utilizes a separate stove and oven for the preparation of warm CRD food. (Buch Aff., Ex. E at ¶ 21; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 64-67).

61.     No steam kettles are used in the preparation of CRD food. (Buch Aff.at ¶ 22).

62.     CRD-designated trays are used for serving the CRD menu, differentiated by color. (Buch Aff., at ¶¶ 23-24, 30, 38; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 106, 119-21).

63.     HCF utilizes disposable eating utensils for CRD meals. (Friedman Dec., at ¶ 7; Berry Dec.at ¶ 18).

64.     CRD-designated cooking utensils are used for the service of the CRD menu. These utensils are engraved with a "K" and are kept in a locked cabinet accessible only by Aramark

supervisors. Usage of these utensils is noted in the log book by Aramark supervisors. (Buch Aff., at ¶¶ 10-14; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 122-25, 128-29; Friedman Dec. at ¶ 10).

65.     The CRD for general population inmates is plated in a separate area of the kitchen line and is delivered to the inmate in the dining hall. CRD trays do not pass through the same line as non-CRD trays. (Buch Aff., at ¶¶ 25-29; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 103-07; Friedman Dec., at ¶ 18).

66.     CRD meals for inmates in segregation are prepared in the CRD-designated room and stacked in a separate area of the food warmer. (Buch Aff. at ¶¶ 32, 34-35; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 131-33).

67.     Menu items used in the CRD are stored separately from non-CRD food items. (Affidavit of Michael Buch, Ex. E at ¶ 16; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 109-10, 114-16; Friedman Dec., at ¶ 6).

68.     CRD-designated trays, utensils, and pots and pans are washed and stored separately from non-CRD items. (Buch Aff.at ¶¶ 15, 23, 30, 38, 42; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34,, Ex. 126-27; Friedman Dec. at ¶¶ 8, 10).

69.     Defendant Pat Berry is contract manager for KDOC. In that capacity, Ms. Berry reviews each approved menu, monitors contract requirements, prepares and processes contract amendments, and conducts food service operation inspections. (Berry Dec., at ¶ 3).

70.     Ms. Berry is not present for day-to-day food preparation and service at HCF. None of the food service employees at HCF are KDOC employees. (Berry Dec., at ¶¶ 6-7).

71.     Ms. Berry periodically conducts inspections of Aramark's delivery of food services at HCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶ 10). On September 6,

2017, Ms. Berry conducted an audit inspection of HCF's food services and found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices. (Berry Dec., at ¶ 12).

72.     On May 1, 2018, Ms. Berry conducted an audit inspection at HCF and found that authorized menus were being used. *Id*.

73.     On November 1, 2018, Ms. Berry conducted an audit inspection at HCF and found that the kitchen had proper kosher food preparation practices. *Id*.

### *Facts regarding El Dorado Correctional Facility ("EDCF")*

74.     Plaintiff is currently housed at EDCF, and has been since January 29, 2018. (Doc. 98-1, at 3).

75.     Requests for religious diets are handled on a facility by facility basis. (Doc. 56, at p. 51 (IMPP 10-110D, § V.2)).

76.     Plaintiff had not requested to be on the religious diet at EDCF. Declaration of Jillian Cheever, Doc. 98-6, at ⁋ 5, attached as Exhibit F hereto.

77.     The CRD menus for 2018 provide kosher items. (Berry Dec., at ⁋⁋ 16, 19; Copy of 2018 Aramark menus attached as Berry Exhibit 5). The CRD menu contains a signature of approval by Aramark's religious authority, Rabbi Fellig. *Id*. Under Rabbi Fellig's signature it states: "This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such cannot confirm that each meal being served is Kosher." *Id*.

78.     The following provisions appear on each menu: "Follow all kosher preparation instructions in recipes for Entrees, Starches, and Salads. Utensils used for scooping, cooking and

serving must be dedicated for kosher food use ONLY and stored in a special area. Serve meal on disposable or designated kosher tray with disposable or kosher only tableware." *Id*.

79.     All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes and Aramark maintains certificates for these food items verifying they are kosher-certified. (Berry Dec., at ¶ 16(a); Ex. 2 to Berry Declaration; Friedman Dec., at ¶ 7).

80.     All entrée items used in the CRD arrive at EDCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (Berry Dec., at ¶ 16(b); Ex. 22-24 to Berry Declaration).

81.     All CRD food items have kosher symbols either on the outer bulk packaging, or on the individual packaging. (Berry Dec., at ¶ 16(c)).

82.     The sliced bread and milk do not have Kosher symbols on the individual packaging. (Friedman Dec., at ¶ 7; Berry Dec., at ¶ 16(c); Ex. 3 to Berry Declaration). Aramark maintains certificates verifying they are in fact kosher. *Id*. The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id*.

83.     CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark supervisors. (Berry Dec., at ¶ 20; Ex. 5-6 to Berry Declaration).

84.     EDCF utilizes a separate oven for the preparation of warm CRD food, marked with a large red sign that reads "kosher only." (Berry Dec., at ¶ 16(d)). Ex. 15 to Berry Declaration).

85.     The stove is cleaned and sanitized prior to being used for the CRD. (Berry Dec., at ¶ 16(e).

86.     No steam kettles are used in the preparation of CRD food. (Berry Dec., at ¶ 16(f)).

87.     EDCF utilizes disposable trays, cups, and sporks for all CRD meals. (Berry Dec., at ¶ 16(g); Ex. 31 to Berry Declaration).

88.     CRD-designated utensils are used for the service of the CRD menu. These utensils are engraved with a "K" and are kept in a locked cabinet accessible only by Aramark supervisors. Usage of these utensils is noted in the log book by Aramark supervisors. (Berry Dec., at ¶ 16(h); Ex. 1-8, 11 to Berry Declaration; Friedman Dec., at ¶ 10).

89.     The CRD for general population inmates is plated in a separate area of the kitchen line. (Berry Dec., at ¶ 16(i); Ex. 26-29 to Berry Declaration; Friedman Dec., at ¶ 18).

90.     Cold CRD items are prepared separately on a table wrapped in plastic. (Berry Dec., at ¶ 16(j); Ex. 17-19 to Berry Declaration).

91.     Warm CRD items are kept heated in a CRD-designated steam well. (Berry Dec., at ¶ 16(k); Ex. 20 to Berry Declaration).

92.     CRD meals for inmates in segregation are prepared in the CRD-designated area of the kitchen and stacked in a separate area of the food warmer after being wrapped in plastic. The CRD meals in the warmer do not touch non-CRD meals. (Berry Dec., at ¶ 16(l)).

93.     Menu items used in the CRD are stored separately from non-CRD food items. (Berry Dec., at ¶ 16(m); Ex. 22-24 to Berry Declaration; Friedman Dec., at ¶ 6).

94.     CRD-designated trays, utensils, and pots and pans are washed and stored separately from non-CRD items. (Berry Dec., at ¶ 16(n); Ex. 1-9 to Berry Declaration; Friedman Dec., at ¶¶ 8, 10).

95.     Defendant Pat Berry is contract manager for KDOC. In that capacity, Ms. Berry reviews each approved menu, monitors contract requirements, prepares and processes contract amendments, and conducts food service operation inspections. (Berry Dec., at ¶ 3).

96.     Ms. Berry is not present for day-to-day food preparation and service at EDCF. None of the food service employees at EDCF are KDOC employees. (Berry Dec., at ¶¶ 6-7).

97.     Ms. Berry periodically conducts inspections of Aramark's delivery of food services at EDCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶ 10). On February 27, 2018 and September 11, 2018, Ms. Berry conducted audit inspections of EDCF's food services and found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices. (Berry Dec., at ¶ 15).

## QUESTIONS PRESENTED

I.      Does Plaintiff have standing to challenge the CRD policies or are his claims moot?

II.     Has Plaintiff exhausted his administrative remedies at EDCF as required as to any claim that he may have that the CRD menu is insufficient to meet the requirements of Jewish dietary laws?

III.    Is Ms. Berry entitled to judgment on Plaintiff's claims under § 1983 because Ms. Berry did not personally participate in the alleged constitutional violations, if any?

IV.     Is Ms. Berry entitled to judgment on Plaintiff's claims under § 1983 because the Plaintiff's rights to religious exercise were not substantially burdened and any alleged violations appear to be isolated incidents of negligence, not actionable under § 1983?

V.      Is Ms. Berry entitled to qualified immunity?

## STANDARD OF REVIEW

### *Summary Judgment Standard*

Summary judgment is required under Rule 56 of the Federal Rules of Civil Procedure when pleadings, affidavits, and any discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To determine whether a genuine issue exists, courts will view evidence in the light most favorable to the nonmoving party and will accept only reasonable inferences. *See Allen v. Muskogee*, 119 F.3d 837, 839-40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Further, any factual dispute must be not only genuine – "such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) – but also material, as determined by substantive law, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). Where there is no genuine dispute of material fact regarding just one of the essential elements a plaintiff must prove, then summary judgment must issue in the defendant's favor. *See Sports Unlimited, Inc. v. Lankford Enterp., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (citing *Adler*, 144 F.3d at 671).

## ARGUMENTS AND AUTHORITIES

### I.   Plaintiff lacks standing to bring his claims regarding the CRD policies and procedures.

Although Defendant Berry previously raised standing and mootness, jurisdiction is a continuous requirement. *See, e.g., Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)); *Tyler v. Kansas Lottery,* 14 F. Supp.

2d 1220 (D. Kan. 1998); *see generally, City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that although the Plaintiff Lyons alleged that he had been subjected to a chokehold during a traffic stop five months before, Plaintiff failed to establish that he was likely to suffer future injury from the use of chokeholds by police officers – that there was a real and immediate threat of this happening in the future, and thus, no jurisdiction existed for Plaintiff's 1983 claim). On summary judgment, the Court need not presume allegations in the Complaint to be true but rather may consider legal issues as they appear based upon the properly supported facts raised in a summary judgment motion.

As to Patricia Berry, a State Official, this Court has held that no retrospective relief is available, but rather that as to her, McCoy is limited to prospective declaratory and injunctive relief. (Doc. 90, at 8). McCoy's claims based upon the allegedly non-kosher conditions he allegedly observed in the LCF kitchen in 2014, particularly as to any request for declaratory or injunctive relief, are moot, given his transfer to EDCF in June 2016. *Jordan v. Sosa,* 654 F.3d 1012, 1027-28 (10th Cir. 2011). Any order this Court could make regarding the conditions of confinement at LCF would not affect McCoy, who is no longer housed there and has not been for nearly two years and is essentially an advisory opinion; this is also true as to McCoy's vague allegations about HCF where he is also no longer housed. *Id*., at 1033. This kind of retroactive relief barred by the Court's previous Order, as well as by the Eleventh Amendment to the U.S. Constitution. *See, e.g., Green v. Mansour,* 474 U.S. 64 (1985).

*Berryman v. Granholm,* No. 07-2081, 343 Fed. Appx. 1, 4, 2009 WL 2461099, **4-5 (6th Cir. Aug. 12, 2009), is on point. There, the Sixth Circuit affirmed the district court's ruling that a prisoner's claim for declaratory and injunctive relief under RILUPA after he was removed from the prison's Kosher Meal Program for purchasing non-Kosher items from the prison store became

moot when the prisoner was transferred to another facility (citing *Cardinal v. Metrish,* 564 F.3d 794, 798-99 (6th Cir. 2009) (citing *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir. 1996)). Other courts have followed suit, holding similar dietary-based claims were mooted by the inmate's transfer. *See, e.g., Mares v. LePage,* No. 16-cv-0382-RBJ-NYW, 2018 WL 1312814 (D. Co. Mar. 13, 2018) (transfer to new facility mooted kosher meal claims against prior facility); *Bowers v. Burnett,* No. 1:08-cv-469, 2011 WL 1047343, * 2 (W.D. Mich. Mar. 18, 2011) (citing *Berryman* and *Kensu*); *see generally Opala v. Watt,* 454 F.3d 1154, 1159 (10th Cir. 2006) (citing *Wyoming Sawmills, Inc. v. United States Forest Serv.*, 383 F.2d 1241 (10th Cir. 2004); *Glover River Org. v. United States Dept. of Interior,* 675 F.3d 251 (10th Cir. 1982)).

Similar to the situation in *Jordan v. Sosa,* KDOC religious programs are administered on a facility-by-facility basis as per IMPP 10-110D, attached to McCoy's Third Amended Complaint. An inmate must submit a request for accommodation of his or her religious practices at each new facility, even if a similar prior request was approved at another facility. Doc. 56, at p. 51 (IMPP 10-110D, § V.2). Because religious accommodations are managed on a facility-by-facility basis, somewhat similarly to the situation in *Jordan v. Sosa,* there is no "statewide" practice to enjoin.

Alternatively, Plaintiff lacks standing to challenge the CRD policies and procedures at EDCF because he has not requested to receive the CRD. *Burnett v. Oklahoma Dep't of Corr.*, No. 17-6202, 2018 WL 2470909, at *4 (10th Cir. June 4, 2018) is on point. In *Burnett,* the Tenth Circuit upheld the district court's dismissal of the plaintiff's RLUIPA claims based on lack of standing. The plaintiff filed suit requesting an injunction ordering the Oklahoma Department of Corrections to change its kosher diet policy that was allegedly violating his rights under RLUIPA. *Id*. The district court found that plaintiff's rights were not being violated because he had not requested the diet by submitting the required form. *Id*. The district court found that "[a]s

it now stands, [plaintiff] is not suffering an actual or continuing injury under the relevant policy." *Id*. Because plaintiff had not submitted himself to the policy, he lacked standing to challenge it. *Id*.; *see also Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997) (stating that "[a]s a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy") (cited with approval in *United States v. Hardman*, 297 F.3d 1116, 1121 (10th Cir. 2002)). Similarly, here, Plaintiff had not submitted himself to the CRD policies at EDCF and, therefore, lacks standing to challenge them. Further, it must be remembered that the reason Plaintiff advanced for requesting the pre-packaged meal was because of his concerns about the conditions in the LCF kitchen, conditions to which he is no longer subject, and the manner in which CRD meals were allegedly served to inmates other than himself in segregation at EDCF and HCF. This action should be dismissed for lack of jurisdiction.

## II. Plaintiff Failed to Exhaust his Administrative Remedies at EDCF.

While Defendant Berry has previously raised an exhaustion argument, this argument may again be considered in light of the facts as developed on summary judgment, particularly where the facts as developed fully demonstrate that it is appropriate that an inmate complaining that a particular aspect of a facility's food-preparation operation renders the food non-kosher is depriving the facility of notice and the opportunity to correct any problems, the policies behind the exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 89-90 (2006).

The PLRA mandates that an inmate exhaust his administrative remedies prior to bringing a lawsuit regarding prison conditions. 42 U.S.C. § 1997e. The PLRA requires "proper exhaustion." *Woodford,* 548 U.S. at 93. However, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). "The statutory exhaustion requirements of § 1997e is mandatory, and the district court [is] not authorized

to dispense with it." *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003). The United States Supreme Court has "stress[ed] the point . . . that we will not read futility or other exceptions into [PLRA's] statutory exhaustion requirement where Congress has provided otherwise." *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Exhaustion is important for two main reasons. First, it protects "administrative agency authority" and gives the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled in federal court." *Woodford*, 548 U.S. at 89 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (internal quotation marks omitted)). Second, it "promotes efficiency." *Id.* Exhaustion allows adjudication of a dispute more quickly than federal court litigation and helps produce a useful record for potential litigation. *See id.* At the heart of exhaustion is the understanding that it gives "the agency a fair and full opportunity to adjudicate their claims." *Id.* at 90.

In Kansas, the first step for exhaustion of administrative remedies is to seek an informal resolution with personnel who work with the inmate on a daily basis and to document that attempted resolution. K.A.R. § 44-15-101(b). "If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections." *Sharrock v. Stephens*, No. 10-CV-3210-CM/SAC, 2011 WL 5526444, at *1 (D. Kan. Nov. 14, 2011), *as amended* (Nov. 15, 2011) (citing K.A.R. § 44-15-101(d)).

The Tenth Circuit has cautioned that "an inmate must properly comply with grievance procedures" and "substantial compliance" with the prison's grievance process is insufficient. *Fields v. Oklahoma State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007); *see also Jernigan v.*

*Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (holding the doctrine of substantial compliance is inapplicable to grievance procedure). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218. In *Jones*, the United States Supreme Court clarified that the contents of any grievance-related form must be robust enough "to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation." *Id.* at 219 (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004) (internal quotation marks omitted)); *see also Woodford*, 548 .S. at 90 ("[P]roper exhaustion of administrative remedies . . . means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).").

Plaintiff's original Complaint and First Amended Complaint indicated that he sought informal resolution with the Chaplain at LCF prior to filing a formal grievance on March 25, 2014. (Doc. 1, p. 13-14; Doc. 11, p. 13-14). According to the Complaint, the LCF Chaplain informed Plaintiff that the CRD diet was the only modified diet provided. (Doc. 1, p.13; Doc. 11; p.13). Plaintiff then appealed the denial of his formal grievance to the warden at LCF and the Secretary of Corrections. (Doc. 1, p.14; Doc. 11, p.14). In Plaintiff's Second Amended Complaint, he added handwritten language to the foregoing that stated "[t]he grievance at all levels concerned the (CRD) meal and meal components not being kosher, the trays not being one-use-trays, and the pots, pans and serving utensils not being stored, handled, & cleaned properly in order to be kosher and thus usable for serving." (Doc. 18, p.15). The same language appeared in Plaintiff's Third Amended Complaint. (Doc. 56, p.15).

While Plaintiff may have grieved his issues at LCF, there is no indication that he grieved his issues with his current facility, EDCF. Plaintiff's Third Amended Complaint does not refer to or attach any grievances relating to the modified religious diet at either HCF or EDCF. It appears the only grievance appeal received from Plaintiff on the religious/food issue was a single appeal regarding LCF. (Doc. 97-5). This is a critical problem because the nature and scope of Plaintiff's complaints regarding food preparation at EDCF have changed significantly since his allegations regarding LCF. In fact, Plaintiff makes no allegations regarding the actual preparation of the CRD meal, presumably because he had no personal knowledge of this process at EDCF. Instead, in the affidavit attached to the Third Amended Complaint, Plaintiff takes issue with how the CRD meals are served generally (although notably he does not speak in terms of his own CRD meals), and how CRD trays are stacked in warmers and on rolling carts for distribution with regular meal trays. (Doc. 56, p. 29). Likewise, Plaintiff is now concerned with how the trays are collected after the meal and stacked on top of one another. (Doc. 56, p. 30). Neither of these issues are present in the body of his Third Amended Complaint. (Doc. 56).

On the face of his Third Amended Complaint, it is apparent that Plaintiff failed to grieve the issues of which he now complains at EDCF, which has deprived EDCF and the KDOC Secretary of notice of Plaintiff's newly-asserted claims and an opportunity to address them at the agency level as opposed to in federal court litigation. *See Brewer v. Gilroy*, 625 Fed. App'x 827, 832 (10th Cir. 2015) (finding failure to assert claims in a grievance rendered them unexhausted). The food preparation/kitchen allegations that Plaintiff complained of at LCF are similarly non-existent in his affidavit regarding EDCF—those LCF claims should not be attributed to EDCF and any allegations about food preparation at EDCF are unexhausted.

22

Furthermore, Plaintiff's allegation that the CRD meals have no kosher symbols or kosher certification at EDCF is pure speculation, as he has provided no basis for his knowledge of this claim. As indicated elsewhere, Plaintiff has not pled that he requested kosher meals at EDCF or that he was approved to receive them, and the facts are to the contrary. Regardless, Plaintiff has failed to grieve such an allegation as it relates to EDCF for the same reasons addressed above.

Plaintiff's only acknowledgment of exhaustion pertains to 2014 and his conditions of confinement at LCF—those conditions are no longer at issue and Plaintiff has failed to grieve his conditions of confinement at EDCF.  *See Patel v. Fleming*, 415 F.3d 1105, 1111 (10th Cir. 2005) (finding prisoner failed to exhaust administrative remedies when prisoner was transferred to another facility and failed to file timely grievance).  Accordingly, judgment for Defendant Berry on these unexhausted claims regarding EDCF is warranted.

### IV.    Defendant Berry is entitled to judgment because Defendant Berry did not personally participate in the alleged constitutional violations.

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (citation omitted); *see also Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). Here, Plaintiff has failed to show that Ms. Berry personally participated in the alleged constitutional violations in Plaintiff's Complaint. To the contrary, as the facts adduced at summary judgment show, Ms. Berry has reasonably and diligently carried out her role as contract compliance manager for the Aramark food service contract where Aramark has the responsibility for all aspects of food service operations at all KDOC facilities, including preparation and service of the food, storage and cleaning. Pat Berry is entitled to judgment on Plaintiff's generalized claims against her.

### A.   Plaintiff's allegations are collective allegations that state nothing about Patricia Berry.

It is not enough for a plaintiff to allege generally that his constitutional rights "were violated" or to make the undifferentiated contention that "defendants" infringed his rights. *Pahls v. Thomas*, 718 F.3d 1210, 1225-26 (10th Cir. 2013). Rather, a plaintiff must make individualized allegations against each defendant that allow for "an individualized assessment of each defendant's conduct and culpability." *Id*. at 1233; *see also Brown v. Montoya,* 662 F.3d 1152, 1165 (10th Cir. 2011); *Burnett v. Miller*, 631 F.App'x 591, 598 n.8 (10th Cir. 2015) (unpublished) ("Defendants ought not to be treated as fungible commodities. A plaintiff is required to identify specific acts or omissions by each defendant entitling him to relief as to that defendant.").

Here, Plaintiff's Complaint fails to specify what actions were taken by Ms. Berry in regards to the acquisition, storage, preparation, service and cleaning procedures of the CRD. It does not specify how Ms. Berry personally participated in the alleged inadequate supervision of the CRD program. Indeed, Ms. Berry did not and does not supervise kitchen staff during daily food service operations. Because Ms. Berry is not present within KDOC facilities on a daily, weekly, or even monthly basis, it is not even plausible there were specific acts or omissions by Ms. Berry that have a connection to Plaintiff's Complaint. Notably, Plaintiff's Complaint "fails to isolate the allegedly unconstitutional acts" of Ms. Berry. *Brown*, 662 F.3d at 1165. Merely listing Ms. Berry in a long list of defendants does not distinguish her actions from the others in the group. Nor does it support an inference that she personally took the actions that the Complaint attributes generally to the numerous defendants listed under Count I. Listing defendants collectively does not show how Ms. Berry "might be individually liable for deprivations of [plaintiff's] constitutional rights." *Id.*; *see also Robbins*, 519 F.3d at 1249-50 (holding that complaint did not state a claim where it used the

collective term "Defendants" and made "no distinctions to what acts [were] attributable to whom").

### B. Plaintiff's allegations are conclusory and not entitled to assumption of truth, particularly on summary judgment

Even if Plaintiff's claims could be construed as allegations that Ms. Berry somehow inadvertently participated in the allegedly inadequate acquisition, storage, preparation, service and cleaning of CRD meals, those allegations should be disregarded as conclusory. "'Allegations of personal participation, like all other factual averments, must be specific, not conclusory.'" *Hachmeister v. Kline*, No. 12-3263-SAC, 2013 WL 237815, at *3 (D. Kan. Jan. 22, 2013).

Here, the Complaint contains no facts about how Ms. Berry personally violated plaintiff's constitutional rights. The Complaint does not, for example, allege that Ms. Berry was present on any of the days he conducted his "investigations" in the LCF kitchens. It does not allege that Ms. Berry was herself directly involved with the supervision of kitchen staff or inmate workers or that she had a decision making role in the day-to-day operations of the LCF, EDCF, or HCF kitchens. It also does not allege that the supervisors, managers or inmate workers employed by Aramark reported to Ms. Berry. Without this supporting factual information, Plaintiff's § 1983 claim fails to state a plausible claim against Ms. Berry under *Ashcroft v. Iqbal* and its progeny and judgment in Ms. Berry's favor is required.

### C. Plaintiff cannot show an affirmative link between the alleged constitutional violations and Patricia Berry.

It is well-established that there is no respondeat superior or vicarious liability under 42 U.S.C. § 1983. "[A] Plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. at 676. Absent personal participation, there is no basis for a claim under 42 U.S.C. § 1983. "It is likewise

well-established that supervisory status alone does not create § 1983 liability." *Hachmeister*, 2013 WL 237815, at *3. "Rather, there must be 'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Gallagher*, 587 F.3d at 1069. The supervisor's "role must be more than one of abstract authority over individuals who actually committed a constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).

This principle has been applied many times to dismiss § 1983 claims, including in the analogous case of *Harris v. Schriro*, 652 F. Supp. 2d 1024, 1038 (D. Ariz. 2009). There, the plaintiff sued the contract specialist that oversaw that food contract for the Arizona Department of Corrections for deviations from kosher policies. The contract specialist was not on site at the facility on a daily basis, she did not participate in food preparation or supervision, and her duties were to monitor the contract and make monthly inspections to make sure kosher rules were followed. *Id.* The court dismissed her from the lawsuit because she "had no involvement in kosher-diet matters except to confirm with the Rabbi that foods to be served and the procedures to prepare and serve the foods complied with kosher dietary standards." *Id.* at 1039. The court found she had a supervisory role and that alone was insufficient to assert liability. *Id.*

Just as the contract specialist was merely in charge of monitoring the contract and confirming with the Rabbi that the menu met kosher food standards, here, Pat Berry is simply in charge of monitoring the contract with Aramark. Ms. Berry is not on site every day overseeing the preparation of the food in all KDOC facilities, a food service operation delivering three meals a day, seven days a week, 365 or 366 days a year. Rather, just like the defendant in *Harris*, Ms. Berry performs occasional inspections of the facilities, which seldom show any violations of the kosher food rules. If and when any issues appear, Ms. Berry brings them to Aramark's attention

and receives their proposed corrective action plan for future compliance as needed. There is nothing more that she can do or that she need do. Further, it is not her duty to determine whether the food is kosher—she is not a religious authority and has to rely on the certification of the menu by Aramark's religious authority, Rabbi Fellig, as per the Aramark contract.

Ms. Berry had no supervisory authority over Aramark kitchen staff. Ms. Berry simply conducts periodic inspections of the kitchens and brings any issues to the attention of the Aramark supervisor. Second, no evidence supports that Ms. Berry personally participated in any aspect of the daily CRD program. Ms. Berry's name is referenced in the Complaint only five times: once to identify her as the KDOC state contact monitor, once in a list of defendants that signed the previous menus, and three times -- in a list of four other defendants -- to assert legal conclusions regarding Count I. (Doc. 56 at 11-13). Plaintiff also mentions Ms. Berry once in an affidavit attached to his Complaint, referencing a 2011 memo sent out by Ms. Berry. None of these references indicate Ms. Berry took a single action with regard to the daily implementation of the CRD program (a time-barred incident given the two-year statute of limitations). Third, the fact that Ms. Berry is the current contract monitor does not suggest she supervises Aramark or its kitchen staff. To the contrary, Ms. Berry does not supervise Aramark's employees or inmate workers and there is no evidence that Ms. Berry took any actions other than conducting periodic inspections and denying Plaintiff's grievance in April 2014. This alone is insufficient to prove an affirmative link. The Tenth Circuit has held the denial of grievances alone is insufficient to establish personal participation in alleged constitutional violations. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir.2009); *Allen v. Reynolds*, 475 Fed. Appx. 280, 284 (10th Cir. 2012) (notice of dispute given to prison warden does not show his personal participation in unconstitutional conduct). Plaintiff's

bare allegations against Ms. Berry are conclusory at best and are not enough to state a plausible claim under 42 U.S.C. § 1983. Therefore, Ms. Berry is entitled to judgment in her favor.

Finally, the Plaintiff cannot show a deliberate, intentional act by Defendant Berry to violate the Plaintiff's constitutional rights as a matter of law. This is also why the punitive damages claim asserted against her should be dismissed because the Plaintiff has failed to adequately allege, and cannot allege, that she acted with the requisite evil motive or intent. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (internal quotation marks omitted) ("Punitive damages are available in § 1983 actions [and] are to be awarded only when the defendant's conduct is shown to be motivated by evil motive or intent, or when it invokes reckless or callous indifference to the federally protected rights of others."). Her supervisory role in managing the contract, reviewing the menus, which reflect kosher options, and her audit inspections do not reflect any deliberate or intentional actions, much less evil motive or intent, that seek to violate the Plaintiff's rights. The Plaintiff attempts to state a claim against Defendant Berry merely by virtue of her status as contract manager, which falls far short of pleading sufficient facts to show personal participation as required by § 1983. Because Defendant Berry did not personally participate in any clearly established violations within the meaning of § 1983, any individual capacity claims against her should be dismissed.

### V. Defendant Berry is Entitled to Qualified Immunity on Plaintiff's § 1983 Claim

Alternatively, Plaintiff's claims against Ms. Berry are barred by qualified immunity. Once a defendant pleads qualified immunity, the plaintiff bears the burden of showing no immunity is warranted. *See Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277-78 (10th Cir. 1998). The burden shifting nature of an assertion of qualified immunity was recently emphasized in *Matthews v. Bergdorf*, 889 F.3d 1136 (10th Cir. 2018). In *Bergdorf*, the Tenth

Circuit reversed a district court because "[t]he district court's approach constituted error because it shifted the burden to the [defendants'] . . . to establish their entitlement to qualified immunity." *Id.* at 1144. The Court noted that in responding to defendant's assertion of qualified immunity, "the complaint must 'isolate the allegedly unconstitutional acts of each defendant'; otherwise the complaint does not 'provide adequate notice as to the nature of the claims against each' and fails for this reason." *Id.* (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)). "Every named Plaintiff ha[s] the burden of adequately pleading every element of his or her claim . . . ." *Id.* at 1145. Then for a plaintiff to get past qualified immunity the "'record must clearly demonstrate that the plaintiff has satisfied . . . [her] heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" *Id.* (*quoting Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

In other words, Ms. Berry is entitled to qualified immunity unless Plaintiff can show not only that Ms. Berry's actions actually deprived him of a federally secured right but also that Ms. Berry had fair warning her own actions were unconstitutional under the First Amendment. The Court can undertake the qualified immunity analysis in any order it chooses. *Pearson*, 55 U.S. at 818. Here, Plaintiff cannot meet either prong and therefore, qualified immunity applies.

### A.     Plaintiff Cannot Establish a Constitutional Violation

In the context of the First Amendment, "inmates are entitled to the reasonable opportunity to pursue their sincerely-held religious beliefs." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citation omitted). Whether a "reasonable opportunity" exists is made "in reference to legitimate penological objectives." *Id.* "Consequently, '[t]he first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held.'" *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (quoting *Snyder v.*

*Murray City Corp.*, 124 F.3d 1349, 1352 (10th Cir. 1997), *opinion vacated in part on reh'g en banc*, 159 F.3d 1227 (10th Cir. 1998)).

In order to allege a constitutional violation based on the free exercise clause of the First Amendment, an inmate must first show a prison regulation "substantially burdened . . . sincerely-held religious beliefs." *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007). A plaintiff bears the burden of proving that a defendant's actions substantially burdened his right of free exercise. *Speed v. Stotts*, 941 F. Supp. 1051, 1056 (D. Kan. 1996). The Tenth Circuit has defined a "substantial burden" in a free exercise claim as one that: (1) significantly inhibits or constrains religious conduct or expression that manifests some central tenet of a prisoner's individual beliefs, (2) meaningfully curtails a prisoner's ability to express adherence to his faith, or (3) denies a prisoner a reasonable opportunity to engage in fundamental religious activities. *Wares v. Simmons*, 524 F. Supp. 2d 1313, 1320 (D. Kan. 2007) (citing *Vasquez v. Ley*, 70 F.3d 1282, 2 (10th Cir. 1995)). In addition, he must "assert conscious or intentional interference with his free exercise rights to state a valid claim under § 1983." *Gallagher,* 587 F.3d at 1069. If a plaintiff does not meet the "substantial burden" test, the inquiry ends; if he does, a defendant may identify legitimate penological interests which justify the impinging conduct. *Wares*, at 1319-20; *see also Boles*, 486 F.3d at 1182 (citation omitted). Once a legitimate penological interest is identified, the court determines the reasonableness of the regulation by balancing the factors set forth in *Turner v. Safley*, 482. U.S. 78, 89-91 (1987).[1]  *Boles*, 486 F.3d at 1181.

---

[1] *Turner* requires consideration of the following factors: "(1) whether a rational connection exists between the prison policy regulation and a legitimate government interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights." *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (citing *Turner*, 482 U.S. at 89-92).

As discussed below, Plaintiff's claim fails at the very first step—he cannot meet his burden to establish that his beliefs are sincerely held and that provision of a freshly prepared kosher meal (as opposed to a pre-packaged one), substantially burdens his right to freely exercise his religious beliefs.

### 1. Plaintiff's beliefs are not sincerely held.

Turning to the first prong of a First Amendment claim, Defendant Berry acknowledges that "summary dismissal on the sincerity prong is appropriate only in the very rare case in which the plaintiff's beliefs are so bizarre, so clearly nonreligious in motivation that they are not entitled to First Amendment protection." *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007). A court's inquiry into a plaintiff's sincerity is "almost exclusively a credibility assessment." *Id.* (quoting *Snyder*, 124 F.3d at 1352-53).

In *Smith v. Bruce*, 568 F. Supp. 2d 1277, 1281 (D. Kan. 2008), the district court denied Aramark's motion for summary judgment on the basis of the plaintiff's sincerity because there was no evidence the plaintiff changed faiths; he was on the vegetarian diet 15 months prior to filing his grievance; and even when he was removed from the vegetarian diet on two occasions, he continued to consume only rice and beans. *Compare Strope v. Cummings,* No. CIV.A. 06-3021-KHV, 2009 WL 484453, at *9 (D. Kan. Feb. 26, 2009) (distinguishing *Smith* when inmate failed to establish that the kosher diet served spoiled fruit and that he was entitled to fresh fruit pursuant to his sincerely held religious beliefs).

As this Court observed in its Memorandum and Order on the defendants' motions to dismiss, Plaintiff has a history of failing to observe kosher dietary practices while simultaneously filing suit seeking access to prepackaged kosher meals. (Doc. 90, at 9, citing *McCoy v. Henderson*, No. 12-3051-SAC, 2013 WL 823380, at *3 (D. Kan. Mar. 6, 2013) (noting McCoy had his kosher

meal authorization revoked for purchasing non-kosher commissary items)). Indeed, Plaintiff does not allege that he requested and was approved for the modified religious diet each time he was transferred to a new facility and that he otherwise has remained eligible for the modified religious diet at all times since June 2016. There is no record that Plaintiff made a request for a certified religious diet at EDCF or that he is currently on the CRD diet at EDCF. (Doc. 98-6). The references to EDCF and HCF in the attachment to his Third Amended Complaint are written only in terms of generalities – how the CRD meals are served to the eligible population in general, not to him. (Doc. 56, at pp. 17, 29, 64). In fact, McCoy was not eligible for the CRD while he was housed at HCF – a fact that he omits in his attachment. Accordingly, Plaintiff may have been consuming the regular prison diet since June 2016, and certainly has not been eating only kosher food since leaving LCF.

Plaintiff's deviation from a kosher diet is also evident on the face of his commissary purchases as shown on Exhibits 7 and 8 to Defendant Berry's Amended Answer (Doc. 98-7, 98-8). Plaintiff is of course well aware of his own purchases. Plaintiff's commissary records establish that he purchased non-certified kosher food items on multiple occasions between 2014 and 2016. *See id.* Such behavior is consistent with the findings in his prior 2013 lawsuit cited by this Court. (Doc. 90, at p.9, citing *McCoy v. Henderson*, No. 12-3051-SAC, 2013 WL 823380, at *3 (D. Kan. Mar. 6, 2013) (noting McCoy had his kosher meal authorization revoked for purchasing non-kosher commissary items)).

While Plaintiff may allege that he sincerely believes in Judaism and subscribing to a kosher food diet, he has failed to abide by such a diet at all times during the pendency of this lawsuit. As it stands, he is not currently entitled to be on the CRD since he has made no such request at his current facility, EDCF. (Doc. 98-6). Unlike the plaintiff in *Smith* who had remained on his

vegetarian diet for 15 months prior to filing his grievance and maintained a vegetarian diet even when twice removed from the vegetarian meal plan, Plaintiff has failed to remain eligible for the CRD.  In fact, under applicable regulations, his eligibility for the modified diet, if any, was subject to being revoked based upon his non-compliance with the diet. (Doc. 98-4, at p.3, § II.D. 2.) Finally, following his transfer to EDCF, Plaintiff did not make a request to be placed on the CRD. Such a failure, in combination with Plaintiff's history of non-kosher commissary purchases, establishes that Plaintiff is not sincere in his beliefs. Consequently, Defendant Berry is entitled to judgment on Plaintiff's § 1983 claim on the basis of the sincerity requirement of the First Amendment.

### 2. Plaintiff cannot establish a substantial burden.

The remaining threshold inquiry in a free exercise claim is whether the plaintiff has established that his religious beliefs are substantially burdened by a prison regulation or policy. *See Boles*, 486 F.3d at 1182.  In *Wares*, this Court stated that the Tenth Circuit "has rarely defined or described [substantial burden] . . . in the context of an inmate's pure First Amendment free exercise claim."  *Wares*, 524 F. Supp. 2d at 1320.  There is no question that the Tenth Circuit has found "prisoners have a constitutional right to a diet conforming to their religious beliefs." *Beerheide*, 286 F.3d at 1185 (citing cases).  A complete failure to provide such meals or to impose the cost of provision on the inmates has been deemed constitutionally deficient. *Id.* at 1185-92. *See also Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317 (10th Cir. 2010) (finding failure to provide a halal diet sufficiently burdened inmate's religious beliefs in RLUIPA context).

Here, the Plaintiff fails to state a claim that his rights were (or are) substantially burdened by Aramark's acquisition, storage, preparation, or service of the CRD. The Plaintiff's belief in a kosher diet is not substantially burdened when he is offered a menu that contains kosher food

prepared by inmate workers trained to observe Jewish dietary laws—the Plaintiff has neither been prevented from participating in the consumption of kosher food nor has he been presented with a Hobson's choice since he currently has access to a diet that is in fact kosher. The menus all reflect that kosher food is served at every CRD meal. The menus are approved by Aramark's Religious Authority, Rabbi Fellig, to ensure that the menus meet kosher dietary requirements. The menus were reviewed and approved, as recently as October 10, 2018, by KDOC's Religious Authority, Rabbi Friedman, and were confirmed as meeting kosher dietary requirements. Aramark maintains policies and procedures regarding the preparation, storage, and service of the CRD. These procedures are approved by Aramark's Religious Authority, Rabbi Fellig. These procedures were also approved by KDOC's Religious Authority, Rabbi Friedman. Inmates who work in the kitchen are trained in CRD food preparation to ensure compliance with Jewish dietary laws. In fact, inmate food service workers at Plaintiff's current facility, EDCF, went through their annual training as recently as October 2018. Plaintiff is not a Rabbi, has provided no evidence that he has rabbinical training, and has no province to testify as to the requirements of such training. As previously stated, Aramark relies upon their Religious Authority, Rabbi Fellig, to ensure compliance with Jewish dietary laws and KDOC relies upon Aramark pursuant to the food service contract.

> ### a. The acquisition and storage of CRD menu items does not substantially burden Plaintiff's rights.

Plaintiff claims the food used for the CRD menu has no kosher markings and is therefore not kosher. (Doc.56 at 11). Plaintiff is misinformed regarding the nature of menu items used in the CRD program. The purchase of food used to prepare the CRD in all KDOC facilities is coordinated by Aramark's dietician to ensure all menu items meet kosher requirements. All CRD menu items are ordered from manufacturers that use kosher manufacturing processes. All CRD menu items are kosher certified. With the exception of sliced bread and milk, all food items served to inmates

receiving the CRD have kosher symbols either on the outer bulk packaging, or on the individual packaging. However, the sliced bread and milk have been confirmed Kosher and verification of this is maintained by Aramark. The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher.

Next, Plaintiff alleges the meal components used for the CRD are stored with non-kosher food. This allegation is conclusory in nature, is made in passing, and the Complaint includes no specific facts or evidence regarding the storage of CRD menu items at any of the facilities. Regardless, the storage of CRD-menu items meets Jewish dietary requirements. All CRD entrée items arrive at KDOC facilities factory sealed. They are purchased and shipped in bulk boxes and broken down into smaller portions to be used according to a set menu rotation schedule. These items are then stored on separate shelving units to distinguish them from food served to inmates on the non-CRD menu. Items that are inherently kosher (fruit and vegetables) are portioned out of bulk packaging as necessary and stored in the cooler until they are used in the weekly menu schedule. Likewise, items that are kosher and are used for all diets are portioned out of bulk packaging as necessary and stored in CRD-designated shelving areas until they are used in the weekly menu schedule. These items do not come into contact with non-kosher food products. The acquisition and storage of CRD menu items at HCF, LCF, and EDCF does not substantially burden Plaintiff's rights.

   **b.    The preparation, service, and cleaning procedures of the CRD do not substantially burden Plaintiff's rights**

Plaintiff cannot establish that the CRD meals provided to him, or the preparation of those meals, amount to a substantial burden on his religious beliefs, whether sincerely held or not. A detention facility that utilizes a designated kitchen space for preparation of religious meals does not place a substantial burden on an inmate's right to practice his religion. *Green v. Werholtz*, No.

08-3260-JAR, 2010 WL 3878772, at *4 (D. Kan. September 28, 2010) (finding no constitutional violation when kosher meals were prepared in separate area of the prison kitchen using religiously-designated utensils that were stored and cleaned separately).

As previously stated, Aramark has policies in place to ensure kosher meals are prepared, served, and cleaned properly. These policies were reviewed and approved by Aramark's religious advisor. All inmates approved to work in the CRD area are trained and monitored by Aramark supervisors. At best, Plaintiff's Complaint alleges no more than isolated acts of negligence. Given the approval of the CRD policies and procedures by at least two Religious Authorities, Plaintiff utterly fails to come forward with any non-speculative and plausible allegations that KDOC kitchens do not comply with kosher dietary laws in the preparation of the CRD. *See Holsombach v. Norris*, No. 2:08CV00022JMMBD, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009); *see also Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *16 (S.D.W. Va. Apr. 5, 2016).

### LCF

The current CRD program in KDOC facilities is substantially similar to what it was when Plaintiff first filed his Complaint, aside from minor changes to enhance efficiency or quality as with any industry. The CRD program at LCF meets all kosher dietary requirements. As Plaintiff concedes in his Complaint, the LCF kitchen maintains a separate locked room within the larger kitchen area to be used exclusively for preparation and cleaning of meal items comprising the CRD. Only those inmates trained in CRD preparation methods are allowed entry into these locked rooms. The CRD preparation rooms have several sinks used exclusively for cleaning items used in the preparation and service of CRD food.

LCF uses separate utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD cooking and serving utensils are distinguishable by two additional holes drilled in the

36

handles, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. Similarly, the facility uses CRD-designated trays, differentiated by color. CRD trays and cooking utensils are washed and stored separately from trays and cooking utensils used for serving non-CRD food items. Pots and pans used for the preparation of the CRD are washed and stored separately on CRD-designated shelves. CRD-designated pots and pans are distinguishable by a black Teflon lining inside the pan. LCF utilizes disposable eating utensils that are discarded after use.

Cool CRD menu items are prepared separately either in the CRD room or on the CRD-designated table just outside the CRD room. Warm CRD menu items are prepared in CRD-designated steam kettles or are reheated in a CRD-designated oven. The food is then transferred to a CRD-designated steam well until taken to the line for service.

CRD meals for general population inmates at LCF are served prior to regular menu meals, and do not come into contact with non-CRD food items. CRD meals for inmates in segregation are prepared on the CRD-designated table and are then stacked in a separate area of the food warmer to await service in the segregation housing unit. After service of the CRD meals, inmates pass the trays through the tray slot. The trays are then collected in a tub and taken to the CRD-designated room to be washed. These procedures conform with Jewish dietary laws.

### *HCF*

Defendant Berry contends that Plaintiff lacks standing to bring claims regarding HCF as he is no longer housed there, was not eligible to receive the CRD while he was housed there[2], and has not filed or exhausted any administrative remedies regarding HCF. Further, Plaintiff's Complaint demonstrates he has no personal knowledge of the HCF kitchen. His statements

---

[2] Plaintiff was ineligible to receive the CRD because he was on a medical diet while he was housed at HCF. Declaration of Sue Stoecklein, Ex. D at ¶ 5.

regarding HCF are limited to one page of his Third Amended Complaint, are conclusory in nature, relate almost exclusively to the service of meal trays to inmates in segregation, and do not provide facts specific to how Ms. Berry personally participated in the violation of his rights. However, without waiving these objections and out of an abundance of caution, Defendant Berry will address HCF's CRD program.[3]

Similar to LCF, the HCF kitchen maintains a separate locked room within the larger kitchen area to be used exclusively for preparation and cleaning of meal items comprising the CRD. Only those inmates trained in CRD preparation methods are allowed entry into this locked room. The CRD preparation room has several sinks used exclusively for cleaning items used in the preparation and service of CRD food.

HCF prepares all cold CRD menu items in the CRD-designated room. Warm food is prepared on a CRD-designated stovetop and is then taken to the CRD-designated warmer until service. HCF maintains a separate CRD-designated stove and oven. The stove used in CRD food preparation has its own ventilation hood.

HCF uses separate cooking utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD utensils are distinguishable by a "K" marking on the handle, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. Similarly, the facility uses CRD-designated trays, differentiated by color. CRD trays are washed and stored separately from trays used for serving non-CRD food items. Pots and pans used for the preparation of the CRD are washed and stored separately on

---

[3] Since no *Martinez* Report was ordered in this case as to either HCF or EDCF but rather was limited to LCF as per Plaintiff's Complaint, Defendant Berry refers to relevant portions of the *Martinez* Report filed in *Jefferson v. Aramark Correctional Serv.*, 17-CV-3161-SAC, subject to judicial notice as per Fed. R. Evid. 201.

CRD-designated shelves. HCF presently utilizes disposable eating utensils for all CRD meals. All CRD-designated items are washed in CRD-designated sinks.

Likewise, the service of the CRD is separated from non-CRD food service. CRD meals for general population inmates are plated on separate tables in the service area and delivered to the inmate in the dining hall. CRD meals for inmates in segregation are prepared in the CRD-designated room and placed in separate areas of the food warmer to await service in the segregation housing unit. After service, trays are passed through the tray slot in the dining hall and taken to the CRD-designated room to be washed. These procedures comport with Jewish dietary laws.

### EDCF

Plaintiff lacks standing to bring his claims regarding EDCF, which are without merit as the CRD program at EDCF meets Jewish dietary requirements. His Complaint makes only a few conclusory allegations about the service of CRD trays to inmates housed in segregation at EDCF (without showing that he was one of the inmates to whom the CRD trays were delivered).

Nonetheless, without waiving her objections and out of an abundance of caution, Ms. Berry has provided facts herein showing that EDCF maintains a CRD program meeting kosher dietary requirements. EDCF maintains a separate area of the kitchen for CRD food preparation. EDCF uses separate cooking utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD cooking and serving utensils are distinguishable by engravings on the handles, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. CRD cooking utensils are washed and stored separately from cooking utensils used for serving non-CRD food items. Pots and pans used for the

preparation of the CRD are washed and stored separately in the separate, locked CRD cabinet. EDCF utilizes disposable eating utensils, trays, and cups that are discarded after use.

Cool CRD menu items are prepared separately on a table that has been wrapped in plastic. Warm CRD menu items are prepared in CRD-designated pots on the stovetop or are reheated in a CRD-designated oven. The CRD-designated oven is distinguishable by a large red "Kosher Only" sign. The food is then transferred to a CRD-designated steam well until taken to the line for service.

CRD meals for general population inmates at EDCF are served on a separate area of the serving line and do not come into contact with non-CRD food items. CRD meals for inmates in segregation are prepared in the CRD-designated area and are then wrapped in plastic and stacked in a separate area of the food warmer to await service in the segregation housing unit. These meals do not touch non-CRD meals in the warmer. All cups, plates, and eating utensils are single-use and are discarded after use. The EDCF procedures comply with Jewish dietary laws.

The record reflects that all three facilities have policies and procedures in place to ensure adequate acquisition, storage, preparation, service and cleaning of the CRD menu items. Plaintiff cannot show that the CRD does not meet Jewish dietary requirements. However, even if Plaintiff's allegations regarding cross-contamination could be proven by competent admissible evidence, those alleged violations were isolated acts of negligence by kitchen staff implementing the CRD meals, staff employed or supervised by Aramark, not KDOC or Berry. This principle has been applied many times to dismiss § 1983 claims; only examples need be given. The case of *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) had similar facts to this case and is instructive. In *Gallagher*, the plaintiff alleged that the defendants denied him the right to a kosher diet. The plaintiff alleged that his food was not prepared according to kosher requirements. Specifically,

serving utensils that were reserved for the kosher food preparation were improperly cleaned with non-kosher utensils. The court in *Gallagher* stated, taking the plaintiff's "allegations as true, the fact that the utensils were not properly washed indicates that the defendants imperfectly implemented the kosher requirements, or were even negligent in implementing his kosher diet. But there is no basis to conclude that any of the defendants deliberately contaminated the kosher utensils, in violation of [plaintiff's] right to free exercise of religion." *Gallagher v. Shelton*, 587 F.3d 1063. This is similar to Plaintiff's allegations in this case. Plaintiff claims that at LCF, the utensils and pans used in the preparation and service of the CRD are washed in the same areas as dishes used for non-kosher meals. (Doc. 56 at 7). To the contrary, the record reflects that LCF utilizes CRD-designated utensils and cookware and all items utilized in the CRD are washed in CRD-designated areas. Plaintiff's Complaint contains no specific facts regarding the cleaning and storage of CRD items at EDCF or HCF. Similar to *Gallagher*, Plaintiff cannot show that Defendant Berry deliberately contaminated the items used in the CRD preparation, storage, or service. In fact, Berry does not supervise the inmate workers purportedly committing these alleged negligent acts, is not present on a day-to-day basis, and has no knowledge of these alleged isolated acts of negligence.

Plaintiff's allegations of misconduct and negligence by inmate workers do not rise to the level of a constitutional violation. In *Holsombach v. Norris*, No. 2:08CV00022JMMBD, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009) the plaintiff had never been inside the facility kitchen and because he lacked personal knowledge of the workings of the kosher kitchen, he called two inmates to testify on his behalf. *Id.* These inmates provided testimony indicating there were incidents in which the procedures established to provide kosher meals were not followed by staff or inmates. The court stated "Defendants cannot be held… to an absolute standard. They

must take reasonable measures, but are not liable for random incidents of misconduct by inmates." *Id*.

Similarly, in *Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *16 (S.D.W. Va. Apr. 5, 2016), the plaintiff made allegations that cross-contamination of trays and utensils resulted in non-kosher food and therefore substantially burdened his rights. The defendant responded that all trays and utensils are distinguishable by color and are stored in separate areas from non-religious food items. *Id*. Plaintiff filed fourteen affidavits from inmates stating they had witnessed cross-contamination. *Id*. The court stated:

> Although the Inmate Affidavits indicate that cross-contamination had occurred in the past, Plaintiffs produce no evidence indicating that cookware, trays, and utensils were not replaced upon notification of cross-contamination. Furthermore, there is no indication that Plaintiffs were forced to eat from cookware, trays, or utensils that were known to be cross-contaminated.

*Id*. at 17 (citing *Lovelace*, 472 F.3d at 194 (RLUIPA is not intended to remedy negligent violations of inmates' religious practices.)) The court further reasoned that "[t]he record…clearly reveals that [the facility] has implemented…policies and protocols to ensure against cross-contamination. . .." *Id*. at *17.

Similar to *Holsombach* and *Blake*, Plaintiff has made allegations of cross-contamination of the items used in the CRD program. Unlike in *Holsombach* and *Blake*, however, Plaintiff has submitted no admissible evidence to show that the CRD procedures are being incorrectly implemented causing the kosher food to become non-kosher. Plaintiff simply relies on his alleged "investigation" in the LCF kitchen and an alleged conversation with another inmate on an unknown date. Although Defendant objects to Plaintiff's reliance on this conversation on several grounds[4] and contends it is not evidence and should not be considered, Plaintiff's hearsay

---

[4] Plaintiff has not submitted a sworn statement from Inmate Peppers. His alleged statements are inadmissible hearsay as per Fed. R. Evid. 802 and are not appropriate to be considered as evidence.

statements are insufficient to establish a violation of either § 1983 under the applicable standard as stated above – it is policies and protocols that count, not isolated incidents. Notably, even Plaintiff's alleged conversation with Inmate Peppers shows that the CRD menu is prepared separately from the non-CRD menu. (Doc. 56 at 24, ¶ 49). Evan Hitchcock explained one of his roles as general manager is to train and supervise food service teams. *Id*. Inmate staff members are trained to keep non-kosher food, pots, and utensils separated from the kosher preparation area. To ensure compliance with the contract, including Aramark's obligations with respect to the CRD menu, Defendant Berry conducts periodic audit inspections of all three facilities. On Defendant Berry's audit visits of LCF, EDCF, and HCF she found the authorized menus were being used and that the kitchen was implementing appropriate kosher food preparation practices. Plaintiff's alleged isolated acts of negligence do not amount to a substantial burden on his religious beliefs.

### B.     The law is not clearly established.

In order to overcome Defendant Berry's qualified immunity, Plaintiff must show not only that Defendant Berry through her own actions (not those of others) actually violated Plaintiff's federally secured rights, but also that Ms. Berry was on notice that her actions violated the Constitution – that an "objectively reasonable officer[] could not have thought the [conduct] constitutionally permissible[.]" *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007); *see also Avery v. Anderson*, 94 F. Appx. 735, 739 (10th Cir. 2004). To make this showing, Plaintiff must demonstrate "that there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Horstkoetter*, 159 F.3d at 1278 (internal citation and quotation marks omitted). Although Plaintiff is not required to point to "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question

beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citations omitted); *see also Grissom v. Roberts*, No. 17-3185, 2018 WL 4102891, at *2 (10th Cir. Aug. 29, 2018); *Leiser v. Moore*, No. 17-3206, 2018 WL 4224663, at *2 (10th Cir. Sept. 6, 2018).

Furthermore, determining whether a particular right was clearly established is a narrowly tailored, context-specific exercise. Nearly every right, when viewed with sufficient generality, can be considered clearly established. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("[T]he clearly established law must be particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.") (internal citations and quotation marks omitted). Thus, for the purposes of qualified immunity, "clearly established" means that the precise contours of a right are so well-developed that every reasonable official would have unquestionably understood whether his or her particular conduct was lawful. *See Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Consequently, if it is *debatable* whether a violation occurred, then the purported right at issue was not clearly established, and the defendant is entitled to qualified immunity. *al-Kidd*, 563 U.S. at 741.

Defendant Berry can find no clearly established case law in the Tenth Circuit or outside of it that would put her on notice as the state contract monitor that a menu and its underlying food sources certified by Aramark's rabbinical authority as kosher violate a kosher-keeping prisoner's constitutional rights. Likewise, as this Court recognized in its Memorandum and Order on the defendants' motions to dismiss, there is no clearly established law entitling Plaintiff to pre-packaged kosher meals, "[t]he court notes, that it is aware of no case law suggesting that prisoners have a constitutional right to factory-sealed TV dinners." (Doc. 90, at p.9). Qualified immunity

bars Plaintiff's claim that he was entitled to have his kosher meal served TV dinner-style. *See, e.g., Reichle*, 566 U.S. at 666-70.

Finally, in regard to the food preparation allegations Plaintiff asserts, Plaintiff has identified no law that clearly establishes that Defendant Berry violated the Constitution by any of her alleged actions (or inactions). To the contrary, the Tenth Circuit has held that isolated incidents of negligence do not rise to the level of a constitutional violation. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009); *see also Kanatzar v. Cole,* No. 17-3115-SAC, 2018 WL 3495844, at *4 (D. Kan. July 20, 2018) (finding isolated acts of negligence that were not "conscious or intentional interference with plaintiff's free exercise rights" did not rise to level of constitutional violation); *Hachmeister v. Kline,* No. 12-3263-SAC, 2013 WL 237815, at *5 (D. Kan. Jan. 22, 2013) ("...mere inconvenience, negligence, and isolated or sporadic incidents are not sufficient to show a substantial burden."). There is no clearly established law that would put Ms. Berry on notice that the Rabbi-approved menu or the Rabbi-reviewed and approved kosher food preparation guidelines that Plaintiff is challenging, and their allegedly negligent implementation, rise to the level of a constitutional violation.

Ultimately, it is Plaintiff's duty to come forward with case law that clearly establishes these principles at a specific level. "[Q]ualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987). One of the purposes of qualified immunity "is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)). This case can be decided on the lack of clearly established law that would have notified Defendant Berry that her conduct ran afoul of the First Amendment—this

issue should be decided early in this litigation. As such, Defendant Berry is entitled to judgment on the basis of qualified immunity.

## CONCLUSION

This Court should grant judgment for the 42 U.S.C. § 1983 claim asserted against Defendant Berry. Plaintiff's claim for injunctive relief is jurisdictionally defective and he lacks standing to assert it. Further, Plaintiff has not exhausted his administrative remedies as to the allegations he asserts as to HCF or EDCF. Finally, Defendant Berry is entitled to qualified immunity because Plaintiff fails to establish a constitutional violation of his sincerely held religious beliefs and can cite no clearly established law entitling him to relief on the issues he presents in this action. Therefore, Defendant Berry respectfully requests judgment be granted in her favor and such other and further relief the Court deems just and equitable.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

s/ Natasha M. Carter
Natasha M. Carter, KS No. 26074
MJ Willoughby, KS No. 14059
Assistant Attorneys General
Memorial Building, 2nd Floor
120 SW 10th Avenue,
Topeka, Kansas, 66612-1597
Phone: (785) 296-6244
Fax: (785) 291-3767
Email: natasha.carter@ag.ks.gov
        mj.willoughby@ag.ks.gov
*Attorneys for Defendant Patricia Berry*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of November, 2018, the above and foregoing was filed with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to the following:

Jeff Cowger, Kansas Department of Corrections
714 SW Jackson, Suite 300
Topeka, KS  66603
Jeff.Cowger@ks.gov
Attorney for Kansas Department of Corrections

Sherri L. Price, Lansing Correctional Facility
301 E. Kansas Avenue
PO Box 2
Lansing, KS 66043
Sherri.Price@doc.ks.gov
*Attorney for Kansas Department of Corrections*

Leigh Ann Massey, KS No. 25959; Catherine A. Stevens, Fed. KS #78565
Baker, Sterchi, Cowden & Rice, LLC
9393 West 110th Street, Suite 500
Overland Park, KS 66210
kreamer@bscr-law.com
cstevens@bscr-law.com
*Attorneys for Defendant Aramark Correctional Services, LLC,*
*Julie Dockendorff, and Rabbi M. Fellig*

Elizabeth M. Phelps, S.Ct. #12285
3700 SW Churchhill Road
Topeka, Kansas 66604
lilybell@cox.net
*Attorney for Defendant Allen*

I also certify that a copy of the above was served via first-class mail, postage prepaid to:

Deron McCoy, Jr., #76894
El Dorado Correctional Facility
PO Box 311
El Dorado, KS  67042
*Pro se Plaintiff*

s/ Natasha M. Carter
Natasha M. Carter
Assistant Attorney General