7/29/22, 2:09 PM                                  Kansas Department of Corrections

Exhibit A

# Names

| Name Type | Name |
|-----------|------|
| Conviction | MCCOY, DERON JR |
| True | MCCOY, DERON JR |
| Alias | MCCOY, DERRON |

# Identification

| KDOC # | SID Num | FBI Num |
|--------|---------|---------|
| 0076894 | 768502 | 101580PB9 |

# Birthdates

| Birthdate Type | Birthdate | Age |
|----------------|-----------|-----|
| True | Mar 02, 1983 | 39 |



(/kasper/search/image?
kdocNumber=0076894&imageNumber=1)

**MCCOY, DERON JR**

**Approx Picture Date**

2015-04-29



(/kasper/search/image?
kdocNumber=0076894&imageNumber=2)

**MCCOY, DERON JR**

**Approx Picture Date**

2015-04-29

# Demographics

| Eye Color | Hair Color | Height | Weight | Gender | Race |
|-----------|------------|--------|--------|--------|------|
| Brown | Black | 6'-0" | 190 | Male | Black |

# Current Status reported by Dept. of Corrections

| Work or Program Participation | Not Working |

| Earliest Possible Release Date (1) | Feb 23, 2036 |

| Current Status | Incarcerated |

| Admission Date | Mar 06, 2012 |

| Current Location (2) | **El Dorado CF-Central** (http://www.doc.ks.gov/facilities/edcf) |

| Custody Level | Special Management |

**(1) This date could be affected by a parole board decision or good time and/or program credit.**

**(2) Click on Location for the Facility web site.**

7/29/22, 2:09 PM                                    Kansas Department of Corrections

# Convictions

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|--------|-----------------|--------------|-----------------|-----|--------------------------------|--------|---------------------|------------------|-------|
| Sedgwick | 01CR266 | Aug 14, 2000 | Oct 18, 2001 | N/A | Aggravated Battery - Intentional, Bodily Harm | 1 | Non Drug-Grid Severity Level 7 | Inactive | KS |
| Sedgwick | 01CR266 | Aug 14, 2000 | Oct 18, 2001 | N/A | Aggravated Assault | 1 | Non Drug-Grid Severity Level 7 | Inactive | KS |
| Reno | 07CR629 | Jul 06, 2007 | Jun 27, 2008 | N/A | Obstructing Legal Process | 1 | Non Drug-Grid Severity Level 9 | Inactive | KS |
| Sedgwick | 09CR3132 | Jul 30, 2009 | Aug 08, 2012 | N/A | Poss of opiates,opium, narc drugs or desig stim | 1 | Drug-grid Severity Level 4 | Active | KS |
| Sedgwick | 09CR3132 | Jul 30, 2009 | Aug 08, 2012 | N/A | Poss of depress, des stim, halluc or sel subst;1st | 1 | Class A Misdemeanor | Active | KS |
| Sedgwick | 02CR2192 | Jun 14, 2002 | Jan 30, 2003 | N/A | Aggravated Escape From Custody - held on Felony | 1 | Non Drug-Grid Severity Level 8 | Inactive | KS |
| Reno | 11CR178 | Mar 11, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 11, 2011 | Oct 28, 2016 | N/A | Poss of opiates,opium, narc drugs or desig stim | 1 | Drug-grid Severity Level 4 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | Solicited | Perjury; False Statement Not Felony | 1 | Non Drug-Grid Severity Level 10 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |

7/29/22, 2:09 PM                                Kansas Department of Corrections

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|---|---|---|---|---|---|---|---|---|---|
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Criminal Possession Firearm;BarLT12", 5yr Felon | 1 | Non Drug-Grid Severity Level 8 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Agg. Endangering a Child | 1 | Non Drug-Grid Severity Level 9 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault | 1 | Non Drug-Grid Severity Level 7 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Kidnapping | 1 | Non Drug-Grid Severity Level 3 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Poss of opiates,opium, narc drugs or desig stim | 1 | Drug-grid Severity Level 4 | Active | KS |
| Reno | 02CR911 | Sep 20, 2002 | Nov 14, 2003 | N/A | Obstructing Legal Process | 1 | Non Drug-Grid Severity Level 9 | Inactive | KS |
| Reno | 02CR911 | Sep 20, 2002 | Nov 14, 2003 | N/A | Battery | 1 | Class B Misdemeanor | Inactive | KS |

(I) If Number includes  JV  : Extended juvenile jurisdiction adjudications with adult prison sentences stayed, then imposed.
(II) If Status includes * : Denotes Active for Post Release Supervision Only.

# KDOC Physical Location History(s)

| Location | Movement Date | Movement Reason |
|---|---|---|
| El Dorado CF-Central | Jun 18, 2019 | Inter-Facility Movement |
| Lansing CF-Central | May 16, 2019 | Inter-Facility Movement |

7/29/22, 2:09 PM                                    Kansas Department of Corrections

| Location | Movement Date | Movement Reason |
| --- | --- | --- |
| El Dorado CF-Central | Sep 04, 2018 | Returned From Court Appearance |
| Reno County | Aug 29, 2018 | Released For Court Appearance |
| El Dorado CF-Central | Jan 29, 2018 | Inter-Facility Movement |
| Hutchinson CF-Central | Mar 22, 2017 | Inter-Facility Movement |
| El Dorado CF-Central | Nov 01, 2016 | Returned From Court Appearance |
| Reno County | Oct 27, 2016 | Released For Court Appearance |
| El Dorado CF-Central | Jul 27, 2016 | Returned From Court Appearance |
| Reno County | Jul 20, 2016 | Released For Court Appearance |
| El Dorado CF-Central | Jun 16, 2016 | Inter-Facility Movement |
| Lansing CF-Central | Nov 15, 2012 | Returned From Court Appearance |
| Reno County | Oct 30, 2012 | Released For Court Appearance |
| Lansing CF-Central | Oct 02, 2012 | Inter-Facility Movement |
| El Dorado CF-RDU | Aug 09, 2012 | Returned From Court Appearance |
| Sedgwick County | Apr 11, 2012 | Released For Court Appearance |
| El Dorado CF-RDU | Apr 09, 2012 | Returned From Court Appearance |
| Reno County | Apr 05, 2012 | Released For Court Appearance |
| El Dorado CF-RDU | Mar 06, 2012 | New Court Commitment |
| Unknown or N/A | Jul 27, 2010 | Expiration Of Sentence |
| Hutchinson CF-Central | May 27, 2010 | Parole Viol. No New Sentence |
| Reno County | Apr 22, 2010 | DOC Warrant Issued |
| Reno County | Apr 22, 2010 | DOC Warrant Issued |
| Unknown or N/A | Feb 25, 2010 | Absconded |
| Sedgwick County | Jan 11, 2010 | Intra-parole/CR |
| Reno County | Jan 05, 2010 | Intra-parole/CR |
| Reno County | Jan 05, 2010 | DOC War. Wthdrwn Supervsn I/S |
| Reno County | Dec 23, 2009 | DOC Warrant Issued |
| Reno County | Dec 17, 2009 | Intra-parole/CR |
| Reno County | Nov 03, 2009 | Intra-parole/CR |
| Sedgwick County | Nov 03, 2009 | DOC War. Wthdrwn Supervsn I/S |

7/29/22, 2:09 PM                                    Kansas Department of Corrections

| Location | Movement Date | Movement Reason |
|---|---|---|
| Reno County | Oct 27, 2009 | DOC Warrant Issued |
| Unknown or N/A | Aug 06, 2009 | Absconded |
| Sedgwick County | Aug 05, 2009 | Intra-parole/CR |
| Sedgwick County | Aug 05, 2009 | DOC War. Wthdrwn Supervsn I/S |
| Sedgwick County | Jul 30, 2009 | DOC Warrant Issued |
| Sedgwick County | Jul 30, 2009 | Intra-parole/CR |
| Sedgwick County | Jun 15, 2009 | In-State Post Release |
| Lansing CF-Central | Sep 18, 2008 | Inter-Facility Movement |
| El Dorado CF-RDU | Aug 06, 2008 | New Court Commitment |
| Unknown or N/A | Jun 14, 2008 | Expiration Of Sentence |
| Reno County | Jun 14, 2008 | Intra-parole/CR |
| Reno County | Jun 14, 2008 | DOC War. Wthdrwn Supervsn I/S |
| Reno County | Apr 25, 2008 | DOC Warrant Issued |
| Unknown or N/A | Apr 17, 2008 | Absconded |
| Sedgwick County | Mar 29, 2008 | Det. Par/CR Rtnd KS Supervsn |
| Reno County | Mar 18, 2008 | Paroled To Detainer |
| El Dorado CF-Central | Nov 13, 2007 | Returned From Court Appearance |
| Reno County | Oct 25, 2007 | Released For Court Appearance |
| El Dorado CF-Central | Sep 27, 2007 | Inter-Facility Movement |
| El Dorado CF-RDU | Aug 20, 2007 | Returned From Court Appearance |
| Reno County | Aug 20, 2007 | Released For Court Appearance |
| El Dorado CF-RDU | Aug 13, 2007 | Parole Viol. No New Sentence |
| Reno County | Jul 23, 2007 | DOC Warrant Issued |
| Reno County | Jul 06, 2007 | DOC Warrant Issued |
| Reno County | Jul 06, 2007 | DOC Warrant Issued |
| Sedgwick County | May 04, 2007 | In-State Post Release |
| Lansing CF-Central | Nov 18, 2003 | Returned From Court Appearance |
| Reno County | Nov 13, 2003 | Released For Court Appearance |
| Lansing CF-Central | Oct 02, 2003 | Returned From Court Appearance |

7/29/22, 2:09 PM                                        Kansas Department of Corrections

| Location | Movement Date | Movement Reason |
|---|---|---|
| Reno County | Sep 25, 2003 | Released For Court Appearance |
| Lansing CF-Central | Sep 16, 2003 | Returned From Court Appearance |
| Reno County | Sep 09, 2003 | Released For Court Appearance |
| Hutchinson CF-Central | Sep 09, 2003 | Inter-Facility Movement |
| Lansing CF-Central | Aug 26, 2003 | Inter-Facility Movement |
| Norton CF-Central | Aug 12, 2003 | Returned From Court Appearance |
| Reno County | Aug 07, 2003 | Released For Court Appearance |
| Norton CF-Central | Jun 24, 2003 | Returned From Court Appearance |
| Reno County | Jun 10, 2003 | Released For Court Appearance |
| Norton CF-Central | May 06, 2003 | Inter-Facility Movement |
| Ellsworth CF | Apr 22, 2003 | Inter-Facility Movement |
| El Dorado CF-Central | Mar 18, 2003 | Probation Viol. New Sentence |

# KDOC Disciplinary Report(s) since January 1996

| Date | Class | Location | Type of report |
|---|---|---|---|
| Dec 17, 2021 | 1 | El Dorado Correctional Fac. - Central | Fighting |
| Dec 17, 2021 | 1 | El Dorado Correctional Fac. - Central | Dangerous Contraband |
| Oct 02, 2021 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Aug 28, 2021 | 1 | El Dorado Correctional Fac. - Central | Dangerous Contraband |
| Feb 27, 2020 | 3 | El Dorado Correctional Fac. - Central | Restr Area and Unauth Presence |
| Dec 16, 2019 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Dec 16, 2019 | 1 | El Dorado Correctional Fac. - Central | Threaten or Intim Any Person |
| Oct 09, 2019 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Oct 09, 2019 | 1 | El Dorado Correctional Fac. - Central | Tobacco Contraband Possession |
| Oct 09, 2019 | 2 | El Dorado Correctional Fac. - Central | Sex Explicit Mtrl, n/SexOfndr |
| Sep 05, 2019 | 2 | El Dorado Correctional Fac. - Central | Restr Area/Unauth Presence |
| Aug 28, 2019 | 2 | El Dorado Correctional Fac. - Central | Sex Explicit Mtrl, n/SexOfndr |

7/29/22, 2:09 PM                                        Kansas Department of Corrections

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| May 17, 2019 | 2 | Lansing Correctional Facility - Central | Obscenity (W/O Children) |
| Feb 28, 2019 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Feb 28, 2019 | 1 | El Dorado Correctional Fac. - Central | Theft |
| Feb 28, 2019 | 2 | El Dorado Correctional Fac. - Central | Misuse of State Property |
| Feb 28, 2019 | 2 | El Dorado Correctional Fac. - Central | Less Dangerous Contraband |
| Jan 25, 2019 | 2 | El Dorado Correctional Fac. - Central | Insub/Disrespect Officer/Other |
| Jan 24, 2019 | 2 | El Dorado Correctional Fac. - Central | Insub/Disrespect Officer/Other |
| Jan 24, 2019 | 2 | El Dorado Correctional Fac. - Central | Restr Area/Unauth Presence |
| Feb 25, 2017 | 2 | El Dorado Correctional Fac. - Central | Misuse of State Property |
| Apr 15, 2016 | 1 | Lansing Correctional Facility - Central | Fighting |
| Apr 09, 2016 | 1 | Lansing Correctional Facility - Central | Misusing Meds |
| Apr 09, 2016 | 2 | Lansing Correctional Facility - Central | Obscenity (W/O Children) |
| Apr 09, 2016 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Apr 09, 2016 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Apr 02, 2016 | 1 | Lansing Correctional Facility - Central | Interf W/Cell Oper/Visibility |
| Apr 02, 2016 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Apr 02, 2016 | 1 | Lansing Correctional Facility - Central | Interf W/Cell Oper/Visibility |
| Jan 21, 2016 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Jan 21, 2016 | 1 | Lansing Correctional Facility - Central | Battery |
| Jan 21, 2016 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Dec 25, 2015 | 1 | Lansing Correctional Facility - Central | Battery |
| Nov 29, 2015 | 1 | Lansing Correctional Facility - Central | Misusing Meds |
| Aug 02, 2015 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Aug 02, 2015 | 1 | Lansing Correctional Facility - Central | Interf W/Cell Oper/Visibility |
| Jun 16, 2015 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jan 30, 2015 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Aug 28, 2014 | 1 | Lansing Correctional Facility - Central | Fighting |
| Aug 28, 2014 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Apr 04, 2014 | 3 | Lansing Correctional Facility - Central | Answering Calls or Passes |

Kansas Department of Corrections

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| Mar 09, 2013 | 1 | Lansing Correctional Facility - Central | Battery |
| Jan 27, 2013 | 1 | Lansing Correctional Facility - Central | Use of Stimulants |
| Jan 27, 2013 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jan 27, 2013 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jun 05, 2010 | 1 | Hutchinson Correctional Fac. - Central | Disobeying Orders |
| Jun 05, 2010 | 2 | Hutchinson Correctional Fac. - Central | Unauthorized Dealing or Trade |
| Jun 05, 2010 | 2 | Hutchinson Correctional Fac. - Central | Lying |
| Mar 25, 2009 | 2 | Lansing Correctional Facility - Central | Sex Explicit Mtrl, n/SexOfndr |
| Mar 16, 2009 | 1 | Lansing Correctional Facility - Central | Use of Stimulants |
| Mar 11, 2009 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Feb 25, 2009 | 2 | Lansing Correctional Facility - Central | Sex Explicit Mtrl, n/SexOfndr |
| Jan 29, 2009 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Dec 21, 2008 | 1 | Lansing Correctional Facility - Central | Lewd Acts |
| Dec 21, 2008 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Dec 20, 2008 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Dec 07, 2008 | 1 | Lansing Correctional Facility - Central | Fighting |
| Aug 11, 2008 | 2 | El Dorado Correctional Fac. - RDU | Unauthorized Dealing or Trade |
| Dec 24, 2007 | 2 | El Dorado Correctional Fac. - Central | Misuse of State Property |
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Battery |
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Battery |
| Apr 08, 2007 | 1 | Lansing Correctional Facility - Central | Use Stimulants, Sedatives, Etc |
| Mar 26, 2007 | 1 | Lansing Correctional Facility - Central | Threaten or Intim Any Person |
| Jan 22, 2007 | 3 | Lansing Correctional Facility - Central | Violation of Published Orders |
| Sep 07, 2006 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Sep 07, 2006 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| May 24, 2006 | 1 | Lansing Correctional Facility - Central | Avoiding an Officer |
| May 24, 2006 | 2 | Lansing Correctional Facility - Central | Tatoos and Body Markings |

Kansas Department of Corrections

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| May 24, 2006 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Apr 19, 2006 | 2 | Lansing Correctional Facility - Central | Falsifying Documents |
| Mar 21, 2006 | 1 | Lansing Correctional Facility - Central | Threaten or Intim Any Person |
| Mar 21, 2006 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Jan 26, 2006 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Jan 07, 2006 | 1 | Lansing Correctional Facility - Central | Threaten or Intim Any Person |
| Jul 20, 2005 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| Jul 14, 2005 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Jun 23, 2005 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Jun 21, 2005 | 1 | Lansing Correctional Facility - Central | Inmate Activity; Limitations |
| Jun 21, 2005 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| May 25, 2005 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| May 13, 2005 | 1 | Lansing Correctional Facility - Central | Use Stimulants, Sedatives, Etc |
| Apr 21, 2005 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Apr 21, 2005 | 2 | Lansing Correctional Facility - Central | Misuse of State Property |
| Mar 01, 2005 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| Mar 01, 2005 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Feb 26, 2005 | 1 | Lansing Correctional Facility - Central | Undue Familiarity |
| Feb 24, 2005 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Feb 03, 2005 | 1 | Lansing Correctional Facility - Central | Theft |
| Jan 27, 2005 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Dec 31, 2004 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Dec 31, 2004 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Dec 07, 2004 | 1 | Lansing Correctional Facility - Central | Use Stimulants, Sedatives, Etc |
| Oct 30, 2004 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| Oct 30, 2004 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Oct 30, 2004 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Sep 16, 2004 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jul 02, 2004 | 2 | Lansing Correctional Facility - Central | Misconduct in Dining Room |

7/29/22, 2:09 PM                              Kansas Department of Corrections

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| Apr 28, 2004 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Apr 28, 2004 | 1 | Lansing Correctional Facility - Central | Avoiding an Officer |
| Mar 21, 2004 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Mar 21, 2004 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Jan 09, 2004 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Jan 09, 2004 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Dec 23, 2003 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Sep 08, 2003 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Sep 08, 2003 | 2 | Lansing Correctional Facility - Central | Misuse of State Property |
| Aug 18, 2003 | 1 | Norton Correctional Facility - Central | Fighting |
| Jul 11, 2003 | 2 | Norton Correctional Facility - Central | Unauthorized Dealing or Trade |
| Jun 30, 2003 | 2 | Norton Correctional Facility - Central | Work Performance |
| Apr 27, 2003 | 3 | Ellsworth Correctional Facility | Restr Area/Unauthor Presence |

Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DERON MCCOY, JR.,

    **Plaintiff,**

    v.

ARAMARK CORRECTIONAL SERVICES,
LLC, et al.,

    **Defendants.**

Case No. 5:16-CV-03027-HLT

## ORDER

Plaintiff inmate DeRon McCoy, Jr. filed this lawsuit against Aramark Correctional Services ("Aramark") and multiple Aramark and Kansas Department of Corrections ("KDOC") personnel alleging First Amendment free exercise violations pursuant to 42 U.S.C. § 1983 and violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.* Doc. 56. The crux of his complaint is that Defendants have failed to provide him with a Kosher diet in accordance with his Jewish faith.[1]

The Court recently granted in part and denied in part a motion for summary judgment filed by the KDOC Defendants. As a result of that ruling, the Court determined that the following claims remained for resolution: (1) official capacity claims for prospective relief against Defendant Patricia Berry under § 1983 and RLUIPA based on the Certified Religious Diet ("CRD") policy;[2] (2) claims for prospective relief against Defendants Aramark, Paul Church (official capacity), and

---

[1] The Court recognizes that Plaintiff is proceeding pro se and therefore "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007).

[2] For ease of reference, the Court uses the terminology "CRD policy" throughout this order. This is a bit of a misnomer. In using this descriptor, the Court uses it in its general sense and refers to the official CRD menu itself, as well as Aramark standards for CRD food preparation.

Julie Dockendorff (official capacity) under § 1983 and RLUIPA[3] based on the CRD policy and meal preparation at three prison facilities; and (3) claims for damages against Defendants Aramark, Church (individual capacity) and Dockendorff (individual capacity) under § 1983 based on the CRD policy and on CRD meal preparation at the same three facilities.

Defendants Aramark, Church, and Dockendorff moved for summary judgment on the remaining claims (Doc. 176) and the Court allowed Defendant Berry to belatedly join their motion (Docs. 182 & 183).

As discussed below, the Court finds that it lacks jurisdiction over <u>all</u> Plaintiff's claims for prospective relief. Plaintiff failed to exhaust his claims for meal preparation at HCF and EDCF. Plaintiff's remaining claims—for damages against Defendants Aramark, Church (individual capacity), and Dockendorff (individual capacity) under § 1983 based on meal preparation at LCF and the CRD policy—lack the factual support needed to survive a summary judgment challenge. Accordingly, the Court grants Defendants' motion for summary judgment.

## I.   BACKGROUND[4]

KDOC contracts with Aramark for meal services at various sites, including Lansing Correctional Facility ("LCF"), El Dorado Correctional Facility ("EDCF"), and Hutchinson Correctional Facility ("HCF"). At all relevant times, Defendant Berry was the Contract Manager for KDOC, including for the Aramark contract. Defendant Church is a District Manager for Aramark and Defendant Dockendorff was a dietician for Aramark during the relevant times of this

---

[3]   Only equitable relief is available against any party under RLUIPA—not damages. *See Hendricks v. Aramark Inc.*, 2015 WL 1809361, at *4 (S.D. Ohio 2015) (citing *Sossamon v. Texas*, 563 U.S. 277, 293 (2011) ("We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."); *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) ("[M]onetary damages are not available under RLUIPA."); and *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) ("[RLUIPA] does not create a cause of action against state employees in their personal capacity.")).

[4]   The following facts are either uncontroverted or viewed in the light most favorable to Plaintiff.

action. Plaintiff has been in KDOC custody since 2012. He is presently incarcerated at EDCF. In 2014, while incarcerated at LCF, Plaintiff changed his religious preference to a sect of the Jewish faith and was placed on the facility's roster to receive a Certified Religious Diet ("CRD"). He is dissatisfied with the CRD at all three KDOC facilities and believes that the diet does not provide Kosher food in conformity with his religious beliefs. Plaintiff was not placed on the roster to receive a CRD at HCF because Plaintiff was on a medical diet when he was housed there. He is currently not on the CRD roster at EDCF[5] because Plaintiff has not requested to be on the religious diet since he was most recently transferred to EDCF.

### A.     The CRD

The agreement between KDOC and Aramark grants Aramark the exclusive right to perform all food service, including non-inmate labor, at KDOC facilities. Aramark's obligations include providing various special diets other than the common fare, including medical diets and the CRD. Aramark develops and implements menus for the foods served to inmates, but KDOC must agree to and approve the menus. Aramark must obtain review of the CRD by an appropriate religious advisor to ensure that the CRD meets the requirements of a certified religious diet.

Aramark has policies to ensure that the CRD is implemented correctly. Aramark's religious authority, Rabbi Fellig, reviews and approves these policies. Aramark's meal preparation procedures require that Kosher products contain a certifying symbol and be stored separately from common fare. Doc. 133-1 at 48-50. The procedures also provide for a Kosher preparation area, separate utensils and cookware, and for separate cleaning areas. *Id.*

---

[5]   It appears that Plaintiff <u>did</u> request the religious diet at EDCF during a previous stay, which would have been effective for about one month before Plaintiff was transferred out of EDCF.

At LCF, Evan Hitchcock works for Aramark as the General Manager/Regional Safety Leader. His job duties include training, managing performance, and directing and overseeing operations related to food service. In an affidavit attached to a previous summary judgment motion (incorporated in Defendants' present motion by reference), Hitchcock described procedures followed at LCF for preparation of CRD meals. Doc. 133-2. The Court declines to exhaustively explain those procedures here but provides the following summary:

- Aramark procures food for the CRD menu from manufacturers that use Kosher manufacturing processes.

- Aramark maintains certificates for this food showing it is Kosher-certified.

- After staff portion entrée items used for the CRD menu out of bulk boxes, the entrée items are stored separately from non-CRD food.

- Sliced bread and milk do not have Kosher symbols on the individual packaging, but Aramark maintains certificates showing they are Kosher.

- LCF uses a locked, CRD-designated room for preparation, service, and cleaning of CRD menu items. It contains its own sink for sanitation. After meals, dirty CRD trays are collected in one tub. These trays are designated by color. Disposable utensils (sporks) are discarded.

- LCF uses a steam kettle and oven to prepare warm CRD food—not stovetops.

- LCF uses separate CRD-designated serving utensils and cookware, which are kept apart from non-CRD utensils and cookware. They are not used to prepare regular meal items.

- CRD food does not come into contact with non-CRD food.

- Inmate workers who prepare CRD food are trained and must sign a training document, along with the Aramark trainer.

Rabbi Ben Friedman, a rabbinical authority, provides consultation to KDOC about Jewish religious issues, including Kosher dietary requirements. His work with KDOC includes ongoing compliance review and monitoring of Aramark's administration of the CRD. This may include monitoring kitchen operations; reviewing policies, procedures, and food labels; and providing

advice to KDOC and Aramark on how to comply with Jewish dietary law. As explained in this Court's most recent Order (Doc. 175), Rabbi Friedman attests that he has reviewed "the procedures, menus, and food labels for all items on the CRD," and that "[i]t is completely permissible for inmates wishing to observe Jewish dietary laws to eat all of the items on the CRD menu, including inmates wishing to meet strict Kosher laws under Orthodox Judaism." Doc. 133-3 at 2. Rabbi Friedman explained that the procedures used by Defendants for preparation, storage, cleaning, and disposal of CRD food, utensils, and dishes were not a violation of Kosher dietary laws—even the specific processes that Plaintiff complains about, such as having some CRD menu items in the same room as non-CRD items, using the same sink for washing cooking utensils at EDCF, or placing CRD trays in the common tray slot after use.[6]

### B.   Plaintiff's Grievance and Allegations

Plaintiff began the grievance process in 2014, while incarcerated at LCF. He stated that CRD meal preparation at LCF resulted in the food, utensils, and dishes being contaminated by non-Kosher contact, and requested the remedy of packaged Kosher meals. His request and appeal were denied, and he commenced this suit. Although his allegations regarding the Kosher status of the CRD have remained consistent, his concerns regarding each facility's meal preparation vary in both their nature and support.

Plaintiff relies on his own investigations and firsthand knowledge, as well as statements of other inmates. From personal experience, Plaintiff states that he has not observed Kosher markings on any food items other than condiments while in KDOC custody. He also discusses his observations of CRD meal preparation and delivery (as well as details others have allegedly shared with him). From fellow inmates, Plaintiff provides affidavits by cooks at HCF and EDCF, who

---

[6]   For a more specific discussion of Rabbi Friedman's affidavit, see Doc. 175 at 4-5.

discuss their observations about preparation of CRD meals at those facilities. Plaintiff has not offered testimony of a rabbi or an expert on Jewish dietary practices to support his claims that the processes utilized by Aramark violate Kosher dietary laws. Nor is Plaintiff himself a rabbi, and he has offered no evidence that he or anyone providing an affidavit on his behalf has rabbinical training.

### C.   The Lawsuit

Plaintiff filed suit while incarcerated at LCF. He was later transferred to EDCF, HCF, EDCF, LCF, and back to EDCF. He filed his third amended complaint while at HCF. As stated above, Plaintiff's third amended complaint asserts § 1983 and RLUIPA claims against Defendants. He alleges that Defendants created and enforced the policy and procedure by which the CRD meals are prepared and food is handled in the facilities where Plaintiff has been housed. Plaintiff seeks $200 in damages, $77,000 in punitive damages, costs of this suit, a declaratory judgment that Defendants are violating his rights, and a permanent injunction directing Defendants to provide Kosher meals conforming with Jewish dietary laws. Plaintiff wants his meals served still sealed (like "TV dinners"), pre-packaged, and visibly marked Kosher. Alternatively, the Kosher meals should be prepared in a separate room, and any utensils or tools used to prepare them must be kept and cleaned separately.

The Court dismissed Plaintiff's RLUIPA claims against Defendants in their individual capacities because RLUIPA does not create a cause of action for individual-capacity claims. Doc. 90 at 13. The Court found that, to the extent Plaintiff seeks money damages or a declaration from the Court that Defendant Berry violated his rights in the past (in her official capacity), relief is barred by the Eleventh Amendment. *Id.* at 8. The Court dismissed Plaintiff's claims for failure to

supervise subordinates. *Id.* His claims remain that Defendants intentionally created, promulgated, implemented, or were otherwise responsible for the CRD menu and its food preparation. *Id.* at 10.

## II.   STANDARD

Summary judgment is appropriate where the moving party demonstrates that "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, courts must view the facts and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.   ANALYSIS

As discussed above, Defendants seek summary judgment on each of the remaining claims asserted against them. Doc. 176. The Court determines that:

- The Court lacks jurisdiction for <u>all</u> claims seeking prospective relief;

- Plaintiff failed to exhaust his claims for damages at HCF and EDCF; and

- Plaintiff fails to demonstrate a genuine issue of material fact with respect to his § 1983 claim for damages against Defendants Aramark, Church, and Dockendorff, based on meal preparation at LCF and the CRD policy.

### A.   Jurisdiction (Standing and Mootness)

The first issue the Court addresses is its jurisdiction over all remaining claims for prospective relief. In this Court's Order dated May 12, 2020, the Court noted that it initially appeared that Plaintiff was no longer requesting or receiving meals under the CRD. But, contrary

to this fact propounded by Defendants, Plaintiff filed a document suggesting that he had, indeed, requested meals under the CRD at his current correctional facility (at the time, EDCF).

Now, Defendants have adduced additional evidence showing that Plaintiff was transferred from EDCF after last requesting meals under the CRD. Although he now resides at EDCF again, this time, Plaintiff has not requested a religious diet. KDOC policy requires that a prisoner renew a request to be placed on a religious diet at each new facility. IMPP 10-110D, § V.2. The Court therefore turns again to its jurisdiction to offer prospective relief.

Article III of the Constitution specifically limits the jurisdiction of federal courts to cases and controversies. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The case or controversy limitation requires that a plaintiff have standing." *United States v. Colo. Sup. Ct.*, 87 F.3d 1161, 1164 (10th Cir. 1996); *see also Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1091 (D. Kan. 2015) ("One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing."). But standing is determined "as of the commencement of suit . . . ." *Lujan*, 504 U.S. at 570 n.5; *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154-55 (10th Cir. 2005). This is not to say that the case-or-controversy requirement ends after commencement; a plaintiff must establish that he has suffered an injury-in-fact throughout the litigation. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (citations omitted). If subsequent events impact whether an actual controversy remains, courts evaluate their continuing jurisdiction under mootness principles. *Prior v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006). Either way, the question is one of a court's jurisdiction.

In this case, Plaintiff filed his original complaint on January 26, 2016. At that time, Plaintiff was housed at LCF, had applied to receive the CRD at LCF, and brought claims about the CRD at LCF. Doc. 1. At commencement, Plaintiff had standing to bring his claims.

The current operative complaint, however, is Plaintiff's third amended complaint. Doc. 56. Plaintiff filed this complaint on June 14, 2017. Before filing, Plaintiff had been moved to EDCF and to HCF (but not yet back to his current location, EDCF). He was at HCF when he filed the third amended complaint and alleged constitutional and RLUIPA violations at all three facilities. The question, then, becomes one of mootness: Did Plaintiff's transfers and his actions or inaction after those transfers remove the actual controversy before the Court?[7] For some of Plaintiff's claims, the answer is yes.

Against the backdrop of these well-established legal principles, the Court has reviewed the record presented by the parties. These facts are uncontroverted:

- Plaintiff was housed at LCF when he filed this lawsuit and remained there until his transfer to EDCF on June 16, 2016. While at LCF, Plaintiff applied for and was approved to receive CRD meals.

- Plaintiff was housed at EDCF from June 16, 2016 until his transfer to HCF on March 22, 2017. Plaintiff has not pointed to any evidence in the record indicating that he requested to receive the CRD during this time at EDCF or that Plaintiff ate CRD meals during this time.

- Plaintiff was housed at HCF from March 22, 2017 to January 29, 2018. While at HCF, Plaintiff applied for a religious diet. His request was initially granted, but then denied. Plaintiff was not eligible to receive the CRD while at HCF because he was on a medical diet. Plaintiff does not allege that he consumed any CRD meals while at HCF.

- Plaintiff was housed at EDCF from January 29, 2018 to May 16, 2019. During that time, on April 11, 2019, plaintiff was apparently approved for the CRD at EDCF.

---

[7] As the Court noted in its Order entered May 12, 2020, it is at least arguable that the Court should consider Plaintiff's standing to bring new claims in the third amended complaint instead of the original complaint—particularly when one of the questions is whether Plaintiff has suffered injury-in-fact from a new claim, not whether he continues to suffer injury-in-fact from an old claim. *Compare Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended."), *with In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000) ("[I]n cases where a plaintiff has filed an amended complaint, federal courts must resolve questions of subject matter jurisdiction by examining the face of the amended complaint."). But again, while this dichotomy raises an interesting question, ultimately, the central question is whether this Court has jurisdiction over Plaintiff's claims. And, once again, the Court believes it can answer that question without expounding at length on whether standing or mootness is the appropriate doctrine to apply here.

- From May 16, 2019 to June 18, 2019, Plaintiff was housed at LCF. There is no evidence that he applied for a religious diet while there.

- Plaintiff is currently housed at EDCF and has been since June 18, 2019. Plaintiff has not applied for the religious diet since being returned to EDCF.[8]

- Requests for religious diets are handled on a facility-by-facility basis. IMPP 10-110D, Section V.B.2. provides, "Even if the particular request for accommodation has been previously approved within KDOC, the request for accommodation shall be forwarded to the Religious Programs Coordinator for review, who shall, at a minimum, confirm that the particular request has been previously accommodated at another facility within KDOC, and in what manner and under what circumstances." Doc. 56 at 50.

Based on these facts, Plaintiff lacks standing to sue for prospective relief about the CRD (either its composition or its execution) because he is no longer under the CRD. Because Plaintiff is no longer subjected to the policies of the CRD, there is no case or controversy for this Court to decide, other than Plaintiff's request for damages for past wrongs. Plaintiff is no longer suffering an injury-in-fact,[9] and the Court lacks jurisdiction over all claims for prospective relief.

## B.    Exhaustion of Administrative Remedies

The Prison Reform Litigation Reform Act ("PLRA") prohibits prisoners from bringing a suit regarding prison conditions until administrative remedies are exhausted.[10]  42 U.S.C.

---

[8]  Plaintiff attempts to controvert this fact by stating that he requested Kosher meals and was placed on the CRD. Plaintiff has, at times, requested Kosher meals and been placed on the CRD. But the evidence Plaintiff cites does not indicate that, during this stay at EDCF, Plaintiff requested to be placed on a religious diet. Instead, he has been receiving non-Kosher, regular menu items at EDCF.

[9]  Plaintiff never was under the CRD at HCF, so he has not suffered injury-in-fact there at all.

[10]  The exhaustion requirement applies to both claims against prison-parties, as well as claims against prison-contractor parties. *Bradley v. Crowther*, 2017 WL 4325804, at *5, n.36 (D. Utah 2017) (citing *Fontenot v. Glob. Expertise In Outsourcing*, 232 F. App'x 393, 394 (5th Cir. 2007); *Martinez v. Guadalupe Cty.*, 200 F. Supp. 3d 1216, 1261 (D.N.M. 2016); *Chandler v. C.C.S. Med. Servs.*, 2016 WL 8453025, at *2 (D. Vt. 2016), report and recommendation adopted, 2016 WL 4491763 (D. Vt. 2016) ("First, it is well established that the PLRA applies to prison contractors like CCS.") (collecting cases)); *see, e.g., Smart v. Dep't of Corr. for Queen Anne's Cty.*, 2019 WL 3997128, at *5 (D. Md. 2019) (dismissing Aramark for failure to exhaust). The requirement is that the suit be related to prison conditions—not that the defendants be the correctional facility or its employees.

§ 1997e(a). In a functioning grievance process, there is no exception for alleged futility. *See Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).[11]

The documentation for Plaintiff's grievance process in this case can be found in the *Martinez* report. *See* Doc. 41-7. When read liberally, as required, Plaintiff's administrative claim concerns the meal service at LCF and includes the Kosher status of CRD meal items. *See id.* at 3-4. Plaintiff has not pursued the grievance process at HCF or EDCF, explaining "To require the plaintiff to file three different grievances then exhaust administrative remedies and then file three separate civil actions for the same exact violations of his right to religious practice would be highly prejudicial, would cause an undue burden upon him financially as each lawsuit cost $350.00 . . . ." Doc. 185 at 17. To the extent Plaintiff bases his claims on the method of meal service at HCF and EDCF, rather than Aramark policies relevant to the CRD, he must first give Aramark the opportunity to address his new grievances.[12]

Plaintiff's claims regarding the meal service and kitchen conditions at HCF and EDCF are unexhausted, and the Court dismisses them without prejudice.[13] *See Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (noting that dismissal of claims based on failure to exhaust should normally be without prejudice).

**C.**   **Remaining Claims: § 1983 Claims for Damages Against Defendants Aramark, Dockendorff (Individual Capacity), and Church (Individual Capacity) Based on Meal Preparation at LCF and the CRD Policy**

---

[11]   Although the Supreme Court has identified rare exceptions to statutory exhaustion, none apply here. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016).

[12]   Plaintiff states in his response brief that he "would like to clarify to the court that he is only bringing claims against the policy and procedure for the (CRD) and the policy makers of the (CRD)." Doc. 185 at 16. Yet, Plaintiff still details his observations at each facility individually. It is somewhat unclear to the Court whether Plaintiff still intends to challenge meal preparation at each facility, but to the extent that he still mounts this challenge, he may not do so without exhausting his claims.

[13]   Of course, the Court has already dismissed some of these claims based on jurisdiction, but failure to exhaust serves as an alternative basis for dismissal.

To show that Defendants violated Plaintiff's constitutional right to free exercise, Plaintiff must show a substantial burden on his exercise of a sincerely-held religious belief. *Id.* at 1069-70. The Tenth Circuit has repeatedly "recognized that an inmate's right to free exercise of religion includes the right to a diet that conforms with their religious beliefs." *Id.* at 1070. And Plaintiff must show that Defendants' actions constituted conscious[14] or intentional interference with his free exercise rights; isolated acts of negligence are insufficient. *Id.*

Plaintiff has submitted countless conclusory allegations about what he believes is required for a Kosher diet and how Defendants have failed to provide it to him. In many instances, Plaintiff neglected to provide any citation to the record.[15] In other instances, Plaintiff provided a citation that is lengthy and broad—not a reference to a particular part of the record materials.[16] Rule 56(c) requires citation to "particular parts of materials in the record." And Plaintiff also cites to inadmissible hearsay for much of his evidence about how CRD meals were prepared at LCF— relying on out-of-court conversations with other inmates.[17] None of this is proper for the Court to consider on a motion for summary judgment.

In contrast, Defendants submitted their policies and procedures and accompanying evidence from rabbinical authority explaining why the policies and procedures comply with Jewish dietary law. The evidence shows that if there were times at LCF that the CRD meal was not Kosher, it was the result of incidental negligence and not conscious or intentional interference with

---

[14]   Note that use of the "conscious interference" has been called into question by the Tenth Circuit. *Ralston v. Cannon*, 884 F.3d 1060, 1063 n.3 (10th Cir. 2018). The Court need not address whether "conscious interference" is enough to show a constitutional deprivation because Plaintiff fails to produce any admissible evidence that would suggest any interference by Defendants was conscious <u>or</u> intentional. <u>At most</u>, Plaintiff has provided evidence of isolated negligent acts.

[15]   Examples include Doc. 185 at 3 ¶¶ 7 & 20; 4 ¶ 23; 5 ¶ 66.

[16]   Examples include Doc. 185 at 3 ¶¶ 4, 12, 15, & 18; 4 ¶¶ 31-32 & 37-41. These paragraphs, as well as others, cite the entirety of multiple exhibits.

[17]   Examples include Doc. 185 at 9 ¶¶ 19-20; 10 ¶ 47; 11 ¶ 60.

Plaintiff's right to the free exercise of his religion. And by seeking rabbinical review and approval of CRD menus and procedures in advance, Defendants have further demonstrated that any interference was neither conscious nor intentional. Moreover, importantly for claims against Aramark and its employees, it was KDOC and Rabbi Friedman who were responsible for approving the CRD menus and denying any request by Plaintiff for a "TV dinner" as his Kosher meal. For liability under § 1983, it must be a defendant's <u>own</u> action, policy, or custom that violates a plaintiff's rights. Aramark and its employees provided Plaintiff CRD meals as specified in its contract with KDOC. They could not have consciously or intentionally interfered with Plaintiff's right to free exercise when they were acting pursuant to contract and lacked the authority to alter Plaintiff's meal plan.

Courts that have permitted prison meal-related free exercise claims to proceed have done so when the prison or contractor has (1) charged a fee to inmates for Kosher meals;[18] (2) provided one Kosher meal per day, but only allowed potentially non-Kosher "vegetarian or pork-free meals" for the other two meals;[19] or (3) failed to contract with approved halal vendors from which it would purchase conforming food for Muslims inmates.[20]

These situations are a far cry from the admissible evidence the Court has before it about Defendants' actions. The uncontroverted evidence shows that Defendants offer Kosher meals to inmates without charge. It further shows that Defendants have procedures in place to ensure that CRD meals are prepared in accord with Jewish dietary practices. Plaintiff's personal "investigation" into Defendants' preparation practices does not reveal any conscious or intentional interference with Plaintiff's right to receive Kosher meals if he properly requests them following

---

[18] *See, e.g., Beerheide v. Suthers*, 286 F.3d 1179, 1192 (10th Cir. 2002).

[19] *See, e.g., Ashelman v. Wawrzaszek*, 111 F.3d 674, 676, 678 (9th Cir. 1997).

[20] *See, e.g., Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317-18 (10th Cir. 2010).

KDOC policy. At most, the admissible evidence may show isolated acts of negligence by workers at LCF. But even if the Court accepts Plaintiff's personal observations of alleged violations as true (for example, on one occasion, he saw cockroaches on a "steam well" that was used to serve the CRD at LCF), the violations do not show that Defendants—who were not present at the time— exhibited a conscious or intentional interference with Plaintiff's free exercise of religion. No reasonable jury could conclude otherwise, so summary judgment is appropriate.

## IV.    CONCLUSION

As a result of the rulings in this Order, Plaintiff has no viable claims remaining against any Defendants in this case. The Court lacks jurisdiction over some of Plaintiff's claims, some must be dismissed without prejudice for failure to exhaust, and others lack evidentiary support. Plaintiff is not entitled to "TV dinners" from KDOC or Aramark and is not entitled to compensation for Defendants' use of the CRD menu to provide Kosher meals for inmates following Jewish dietary laws.

THE COURT THEREFORE ORDERS that Defendants' motion for summary judgment (Doc. 176) is GRANTED. The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiff. The case is closed.

IT IS SO ORDERED.

Dated: October 2, 2020                    /s/  Holly L. Teeter
                                          HOLLY L. TEETER
                                          UNITED STATES DISTRICT JUDGE

Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

DERON MCCOY, JR.,              )
                              )
            Plaintiff,         )
                              )
v.                            )        Case No. 16-3027-CM-KGG
                              )
ARAMARK CORRECTIONAL           )
SERVICES, et al,               )
                              )
            Defendants.        )
_____)

### MEMORANDOM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Patricia Berry, by and through counsel, Assistant Attorneys General Natasha M. Carter and M.J. Willoughby, and in accordance with D. Kan. 7.1(a) and D. Kan. 7.6, submits this Memorandum in Support of her Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. The Notice required by D. Kan. 56.1(f) is also being provided herewith. Because there is no genuine issue of material fact that the meals served at Lansing, Hutchinson and El Dorado Correctional Facilities are kosher and because Defendant Berry is entitled to judgment as a matter of law, Defendant Berry respectfully requests that her motion be granted, stating the following in support.

### NATURE OF THE CASE

The Plaintiff is an inmate currently housed at El Dorado Correctional Facility ("EDCF"). (Doc. 108-1 at 2). Plaintiff filed his Third Amended Complaint on June 14, 2017, styling it as a civil rights complaint pursuant to 42 U.S.C. § 1983, but also invoking jurisdiction on the basis of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (Doc. 56). The Court dismissed the § 1983 claim against Berry in her official capacity and for any retroactive relief and dismissed the RLUIPA claims. (Doc. 90). The general requirements of kosher food service

require the use of food products that are kosher certified, utensils, pots, and pans that are designated for kosher food preparation only, and the cleaning of items separately from non-kosher food items. Kosher food items must also be stored, prepared, and served separately from non-kosher food items. Plaintiff alleges that Defendant Berry, a contract manager for the Kansas Department of Corrections ("KDOC"), violated his right to exercise his religious beliefs under the First Amendment by implementing a certified religious meal ("CRD") menu he alleges does not comply with Jewish dietary laws regarding source, storage, preparation, and service. Plaintiff further alleges he has a right to have his kosher food served as a sealed, TV-style dinner.

## STATEMENT OF FACTS

As per D. Kan. 56.1(a), the following is a concise statement of material facts as to which no genuine issue exists:

1.       Plaintiff is currently housed at EDCF. (Doc. 108-1 at 2).

2.       Aramark Correctional Services is a food service contractor for KDOC and is responsible for developing and implementing menus for the foods that inmates are served at KDOC. (Declaration of Pat Berry, ¶ 4, Exhibit A hereto ("Berry Dec."); Copy of Aramark Contract attached as Berry Exhibit 1 at 5, ¶ 7).

3.       The relevant provision as to CRD in the Aramark Contract states: : "…[Aramark] shall provide other special diets as mutually agreed upon by [Aramark] and the [KDOC to include, but not limited to a certified religious diet and certain standardized medical diets. [Aramark] shall be responsible for obtaining review of the certified religious diet by appropriate religious advisor to insure that the diet meets the requirements of a certified religious diet as defined by the [KDOC], and shall provide proof of the review to the [KDOC]. (Berry Dec., at ¶¶ 4, 9, Aramark Contract. Berry Exh. 1 at 5, ¶ 7).

4.      Aramark is responsible for all aspects of food preparation and service at all KDOC
facilities, including staffing and supervising food service, including inmate labor. (Berry Dec., at
¶ 4; Berry Exh. 1 at 1, ¶ 1, 12, ¶ 37).

5.      Aramark has policies in place to ensure the CRD is correctly implemented. These
policies are periodically reviewed and approved by Aramark's religious authority, Rabbi Fellig.
(Berry Dec., at ¶¶ 9, 20, Copy of Aramark's Preparing a Kosher Environment attached as Berry
Exh. 6).

### Facts regarding Lansing Correctional Facility ("LCF")

6.      Plaintiff was housed at LCF from October 2, 2012, to June 16, 2016. (Doc. 41 at
2).

7.      On January 22, 2014, Plaintiff changed his religious preference from Protestant to
Assembly of Yahweh. (Affidavit of Don Almond, Doc. 41-2, Ex. B at ¶ 3). Plaintiff was added to
the religious meals roster at that time. *Id.*

8.      On August 24, 2014, Plaintiff changed his religious preference from Assembly of
Yahweh to Judaism. (*Id.* at ¶ 5).

9.      Plaintiff has eaten non-kosher food/consumed non-kosher commissary items
continuously throughout his incarceration. (Docs. 98-7, 98-8).

10.     Evan Hitchcock is employed by Aramark as the General Manager/Regional Safety
Leader at LCF. His job duties include, in part, training, managing performance, and directing and
overseeing operations related to food service. (Affidavit of Evan Hitchcock, at ¶¶ 2-3 (hereinafter,
"Hitchcock Aff."), attached hereto as Exhibit B).

11.     The CRD menus used for male inmates in 2014 and 2015 provided kosher items.
(Doc. 41-3, Ex. C at 3-7). The CRD menus contain a signature of approval by Aramark's religious

3

authority, Rabbi Fellig. *Id.* Under Rabbi Fellig's signature it states: "This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such cannot confirm that each meal being served is Kosher." *Id.*

12.　　All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes and Aramark maintains certificates for these food items verifying they are kosher-certified. (Hitchcock Aff., at ¶¶ 18-19; Berry Dec., at ¶ 16(a); Ex. 2 to Berry Dec. to be filed conventionally with leave of Court).

13.　　All entrée items used in the CRD arrive at LCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (Hitchcock Aff., at ¶¶ 20-21; Ex. 1-2 to Hitchcock Aff.).

14.　　CRD entree items have kosher symbols on the outer bulk packaging. (Hitchcock Aff., at ¶ 20; Ex.61-62 to Hitchcock Affidavit; Declaration of Rabbi Ben Friedman, at ¶ 7 (hereinafter, "Friedman Dec."), attached hereto as Exhibit C).

15.　　The sliced bread and milk do not maintain kosher symbols on the individual packaging. (Friedman Dec.at ¶ 7). Aramark maintains certificates verifying they are in fact kosher. *Id.* The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id.*

16.　　CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark supervisors. (Hitchcock Aff. at ¶¶ 45-46; Friedman Dec., at ¶ 20; Ex. 2 to Friedman Dec.).

17.     LCF maintains a separate CRD-designated room for the preparation, service, and cleaning of CRD menu items. Only authorized staff are allowed into the locked CRD-designated room. (Hitchcock Aff., at ¶¶ 6-9; Ex. 10-13, 15-28 to Hitchcock Aff.; Friedman Dec., at ¶ 12).

18.     The CRD-designated room contains a sink in which all CRD-related items are cleaned and sanitized. (Hitchcock Aff., at ¶¶ 6-9; Ex. 20, 27 to Hitchcock Aff.; Friedman Dec.at ¶ 12).

19.     Following the service of the CRD meals, CRD trays are collected, disposable utensils are discarded, and there is one tub used for collection of the dirty CRD trays after the meal. (Hitchcock Aff., at ¶¶ 33-34).

20.     It is not a violation of kosher dietary laws for CRD designated and non-CRD designated trays to pass through the same tray slot after use, or to be dumped in the same trash. Friedman Dec., at ¶ 19.

21.     LCF utilizes a steam kettle and oven for the preparation of warm CRD food. (Hitchcock Aff., at ¶ 27; Ex. 35-36, 39 to Hitchcock Aff.).

22.     No stovetops are used in the preparation of CRD food. (Hitchcock Aff. at ¶ 25).

23.     CRD-designated trays are used for serving the CRD menu, differentiated by color. (Hitchcock Aff.at ¶ 29; Ex. 24 to Hitchcock Aff.; Friedman Dec. at ¶ 8).

24.     CRD meal trays for general population inmates are purple and not insulated. General population trays for all diets other than CRD are tan and not insulated. (Hitchcock Aff., at ¶ 30; Ex. 24 to Hitchcock Aff.).

25.     Disposable sporks are used for CRD meals. (Hitchcock Aff.at ¶ 32; Ex. 66-67 to Hitchcock Aff.; Friedman Dec. at ¶ 8).

26.     CRD-designated utensils are used for the service of the CRD menu. These utensils are distinguishable by two holes in the handle and are kept in a locked cabinet accessible only by Aramark supervisors. (Hitchcock Aff., at ¶¶ 10-12; Ex. 14-15 to Hitchcock Aff.; Friedman Dec., at ¶ 10).

27.     CRD-designated cookware is distinguishable by a black Teflon coating on the inside of the pan. Pans used for the regular menu food do not have the black Teflon coating. (Hitchcock Aff., at ¶¶ 13-14; Ex. 32, 37 to Hitchcock Aff.; Friedman Dec., at ¶ 8).

28.     When not in use, the cookware used in preparation of the CRD is stored in the CRD-designated room. (Hitchock Aff., at ¶ 15; Friedman Dec., at ¶ 8).

29.     The cookware and other CRD-designated tools are not used to prepare regular meal items. (Hitchcock Aff., at ¶ 13; Friedman Dec. at ¶ 8)

30.     The CRD for general population inmates is plated on a separate area of the kitchen line. CRD food is plated and served prior to regular menu items. CRD food does not come into contact with non-CRD menu items. (Hitchcock Aff., at ¶¶ 25-29; Ex. 58-60 to Hitchcock Aff.; Friedman Dec. at ¶ 18).

31.     Following service of the CRD meal, CRD-designated trays are collected and the disposable utensils are discarded. (Hitchcock Aff., at ¶ 33).

32.     CRD trays are collected in a plastic tub and are taken to the CRD-designated sinks to be washed and sanitized. (Hitchcock Aff., at ¶¶ 34-35).

33.     CRD meal trays for inmates in segregation are differentiated by color and stored separately from trays used for serving regular menu meals. (Hitchcock Aff., at ¶ 37).

34.     Segregation meal trays for the CRD are tan/yellow and are insulated. Segregation meal trays used for the other menus are brown or gray. (Hitchcock Aff., at ¶ 38).

35.     CRD meals for inmates in segregation are prepared on the CRD-designated table and stacked in a separate area of the food warmer. (Hitchcock Aff., at ¶¶ 39-40).

36.     The CRD has a dedicated steam table only used for service of the CRD meals. (*Martinez* Report, Doc. 41 at 4; Affidavit of Randall Singletary, Doc. 41-6, Ex. F at ¶ 6).

37.     Menu items used in the CRD are stored separately from non-CRD food items, in separate areas of the warehouse or dry storage room. (*Martinez* Report, Doc. 41 at 4; Hitchcock Aff.at ¶¶ 21-22; Ex. 1-2, 61 to Hitchcock Aff.; Affidavit of Randall Singletary, Doc. 41-6, Ex. F at ¶ 3; Friedman Dec., at ¶ 6).

38.     CRD-designated trays, cooking utensils, and pots and pans are washed and stored separately from non-CRD items. (Hitchcock Aff., at ¶¶ 29, 37, 43-44; Friedman Dec., at ¶ 8).

39.     Once an inmate food service worker is assigned to assist in CRD meal preparation, he is trained in proper preparation of kosher meals. (Hitchcock Aff., at ¶ 45).

40.     The training document is signed by both the inmate food service worker and the Aramark trainer. (Hitchcock Aff., at ¶ 15).

41.     Defendant Pat Berry is contract manager for KDOC. In that capacity, Ms. Berry reviews each approved menu, monitors contract requirements, prepares and processes contract amendments, and conducts food service operation inspections. (Declaration of Pat Berry, Ex. A at ¶¶ 2-3).

42.     Ms. Berry is not present for day-to-day food preparation and service at LCF. None of the food service employees at LCF are KDOC employees. (Berry Dec., at ¶¶ 6-7).

43.     Ms. Berry periodically conducts inspections of Aramark's delivery of food services at LCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶¶ 13-14).

44.     Ms. Berry periodically conducts inspections of Aramark's delivery of food services at LCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶ 10).

45.     Ms. Berry's February 24, 2014, July 22, 2014, December 18, 2014, and September 30, 2015 audit inspections of LCF's food services found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices, and that pest control was evident and pest control procedure was maintained. (Berry Dec., at ¶ 13).

46.     On July 3, 2014 Ms. Berry conducted an unannounced cite visit at LCF as a result of concerns expressed by facility management by a facility lockdown. During this inspection, she found additional food stored in the CRD cooler as the pass through cooler on the front line was not working. No other issues regarding the preparation, serving or storage of the CRD were observed. (Berry Dec. at ¶ 14).

### Facts regarding Hutchinson Correctional Facility ("HCF")

47.     Plaintiff was housed at HCF from March 22, 2017 to January 29, 2018. (Doc. 94-1 at 3).

48.     Plaintiff was not eligible to receive the CRD while housed at HCF because he was on a medical diet. (Declaration of Sue Stoecklein, at ¶ 5, attached hereto as Ex. D).

49.     Michael Buch is employed by Aramark as the Assistant Food Service Director at HCF. His job duties include, in part, training, managing performance, and directing and overseeing operations related to food service. (Affidavit of Michael Buch, at ¶ 3, attached hereto as Ex. E, hereinafter "Buch Aff.").

50.     The CRD menus for 2017 provided kosher items. (*Martinez* Report filed in *Jefferson v. Aramark Corr. Serv.,* No. 17-CV-3161-SAC-DJW, Doc. 34-4, Ex. 4 at 1-5, subject to judicial notice as per Fed. R. Evid. 201, cited items to be provided to Plaintiff). The CRD menu

contains a signature of approval by Aramark's religious authority, Rabbi Fellig. *Id.* Under Rabbi

Fellig's signature it states: "This menu, its meal components and preparation processes follow

Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and

as such cannot confirm that each meal being served is Kosher." *Id.*

51.     The CRD menus for 2018 provide Kosher items. (Berry Dec., at ¶¶ 16, 19 Copy of

2018 Aramark menus attached as Berry Exhibit 5). The CRD menu contains a signature of

approval by Aramark's religious authority, Rabbi Fellig. *Id.* Under Rabbi Fellig's signature it

states: "This menu, its meal components and preparation processes follow Jewish dietary laws. It

is understood that I am not overseeing the preparation of these meals and as such cannot confirm

that each meal being served is Kosher." *Id.*

52.     The following provisions appear on each menu: "Follow all kosher preparation

instructions in recipes for Entrees, Starches, and Salads. Utensils used for scooping, cooking and

serving must be dedicated for kosher food use ONLY and stored in a special area. Serve meal on

disposable or designated kosher tray with disposable or kosher only tableware." *Id.*

53.     All food used in the preparation of the CRD menu is sourced from manufacturers

that use kosher manufacturing processes and Aramark maintains certificates for these food items

verifying they are kosher-certified. (Buch Aff., at ¶¶ 18-19).

54.     All entrée items used in the CRD arrive at HCF factory sealed, are portioned out of

bulk boxes, and are stored on separate shelving units from non-CRD food. (Buch Aff., at ¶ 20;

*Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 109-110, 113-116).

55.     CRD entree items have kosher symbols on the outer bulk packaging. (Friedman

Dec., at ¶ 7; *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 78-83).

56.     The sliced bread and milk do not have kosher symbols on the individual packaging. (Friedman Dec., at ¶ 7). Aramark maintains certificates verifying they are in fact kosher. *Id.* The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id.*

57.     CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark supervisors. (Buch Aff., at ¶ 3; Berry Dec., at ¶ 20).

58.     HCF maintains a separate CRD-designated room for the preparation, service, and cleaning of CRD menu items. Only authorized staff are allowed into the locked CRD-designated room. (Buch Aff., at ¶¶ 6-8; *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 74-75).

59.     The CRD-designated room contains several sinks in which all CRD-related items are cleaned and sanitized. (Buch Aff.at ¶ 8; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 68-71, 73).

60.     HCF utilizes a separate stove and oven for the preparation of warm CRD food. (Buch Aff., Ex. E at ¶ 21; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 64-67).

61.     No steam kettles are used in the preparation of CRD food. (Buch Aff.at ¶ 22).

62.     CRD-designated trays are used for serving the CRD menu, differentiated by color. (Buch Aff., at ¶¶ 23-24, 30, 38; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 106, 119-21).

63.     HCF utilizes disposable eating utensils for CRD meals. (Friedman Dec., at ¶ 7; Berry Dec.at ¶ 18).

64.     CRD-designated cooking utensils are used for the service of the CRD menu. These utensils are engraved with a "K" and are kept in a locked cabinet accessible only by Aramark

Case 5:21-cv-03269-SAC-DJW   Document 135   Filed 06/15/22   Page 11 of 47

supervisors. Usage of these utensils is noted in the log book by Aramark supervisors. (Buch Aff., at ¶¶ 10-14; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 122-25, 128-29; Friedman Dec. at ¶ 10).

65.     The CRD for general population inmates is plated in a separate area of the kitchen line and is delivered to the inmate in the dining hall. CRD trays do not pass through the same line as non-CRD trays. (Buch Aff., at ¶¶ 25-29; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 103-07; Friedman Dec., at ¶ 18).

66.     CRD meals for inmates in segregation are prepared in the CRD-designated room and stacked in a separate area of the food warmer. (Buch Aff. at ¶¶ 32, 34-35; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 131-33).

67.     Menu items used in the CRD are stored separately from non-CRD food items. (Affidavit of Michael Buch, Ex. E at ¶ 16; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 109-10, 114-16; Friedman Dec., at ¶ 6).

68.     CRD-designated trays, utensils, and pots and pans are washed and stored separately from non-CRD items. (Buch Aff.at ¶¶ 15, 23, 30, 38, 42; *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34,, Ex. 126-27; Friedman Dec. at ¶¶ 8, 10).

69.     Defendant Pat Berry is contract manager for KDOC. In that capacity, Ms. Berry reviews each approved menu, monitors contract requirements, prepares and processes contract amendments, and conducts food service operation inspections. (Berry Dec., at ¶ 3).

70.     Ms. Berry is not present for day-to-day food preparation and service at HCF. None of the food service employees at HCF are KDOC employees. (Berry Dec., at ¶¶ 6-7).

71.     Ms. Berry periodically conducts inspections of Aramark's delivery of food services at HCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶ 10). On September 6,

2017, Ms. Berry conducted an audit inspection of HCF's food services and found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices. (Berry Dec., at ¶ 12).

72.      On May 1, 2018, Ms. Berry conducted an audit inspection at HCF and found that authorized menus were being used. *Id.*

73.      On November 1, 2018, Ms. Berry conducted an audit inspection at HCF and found that the kitchen had proper kosher food preparation practices. *Id.*

### *Facts regarding El Dorado Correctional Facility ("EDCF")*

74.      Plaintiff is currently housed at EDCF, and has been since January 29, 2018. (Doc. 98-1, at 3).

75.      Requests for religious diets are handled on a facility by facility basis. (Doc. 56, at p. 51 (IMPP 10-110D, § V.2)).

76.      Plaintiff had not requested to be on the religious diet at EDCF. Declaration of Jillian Cheever, Doc. 98-6, at ¶ 5, attached as Exhibit F hereto.

77.      The CRD menus for 2018 provide kosher items. (Berry Dec., at ¶¶ 16, 19; Copy of 2018 Aramark menus attached as Berry Exhibit 5). The CRD menu contains a signature of approval by Aramark's religious authority, Rabbi Fellig. *Id.* Under Rabbi Fellig's signature it states: "This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such cannot confirm that each meal being served is Kosher." *Id.*

78.      The following provisions appear on each menu: "Follow all kosher preparation instructions in recipes for Entrees, Starches, and Salads. Utensils used for scooping, cooking and

serving must be dedicated for kosher food use ONLY and stored in a special area. Serve meal on disposable or designated kosher tray with disposable or kosher only tableware." *Id.*

79.     All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes and Aramark maintains certificates for these food items verifying they are kosher-certified. (Berry Dec., at ¶ 16(a); Ex. 2 to Berry Declaration; Friedman Dec., at ¶ 7).

80.     All entrée items used in the CRD arrive at EDCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (Berry Dec., at ¶ 16(b); Ex. 22-24 to Berry Declaration).

81.     All CRD food items have kosher symbols either on the outer bulk packaging, or on the individual packaging. (Berry Dec., at ¶ 16(c)).

82.     The sliced bread and milk do not have Kosher symbols on the individual packaging. (Friedman Dec., at ¶ 7; Berry Dec., at ¶ 16(c); Ex. 3 to Berry Declaration). Aramark maintains certificates verifying they are in fact kosher. *Id.* The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id.*

83.     CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark supervisors. (Berry Dec., at ¶ 20; Ex. 5-6 to Berry Declaration).

84.     EDCF utilizes a separate oven for the preparation of warm CRD food, marked with a large red sign that reads "kosher only." (Berry Dec., at ¶ 16(d)). Ex. 15 to Berry Declaration).

85.     The stove is cleaned and sanitized prior to being used for the CRD. (Berry Dec., at ¶ 16(e)).

86.     No steam kettles are used in the preparation of CRD food. (Berry Dec., at ¶ 16(f)).

87.     EDCF utilizes disposable trays, cups, and sporks for all CRD meals. (Berry Dec., at ¶ 16(g); Ex. 31 to Berry Declaration).

88.     CRD-designated utensils are used for the service of the CRD menu. These utensils are engraved with a "K" and are kept in a locked cabinet accessible only by Aramark supervisors. Usage of these utensils is noted in the log book by Aramark supervisors. (Berry Dec., at ¶ 16(h); Ex. 1-8, 11 to Berry Declaration; Friedman Dec., at ¶ 10).

89.     The CRD for general population inmates is plated in a separate area of the kitchen line. (Berry Dec., at ¶ 16(i); Ex. 26-29 to Berry Declaration; Friedman Dec., at ¶ 18).

90.     Cold CRD items are prepared separately on a table wrapped in plastic. (Berry Dec., at ¶ 16(j); Ex. 17-19 to Berry Declaration).

91.     Warm CRD items are kept heated in a CRD-designated steam well. (Berry Dec., at ¶ 16(k); Ex. 20 to Berry Declaration).

92.     CRD meals for inmates in segregation are prepared in the CRD-designated area of the kitchen and stacked in a separate area of the food warmer after being wrapped in plastic. The CRD meals in the warmer do not touch non-CRD meals. (Berry Dec., at ¶ 16(l)).

93.     Menu items used in the CRD are stored separately from non-CRD food items. (Berry Dec., at ¶ 16(m); Ex. 22-24 to Berry Declaration; Friedman Dec., at ¶ 6).

94.     CRD-designated trays, utensils, and pots and pans are washed and stored separately from non-CRD items. (Berry Dec., at ¶ 16(n); Ex. 1-9 to Berry Declaration; Friedman Dec., at ¶¶ 8, 10).

95.     Defendant Pat Berry is contract manager for KDOC. In that capacity, Ms. Berry reviews each approved menu, monitors contract requirements, prepares and processes contract amendments, and conducts food service operation inspections. (Berry Dec., at ¶ 3).

96.    Ms. Berry is not present for day-to-day food preparation and service at EDCF. None of the food service employees at EDCF are KDOC employees. (Berry Dec., at ¶¶ 6-7).

97.    Ms. Berry periodically conducts inspections of Aramark's delivery of food services at EDCF, including Aramark's delivery of the CRD menu. (Berry Dec., at ¶ 10). On February 27, 2018 and September 11, 2018, Ms. Berry conducted audit inspections of EDCF's food services and found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices. (Berry Dec., at ¶ 15).

## QUESTIONS PRESENTED

I.    Does Plaintiff have standing to challenge the CRD policies or are his claims moot?

II.    Has Plaintiff exhausted his administrative remedies at EDCF as required as to any claim that he may have that the CRD menu is insufficient to meet the requirements of Jewish dietary laws?

III.    Is Ms. Berry entitled to judgment on Plaintiff's claims under § 1983 because Ms. Berry did not personally participate in the alleged constitutional violations, if any?

IV.    Is Ms. Berry entitled to judgment on Plaintiff's claims under § 1983 because the Plaintiff's rights to religious exercise were not substantially burdened and any alleged violations appear to be isolated incidents of negligence, not actionable under § 1983?

V.    Is Ms. Berry entitled to qualified immunity?

## STANDARD OF REVIEW

### *Summary Judgment Standard*

Summary judgment is required under Rule 56 of the Federal Rules of Civil Procedure when pleadings, affidavits, and any discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To determine whether a genuine issue exists, courts will view evidence in the light most favorable to the nonmoving party and will accept only reasonable inferences. *See Allen v. Muskogee*, 119 F.3d 837, 839-40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Further, any factual dispute must be not only genuine – "such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) – but also material, as determined by substantive law, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). Where there is no genuine dispute of material fact regarding just one of the essential elements a plaintiff must prove, then summary judgment must issue in the defendant's favor. *See Sports Unlimited, Inc. v. Lankford Enterp., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (citing *Adler*, 144 F.3d at 671).

## ARGUMENTS AND AUTHORITIES

**I.      Plaintiff lacks standing to bring his claims regarding the CRD policies and procedures.**

Although Defendant Berry previously raised standing and mootness, jurisdiction is a continuous requirement. *See, e.g., Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)); *Tyler v. Kansas Lottery*, 14 F. Supp.

2d 1220 (D. Kan. 1998); *see generally, City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that although the Plaintiff Lyons alleged that he had been subjected to a chokehold during a traffic stop five months before, Plaintiff failed to establish that he was likely to suffer future injury from the use of chokeholds by police officers – that there was a real and immediate threat of this happening in the future, and thus, no jurisdiction existed for Plaintiff's 1983 claim). On summary judgment, the Court need not presume allegations in the Complaint to be true but rather may consider legal issues as they appear based upon the properly supported facts raised in a summary judgment motion.

As to Patricia Berry, a State Official, this Court has held that no retrospective relief is available, but rather that as to her, McCoy is limited to prospective declaratory and injunctive relief. (Doc. 90, at 8).  McCoy's claims based upon the allegedly non-kosher conditions he allegedly observed in the LCF kitchen in 2014, particularly as to any request for declaratory or injunctive relief, are moot, given his transfer to EDCF in June 2016. *Jordan v. Sosa,* 654 F.3d 1012, 1027-28 (10th Cir. 2011). Any order this Court could make regarding the conditions of confinement at LCF would not affect McCoy, who is no longer housed there and has not been for nearly two years and is essentially an advisory opinion; this is also true as to McCoy's vague allegations about HCF where he is also no longer housed. *Id.,* at 1033. This kind of retroactive relief barred by the Court's previous Order, as well as by the Eleventh Amendment to the U.S. Constitution. *See, e.g., Green v. Mansour,* 474 U.S. 64 (1985).

*Berryman v. Granholm,* No. 07-2081, 343 Fed. Appx. 1, 4, 2009 WL 2461099, **4-5 (6th Cir. Aug. 12, 2009), is on point. There, the Sixth Circuit affirmed the district court's ruling that a prisoner's claim for declaratory and injunctive relief under RILUPA after he was removed from the prison's Kosher Meal Program for purchasing non-Kosher items from the prison store became

moot when the prisoner was transferred to another facility (citing *Cardinal v. Metrish,* 564 F.3d

794, 798-99 (6th Cir. 2009) (citing *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir. 1996)).  Other courts

have followed suit, holding similar dietary-based claims were mooted by the inmate's transfer.

*See, e.g., Mares v. LePage,* No. 16-cv-0382-RBJ-NYW, 2018 WL 1312814 (D. Co. Mar. 13,

2018) (transfer to new facility mooted kosher meal claims against prior facility); *Bowers v.*

*Burnett,* No. 1:08-cv-469, 2011 WL 1047343, * 2 (W.D. Mich. Mar. 18, 2011) (citing *Berryman*

and *Kensu*); *see generally Opala v. Watt,* 454 F.3d 1154, 1159 (10th Cir. 2006) (citing *Wyoming*

*Sawmills, Inc. v. United States Forest Serv.*, 383 F.2d 1241 (10th Cir. 2004); *Glover River Org. v.*

*United States Dept. of Interior,* 675 F.3d 251 (10th Cir. 1982)).

     Similar to the situation in *Jordan v. Sosa,* KDOC religious programs are administered on

a facility-by-facility basis as per IMPP 10-110D, attached to McCoy's Third Amended Complaint.

An inmate must submit a request for accommodation of his or her religious practices at each new

facility, even if a similar prior request was approved at another facility. Doc. 56, at p. 51 (IMPP

10-110D, § V.2). Because religious accommodations are managed on a facility-by-facility basis,

somewhat similarly to the situation in *Jordan v. Sosa,* there is no "statewide" practice to enjoin.

     Alternatively, Plaintiff lacks standing to challenge the CRD policies and procedures at

EDCF because he has not requested to receive the CRD. *Burnett v. Oklahoma Dep't of Corr.,*

No. 17-6202, 2018 WL 2470909, at *4 (10th Cir. June 4, 2018) is on point. In *Burnett,* the Tenth

Circuit upheld the district court's dismissal of the plaintiff's RLUIPA claims based on lack of

standing. The plaintiff filed suit requesting an injunction ordering the Oklahoma Department of

Corrections to change its kosher diet policy that was allegedly violating his rights under

RLUIPA. *Id.* The district court found that plaintiff's rights were not being violated because he

had not requested the diet by submitting the required form. *Id.* The district court found that "[a]s

it now stands, [plaintiff] is not suffering an actual or continuing injury under the relevant policy." *Id.* Because plaintiff had not submitted himself to the policy, he lacked standing to challenge it. *Id.*; *see also Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997) (stating that "[a]s a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy") (cited with approval in *United States v. Hardman*, 297 F.3d 1116, 1121 (10th Cir. 2002)). Similarly, here, Plaintiff had not submitted himself to the CRD policies at EDCF and, therefore, lacks standing to challenge them. Further, it must be remembered that the reason Plaintiff advanced for requesting the pre-packaged meal was because of his concerns about the conditions in the LCF kitchen, conditions to which he is no longer subject, and the manner in which CRD meals were allegedly served to inmates other than himself in segregation at EDCF and HCF. This action should be dismissed for lack of jurisdiction.

## II.   Plaintiff Failed to Exhaust his Administrative Remedies at EDCF.

While Defendant Berry has previously raised an exhaustion argument, this argument may again be considered in light of the facts as developed on summary judgment, particularly where the facts as developed fully demonstrate that it is appropriate that an inmate complaining that a particular aspect of a facility's food-preparation operation renders the food non-kosher is depriving the facility of notice and the opportunity to correct any problems, the policies behind the exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 89-90 (2006).

The PLRA mandates that an inmate exhaust his administrative remedies prior to bringing a lawsuit regarding prison conditions. 42 U.S.C. § 1997e. The PLRA requires "proper exhaustion." *Woodford*, 548 U.S. at 93. However, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). "The statutory exhaustion requirements of § 1997e is mandatory, and the district court [is] not authorized

to dispense with it." *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003). The United States Supreme Court has "stress[ed] the point . . . that we will not read futility or other exceptions into [PLRA's] statutory exhaustion requirement where Congress has provided otherwise." *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Exhaustion is important for two main reasons. First, it protects "administrative agency authority" and gives the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled in federal court." *Woodford*, 548 U.S. at 89 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (internal quotation marks omitted)). Second, it "promotes efficiency." *Id.* Exhaustion allows adjudication of a dispute more quickly than federal court litigation and helps produce a useful record for potential litigation. *See id.* At the heart of exhaustion is the understanding that it gives "the agency a fair and full opportunity to adjudicate their claims." *Id.* at 90.

In Kansas, the first step for exhaustion of administrative remedies is to seek an informal resolution with personnel who work with the inmate on a daily basis and to document that attempted resolution. K.A.R. § 44-15-101(b). "If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections." *Sharrock v. Stephens*, No. 10-CV-3210-CM/SAC, 2011 WL 5526444, at *1 (D. Kan. Nov. 14, 2011), *as amended* (Nov. 15, 2011) (citing K.A.R. § 44-15-101(d)).

The Tenth Circuit has cautioned that "an inmate must properly comply with grievance procedures" and "substantial compliance" with the prison's grievance process is insufficient. *Fields v. Oklahoma State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007); *see also Jernigan v.*

*Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (holding the doctrine of substantial compliance is inapplicable to grievance procedure). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218. In *Jones*, the United States Supreme Court clarified that the contents of any grievance-related form must be robust enough "to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation." *Id.* at 219 (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004) (internal quotation marks omitted)); *see also Woodford*, 548 .S. at 90 ("[P]roper exhaustion of administrative remedies . . . means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).").

Plaintiff's original Complaint and First Amended Complaint indicated that he sought informal resolution with the Chaplain at LCF prior to filing a formal grievance on March 25, 2014. (Doc. 1, p. 13-14; Doc. 11, p. 13-14). According to the Complaint, the LCF Chaplain informed Plaintiff that the CRD diet was the only modified diet provided. (Doc. 1, p.13; Doc. 11; p.13). Plaintiff then appealed the denial of his formal grievance to the warden at LCF and the Secretary of Corrections. (Doc. 1, p.14; Doc. 11, p.14). In Plaintiff's Second Amended Complaint, he added handwritten language to the foregoing that stated "[t]he grievance at all levels concerned the (CRD) meal and meal components not being kosher, the trays not being one-use-trays, and the pots, pans and serving utensils not being stored, handled, & cleaned properly in order to be kosher and thus usable for serving." (Doc. 18, p.15). The same language appeared in Plaintiff's Third Amended Complaint. (Doc. 56, p.15).

21

While Plaintiff may have grieved his issues at LCF, there is no indication that he grieved his issues with his current facility, EDCF. Plaintiff's Third Amended Complaint does not refer to or attach any grievances relating to the modified religious diet at either HCF or EDCF. It appears the only grievance appeal received from Plaintiff on the religious/food issue was a single appeal regarding LCF. (Doc. 97-5). This is a critical problem because the nature and scope of Plaintiff's complaints regarding food preparation at EDCF have changed significantly since his allegations regarding LCF. In fact, Plaintiff makes no allegations regarding the actual preparation of the CRD meal, presumably because he had no personal knowledge of this process at EDCF. Instead, in the affidavit attached to the Third Amended Complaint, Plaintiff takes issue with how the CRD meals are served generally (although notably he does not speak in terms of his own CRD meals), and how CRD trays are stacked in warmers and on rolling carts for distribution with regular meal trays. (Doc. 56, p. 29). Likewise, Plaintiff is now concerned with how the trays are collected after the meal and stacked on top of one another. (Doc. 56, p. 30). Neither of these issues are present in the body of his Third Amended Complaint. (Doc. 56).

On the face of his Third Amended Complaint, it is apparent that Plaintiff failed to grieve the issues of which he now complains at EDCF, which has deprived EDCF and the KDOC Secretary of notice of Plaintiff's newly-asserted claims and an opportunity to address them at the agency level as opposed to in federal court litigation. *See Brewer v. Gilroy*, 625 Fed. App'x 827, 832 (10th Cir. 2015) (finding failure to assert claims in a grievance rendered them unexhausted). The food preparation/kitchen allegations that Plaintiff complained of at LCF are similarly non-existent in his affidavit regarding EDCF—those LCF claims should not be attributed to EDCF and any allegations about food preparation at EDCF are unexhausted.

Furthermore, Plaintiff's allegation that the CRD meals have no kosher symbols or kosher certification at EDCF is pure speculation, as he has provided no basis for his knowledge of this claim. As indicated elsewhere, Plaintiff has not pled that he requested kosher meals at EDCF or that he was approved to receive them, and the facts are to the contrary. Regardless, Plaintiff has failed to grieve such an allegation as it relates to EDCF for the same reasons addressed above.

Plaintiff's only acknowledgment of exhaustion pertains to 2014 and his conditions of confinement at LCF—those conditions are no longer at issue and Plaintiff has failed to grieve his conditions of confinement at EDCF. *See Patel v. Fleming*, 415 F.3d 1105, 1111 (10th Cir. 2005) (finding prisoner failed to exhaust administrative remedies when prisoner was transferred to another facility and failed to file timely grievance). Accordingly, judgment for Defendant Berry on these unexhausted claims regarding EDCF is warranted.

### IV. Defendant Berry is entitled to judgment because Defendant Berry did not personally participate in the alleged constitutional violations.

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (citation omitted); *see also Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). Here, Plaintiff has failed to show that Ms. Berry personally participated in the alleged constitutional violations in Plaintiff's Complaint. To the contrary, as the facts adduced at summary judgment show, Ms. Berry has reasonably and diligently carried out her role as contract compliance manager for the Aramark food service contract where Aramark has the responsibility for all aspects of food service operations at all KDOC facilities, including preparation and service of the food, storage and cleaning. Pat Berry is entitled to judgment on Plaintiff's generalized claims against her.

Case 5:21-cv-03269-SAC   Document 13   Filed 06/15/22   Page 24 of 47

### A.      Plaintiff's allegations are collective allegations that state nothing about Patricia Berry.

It is not enough for a plaintiff to allege generally that his constitutional rights "were violated" or to make the undifferentiated contention that "defendants" infringed his rights. *Pahls v. Thomas*, 718 F.3d 1210, 1225-26 (10th Cir. 2013). Rather, a plaintiff must make individualized allegations against each defendant that allow for "an individualized assessment of each defendant's conduct and culpability." *Id.* at 1233; *see also Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011); *Burnett v. Miller*, 631 F.App'x 591, 598 n.8 (10th Cir. 2015) (unpublished) ("Defendants ought not to be treated as fungible commodities. A plaintiff is required to identify specific acts or omissions by each defendant entitling him to relief as to that defendant.").

Here, Plaintiff's Complaint fails to specify what actions were taken by Ms. Berry in regards to the acquisition, storage, preparation, service and cleaning procedures of the CRD. It does not specify how Ms. Berry personally participated in the alleged inadequate supervision of the CRD program. Indeed, Ms. Berry did not and does not supervise kitchen staff during daily food service operations. Because Ms. Berry is not present within KDOC facilities on a daily, weekly, or even monthly basis, it is not even plausible there were specific acts or omissions by Ms. Berry that have a connection to Plaintiff's Complaint. Notably, Plaintiff's Complaint "fails to isolate the allegedly unconstitutional acts" of Ms. Berry. *Brown*, 662 F.3d at 1165. Merely listing Ms. Berry in a long list of defendants does not distinguish her actions from the others in the group. Nor does it support an inference that she personally took the actions that the Complaint attributes generally to the numerous defendants listed under Count I. Listing defendants collectively does not show how Ms. Berry "might be individually liable for deprivations of [plaintiff's] constitutional rights." *Id.*; *see also Robbins*, 519 F.3d at 1249-50 (holding that complaint did not state a claim where it used the

collective term "Defendants" and made "no distinctions to what acts [were] attributable to whom").

### B. Plaintiff's allegations are conclusory and not entitled to assumption of truth, particularly on summary judgment

Even if Plaintiff's claims could be construed as allegations that Ms. Berry somehow inadvertently participated in the allegedly inadequate acquisition, storage, preparation, service and cleaning of CRD meals, those allegations should be disregarded as conclusory. "'Allegations of personal participation, like all other factual averments, must be specific, not conclusory.'" *Hachmeister v. Kline*, No. 12-3263-SAC, 2013 WL 237815, at *3 (D. Kan. Jan. 22, 2013).

Here, the Complaint contains no facts about how Ms. Berry personally violated plaintiff's constitutional rights. The Complaint does not, for example, allege that Ms. Berry was present on any of the days he conducted his "investigations" in the LCF kitchens. It does not allege that Ms. Berry was herself directly involved with the supervision of kitchen staff or inmate workers or that she had a decision making role in the day-to-day operations of the LCF, EDCF, or HCF kitchens. It also does not allege that the supervisors, managers or inmate workers employed by Aramark reported to Ms. Berry. Without this supporting factual information, Plaintiff's § 1983 claim fails to state a plausible claim against Ms. Berry under *Ashcroft v. Iqbal* and its progeny and judgment in Ms. Berry's favor is required.

### C. Plaintiff cannot show an affirmative link between the alleged constitutional violations and Patricia Berry.

It is well-established that there is no respondeat superior or vicarious liability under 42 U.S.C. § 1983. "[A] Plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. at 676. Absent personal participation, there is no basis for a claim under 42 U.S.C. § 1983. "It is likewise

well-established that supervisory status alone does not create § 1983 liability." *Hachmeister*, 2013 WL 237815, at *3. "Rather, there must be 'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Gallagher*, 587 F.3d at 1069. The supervisor's "role must be more than one of abstract authority over individuals who actually committed a constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).

This principle has been applied many times to dismiss § 1983 claims, including in the analogous case of *Harris v. Schriro*, 652 F. Supp. 2d 1024, 1038 (D. Ariz. 2009). There, the plaintiff sued the contract specialist that oversaw that food contract for the Arizona Department of Corrections for deviations from kosher policies. The contract specialist was not on site at the facility on a daily basis, she did not participate in food preparation or supervision, and her duties were to monitor the contract and make monthly inspections to make sure kosher rules were followed. *Id.* The court dismissed her from the lawsuit because she "had no involvement in kosher-diet matters except to confirm with the Rabbi that foods to be served and the procedures to prepare and serve the foods complied with kosher dietary standards." *Id.* at 1039. The court found she had a supervisory role and that alone was insufficient to assert liability. *Id.*

Just as the contract specialist was merely in charge of monitoring the contract and confirming with the Rabbi that the menu met kosher food standards, here, Pat Berry is simply in charge of monitoring the contract with Aramark. Ms. Berry is not on site every day overseeing the preparation of the food in all KDOC facilities, a food service operation delivering three meals a day, seven days a week, 365 or 366 days a year. Rather, just like the defendant in *Harris*, Ms. Berry performs occasional inspections of the facilities, which seldom show any violations of the kosher food rules. If and when any issues appear, Ms. Berry brings them to Aramark's attention

and receives their proposed corrective action plan for future compliance as needed. There is nothing more that she can do or that she need do. Further, it is not her duty to determine whether the food is kosher—she is not a religious authority and has to rely on the certification of the menu by Aramark's religious authority, Rabbi Fellig, as per the Aramark contract.

Ms. Berry had no supervisory authority over Aramark kitchen staff. Ms. Berry simply conducts periodic inspections of the kitchens and brings any issues to the attention of the Aramark supervisor. Second, no evidence supports that Ms. Berry personally participated in any aspect of the daily CRD program. Ms. Berry's name is referenced in the Complaint only five times: once to identify her as the KDOC state contact monitor, once in a list of defendants that signed the previous menus, and three times -- in a list of four other defendants -- to assert legal conclusions regarding Count I. (Doc. 56 at 11-13). Plaintiff also mentions Ms. Berry once in an affidavit attached to his Complaint, referencing a 2011 memo sent out by Ms. Berry. None of these references indicate Ms. Berry took a single action with regard to the daily implementation of the CRD program (a time-barred incident given the two-year statute of limitations). Third, the fact that Ms. Berry is the current contract monitor does not suggest she supervises Aramark or its kitchen staff. To the contrary, Ms. Berry does not supervise Aramark's employees or inmate workers and there is no evidence that Ms. Berry took any actions other than conducting periodic inspections and denying Plaintiff's grievance in April 2014. This alone is insufficient to prove an affirmative link. The Tenth Circuit has held the denial of grievances alone is insufficient to establish personal participation in alleged constitutional violations. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir.2009); *Allen v. Reynolds*, 475 Fed. Appx. 280, 284 (10th Cir. 2012) (notice of dispute given to prison warden does not show his personal participation in unconstitutional conduct). Plaintiff's

bare allegations against Ms. Berry are conclusory at best and are not enough to state a plausible claim under 42 U.S.C. § 1983. Therefore, Ms. Berry is entitled to judgment in her favor.

Finally, the Plaintiff cannot show a deliberate, intentional act by Defendant Berry to violate the Plaintiff's constitutional rights as a matter of law. This is also why the punitive damages claim asserted against her should be dismissed because the Plaintiff has failed to adequately allege, and cannot allege, that she acted with the requisite evil motive or intent. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (internal quotation marks omitted) ("Punitive damages are available in § 1983 actions [and] are to be awarded only when the defendant's conduct is shown to be motivated by evil motive or intent, or when it invokes reckless or callous indifference to the federally protected rights of others."). Her supervisory role in managing the contract, reviewing the menus, which reflect kosher options, and her audit inspections do not reflect any deliberate or intentional actions, much less evil motive or intent, that seek to violate the Plaintiff's rights. The Plaintiff attempts to state a claim against Defendant Berry merely by virtue of her status as contract manager, which falls far short of pleading sufficient facts to show personal participation as required by § 1983. Because Defendant Berry did not personally participate in any clearly established violations within the meaning of § 1983, any individual capacity claims against her should be dismissed.

### V.   Defendant Berry is Entitled to Qualified Immunity on Plaintiff's § 1983 Claim

Alternatively, Plaintiff's claims against Ms. Berry are barred by qualified immunity. Once a defendant pleads qualified immunity, the plaintiff bears the burden of showing no immunity is warranted. *See Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277-78 (10th Cir. 1998). The burden shifting nature of an assertion of qualified immunity was recently emphasized in *Matthews v. Bergdorf*, 889 F.3d 1136 (10th Cir. 2018). In *Bergdorf*, the Tenth

Circuit reversed a district court because "[t]he district court's approach constituted error because it shifted the burden to the [defendants'] . . . to establish their entitlement to qualified immunity." *Id.* at 1144. The Court noted that in responding to defendant's assertion of qualified immunity, "the complaint must 'isolate the allegedly unconstitutional acts of each defendant'; otherwise the complaint does not 'provide adequate notice as to the nature of the claims against each' and fails for this reason." *Id.* (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)). "Every named Plaintiff ha[s] the burden of adequately pleading every element of his or her claim . . . ." *Id.* at 1145. Then for a plaintiff to get past qualified immunity the "'record must clearly demonstrate that the plaintiff has satisfied . . . [her] heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" *Id.* (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

In other words, Ms. Berry is entitled to qualified immunity unless Plaintiff can show not only that Ms. Berry's actions actually deprived him of a federally secured right but also that Ms. Berry had fair warning her own actions were unconstitutional under the First Amendment. The Court can undertake the qualified immunity analysis in any order it chooses. *Pearson*, 55 U.S. at 818. Here, Plaintiff cannot meet either prong and therefore, qualified immunity applies.

### A.   Plaintiff Cannot Establish a Constitutional Violation

In the context of the First Amendment, "inmates are entitled to the reasonable opportunity to pursue their sincerely-held religious beliefs." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citation omitted). Whether a "reasonable opportunity" exists is made "in reference to legitimate penological objectives." *Id.* "Consequently, '[t]he first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held.'" *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (quoting *Snyder v.*

*Murray City Corp.*, 124 F.3d 1349, 1352 (10th Cir. 1997), *opinion vacated in part on reh'g en banc*, 159 F.3d 1227 (10th Cir. 1998)).

In order to allege a constitutional violation based on the free exercise clause of the First Amendment, an inmate must first show a prison regulation "substantially burdened . . . sincerely-held religious beliefs." *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007). A plaintiff bears the burden of proving that a defendant's actions substantially burdened his right of free exercise. *Speed v. Stotts*, 941 F. Supp. 1051, 1056 (D. Kan. 1996). The Tenth Circuit has defined a "substantial burden" in a free exercise claim as one that: (1) significantly inhibits or constrains religious conduct or expression that manifests some central tenet of a prisoner's individual beliefs, (2) meaningfully curtails a prisoner's ability to express adherence to his faith, or (3) denies a prisoner a reasonable opportunity to engage in fundamental religious activities. *Wares v. Simmons*, 524 F. Supp. 2d 1313, 1320 (D. Kan. 2007) (citing *Vasquez v. Ley*, 70 F.3d 1282, 2 (10th Cir. 1995)). In addition, he must "assert conscious or intentional interference with his free exercise rights to state a valid claim under § 1983." *Gallagher*, 587 F.3d at 1069. If a plaintiff does not meet the "substantial burden" test, the inquiry ends; if he does, a defendant may identify legitimate penological interests which justify the impinging conduct. *Wares*, at 1319-20; *see also Boles*, 486 F.3d at 1182 (citation omitted). Once a legitimate penological interest is identified, the court determines the reasonableness of the regulation by balancing the factors set forth in *Turner v. Safley*, 482. U.S. 78, 89-91 (1987).[1] *Boles*, 486 F.3d at 1181.

---

[1] *Turner* requires consideration of the following factors: "(1) whether a rational connection exists between the prison policy regulation and a legitimate government interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights." *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (citing *Turner*, 482 U.S. at 89-92).

Case 5:21-cv-03269-SAC   Document 133   Filed 06/15/22   Page 31 of 47

As discussed below, Plaintiff's claim fails at the very first step—he cannot meet his burden to establish that his beliefs are sincerely held and that provision of a freshly prepared kosher meal (as opposed to a pre-packaged one), substantially burdens his right to freely exercise his religious beliefs.

### 1. Plaintiff's beliefs are not sincerely held.

Turning to the first prong of a First Amendment claim, Defendant Berry acknowledges that "summary dismissal on the sincerity prong is appropriate only in the very rare case in which the plaintiff's beliefs are so bizarre, so clearly nonreligious in motivation that they are not entitled to First Amendment protection." *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007). A court's inquiry into a plaintiff's sincerity is "almost exclusively a credibility assessment." *Id.* (quoting *Snyder*, 124 F.3d at 1352-53).

In *Smith v. Bruce*, 568 F. Supp. 2d 1277, 1281 (D. Kan. 2008), the district court denied Aramark's motion for summary judgment on the basis of the plaintiff's sincerity because there was no evidence the plaintiff changed faiths; he was on the vegetarian diet 15 months prior to filing his grievance; and even when he was removed from the vegetarian diet on two occasions, he continued to consume only rice and beans. *Compare Strope v. Cummings,* No. CIV.A. 06-3021-KHV, 2009 WL 484453, at *9 (D. Kan. Feb. 26, 2009) (distinguishing *Smith* when inmate failed to establish that the kosher diet served spoiled fruit and that he was entitled to fresh fruit pursuant to his sincerely held religious beliefs).

As this Court observed in its Memorandum and Order on the defendants' motions to dismiss, Plaintiff has a history of failing to observe kosher dietary practices while simultaneously filing suit seeking access to prepackaged kosher meals. (Doc. 90, at 9, citing *McCoy v. Henderson*, No. 12-3051-SAC, 2013 WL 823380, at *3 (D. Kan. Mar. 6, 2013) (noting McCoy had his kosher

meal authorization revoked for purchasing non-kosher commissary items)). Indeed, Plaintiff does not allege that he requested and was approved for the modified religious diet each time he was transferred to a new facility and that he otherwise has remained eligible for the modified religious diet at all times since June 2016. There is no record that Plaintiff made a request for a certified religious diet at EDCF or that he is currently on the CRD diet at EDCF. (Doc. 98-6).   The references to EDCF and HCF in the attachment to his Third Amended Complaint are written only in terms of generalities – how the CRD meals are served to the eligible population in general, not to him. (Doc. 56, at pp. 17, 29, 64). In fact, McCoy was not eligible for the CRD while he was housed at HCF – a fact that he omits in his attachment. Accordingly, Plaintiff may have been consuming the regular prison diet since June 2016, and certainly has not been eating only kosher food since leaving LCF.

Plaintiff's deviation from a kosher diet is also evident on the face of his commissary purchases as shown on Exhibits 7 and 8 to Defendant Berry's Amended Answer (Doc. 98-7, 98-8). Plaintiff is of course well aware of his own purchases. Plaintiff's commissary records establish that he purchased non-certified kosher food items on multiple occasions between 2014 and 2016. *See id.* Such behavior is consistent with the findings in his prior 2013 lawsuit cited by this Court. (Doc. 90, at p.9, citing *McCoy v. Henderson*, No. 12-3051-SAC, 2013 WL 823380, at *3 (D. Kan. Mar. 6, 2013) (noting McCoy had his kosher meal authorization revoked for purchasing non-kosher commissary items)).

While Plaintiff may allege that he sincerely believes in Judaism and subscribing to a kosher food diet, he has failed to abide by such a diet at all times during the pendency of this lawsuit.  As it stands, he is not currently entitled to be on the CRD since he has made no such request at his current facility, EDCF. (Doc. 98-6). Unlike the plaintiff in *Smith* who had remained on his

vegetarian diet for 15 months prior to filing his grievance and maintained a vegetarian diet even when twice removed from the vegetarian meal plan, Plaintiff has failed to remain eligible for the CRD. In fact, under applicable regulations, his eligibility for the modified diet, if any, was subject to being revoked based upon his non-compliance with the diet. (Doc. 98-4, at p.3, § II.D. 2.) Finally, following his transfer to EDCF, Plaintiff did not make a request to be placed on the CRD. Such a failure, in combination with Plaintiff's history of non-kosher commissary purchases, establishes that Plaintiff is not sincere in his beliefs. Consequently, Defendant Berry is entitled to judgment on Plaintiff's § 1983 claim on the basis of the sincerity requirement of the First Amendment.

### 2. Plaintiff cannot establish a substantial burden.

The remaining threshold inquiry in a free exercise claim is whether the plaintiff has established that his religious beliefs are substantially burdened by a prison regulation or policy. *See Boles*, 486 F.3d at 1182. In *Wares*, this Court stated that the Tenth Circuit "has rarely defined or described [substantial burden] . . . in the context of an inmate's pure First Amendment free exercise claim." *Wares*, 524 F. Supp. 2d at 1320. There is no question that the Tenth Circuit has found "prisoners have a constitutional right to a diet conforming to their religious beliefs." *Beerheide*, 286 F.3d at 1185 (citing cases). A complete failure to provide such meals or to impose the cost of provision on the inmates has been deemed constitutionally deficient. *Id.* at 1185-92. *See also Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317 (10th Cir. 2010) (finding failure to provide a halal diet sufficiently burdened inmate's religious beliefs in RLUIPA context).

Here, the Plaintiff fails to state a claim that his rights were (or are) substantially burdened by Aramark's acquisition, storage, preparation, or service of the CRD. The Plaintiff's belief in a kosher diet is not substantially burdened when he is offered a menu that contains kosher food

prepared by inmate workers trained to observe Jewish dietary laws—the Plaintiff has neither been prevented from participating in the consumption of kosher food nor has he been presented with a Hobson's choice since he currently has access to a diet that is in fact kosher. The menus all reflect that kosher food is served at every CRD meal.  The menus are approved by Aramark's Religious Authority, Rabbi Fellig, to ensure that the menus meet kosher dietary requirements. The menus were reviewed and approved, as recently as October 10, 2018, by KDOC's Religious Authority, Rabbi Friedman, and were confirmed as meeting kosher dietary requirements.  Aramark maintains policies and procedures regarding the preparation, storage, and service of the CRD.  These procedures are approved by Aramark's Religious Authority, Rabbi Fellig. These procedures were also approved by KDOC's Religious Authority, Rabbi Friedman.  Inmates who work in the kitchen are trained in CRD food preparation to ensure compliance with Jewish dietary laws. In fact, inmate food service workers at Plaintiff's current facility, EDCF, went through their annual training as recently as October 2018.  Plaintiff is not a Rabbi, has provided no evidence that he has rabbinical training, and has no province to testify as to the requirements of such training. As previously stated, Aramark relies upon their Religious Authority, Rabbi Fellig, to ensure compliance with Jewish dietary laws and KDOC relies upon Aramark pursuant to the food service contract.

### a.   The acquisition and storage of CRD menu items does not substantially burden Plaintiff's rights.

Plaintiff claims the food used for the CRD menu has no kosher markings and is therefore not kosher. (Doc.56 at 11). Plaintiff is misinformed regarding the nature of menu items used in the CRD program. The purchase of food used to prepare the CRD in all KDOC facilities is coordinated by Aramark's dietician to ensure all menu items meet kosher requirements. All CRD menu items are ordered from manufacturers that use kosher manufacturing processes. All CRD menu items are kosher certified. With the exception of sliced bread and milk, all food items served to inmates

receiving the CRD have kosher symbols either on the outer bulk packaging, or on the individual packaging. However, the sliced bread and milk have been confirmed Kosher and verification of this is maintained by Aramark. The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher.

Next, Plaintiff alleges the meal components used for the CRD are stored with non-kosher food. This allegation is conclusory in nature, is made in passing, and the Complaint includes no specific facts or evidence regarding the storage of CRD menu items at any of the facilities. Regardless, the storage of CRD-menu items meets Jewish dietary requirements. All CRD entrée items arrive at KDOC facilities factory sealed. They are purchased and shipped in bulk boxes and broken down into smaller portions to be used according to a set menu rotation schedule. These items are then stored on separate shelving units to distinguish them from food served to inmates on the non-CRD menu. Items that are inherently kosher (fruit and vegetables) are portioned out of bulk packaging as necessary and stored in the cooler until they are used in the weekly menu schedule. Likewise, items that are kosher and are used for all diets are portioned out of bulk packaging as necessary and stored in CRD-designated shelving areas until they are used in the weekly menu schedule. These items do not come into contact with non-kosher food products. The acquisition and storage of CRD menu items at HCF, LCF, and EDCF does not substantially burden Plaintiff's rights.

### b. The preparation, service, and cleaning procedures of the CRD do not substantially burden Plaintiff's rights

Plaintiff cannot establish that the CRD meals provided to him, or the preparation of those meals, amount to a substantial burden on his religious beliefs, whether sincerely held or not. A detention facility that utilizes a designated kitchen space for preparation of religious meals does not place a substantial burden on an inmate's right to practice his religion. *Green v. Werholtz*, No.

08-3260-JAR, 2010 WL 3878772, at *4 (D. Kan. September 28, 2010) (finding no constitutional violation when kosher meals were prepared in separate area of the prison kitchen using religiously-designated utensils that were stored and cleaned separately).

As previously stated, Aramark has policies in place to ensure kosher meals are prepared, served, and cleaned properly. These policies were reviewed and approved by Aramark's religious advisor. All inmates approved to work in the CRD area are trained and monitored by Aramark supervisors. At best, Plaintiff's Complaint alleges no more than isolated acts of negligence. Given the approval of the CRD policies and procedures by at least two Religious Authorities, Plaintiff utterly fails to come forward with any non-speculative and plausible allegations that KDOC kitchens do not comply with kosher dietary laws in the preparation of the CRD. *See Holsombach v. Norris*, No. 2:08CV00022JMMBD, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009); *see also Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *16 (S.D.W. Va. Apr. 5, 2016).

### *LCF*

The current CRD program in KDOC facilities is substantially similar to what it was when Plaintiff first filed his Complaint, aside from minor changes to enhance efficiency or quality as with any industry. The CRD program at LCF meets all kosher dietary requirements. As Plaintiff concedes in his Complaint, the LCF kitchen maintains a separate locked room within the larger kitchen area to be used exclusively for preparation and cleaning of meal items comprising the CRD. Only those inmates trained in CRD preparation methods are allowed entry into these locked rooms. The CRD preparation rooms have several sinks used exclusively for cleaning items used in the preparation and service of CRD food.

LCF uses separate utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD cooking and serving utensils are distinguishable by two additional holes drilled in the

36

handles, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor.  Similarly, the facility uses CRD-designated trays, differentiated by color. CRD trays and cooking utensils are washed and stored separately from trays and cooking utensils used for serving non-CRD food items.  Pots and pans used for the preparation of the CRD are washed and stored separately on CRD-designated shelves. CRD-designated pots and pans are distinguishable by a black Teflon lining inside the pan. LCF utilizes disposable eating utensils that are discarded after use.

Cool CRD menu items are prepared separately either in the CRD room or on the CRD-designated table just outside the CRD room. Warm CRD menu items are prepared in CRD-designated steam kettles or are reheated in a CRD-designated oven. The food is then transferred to a CRD-designated steam well until taken to the line for service.

CRD meals for general population inmates at LCF are served prior to regular menu meals, and do not come into contact with non-CRD food items.  CRD meals for inmates in segregation are prepared on the CRD-designated table and are then stacked in a separate area of the food warmer to await service in the segregation housing unit. After service of the CRD meals, inmates pass the trays through the tray slot. The trays are then collected in a tub and taken to the CRD-designated room to be washed. These procedures conform with Jewish dietary laws.

### HCF

Defendant Berry contends that Plaintiff lacks standing to bring claims regarding HCF as he is no longer housed there, was not eligible to receive the CRD while he was housed there[2], and has not filed or exhausted any administrative remedies regarding HCF. Further, Plaintiff's Complaint demonstrates he has no personal knowledge of the HCF kitchen. His statements

---

[2] Plaintiff was ineligible to receive the CRD because he was on a medical diet while he was housed at HCF. Declaration of Sue Stoecklein, Ex. D at ¶ 5.

regarding HCF are limited to one page of his Third Amended Complaint, are conclusory in nature, relate almost exclusively to the service of meal trays to inmates in segregation, and do not provide facts specific to how Ms. Berry personally participated in the violation of his rights. However, without waiving these objections and out of an abundance of caution, Defendant Berry will address HCF's CRD program.[3]

Similar to LCF, the HCF kitchen maintains a separate locked room within the larger kitchen area to be used exclusively for preparation and cleaning of meal items comprising the CRD. Only those inmates trained in CRD preparation methods are allowed entry into this locked room. The CRD preparation room has several sinks used exclusively for cleaning items used in the preparation and service of CRD food.

HCF prepares all cold CRD menu items in the CRD-designated room. Warm food is prepared on a CRD-designated stovetop and is then taken to the CRD-designated warmer until service. HCF maintains a separate CRD-designated stove and oven. The stove used in CRD food preparation has its own ventilation hood.

HCF uses separate cooking utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD utensils are distinguishable by a "K" marking on the handle, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. Similarly, the facility uses CRD-designated trays, differentiated by color. CRD trays are washed and stored separately from trays used for serving non-CRD food items. Pots and pans used for the preparation of the CRD are washed and stored separately on

---

[3] Since no *Martinez* Report was ordered in this case as to either HCF or EDCF but rather was limited to LCF as per Plaintiff's Complaint, Defendant Berry refers to relevant portions of the *Martinez* Report filed in *Jefferson v. Aramark Correctional Serv.*, 17-CV-3161-SAC, subject to judicial notice as per Fed. R. Evid. 201.

CRD-designated shelves. HCF presently utilizes disposable eating utensils for all CRD meals. All CRD-designated items are washed in CRD-designated sinks.

Likewise, the service of the CRD is separated from non-CRD food service. CRD meals for general population inmates are plated on separate tables in the service area and delivered to the inmate in the dining hall. CRD meals for inmates in segregation are prepared in the CRD-designated room and placed in separate areas of the food warmer to await service in the segregation housing unit. After service, trays are passed through the tray slot in the dining hall and taken to the CRD-designated room to be washed. These procedures comport with Jewish dietary laws.

### EDCF

Plaintiff lacks standing to bring his claims regarding EDCF, which are without merit as the CRD program at EDCF meets Jewish dietary requirements. His Complaint makes only a few conclusory allegations about the service of CRD trays to inmates housed in segregation at EDCF (without showing that he was one of the inmates to whom the CRD trays were delivered).

Nonetheless, without waiving her objections and out of an abundance of caution, Ms. Berry has provided facts herein showing that EDCF maintains a CRD program meeting kosher dietary requirements. EDCF maintains a separate area of the kitchen for CRD food preparation. EDCF uses separate cooking utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD cooking and serving utensils are distinguishable by engravings on the handles, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. CRD cooking utensils are washed and stored separately from cooking utensils used for serving non-CRD food items. Pots and pans used for the

preparation of the CRD are washed and stored separately in the separate, locked CRD cabinet. EDCF utilizes disposable eating utensils, trays, and cups that are discarded after use.

Cool CRD menu items are prepared separately on a table that has been wrapped in plastic. Warm CRD menu items are prepared in CRD-designated pots on the stovetop or are reheated in a CRD-designated oven. The CRD-designated oven is distinguishable by a large red "Kosher Only" sign. The food is then transferred to a CRD-designated steam well until taken to the line for service.

CRD meals for general population inmates at EDCF are served on a separate area of the serving line and do not come into contact with non-CRD food items. CRD meals for inmates in segregation are prepared in the CRD-designated area and are then wrapped in plastic and stacked in a separate area of the food warmer to await service in the segregation housing unit. These meals do not touch non-CRD meals in the warmer. All cups, plates, and eating utensils are single-use and are discarded after use. The EDCF procedures comply with Jewish dietary laws.

The record reflects that all three facilities have policies and procedures in place to ensure adequate acquisition, storage, preparation, service and cleaning of the CRD menu items. Plaintiff cannot show that the CRD does not meet Jewish dietary requirements. However, even if Plaintiff's allegations regarding cross-contamination could be proven by competent admissible evidence, those alleged violations were isolated acts of negligence by kitchen staff implementing the CRD meals, staff employed or supervised by Aramark, not KDOC or Berry. This principle has been applied many times to dismiss § 1983 claims; only examples need be given. The case of *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) had similar facts to this case and is instructive. In *Gallagher*, the plaintiff alleged that the defendants denied him the right to a kosher diet. The plaintiff alleged that his food was not prepared according to kosher requirements. Specifically,

serving utensils that were reserved for the kosher food preparation were improperly cleaned with non-kosher utensils. The court in *Gallagher* stated, taking the plaintiff's "allegations as true, the fact that the utensils were not properly washed indicates that the defendants imperfectly implemented the kosher requirements, or were even negligent in implementing his kosher diet. But there is no basis to conclude that any of the defendants deliberately contaminated the kosher utensils, in violation of [plaintiff's] right to free exercise of religion." *Gallagher v. Shelton*, 587 F.3d 1063. This is similar to Plaintiff's allegations in this case. Plaintiff claims that at LCF, the utensils and pans used in the preparation and service of the CRD are washed in the same areas as dishes used for non-kosher meals. (Doc. 56 at 7). To the contrary, the record reflects that LCF utilizes CRD-designated utensils and cookware and all items utilized in the CRD are washed in CRD-designated areas. Plaintiff's Complaint contains no specific facts regarding the cleaning and storage of CRD items at EDCF or HCF. Similar to *Gallagher*, Plaintiff cannot show that Defendant Berry deliberately contaminated the items used in the CRD preparation, storage, or service. In fact, Berry does not supervise the inmate workers purportedly committing these alleged negligent acts, is not present on a day-to-day basis, and has no knowledge of these alleged isolated acts of negligence.

Plaintiff's allegations of misconduct and negligence by inmate workers do not rise to the level of a constitutional violation. In *Holsombach v. Norris*, No. 2:08CV00022JMMBD, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009) the plaintiff had never been inside the facility kitchen and because he lacked personal knowledge of the workings of the kosher kitchen, he called two inmates to testify on his behalf. *Id.* These inmates provided testimony indicating there were incidents in which the procedures established to provide kosher meals were not followed by staff or inmates. The court stated "Defendants cannot be held… to an absolute standard. They

must take reasonable measures, but are not liable for random incidents of misconduct by inmates." *Id.*

Similarly, in *Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *16 (S.D.W. Va. Apr. 5, 2016), the plaintiff made allegations that cross-contamination of trays and utensils resulted in non-kosher food and therefore substantially burdened his rights. The defendant responded that all trays and utensils are distinguishable by color and are stored in separate areas from non-religious food items. *Id.* Plaintiff filed fourteen affidavits from inmates stating they had witnessed cross-contamination. *Id.* The court stated:

> Although the Inmate Affidavits indicate that cross-contamination had occurred in the past, Plaintiffs produce no evidence indicating that cookware, trays, and utensils were not replaced upon notification of cross-contamination. Furthermore, there is no indication that Plaintiffs were forced to eat from cookware, trays, or utensils that were known to be cross-contaminated.

*Id.* at 17 (citing *Lovelace*, 472 F.3d at 194 (RLUIPA is not intended to remedy negligent violations of inmates' religious practices.)) The court further reasoned that "[t]he record...clearly reveals that [the facility] has implemented...policies and protocols to ensure against cross-contamination. . .." *Id.* at *17.

Similar to *Holsombach* and *Blake*, Plaintiff has made allegations of cross-contamination of the items used in the CRD program. Unlike in *Holsombach* and *Blake*, however, Plaintiff has submitted no admissible evidence to show that the CRD procedures are being incorrectly implemented causing the kosher food to become non-kosher. Plaintiff simply relies on his alleged "investigation" in the LCF kitchen and an alleged conversation with another inmate on an unknown date. Although Defendant objects to Plaintiff's reliance on this conversation on several grounds[4] and contends it is not evidence and should not be considered, Plaintiff's hearsay

---

[4] Plaintiff has not submitted a sworn statement from Inmate Peppers. His alleged statements are inadmissible hearsay as per Fed. R. Evid. 802 and are not appropriate to be considered as evidence.

statements are insufficient to establish a violation of either § 1983 under the applicable standard as stated above – it is policies and protocols that count, not isolated incidents. Notably, even Plaintiff's alleged conversation with Inmate Peppers shows that the CRD menu is prepared separately from the non-CRD menu. (Doc. 56 at 24, ¶ 49). Evan Hitchcock explained one of his roles as general manager is to train and supervise food service teams. *Id.* Inmate staff members are trained to keep non-kosher food, pots, and utensils separated from the kosher preparation area. To ensure compliance with the contract, including Aramark's obligations with respect to the CRD menu, Defendant Berry conducts periodic audit inspections of all three facilities. On Defendant Berry's audit visits of LCF, EDCF, and HCF she found the authorized menus were being used and that the kitchen was implementing appropriate kosher food preparation practices. Plaintiff's alleged isolated acts of negligence do not amount to a substantial burden on his religious beliefs.

**B.    The law is not clearly established.**

In order to overcome Defendant Berry's qualified immunity, Plaintiff must show not only that Defendant Berry through her own actions (not those of others) actually violated Plaintiff's federally secured rights, but also that Ms. Berry was on notice that her actions violated the Constitution – that an "objectively reasonable officer[] could not have thought the [conduct] constitutionally permissible[.]" *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007); *see also Avery v. Anderson*, 94 F. Appx. 735, 739 (10th Cir. 2004). To make this showing, Plaintiff must demonstrate "that there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Horstkoetter*, 159 F.3d at 1278 (internal citation and quotation marks omitted). Although Plaintiff is not required to point to "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question

43

beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citations omitted); *see also Grissom v. Roberts*, No. 17-3185, 2018 WL 4102891, at \*2 (10th Cir. Aug. 29, 2018); *Leiser v. Moore*, No. 17-3206, 2018 WL 4224663, at \*2 (10th Cir. Sept. 6, 2018).

Furthermore, determining whether a particular right was clearly established is a narrowly tailored, context-specific exercise. Nearly every right, when viewed with sufficient generality, can be considered clearly established. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("[T]he clearly established law must be particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.") (internal citations and quotation marks omitted). Thus, for the purposes of qualified immunity, "clearly established" means that the precise contours of a right are so well-developed that every reasonable official would have unquestionably understood whether his or her particular conduct was lawful. *See Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Consequently, if it is *debatable* whether a violation occurred, then the purported right at issue was not clearly established, and the defendant is entitled to qualified immunity. *al-Kidd*, 563 U.S. at 741.

Defendant Berry can find no clearly established case law in the Tenth Circuit or outside of it that would put her on notice as the state contract monitor that a menu and its underlying food sources certified by Aramark's rabbinical authority as kosher violate a kosher-keeping prisoner's constitutional rights. Likewise, as this Court recognized in its Memorandum and Order on the defendants' motions to dismiss, there is no clearly established law entitling Plaintiff to pre-packaged kosher meals, "[t]he court notes, that it is aware of no case law suggesting that prisoners have a constitutional right to factory-sealed TV dinners." (Doc. 90, at p.9). Qualified immunity

bars Plaintiff's claim that he was entitled to have his kosher meal served TV dinner-style. *See, e.g., Reichle*, 566 U.S. at 666-70.

Finally, in regard to the food preparation allegations Plaintiff asserts, Plaintiff has identified no law that clearly establishes that Defendant Berry violated the Constitution by any of her alleged actions (or inactions). To the contrary, the Tenth Circuit has held that isolated incidents of negligence do not rise to the level of a constitutional violation. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009); *see also Kanatzar v. Cole,* No. 17-3115-SAC, 2018 WL 3495844, at *4 (D. Kan. July 20, 2018) (finding isolated acts of negligence that were not "conscious or intentional interference with plaintiff's free exercise rights" did not rise to level of constitutional violation); *Hachmeister v. Kline,* No. 12-3263-SAC, 2013 WL 237815, at *5 (D. Kan. Jan. 22, 2013) ("…mere inconvenience, negligence, and isolated or sporadic incidents are not sufficient to show a substantial burden."). There is no clearly established law that would put Ms. Berry on notice that the Rabbi-approved menu or the Rabbi-reviewed and approved kosher food preparation guidelines that Plaintiff is challenging, and their allegedly negligent implementation, rise to the level of a constitutional violation.

Ultimately, it is Plaintiff's duty to come forward with case law that clearly establishes these principles at a specific level. "[Q]ualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987). One of the purposes of qualified immunity "is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 817 (1982)). This case can be decided on the lack of clearly established law that would have notified Defendant Berry that her conduct ran afoul of the First Amendment—this

issue should be decided early in this litigation. As such, Defendant Berry is entitled to judgment on the basis of qualified immunity.

## CONCLUSION

This Court should grant judgment for the 42 U.S.C. § 1983 claim asserted against Defendant Berry. Plaintiff's claim for injunctive relief is jurisdictionally defective and he lacks standing to assert it. Further, Plaintiff has not exhausted his administrative remedies as to the allegations he asserts as to HCF or EDCF. Finally, Defendant Berry is entitled to qualified immunity because Plaintiff fails to establish a constitutional violation of his sincerely held religious beliefs and can cite no clearly established law entitling him to relief on the issues he presents in this action. Therefore, Defendant Berry respectfully requests judgment be granted in her favor and such other and further relief the Court deems just and equitable.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

s/ Natasha M. Carter
Natasha M. Carter, KS No. 26074
MJ Willoughby, KS No. 14059
Assistant Attorneys General
Memorial Building, 2nd Floor
120 SW 10th Avenue,
Topeka, Kansas, 66612-1597
Phone: (785) 296-6244
Fax: (785) 291-3767
Email: natasha.carter@ag.ks.gov
        mj.willoughby@ag.ks.gov
*Attorneys for Defendant Patricia Berry*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of November, 2018, the above and foregoing was filed with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to the following:

Jeff Cowger, Kansas Department of Corrections
714 SW Jackson, Suite 300
Topeka, KS  66603
Jeff.Cowger@ks.gov
Attorney for Kansas Department of Corrections

Sherri L. Price, Lansing Correctional Facility
301 E. Kansas Avenue
PO Box 2
Lansing, KS 66043
Sherri.Price@doc.ks.gov
*Attorney for Kansas Department of Corrections*

Leigh Ann Massey, KS No. 25959; Catherine A. Stevens, Fed. KS #78565
Baker, Sterchi, Cowden & Rice, LLC
9393 West 110th Street, Suite 500
Overland Park, KS 66210
kreamer@bscr-law.com
cstevens@bscr-law.com
*Attorneys for Defendant Aramark Correctional Services, LLC,*
*Julie Dockendorff, and Rabbi M. Fellig*

Elizabeth M. Phelps, S.Ct. #12285
3700 SW Churchhill Road
Topeka, Kansas 66604
lilybell@cox.net
*Attorney for Defendant Allen*

I also certify that a copy of the above was served via first-class mail, postage prepaid to:

Deron McCoy, Jr., #76894
El Dorado Correctional Facility
PO Box 311
El Dorado, KS  67042
*Pro se Plaintiff*

s/ Natasha M. Carter
Natasha M. Carter
Assistant Attorney General

# KANSAS DEPARTMENT OF CORRECTIONS

Exhibit D

| **K**ansas<br>Department of Corrections | **I**NTERNAL<br>**M**ANAGEMENT<br>**P**OLICY AND<br>**P**ROCEDURE | SECTION NUMBER<br><br>**10-110D** | PAGE NUMBER<br><br>**1 of 11** |
|---|---|---|---|
| | | SUBJECT:<br><br>PROGRAMS AND SERVICES:  Religious Programs | |
| Approved By:<br><br><br>**Secretary of Corrections** | | Original Date Issued:    **03-08-16** | |
| | | Replaces Version Issued:    **03-08-16** | |
| | | **CURRENT VERSION EFFECTIVE:**    **01-30-18** | |

| APPLICABILITY: | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

Offenders shall be permitted to practice a religion to which they sincerely ascribe within the limitations imposed by individual facility physical structures, staffing levels, other considerations of security, good order and discipline, consistent with consideration of costs and limited resources.  All limitations or prohibitions shall be consistent with considerations of whether the limitation or prohibition is in furtherance of a compelling government interest and is the least restrictive means of furthering that compelling governmental interest. (ACI 4-4517)

## DEFINITIONS

Chaplain's/Warden's/Superintendent's Designee:  A facility staff member or volunteer designated with the responsibility to coordinate and oversee religious programs for the offender population and to advise the warden/superintendent regarding religious programming.

Communion Service:  A religious service, consisting of prayers and a sacramental rite, in which bread may be dipped lightly into fermented wine or a substitute acceptable to the religion, and consumed by the participants. Many church groups provide the bread and cup separately.

Desiccated:  Thoroughly dried out; preserved through drying.

Feathers:  Refers to such feathers as they are obtained in their natural state and shall not be inclusive of any feather or feathers that have been altered as to color.  All such religious artifacts may be possessed by offenders only so long as their natural colors are maintained.  Any feathers that have been colored in any manner shall be considered contraband, shall be seized and confiscated, and the offender possessing such artifacts may be charged with possession of contraband as provided by appropriate Kansas Administrative Regulations.

Frequent:  More than twice a calendar year.

Medallion:  A religious symbol worn around the neck, next to the body, on a chain.

Medicine Bag:  A small pouch-type container made of cloth or leather, closed with a drawstring, used to carry natural objects, such as stones, desiccated animal parts (shells, bones, feathers, claws, teeth, etc.), or herbs.

Religious Observance:  The act or practice of complying with a law, custom or ritual of one's faith.

Religious Programs Coordinator:  The person designated by the Deputy Secretary of Facilities Management responsible for the coordination and general oversight of the department's religious programs.

<u>Scapular</u>:  A religious devotional article consisting of two (2) small square pieces of cloth joined or suspended by strings, worn across the shoulders under clothing.

## PROCEDURES

**I.**    **Coordination and Oversight of Religious Programs**

    **A.**    The Deputy Secretary of Facilities Management shall implement this policy.

        **1.**    A divisional staff member may be designated to serve as the Religious Programs Coordinator for the Department.

        **2.**    Each warden/superintendent shall designate a qualified staff member responsible to coordinate, supervise, and provide advice and recommendations regarding religious programming within the facility.

    **B.**    A designated Religious Programs Coordinator shall be responsible for:

        **1.**    Overseeing the implementation of the Department's policy regarding religious programs and procedures to ensure offenders the opportunities to practice their faith;

        **2.**    Advising the wardens/superintendents or the chaplain's/warden's/superintendent's designees in the development of specific plans applicable to the facility consistent with the Department's policy; and,

        **3.**    Serving as a liaison with community resources to ensure the Department's policy regarding religious programs is current and consistent with the practices of religions. (ACI 4-4516)

**II.**   **Responsibilities of Chaplain's/Warden's/Superintendent's Designee**

    **A.**    Each warden/superintendent shall ensure that a chaplain's/warden's/superintendent's designee is available to provide religious programming for the offender population.

        **1.**    The chaplain's/warden's/superintendent's designee shall be responsible for:

            **a.**    Coordinating religious programs in accordance with provisions of this policy and, to the extent possible, ensuring that adequate space and equipment is provided for conducting and administering religious programs and services consistent with security and custody considerations, operational needs, rehabilitation goals, and the mission of the Department; (ACI 4-4520)

            **b.**    Advising the warden/superintendent on all issues involving religious programs and related matters; and,

            **c.**    To the extent possible, incorporating available and utilizing existing community resources in the provision of religious programming. (ACI 4-4516)

**III.**  **Religious Programs Guidelines**

    **A.**    Offenders shall be permitted the opportunity to learn about other religious affiliations but shall not be allowed to fully engage in the practices of other religions except when a change of affiliations is requested.

        **1.**    Participation in or attendance at any religious services by any offender shall be on a voluntary basis.

    **B.**    Religious observances, services, activities, and group meetings; restrictions on attendance.

1.    Except as provided in IMPP 10-108D when food is requested, and the request must be made at least 60 days prior to the event, an offender requesting a religious observance shall make the request in writing to the chaplain's/warden's/superintendent's designee, and shall ensure that the chaplain's/warden's/superintendent's designee is in receipt of the request at least 15 working days prior to the date for the observance.

   a.    When appropriate, offenders may receive an entire day off from work or programs for purposes of a religious observance (Please see procedure VI.C.2.c.).

2.    Offenders shall seek the recommendation of the chaplain's/warden's/superintendent's designee and authorization and approval from the warden/superintendent or designee before two (2) or more offenders can form and meet as a group and hold religious services together.

   a.    **ADULT:** In accordance with K.A.R. 44-12-325.

   b.    **JUVENILE:** In accordance with K.A.R. 123-12-325.

3.    Offenders shall not be permitted to form or meet in a group to hold religious services if such a group would likely threaten facility security by causing affiliations to be established among the group of offenders that would incite challenges to prison authority or conflicts with other offenders.

4.    Religious observances and/or services shall not be held or scheduled at the times or with the frequency chosen by the offenders or mandated by the religion if those times conflict with the facility security, operational and management needs or would otherwise disrupt the order of the facility.

5.    When religious observances and/or services are held or scheduled at the times chosen by the offenders or mandated by the religion, all offenders who are members of the religion shall be permitted to attend such observances or services, except when:

   a.    Allowing the offender to attend is incompatible with his or her custody and security classification status;

   b.    The offender is assigned at that time to a work detail that is essential to the operation of the facility; and/or,

   c.    The offender is assigned at that time to a work detail or program the purpose of which is to promote rehabilitation by providing education, simulating societal working conditions, or fulfilling the requirements of program agreement.

6.    Offenders of all incentive levels may attend religious activities other than those where the primary intent is social in nature.  Those events which are determined to be primarily social in nature may be attended only by offenders at Incentive Level III, unless the event is recognized as a tenet of the religion, in which case Level I and Level II offenders may also attend.

7.    Religious group meetings or religious services may be conducted in or restricted to a part of the facility other than the chapel or any other requested location if security and order or other operational interest, would be better served elsewhere in the facility.  Facility staff may supervise or monitor the meetings or services to maintain security and order.

8.    Special facilities that are essential to the worship or ceremonies of a particular religion shall be provided, subject to the limitations established in Section VI.C.2. of this IMPP. (ACI 4-4520)

9.    **ADULT:**  Wichita Work Release offenders, as interest is expressed, may generally be permitted to attend religious services in the community.

    a.    Work release participants who wish to participate in religious services or activities may be permitted to attend services of religious denominations available within the community in which the facility is located.

    (1)    The warden shall permit work release participants to leave the facility for religious practices as an extension of confinement unless chaplaincy services are available on the premises.

10.    All proposed restrictions to accommodation shall be subject to the criteria set forth at Section VI.A.1.(a)-(d), below.

C.    Visitation or conducting of religious services by clergy or other representatives of the religion.

1.    Visitation shall be permitted by clergy to conduct religious services or lead religious group meetings that are otherwise permitted in a manner consistent with and as authorized by the facility's general orders.

    a.    **ADULT:** In accordance with K.A.R. 44-7-113.

2.    A reasonable attempt shall be made to make clergy or other representatives of all religious groups, including religious volunteers, available and accessible to offenders.

    a.    Clergy or other representatives of a religion may be required to demonstrate some type of credentials according to the standards established for that purpose by the religion in question.

3.    Clergy shall be subject to the same visitation policies and security restrictions as are all other visitors to the facility. This shall not be construed to mean that clergy are required to be on visiting lists.

    a.    **ADULT:** In accordance with K.A.R. 44-7-104, IMPPs 10-113D and 12-115D.

    b.    **JUVENILE:** In accordance with K.A.R. 123-5-505.

D.    Availability, possession, and use of religious items/property.

1.    The chaplain's/warden's/superintendent's designee shall be responsible to approve religious articles permitted per IMPP 10-110D through a special purchase order from an approved vendor that is purchased or donated through an approved source.

    a.    **ADULT:** The specifications, quantity and value of such articles of property shall be governed by IMPP 12-120.

2.    Offenders shall generally be allowed to possess a bible or other primary text of their religion that shall be provided to them, upon their request subject to availability

    a.    **ADULT:** As required by K.S.A. 75-5223 and K.A.R. 44-7-113.

3.    No religious items shall be provided to offenders at State expense.

    a.    Items intended for religious group use that are donated, if approved by the warden/superintendent or designee and may be checked out to offenders, but these items remain the property of the facility.

    b    Donors must provide delivery of the donated items to the facility or other location designated by the warden/superintendent. State vehicles shall not be employed to transport or deliver donated items from the donor to the facility.

4.  The use or possession of religious items may be limited to use or possession by clergy during visits, religious services or ceremonies.

    a.  **ADULT:** Other than those authorized per IMPP 12-120.

5.  Fermented wine for use in communion services may be authorized by the warden/superintendent or designee.

6.  Tobacco and/or tobacco mixtures for religious use.

    a.  An exception to the tobacco-free environment as set forth in IMPP 09-107D shall be in effect for religious activities as outlined below:

        (1)  Tobaccos and/or tobacco mixtures shall be allowed in specified amounts in accordance with facility policy.

        (2)  All tobacco shall be stored in a locked file and/or cabinet by Chaplaincy staff.

            (a)  Medicine bags containing tobacco shall be confiscated, at which time offenders shall make the decision to mail out the medicine bag at his/her expense or have the medicine bag destroyed.

        (3)  Appointing Authorities shall designate appropriate security protocols for receipt and distribution of said tobacco and the use/storage of any lighters and/or matches.

        (4)  Use of tobacco during religious activities shall be limited to offenders who are participating in their designated primary religion.

        (5)  Religious use of tobacco or tobacco substitutes shall not be allowed in any building.

7.  The use or possession of religious items may be limited to religious services, supervised activities, ceremonies, or prayers that the offender is allowed to conduct privately in his or her assigned living area, room or cell, with the items being unavailable to the offenders at all other times.

    a.  **ADULT:** Other than those authorized per IMPP 12-120.

8.  Commensurate with legitimate concerns for order, rehabilitation goals, the mission of the Department, and/or maintenance of security; offenders shall not be allowed to possess any religious items other than a religious medallion or scapula, and such other items as are referenced under allowable personal property referenced in Attachments A or B.

    a.  **ADULT:** Specifically allowed by IMPP 12-120.

9.  Other items are prohibited consistent with the principle of tempering the accommodation of religious requirements with the effective acknowledgement of legitimate security concerns.

10.  Legitimate concerns for order or security include but are not limited to:

    a.  Proper utilization of available space;

    b.  Safety from fire and other physical hazards;

    c.  Dangerousness of the item, including its potential for use as a weapon; or,

    d.    The item's value or attractiveness encourages conflicts or theft.

    11.    When items are confiscated, the chaplain is consulted as to their religious significance.

E.    Religious attire, including clothing, jewelry, and other ornaments, and head garments.

    1.    All religious medallions and scapulars shall be worn around the neck, inside the shirt.

    2.    Medicine bags shall be worn around the neck inside the shirt, or carried in a pocket.

    3.    Yarmulkes, koofi and tams may be worn at all times.

    4.    Offenders shall not be permitted to wear religious attire, including clothing, jewelry or other ornaments, or head garments unless the prohibition against the particular attire is not based on legitimate concerns for order, security, and hygiene. The prohibition must be defensible in terms of criteria set forth at Section VI.A.1.(a)-(d), below, in balancing the desired accommodation of religious practice against legitimate security interests.

        a.    **ADULT**: That is not otherwise allowed by IMPP 12-127 or general orders of the facility.

    5.    Legitimate concerns for order, security, and hygiene include but are not limited to:

        a.    The interference of the attire with the ability to properly identify the offender at all times;

        b.    The interference with the ability to identify the offender's job or living unit assignment to the extent that the job or living areas are reflected by the clothing or head garment the offender is required to wear;

        c.    The possibility that the attire can be used to hide weapons and other contraband; or,

        d.    Whether permission to wear the attire could cause conflict as a special privilege allowed only for a certain group of offenders.

    6.    The wearing of religious attire may be limited to private prayer in the offender's assigned living area, room or cell, religious services, or ceremonies.

        a.    **ADULT**: Other than that authorized per IMPP 12-120.

F.    Hair, including facial hair; appearance or grooming requirements.

    1.    Offenders may be subject to grooming requirements that require certain haircuts and removal of facial hair upon admission or that prohibit the growing of long hair or facial hair, unless the restrictions or prohibitions are not founded on legitimate concerns for order, security, or hygiene. The prohibition must be defensible in terms of criteria set forth at Section VI.A.1.(a)-(d), below, in balancing the desired accommodation of religious practice against legitimate security interests.

        a.    **ADULT**: Established pursuant to IMPPs 12-129D and 12-131 and by the general orders of the facility.

    2.    Legitimate concerns for order, security, or hygiene include but are not limited to:

        a.    The interference of long hair or facial hair with the ability to properly identify offenders at all times;

        b.    The interference of long hair or facial hair with offenders' personal hygiene;

    c.    The interference of long hair or facial hair with safety, because it could present a hazard in the operation of machinery, the use of chemicals, or in other work or program assignments;

    d.    The possibility that weapons or other contraband could be hidden in long hair or facial hair; or,

    e.    The identification of a particular style of hair or facial hair with any unauthorized prison group.

G.    Religious diets.

    1.    Offenders may be provided with a diet required by their religion and that provides adequate nutrition.

    2.    An offender who requests an accommodation in the form of a religious diet shall not be entitled to dictate the form in which the diet is provided if the diet requirements of the religion or religious beliefs, including the diet requirements for religious holidays, and the nutritional needs of the offender are met by the diet.

    3.    The Department or facility may choose whether to establish cooking and dining areas and equipment that enable the proper preparation and consumption of the religious diet at the facility or to utilize food prepared outside of the facility to accommodate the request for the religious diet.

    4.    An offender whose request for a religious diet has been accommodated may be denied continued access to the diet if he or she consistently consumes meals from the facility meal line that are inconsistent with the approved religious diet, per IMPP 10-119D.

        a.    Offenders approved for a modified diet for religious reasons shall be served at each meal with the modified diet meal prepared by food service.

        b.    Such offenders shall not have the option of eating from the regular menu during the period the individual is placed on the modified diet list, unless and until that offender inmate submits a request to the chaplain or designee regarding a desire to terminate the modified diet.

        c.    Offenders who are removed or who elect to withdraw from the modified diet may request readmission to the modified diet program in concert with the applicable provisions of IMPP 10-119D.

## IV.    Establishment and Change of Religious Affiliation

A.    Each offender shall complete a Religious Information Form (Attachment C,) upon admission to Departmental custody.

    1.    If the Religious Information Form is not in the offender's Unit Team file upon inter-facility transfer, the offender shall be given an opportunity to complete the form at the receiving facility.

B.    Offenders may request a change of religious affiliation by submitting a Change of Religion Request form (Attachment D) to the chaplain's/warden's/superintendent's designee.

C.    A copy of the request to change religions shall be placed in the offender's master file and unit team file.

D.    Subsequent requests to change religious affiliation, or, to return to the original religious affiliation shall be documented and achieved through the above procedure.

1.  The frequent change of religions, purely to have privileges under the claim of First Amendment Rights, shall be deemed a manipulation of the religious program and special privileges shall not be afforded to offender's seeking frequent changes.

## V.  Requesting the Accommodation of Religious Practices

A.  An offender may request that the Department accommodate a particular practice of his/ her religion that involves an exception to or requires specific authorization under existing rules and regulations, policies and procedures, general orders, or other written mandates of the Department or the facility.

B.  An offender who desires to request an accommodation of a religious practice shall comply with the following procedures:

1.  The offender shall complete the Request for Accommodation of Religious Practices Form (Attachment E) by providing the following information:

   a.  Information about the religion or religious belief itself;

   b.  Information regarding or verifying the offender's claim of sincere adherence to the religion or religious belief;

   c.  Information regarding the particular sect, if any, of the religion to which the offender claims sincere adherence;

   d.  Information about the practice for which accommodation is sought: and,

   e.  The offender's good faith suggestions for accommodation of the request which do not conflict or infringe upon the legitimate security, good order, and discipline interests of the facility.

2.  The completed request form shall be submitted to the chaplain's/warden's/ superintendent's designee, who will conduct any necessary inquiry or investigation into the matter and within 14 working days of receipt of the form from the offender, furnish pertinent information in writing to the Religious Programs Coordinator.

   a.  Even if the particular request for accommodation has been previously approved within KDOC, the request for accommodation shall be forwarded to the Religious Programs Coordinator for review, who shall, at a minimum, confirm that the particular request has been previously accommodated at another facility within KDOC, and in what manner and under what circumstances.

   b.  The Religious Programs Coordinator shall research the request as deemed necessary by the Coordinator and inform the chaplain's/warden's/superintendent's designee once the information is received.  Once a recommendation has been made, the Religious Programs Coordinator will inform the chaplain's/warden's/ superintendent's designee regarding any additional processing which may be required.

   c.  The Religious Programs Coordinator may inquire of the offender seeking the accommodation, contact clergy or other representatives or practitioners of the religion, consult with Departmental contract religious advisors when appropriate, consult any texts of or other reliable writings about the religion, or conduct any other investigation necessary to determine the factual background of the request, and to make a recommendation as to whether and how the request should be accommodated.

3.   Within three (3) working days of completion, the recommendation and the completed form shall be forwarded by the Religious Programs Coordinator to the warden/superintendent or designee with the reasons for the recommendation attached.

4.   The warden/superintendent shall make the final determination to grant or deny the request, using the criteria set forth in Sec. VI. below, and shall notify the offender, the chaplain's/warden's/superintendent's designee, and the Religious Programs Coordinator of the decision and the reason(s) for it within 14 working days of receipt of the completed request form and written recommendations.

5.   The offender may utilize the grievance procedure to appeal the warden's/superintendent's decision if the offender finds it unacceptable.

VI.   **Determination to Accommodate Inmate Requests (ACI 4-4517)**

A.   Requests for accommodation of certain religious practices and observances shall be considered from offenders who provide sufficient evidence of their belief and affiliation with the religion.

1.   All requests for accommodation of religious practices shall be treated equally regardless of the religion involved.

a.   Equal, consistent treatment of all religions or religious beliefs, shall not always require the same accommodations of the same religious practices in all facilities or for all offenders.

B.   The determination to be made when an offender requests an accommodation of a religious practice shall be whether any existing restriction on the practice or any justification offered for denial of the practice is in furtherance of a compelling correctional interest, and is the least restrictive means of furthering that compelling correctional interest.

C.   A claimed religion or religious belief is entitled consideration for accommodation if it:

1.   Has an established historical or organizational foundation; or,

2.   Occupies a place in the lives of its claimed adherents that is parallel to that of more conventional religions, rather than a personal philosophy.

3.   The determination shall be made, in accordance with the procedure outlined above, when an offender seeks recognition of a set of beliefs or religion by the Department or facility. Some factors that may be taken into consideration in making the determination include the following:

a.   The history or origin of the religion or religious beliefs, including when, where, and by whom it was founded or established;

b.   Whether the religion is organized, or has established or formed churches, temples, synagogues, or other facilities or groups for the purpose of practicing the religion;

c.   Where unconventional or uncommon, whether it can be confirmed that the offender's set of beliefs or religion plays the same role in the offender's spiritual life as more conventional religions or religious beliefs play in the lives of their practitioners; and,

d.   The relationship between the accommodation and the religious belief or beliefs.

D.   All requests for accommodation of religious practices shall be treated equally regardless of the religion involved.

1.   The determination to be made shall not be whether the chaplain's/warden's/ superintendent's designee or the warden/superintendent approves of the religious beliefs or religion to which the offender claims to adhere, but:

    a.   Whether the claimed religion or beliefs are entitled to recognition pursuant to subsection C., above; and,

    b.   Whether the manner in which the offender seeks to practice the religion or exercise the beliefs will disrupt departmental and facility practices, policies, or operations that are founded on concerns for security, safety, rehabilitation, or sound correctional management.

2.   Equal, consistent treatment of all religions or religious beliefs shall not always require the same accommodations of the same religious practices in all facilities or for all offenders. (ACI 4-4517)

    a.   The nature of a particular facility, including the physical limitations, the custody level(s) and security classification status of the offender housed there, and the correctional goals sought to be met there may be taken into consideration in determining whether to allow a particular religious practice at the facility.

    b.   Some factors that may justify the restriction of certain religious practices for which accommodation is sought at particular facilities include, but are not limited to the following:

        (1)   A facility may simply not have the physical capacity to accommodate the type of religious practice for which permission is sought.

        (2)   While some offenders may be entitled, by virtue of their behavior records, the passage of their term(s) of incarceration, or other legitimate classification criteria, to be classified at a custody level that allows them to live at a facility where security and operational needs do not preclude the accommodation of particular religious practices, those practices might appropriately be prohibited or restricted at a different facility.

    c.   The correctional goals of a particular facility may be more significantly impeded by a particular accommodation than would those of a different facility.

        (1)   A facility where the goal is to provide and require meaningful work assignments for the offender population might appropriately refuse to excuse offenders from a work detail temporarily to attend religious services or for the full work day on the observance of a religious holiday; while,

        (2)   Such a restriction may be inappropriate at a facility where the facility operations are not significantly impacted, and the offenders are not similarly otherwise occupied.

E.   Requests for accommodation of certain religious practices shall be considered only from offenders who are actual members or adherents to their religious beliefs or in their affiliation with the religion.

1.   Some factors that may be considered, but are not pivotal, in making the determination about the inmate's affiliation include:

    a.   Whether the offender indicated membership in or affiliation with the religion upon admission or has a verifiable history of such affiliation;

    b.   Whether the offender qualifies for membership in the religion according to the religion's own criteria for membership;

c.    Whether the offender is familiar with the primary written text(s), if any, of the religion; and,

d.    Whether the offender has changed religious affiliations and how often.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

None.

## REFERENCES

K.S.A. 75-5223
K.A.R. 44-7-104, 44-7-113, 44-12-325; 123-12-325, 123-5-505
IMPP 09-107D, 10-108D, 10-113D, 10-119D, 11-101, 11-101J, 12-103D, 12-115D, 12-120, 12-127, 12-129D, 12-131
ACI 4-4516, 4-4517, 4-4520

## ATTACHMENTS

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | Reference Table of Religious Tenets | 4 pages |
| B | Instructional Material Concerning Native American Religious Artifacts | 1 page |
| C | Religious Information form | 1 page |
| D | Change of Religion Request form | 1 page |
| E | Request for Accommodations of Religious Practices form | 2 pages |

Page 1 of 4, Attachment A, IMPP 10-110D
Effective 01-30-18

## REFERENCE TABLE OF RELIGIOUS TENETS

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| **Asatru/ Odinist** Worship weekly | The Poetic Edda | n/a | Runes/Bag/Cloth | Thor's Hammer | Esbats, Sabbats, Yule (Dec. 21) | n/a | Gandr, Runes, Drinking Horn, Altar, Cauldron, Evergreen twig, Oath ring, Candles/holder, Thor's Hammer |
| **Assembly of Yahweh** Worship on Sabbath | Sacred Name Text | Kosher | n/a | n/a | Passover, Days of Unleavened Bread, Pentecost, Feast of Weeks, Feast of Trumpets, Day of Atonement, Feast of Tabernacles | n/a | Readings |
| **Buddhism** Worship weekly | Tripitaka or Sutra or Tam Rim Teachings of Buddha | Vegetarian | Meditation beads, pictures of Buddha, meditation mat and/or cushion | Wheel of Dharma, Statue of Buddha | Vesak, Dharma Day, Buddha's Birthday | n/a | Statue of Buddha, Incense, Incense bowl |
| *Catholic* 1/week | Old/ New Testament (also Apocrypha for Catholic) | n/a | Rosary Scapula | Saints medal Crucifix Chain | Easter Christmas (major Christian holiday) | n/a | Communion elements Bible Large cross/crucifix Candles/holder |
| **Christian Science** Weekly worship | *Science and Health, Key to the Scripture* by Mary Baker Eddy and Old/New Testament | n/a | n/a | n/a | Christmas Easter | n/a | Readings |
| **Hinduism** Weekly worship | Veta-Sruti literature | *Vegetarian* | Picture of a Hindu God, pure water | n/a | n/a | n/a | Incense, incense burner, picture of a Hindu God. |
| **House of Yahweh** Weekly worship | Book of Yahweh | Kosher | Kippah (black), Prayer shawl | n/a | Passover, Feast of Weeks, Feast of Trumpets, Day of Atonement, Feast of Tabernacles | n/a | n/a |

Page 2 of 4, Attachment A, IMPP 10-110D
Effective 01-30-18

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| **Islam** Jumah prayer (Fri. p.m.) | Qur'an | Non-pork Ramadan fasting | Prayer Rug Male Koofi cap (black), Female Head Scarf, Prayer beads | Crescent & Star, Islamic scriptures engraved on medallion | Eid-ul-Fitr (immediately following Ramadan) Eid-ul-Adha about 2 months following Ramadan | Must bathe within 24 hours of worship (Jumah prayer) | Qur'an Prayer Rug Male: Koofi Cap (black) Female: Head Scarf (black) |
| **Jehovah Witness** Weekly worship | The New World Translation of the Holy Scriptures | n/a | n/a | n/a | The Lord's Evening Meal (Memorial) | n/a | n/a |
| **Judaism** Worship on Sabbath (Day of rest) | Torah Tanakh Prayer books Code of Jewish Law | Kosher | Yarmulke (black) Tzi Tzit Prayer Shawl | Star of David (6-point) | Purim Passover Yom Kippur Sukkot Hanukkah Rosh Hashanah Shavuot | n/a | Rams Horn (Rosh Hashanah) Candle/holder Menorah, Tefillin, Yarmulke |
| **Krishna** Worship weekly Certain rituals can Only be performed by authorized Practitioners | Vedic literature | Vegetarian | Prayer beads, bead necklace | n/a | | Forehead markings | n/a |
| **Latter Day Saints** (Mormons) worship weekly -Sunday | Old/New Testament Book of Mormon, Doctrine Covenants and the Pearl of Great Price | Abstain from nicotine/ caffeine products | n/a | n/a | Major Christian Holidays | n/a | n/a |
| **Moorish Science Temple of America** (MSTA) worship weekly- Friday | Holy Koran by Noble Drew Ali | Non-pork Fasting is individual choice | Fez (black) (males) Turban (females) and button | n/a | January 8th – Prophet Noble Drew Ali's birthday January 15th – Moorish New Year March (1st Sunday) – Moorish Seniors Day July 20th – Authority Day Some may participate in Ramadan - Fridays | n/a | Flags, Circle / Emblem, Picture of Prophet, Picture 1st Convention, Warrant of Authority, Moorish Button |

Page 3 of 4, Attachment A, IMPP 10-110D
Effective 01-30-18

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| **Native American** Worship Drum Ceremony Sweat Lodge Pow Wow | Use music and storytelling (verbal tradition) | n/a | 5 neutral colored feathers, Sage, Sweetgrass, Cedar, smudging bowl, white bandana | Medicine bag | Seasonal Dances [Pow Wows] | Smudging Sweat lodge | Blankets for sweats, buffalo skull, ceremonial pipe, Dance Bells, Drum, Sweat Lodge, Tobacco, White Bandana, Medicine Wheel, Flute, sage, sweetgrass, cedar |
| **Protestants** Worship weekly | Old/New testament | n/a | n/a | Cross/chain | Easter, Christmas (major Christian holidays) | n/a | Communion, Communion elements, Bible, Candles/holder |
| **Rastafarian** Meet weekly for worship | Selected portions of Old/New Testament | Vegetarian | Tam (black) | Ankh medallion | July 23 [Halile Selassie's Birthday] | n/a | Reggae music, Bongo drums, African flag, Wooden Candle stick |
| **7 Day Adventist** Saturday | Old/New Testament | Vegetarian/ Non Pork | | Cross/chain | Easter, Christmas (major Christian holidays) | n/a | Communion elements, Bible |
| **Sikh** Meet weekly for worship | Peace Lagoon | Vegetarian | Turban, Large comb, Bracelet on right wrist | Khanda | n/a | n/a | |

*The pipe keeper may keep pipe in his/her possession.

Page 4 of 4, Attachment A, IMPP 10-110D
Effective 01-30-18

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| *Thelema* Worship weekly | Holy Books of Thelema by Aleister Crowley or the Book of the Law | n/a | Prayer Rug, Oil (4 oz.) of Abramelin, Stele of Revealing, Electric Candle, Plastic Cup, Fire Wand, Altar Cloth, Altar Statue, Pentacle, Facsimile Stones, Tarot Cards, Virgin Paper, Dragons Blood Ink, Masking Tape, Calendar, Personal Book of Shadows | 6 Pointed Talisman | The Rituals of the Elements and Feast of the Times, The Feast for the First Night of the Prophet and his Bride, The Feast for the Three Days of the Writing of the Book of the Law, The Feast for the Supreme Ritual, The Feast for the Equinox of the Gods | n/a | |
| Unity Worship weekly | Old/New Testament | n/a | n/a | Christian cross | n/a | n/a | |
| Wiccan Worship weekly | *Golden Dawn* or *Bucklands Complete Book of Witchcraft* or *Farrars Witches Bible* | n/a | Book of Shadows (A spiritual journal), White Table Salt, 5 neutral colored feathers, Electric/Facsimile of Candle, Tarot Cards, Prayer rug, Runes/bag, Altar Cloth | Pentagram with two points down | Sabbats (observed at the change of seasons) Esbats | Salt in cell | Candles/holder, Incense/burner, Salt, Feathers, Cardboard sword, Tarot Cards, Runes, Altar, Altar Cloth, Chalice |

Attachment B, IMPP 10-110D
Effective 01-30-18

## KANSAS DEPARTMENT OF CORRECTIONS
## INSTRUCTIONAL MATERIAL CONCERNING NATIVE AMERICAN RELIGIOUS ARTIFACTS

1. Offenders may possess five (5) real, facsimile or synthetic feathers which may be beaded or decorated with materials which conform to security considerations.

2. If, at the discretion of the warden/superintendent, offenders are permitted to make their own medicine bags, all materials shall be approved by the chaplain to ensure conformity with security considerations and specifications for medicine bags, per Section VI.

3. Offenders may possess a cloth or leather medicine bag, not to exceed four (4) inches in diameter when laid out flat, which may be beaded or decorated with materials that conform to security considerations. The medicine bag shall be worn around the neck inside the shirt or carried in the pocket.

4. The chaplain's/warden's/superintendent's designee shall be responsible to maintain items used by Native American Religion practitioners in cleansing, blessing and purification, and making such items available upon valid request. Such items include, but are not limited to sage, sweet grass, cedar, and tobacco.

5. The chaplain's/warden's/superintendent's designee shall be responsible to provide training to staff on the proper method for the inspection of a medicine bag to ensure that it is treated with dignity and respect.

   a. Medicine bags and other religious artifacts shall be subject to inspection per provisions of KDOC IMPP 12-103D. A staff member may direct an offender to open his/her medicine bag for a visual inspection, or may require an inmate to allow the inspection of any other religious artifact.

   b. Ordinarily the offender should handle the bag or other religious artifact at all times and neither the bag nor its contents, nor any other religious artifact, should be touched by the staff member.

   c. If there are questions or problems regarding the inspection of a medicine bag or other religious artifact, the staff member shall confiscate the bag or other religious artifact and, with an evidence card attached, place the bag or other religious artifact in a secured location as evidence.

   d. To ensure that religious artifacts are treated with respect by the examining staff, the chaplain's/warden's/superintendent's designee shall be present when a medicine bag and contents (or any other religious artifact), placed in evidence, is examined.

   e. If a medicine bag or other religious artifact is clearly determined to contain contraband, the bag or other religious artifact loses its religious significance.

Attachment C, IMPP 10-110D
Effective 01-30-18

KANSAS DEPARTMENT OF CORRECTIONS
# RELIGIOUS AFFILIATION INFORMATION

DATE_____

OFFENDER NAME_____NUMBER_____

PRESENT RELIGIOUS AFFILIATION:

| | | | |
|---|---|---|---|
| ___Asatru/Odinist | ___Assembly of Yahweh | ___Buddhist | ___Catholic |
| ___Christian Science | ___Hinduism | ___House of Yahweh | ___Islam |
| __Jehovah Witness | ___Judaism | ___Krishna | ___Mormon |
| ___MSTA | ___Native American | ___Christian/Protestant | ___Rastafarian |
| ___7-Day Adventist | ___Sikh | ___Thelema | ___Unity |
| ___Wiccan | ___Other (_____) | | |

NAME OF YOUR OUTSIDE RELIGIOUS GROUP:
_____

NAME OF RELIGIOUS LEADER (Priest, Pastor, Imam, Sheik, Medicine Man, etc.):

_____

ADDRESS OF RELIGIOUS LEADER:_____
                                      Number        Street
                              _____
                                 City     State    Zip Code

If I decide to change my religious affiliation, I will make my request to the Pastoral Care Department.

Signed:_____     _____  _____
        Offender Name        Number   Chaplain's/Warden's/Superintendent's Designee   Date

cc:    Unit Team/Unit File
       Central File

Attachment D, IMPP 10-110D
Effective 01-30-18

## KANSAS DEPARTMENT OF CORRECTIONS
# CHANGE OF RELIGION REQUEST

OFFENDER NAME_____NUMBER_____CELL_____

MOST CURRENT RELIGOUS PREFERENCE: _____

CHANGE TO RELIGIOUS PREFERENCE (Check One):

| | | | |
|---|---|---|---|
| ___Asatru/Odinist | ___Assembly of Yahweh | ___Buddhist | ___Catholic |
| ___Christian Science | ___Hinduism | ___House of Yahweh | ___Islam |
| ___Jehovah Witness | ___Judaism | ___Krishna | ___Mormon |
| ___MSTA | ___Native American | ___Christian/Protestant | ___Rastafarian |
| ___7-Day Adventist | ___Sikh | ___Thelema | ___Unity |
| ___Wiccan | ___Other (_____) | | |

Do you wish to have your name placed on all the applicable religious activities in your faith group?

_____YES                              _____NO

Complete the information below if there is a religious official, (Priest, Pastor, Imam, Sheik, Medicine Man, etc.), that you wish to have visit:

Name: _____

Street Address: _____

City:_____   State:_____   Zip Code: _____

Offender's Signature: _____

Date: _____

Chaplain's/Warden's/Superintendent's Designee Signature: _____

Date: _____

Entered into OMIS/JCFS Date _____  Initials: _____

cc:   Unit Team/Unit
       Central File

Page 1 of 2, Attachment E, IMPP 10-110D
Effective 01-30-18

### KANSAS DEPARTMENT OF CORRECTIONS
## REQUEST FOR ACCOMMODATION OF RELIGIOUS PRACTICES

Offender Last Name _____   First Name _____

Number _____   Facility_____   Date_____

1.   Faith group for which you are requesting accommodation? _____

2.   If this religion is not already listed, what is the accommodation you are requesting? _____
_____

3.   Are you officially recognized as a member of this group?   YES ___      NO ____

4.   If this religion is already listed, what is the accommodation you are now requesting?_____
_____

5.   How long have you been a member of this group? _____

6.   Please list your outside spiritual advisor:

Group Name _____

Address _____

City _____   State _____   Zip Code _____

Telephone Number _____   Contact Person_____

7.   What documentation, if any, is required to participate in this group?_____

8.   What is there that sets this group apart from others? _____

9.   Please list the National or International Offices: _____

Name of Faith group _____

Other Names it goes by _____

Street Address _____

City _____   State _____   Zip Code_____

Telephone Number _____

10.   When, Where, and Who founded this group? _____
_____

11.   How is it organized? (e.g., districts, local churches, etc.) _____
_____

12.   Where is the nearest group to the facility? _____
_____

13.   Is it your understanding that there are certain requirements before one can officially "convert" to this faith
group?  If yes, please explain. _____
_____

Page 2 of 2, Attachment E, IMPP 10-110D
Effective 01-30-18

14.   What is the name of the primary religious text of this faith group?_____
_____

15.   Who wrote the text? _____

16.   What are some related source books about the religious practices and where can these books be obtained? _____

17.   What do you consider the major beliefs or doctrines of the religion to be? _____
_____
_____

18.   What are the basic teachings of this religion? _____
_____
_____

19.   What are the historical roots of this religion? _____
_____
_____

20.   Is there a purification ritual?  If so, please describe._____
_____

21.   Are there fundamental tenets of the religion that must be practiced while one is incarcerated?_____
_____
_____

22.   What are your religious holidays?_____
_____

23.   Are there property or artifacts which are required in order to practice this religion?  If so, what? _____
_____
_____

24.   Does your religion have a religious medallion?  If so, please describe._____
_____

25.   Are there dietary standards that are required? If so, what? _____
_____
_____

26.   Are there any special medical issues that this religion follows or prohibits?  If so, what? _____
_____

27.   Are there any requirements for worship?  If so, what? _____
_____

28.   When or how does worship occur? _____
_____

29.   Is it necessary for a congregational meeting if there are more than two people in the religion? _____
_____

30.   What other faith groups have you belonged to and when? _____
_____

Exhibit E

# KANSAS DEPARTMENT OF CORRECTIONS

| | **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | **SECTION NUMBER** 10-106D | **PAGE NUMBER** 1 of 7 |
|---|---|---|---|
| Kansas Department of Corrections | | **SUBJECT:** **PROGRAM AND SERVICES:  Standardized Menu, Ensuring Nutritional Adequacy of Diets, and Meal Service Schedules** | |
| **Approved By:** | | **Original Date Issued:** 09-29-15 | |
| | | **Replaces Version Issued:** N/A | |
| **Secretary of Corrections** | | **CURRENT VERSION EFFECTIVE:** 09-29-15 | |

| APPLICABILITY: | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

All departmental food service operations shall follow a standardized menu that shall**:**

**ADULT:**  Incorporate the MyPlate guidelines published by the United States Department of Agriculture and be in compliance with recommended dietary allowances published by the National Academy of Sciences for adult men and women. (NCCHC P-46)

**JUVENILE**:  Be in compliance with the standards of the Kansas Department of Education, School Food Service Program for Residential facilities, and dietary standards established by the American Correctional Association. Nutrition programs for the offenders shall include the Federal school breakfast program, national school lunch program, and after school care snack program.

Food shall not be withheld from offenders as a disciplinary sanction. (ACA 4-4320; 4-JCF-3B-05)

## DEFINITIONS

Alternative Meal Service:  Food or food ware served with consideration made for health and safety, i.e., food items free of bones or other potentially harmful objects, and meals not requiring utensils, such as finger foods or meat/meal loaf.

Crisis Level Placement:  An offender who, based upon a report and recommendation of a behavioral health practitioner, is housed in Restrictive Housing for purposes of monitoring/observing behavior and actions to prevent self-injury or harm.

Contract Monitor: The staff member designated by the Deputy Secretary of Facilities Management to monitor the quality and quantity of food service contract delivery, provide input with regard to the development of modified diets, and to facilitate decisions and coordinate standardized departmental food service management.

Departmental Clinical Health Authority:  The physician Medical Director (Regional Medical Director) of the agency or organization responsible for the provision of health care services for the KDOC.  This position has full clinical autonomy and responsibility for clinical health care issues within the KDOC.

Director of Health Care Services:  Acts as the administrative health authority for the Department.  This position manages health care systems, directs the health care services model, and has final approval on all policies and procedures in the health care system.

<u>Facility Administrative Health Authority</u>:  The Health Services Administrator responsible for the provision of health care services at a facility.  The Facility Health Authority works under the direction of the Departmental Clinical Health Authority and the Regional Vice President or designee administratively.

<u>Facility Clinical Health Authority</u>:  The site physician Medical Director responsible to the Departmental Clinical Health Authority for all clinical matters and to the Health Services Administrator for all administrative matters.

<u>Health Care Practitioner</u>:  A person who has met the requirements of and is engaged in the practice of medicine, dentistry, or nursing.

<u>Individualized Diet</u>:  An adaptation of the medical or religious-type modified diet prescribed to meet specific needs, which are not addressed by the standardized modified diet.

<u>Modified Diets</u>:  Diets most commonly prescribed to meet offenders' medical, dental, therapeutic or religious needs, developed from written instructions provided by the treating physician, dentist, Health Services Administrator, and/or Chaplain and which conform as closely as possible to the standardized menu.   More specific modified diets are prescribed as individualized diets.

<u>Registered Licensed Dietician</u>:  A person registered by the American Dietetic Association or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education, and who is licensed by the State of Kansas to practice dietetics.

<u>Standardized Menu</u>:  A listing of the dishes to be served at all KDOC facilities for a particular meal, on a particular day; the same meal items, quantity and quality, served to offenders and to staff, and official visitors who purchase meals.

## PROCEDURES

I.      **Contract Staff and Responsibilities**

      A.      The contractor staff shall be responsible for the following:

            1.      Planning and developing a standardized menu. (ACA 4-4328; 4-JCF-4A-08)

                  a.      The finalized menu shall be reviewed and approved by the Deputy Secretary of Facilities Management, with input from the contract monitor and Department's contracted, registered-licensed dietitian.

            2.      The Food Service Contractor shall also:

                  a.      Ensure, via a quarterly review, that the established basic servings per menu at the contracting facility meet required dietary allowances;

                      (1)      To facilitate evaluations, the KDOC Meal Evaluation Form (Attachment A) may be used by appropriate staff.

                  b.      Poll offender preferences and acceptance of menu items on an annual basis, and report findings as guidance for the revision of the standardized menu;

                  c.      Document substitutions and modifications to the menu, and request approval for any permanent changes; and,

                  d.      Provide drafts of any generated standardized menus to appropriate Departmental staff for review, comments and approval.

II.     **Provisions Ensuring Nutritional Adequacy and Variety in the Menu**

      A.      The menu shall be developed by the contractor in conjunction with the Department's contract monitor, and the Department's contracted registered-licensed dietician (ACA 4-4317; 4-JCF-4A-

04) to provide food service to offenders within the care and custody of the Secretary of Corrections, shall be subject to approval by the Secretary or designee.

    1.    Facilities provided meal service by other governmental agencies shall be exempt from adherence to the KDOC standardized menu but shall require documentation that the menu utilized meets the requirements of this policy.

B.    Menus shall be developed according to the following minimum dietary requirements:

    1.    **ADULT:**  The diets for offenders shall consist of not less than a weekly average of 2900 calories per day for men and a similarly computed average of 2200 calories per day for women.

        a.    **JUVENILE**:  The food service contractor or state agency shall provide well-balanced meals to include 3500 calories per day for all male and female offenders.

    2.    Notwithstanding the preceding provisions, offenders undergoing medical treatment may receive a diet of a higher or lower average caloric content based upon the prescriptive authority of their attending physician or other health care professional.

    3.    The daily menus supplied by contractor shall satisfy the current nutritional requirements for offenders as called for by:

        a.    **ADULT:**  The National Academy of Sciences and

        b.    **JUVENILE:**  The American Correctional Association.

C.    Menu planning and production shall employ standardized recipes provided by the contractor.

    1.    All food items shall be prepared in accordance with the stated ingredients of the recipes, with adjustments made for yields appropriate to the facility. (ACA 4-4317; 4-JCF-4A-04)

    2.    The planning and preparation of all meals shall take into consideration food flavor, texture, temperature, appearance, and palatability. (ACA 4-4317; 4-JCF-4A-04)

D.    In conjunction with the development of the cyclical menus (Fall/Winter menu and Spring/Summer menu) or whenever substantial changes in the menu are made, the Department's contracted registered dietician shall review the menu. Once the Department's contracted registered dietician verifies that the menu meets the nutritional requirements stipulated in the food service contract, the contracted registered dietician and the contract monitor will sign it certifying that those requirements have been met.

    1.    The finalized Religious Diet menu shall also be reviewed and approved by the contractor's religious authority, indicated by his/her signature on the menu.

    2.    Copies of all menus, including modified and individualized diets, shall be retained by the facilities for the contract monitor's review, along with documentation of deviations from the menu as served.

    3.    Facility food service supervisory staff shall conduct meal evaluations on a quarterly basis to verify the facility's adherence to the established basic daily servings. (ACA 4-4316; 4-JCF-4A-03)

**III.**    **Provisions Ensuring Nutritional Adequacy in Modified Diets**

A.    The standardized menu shall ensure basic nutritional requirements for all meals served to include provisions for alterations, substitutions and modifications for medical, dental, behavioral health, (NCCHC P-46) religious purposes (ACA 4-4319, 4-4327, 4-JCF-4A-04, 4-JCF-4A-07, ACI 3-

4299, 3-4300) and alternative meal service, which conform as closely as possible to the menu and ensure the nutritional adequacy of food items substituted for standard menu items.

    1.    Instructions for modified diets shall provide for consideration of the most commonly prescribed modified diet for medical purposes or to address the most common religious dietary laws.

    2.    Alternative meal service may be provided to an offender who uses food or food service equipment in a manner that is hazardous to self, staff or other offenders.

        a.    Alternative meal service shall be based on health and safety considerations only and shall be approved in writing by the warden/superintendent and Site Medical Director. (ACA 4-4320; 4-JCF-3B-05)

B.    Individualized diets may be written and prescribed by the treating physician and/or dentist, when the offender's specific need cannot be met by a standardized modified medical diet. (ACA 4-4318; 4-JCF-4A-06; NCCHC P-F-02, Y-F-02)

    1.    All individualized diet prescriptions shall be specific and as complete and as simple as possible while adhering as closely as possible to the standardized modified menu.

    2.    All individualized diet prescriptions shall be reviewed monthly.

## IV.    Identification and Tracking of Approved Modified Diets

A.    Facility personnel shall ensure that a list of names of offenders receiving a modified diet of any type shall be prepared by the Health Services Administrator or designee and Chaplain, as appropriate, consistent with IMPP 10-119D, and forwarded, within 24 hours, to the Food Service Manager and Chief of Security or designee.

    1.    Crisis level placements shall receive alternative meal service in the form of finger food for the duration of their crisis level placement, but not to exceed seven (7) days.

        a.    Alternative meals for crisis level offenders shall meet basic nutritional requirements.

    2.    The Health Care Practitioner shall be responsible for prescriptions for modified diets for health reasons. The Health Services Administrator or designee shall maintain a current list of offenders authorized to receive such diets.

    3.    The daily list of modified diets for medical prescriptions or religious needs shall include:

        a.    The name of the offender;

        b.    The type of modified diet prescribed; and,

        c.    A designation as to whether to add or to remove the offender's name to the list of modified diets.

    4.    The food service manager shall refer to the list of modified diets to:

        a.    Adjust the amount of modified foods to serve and control food waste; and,

        b.    Aid in the identification of offenders placed on modified diets.

    5.    The chief of security or designee shall refer to the list of modified diets to affix the appropriate color coded sticker to the offender's identification badge, per IMPP 12-131, indicating the type of diet the offender is approved to receive.

6.      Facility personnel shall provide for the removal of offenders' names from the list of modified diets.

    a.      The removal of offender names from the list of modified diets shall be effected within 24 hours of the determination of the Health Care Practitioner or the Chaplain.

    b.      See IMPP 10-119D for the refusal process for medical diets and procedures to remove offenders' names from the medical diet list.

7       Names of offenders receiving modified diets shall be forwarded within 24 hours by a copy of the list provided to the food manager and the chief of security or designee to facilitate an offender's visual badge identification of a modified diet prescription.

    a.      Offenders receiving medical diet prescriptions shall sign for them as they pass through the food line.

## V.      Preparation and Serving of Modified Diets

A.      Medical clinic staff shall be trained by the Site Medical Director as to the suggested prescription routine determining the use of each diet type and departmental policy and procedure surrounding medical diet prescriptions.

B.      Senior food service staff shall be trained in the provision of the medical diets by the contractor's Registered Dietician.

C.      Senior food service staff shall be trained by the contractor's Registered Dietician concerning the policy and procedure for provision of the standardized religious diet types.

D.      Chaplains shall be trained by the Secretary's designee for chaplaincy programs concerning the policy and procedure for provision of the standardized religious diet types.

## VI.      Provisions Ensuring Nutritional Adequacy for Restrictive Housing Offenders

A.      Restrictive Housing offenders shall receive the same menu items served to the general population and shall be served these items at a temperature similar to that served to the general population, unless an offender uses food or food service equipment (to include obstructing closure of the food pass), in a manner that is hazardous to the offender, staff or other offenders.

    1.      Alternative meal service for a restrictive housing offender shall be on an individual, case-by-case basis and shall be based on health and safety considerations.

        a.      Such alternative meals shall be served in accordance with the General Orders of the facility.

        b.      Alternative meal service shall not exceed seven (7) consecutive days.

    2.      Alternative meals for restrictive housing offenders shall meet basic nutritional requirements.

    3.      Alternative meal service shall be approved in writing by the warden/superintendent and the Site Medical Director.

B.      Offenders who have obstructed closure of the food pass shall not receive meal service, including alternative meal service, until relinquishing control of the food pass and positioning themselves in a manner that does not endanger staff.  Meal service, which may include alternative meal service, shall be initiated when delivery of the meal does not place staff in danger (i.e. offender has moved to the rear of the cell and is not holding any objects).

**VII.** **Establishing Meal Schedules**

    A.    The menu shall be established on a five (5)-week rotating cycle to provide for sufficient advance planning and preparation, consistent with applicable health, sanitation, and safety codes. (ACA 4-4317; 4-JCF-4A-04)

        1.    Menus shall be reviewed every six (6) months, or whenever substantial changes in the menu are made by a registered dietician. (NCCHC P-F-02, Y-F-02; ACA 4-4316, 4-JCF-4A-03)

        2.    Quarterly meal evaluations shall be conducted by the contracted food service supervisor, or staff to verify adherence to the established basic daily servings. (ACA 4-4316; 4-JCF-4A-03)

    B.    Each facility shall establish routine meal service schedules consistent with the policy established by this IMPP.

        1.    With the exception of variations for weekend or holiday service schedules approved by the Deputy Secretary of Facilities Management or Deputy Secretary of Juvenile Services, at least three (3) meals (including two [2] hot meals) shall be served at regular times during each 24-hour period, with no more than 14 hours between the evening meal and breakfast.

    C.    Facilities shall be allowed to adopt and use a Standardized Brunch Menu if a variation is authorized by the Deputy Secretary of Facility Management and if:

        1.    Staff can better manage the food service demands of the facility for weekends and holidays.

        2.    Offender visiting hours for weekends and holidays can be better managed by adjusting the food service schedule.

        3.    Weekend or holiday brunch meal schedules shall be arranged so that no more than eight (8) hours elapse between the brunch and the evening meal.

        4.    The Standardized Brunch Menu is reviewed by the contractor's Registered Dietician to certify that it will meet all the nutritional requirements of three (3) regular meals.

**VIII.** **Food Production Record Monitoring**

    A.    The contractor shall maintain a food production record that shall be used as a daily addendum to the standardized menus and includes portion-sizing controls.

        1.    The food production record shall be completed each day to record all substitutions, alterations, or changes made to the standardized menu.

        2.    The food productions record shall be maintained to monitor the number of meals served and record information on leftover portions. (ACA 4-4315; 4-JCF-4A-08)

    B.    Alterations and substitutions of food items and the shifting of the daily menu to another day in the cycle shall be allowed for in the Standardized Menu, at the discretion of the senior facility food service staff member, for the following reasons: (ACA 4-4328; 4-JCF-4A-08)

        1.    Unavoidable changes due to spoilage or contamination;

            a.    Substitutions should be equivalent in nutritional value and from the same food group.

2.   Changes to accommodate purchasing patterns necessary to take full advantage of commodities;

3.   Changes due to equipment failure; and/or,

4.   Special holiday meal planning.

**IX.   Purchase of Meals by Staff and Official Visitors**

A.   Staff members, guests and official visitors may purchase meals from the contractor at the cost established by the contractor unless personnel provisions have established preemptive policy and procedure.

1.   Meals served to facility staff, guests, and official visitors shall consist of the same menu items, be of the same quantity and quality as those served to offenders.

2.   Accurate records shall be maintained of all meals served. (ACA 4-4315; 4-JCF-4A-08, 4-JCF-4A-05)

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them.  They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties.   Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS REQUIRED**

None.

**REFERENCES**

K.S.A. 75-5210
IMPP 10-119, 12-131
ACI 4-4315; 4-4316; 4-4317; 4-4318; 4-4319; 4-4320; 4-4327; 4-4328
JCF 4-JCF-4A-03; 4-JCF-4A-04; 4-JCF-4A-05; 4-JCF-4A-06; 4-JCF-4A-07; 4-JCF-4A-08; 4-JCF-3B-05
NCCHC P-F-04; Y-F-02
*Recommended Dietary Allowances,* Tenth Edition, National Research Council, 1989

**ATTACHMENTS**

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | KDOC Meal Evaluation Form | 1 page |

Case 5:21-cv-03269-SAC   Document 7-5   Filed 06/15/22   Page 8 of 8

Attachment A, IMPP 10-106D
Effective 09-29-15

## KDOC Meal Evaluation Form

Date: _____   Evaluator: _____

Breakfast ___   Lunch ___   Dinner ___   Facility: _____   Unit: _____

(Please Print Name & Title)

Restrictive Housing: ___ Y ___ N

| ITEM | YES | NO | COMMENTS |
|---|---|---|---|
| WAS TRAY NEATLY ARRANGED? | | | |
| DID SUPERVISOR SERVE ENTRÉE? | | | |
| **PORTIONS ADEQUATE PER MENU** | | | |
| ENTREE: | | | |
| POTATO/STARCH: | | | |
| VEGETABLE: | | | |
| DESSERT: | | | |
| BEVERAGE: | | | |
| OTHER ITEMS: | | | |
| **SUBSTITUTIONS** | | | |
| WERE THERE MENU SUBSTITUTIONS?   SPECIFY | | | |
| **WERE THERE ANY RUNOUTS?**   SPECIFY | | | |
| ARE MENU SUBSTITUTIONS RECORDED BY THE CONTRACTOR | | | |
| **FOOD TEMPERATURES** | | | |
| WERE HOT FOODS SERVED HOT?   SPECIFY | | | |
| WERE COLD FOODS SERVED COLD?   SPECIFY | | | |
| WAS FOOD TASTE APPROPRIATE TO THE ITEM? | | | |
| **FOOD SERVICE WORKERS** | | | |
| CLEAN AND IN PROPER UNIFORM? | | | |
| WEARING HAIR NET/HAT AND/OR BEARD NET? | | | |
| USING GLOVES? | | | |
| **DINING AREA** | | | |
| CLEAN AND SANITARY? | | | |

**OFFENDER EVALUATION:** Did offenders generally like the meal? ___ Yes ___ No   COMMENTS:

CC:   Contract Food Service Director
      Facility Warden/Superintendent or Designee

Canteen — KDOC Intranet

Case 5:21-cv-03269-SAC    Document 7-6    Filed 06/15/22    Page 1 of 17

https://ekdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&SUBMIT=Submit+Query

Exhibit F

next 100 results

| Facility | Inmate # | Inmate Name | Date | Item # | Item Description | Quantity | Purchased |
|---|---|---|---|---|---|---|---|
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/5/25 | 6009 | 6009 FOLGERS INSTANT | 1.0 | 6.34 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/5/25 | 6940 | 6940 NISSIN PICANTE | 30.0 | 9.3 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/5/25 | 7170 | 7170 CHICK-O-STICK | 2.0 | 0.36 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/5/25 | 99999 | RESIDENT TAXES | 1.0 | 1.04 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/5/11 | 6585 | 6585 REFRIED BEANS J | 1.0 | 1.57 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/5/11 | 6940 | 6940 NISSIN PICANTE | 28.0 | 8.68 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/5/11 | 99999 | RESIDENT TAXES | 1.0 | 0.67 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/27 | 5641 | 5641 USA FOREVER STA | 1.0 | 0.58 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/27 | 6009 | 6009 FOLGERS INSTANT | 1.0 | 6.34 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/27 | 6517 | 6517 Eastview Habane | 1.0 | 1.69 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/27 | 6585 | 6585 REFRIED BEANS J | 1.0 | 1.57 |

6/14/2022, 11:24 AM

https://ekdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&SUBMIT=Submit+Query

Central

| Facility | Number | Name | Date | Item # | Description | Qty | Amount |
|---|---|---|---|---|---|---|---|
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/27 | 6940 | 6940 NISSIN PICANTE | 26.0 | 8.06 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/27 | 99999 | RESIDENT TAXES | 1.0 | 1.15 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/20 | 4954 | 4954 LUSTERS PINK MO | 1.0 | 5.71 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/20 | 6009 | 6009 FOLGERS INSTANT | 1.0 | 6.34 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/20 | 6874 | 6874 FISHSTEAKS IN H | 2.0 | 2.04 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/20 | 99999 | RESIDENT TAXES | 1.0 | 0.92 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/13 | 4930 | 4930 LUSTI POMADE | 1.0 | 1.98 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/13 | 5094 | 5094 GOLD LEVEL10 AN | 2.0 | 2.52 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/13 | 5108 | 5108 Suave Citrus an | 1.0 | 3.45 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/13 | 5519 | 5519 ENVELOPE #10 WH | 10.0 | 0.5 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/13 | 5641 | 5641 USA FOREVER STA | 4.0 | 2.32 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/13 | 99999 | RESIDENT TAXES | 1.0 | 0.55 |

Canteen — KDOC Intranet

Case 5:21-cv-03269-SAC   Document 7-6   Filed 06/15/22   Page 3 of 17

https://ikdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&SUBMIT=Submit+Query

| Central | | | | | | | |
|---|---|---|---|---|---|---|---|
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 4563 | 4563 LIGHT BULB 40W | 1.0 | 2.35 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 5013 | 5013 Personal Care V | 1.0 | 1.6 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 5598 | 5598 THANK YOU CARD | 1.0 | 0.5 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 6031 | 6031 FRENCH VANILLA | 1.0 | 1.6 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 6421 | 6421 HIDDEN VALLEY O | 4.0 | 2.12 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 6518 | 6518 Eastview Jalape | 1.0 | 1.69 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 6585 | 6585 REFRIED BEANS J | 2.0 | 3.14 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 6940 | 6940 NISSIN PICANTE | 27.0 | 8.37 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 7069 | 7069 LIL DUTCHMAID S | 1.0 | 1.87 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 7170 | 7170 CHICK-O-STICK | 3.0 | 0.54 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 8620 | 8620 Cafe Cinnamon C | 1.0 | 2.69 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2022/4/6 | 99999 | RESIDENT TAXES | 1.0 | 1.72 |

https://ekdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&&SUBMIT=Submit+Query

| Location | | | | | | | |
|---|---|---|---|---|---|---|---|
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/12/8 | 5641 | 5641 USA FOREVER STA | 1.0 | 0.58 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/12/8 | 8620 | 8620 Cafe Cinnamon C | 1.0 | 2.69 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/12/8 | 99999 | RESIDENT TAXES | 1.0 | 0.17 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 5094 | 5094 GOLD LEVEL10 AN | 2.0 | 2.52 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 5097 | 5097 LEVEL 10 MOISTU | 1.0 | 1.26 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 5721 | 5721 DISPOSABLE EAR | 2.0 | 0.56 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 6347 | 6347 EL PATO HOT SAU | 1.0 | 1.53 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 6517 | 6517 Eastview Habane | 1.0 | 1.69 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 6585 | 6585 REFRIED BEANS J | 1.0 | 1.57 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 6940 | 6940 NISSIN PICANTE | 10.0 | 3.1 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 6942 | 6942 NISSIN CAJUN CH | 6.0 | 1.86 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 7225 | 7225 LIL DUTCH PEANU | 1.0 | 1.24 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Central | | | | | | |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 7226 | 7226 STRAWBERRY CREM | 1.0 | 1.24 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 7513 | 7513 PEPE HOT & SPIC | 1.0 | 1.09 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 9980 | 9980 COPY TICKET | 2.0 | 4.0 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/20 | 99999 | RESIDENT TAXES | 1.0 | 1.41 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/13 | 6031 | 6031 FRENCH VANILLA | 1.0 | 1.6 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/13 | 6054 | 6054 PREMIUM SELECT | 1.0 | 2.78 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/13 | 6517 | 6517 Eastview Habane | 1.0 | 1.69 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/13 | 6555 | 6555 WHITE RICE | 1.0 | 1.06 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/13 | 6585 | 6585 REFRIED BEANS J | 1.0 | 1.57 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/13 | 6940 | 6940 NISSIN PICANTE | 10.0 | 3.1 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/10/13 | 99999 | RESIDENT TAXES | 1.0 | 0.77 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/29 | 4563 | 4563 LIGHT BULB 40W | 1.0 | 2.35 |

Canteen — KDOC Intranet

https://exdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&SUBMIT=Submit+Query

6/14/2022, 11:24 AM

| Facility | ID | Name | Date | Item # | Description | Qty | Price |
|---|---|---|---|---|---|---|---|
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/29 | 4930 | 4930 LUSTI POMADE | 1.0 | 1.98 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/29 | 5560 | 5560 PEN BLACK FLEX | 1.0 | 0.5 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/29 | 99999 | RESIDENT TAXES | 1.0 | 0.31 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/1 | 5047 | 5047 BABY OIL SIZE 6 | 1.0 | 1.17 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/1 | 5097 | 5097 LEVEL 10 MOISTU | 2.0 | 2.52 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/1 | 5418 | 5418 COTTON SWABS 40 | 1.0 | 0.78 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/9/1 | 99999 | RESIDENT TAXES | 1.0 | 0.29 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/8/25 | 5094 | 5094 GOLD LEVEL10 AN | 3.0 | 3.78 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/8/25 | 5124 | 5124 Urban Wash Ocea | 1.0 | 2.5 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/8/25 | 5641 | 5641 USA FOREVER STA | 2.0 | 1.1 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/8/25 | 99999 | RESIDENT TAXES | 1.0 | 0.41 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/28 | 4219 | 4219 COAXIAL CABLE C | 1.0 | 1.98 |

Canteen — KDOC Intranet

https://ekdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&SUBMIT=Submit+Query

Central

| | | | | | | |
|---|---|---|---|---|---|---|
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/28 | 4233 | 4233 CLEAR TUNES 6' | 1.0 | 6.65 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/28 | 5578 | 5578 SHEET PROTECTOR | 3.0 | 0.9 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/28 | 99999 | RESIDENT TAXES | 1.0 | 0.62 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/15 | 4218 | 4218 6' HEADPHONE EX | 1.0 | -3.91 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/15 | 99999 | RESIDENT TAXES | 1.0 | -0.25 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 4218 | 4218 6' HEADPHONE EX | 1.0 | 3.91 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 4563 | 4563 LIGHT BULB 40W | 1.0 | 2.35 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 4788 | 4788 MINT FLOSSERS | 1.0 | 2.08 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 5055 | 5055 Lucky Petroleum | 1.0 | 1.99 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 5206 | 5206 LADY SPEED STIC | 1.0 | 2.68 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 5429 | 5429 SMALL TOILETRIE | 1.0 | 2.09 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 5436 | 5436 WASH CLOTH BEIG | 1.0 | 2.0 |

6/14/2022, 11:24 AM

Canteen — KDOC Intranet

https://ikdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&SUBMIT=Submit+Query

6/14/2022, 11:24 AM

Central

| Facility | ID | Name | Date | Item # | Description | Qty | Price |
|---|---|---|---|---|---|---|---|
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 5482 | 5482 LEVEL 10 CLEAR | 1.0 | 1.0 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 5721 | 5721 DISPOSABLE EAR | 1.0 | 0.28 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 6031 | 6031 FRENCH VANILLA | 2.0 | 3.2 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 6518 | 6518 Eastview Jalape | 1.0 | 1.69 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 6585 | 6585 REFRIED BEANS J | 2.0 | 3.14 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 6940 | 6940 NISSIN PICANTE | 10.0 | 2.9 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 7577 | 7577 Coyote Valley H | 2.0 | 3.6 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/14 | 99999 | RESIDENT TAXES | 1.0 | 2.14 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/7/13 | 95031 | BACK COUNTRY HOT FRI | 1.0 | -3.14 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/30 | 4563 | 4563 LIGHT BULB 40W | 1.0 | 2.35 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/30 | 5047 | 5047 BABY OIL SIZE 6 | 1.0 | 1.17 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/30 | 5408 | 5408 LIVI 2 PLY FACI | 1.0 | 1.08 |

Case 5:21-cv-03269-SAC   Document 7-6   Filed 06/15/22   Page 8 of 17

Canteen — KDOC Intranet

https://ekdoc.doc.ks.gov/canteen/canteenreport?CDTDCN=0076894&SUBMIT=Submit+Query

Central

| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/30 | 5416 | 5416 MIRROR ACRYLIC | 1.0 | 3.04 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/30 | 7714 | 7714 FAYGO ROOTBEER | 1.0 | 0.83 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/30 | 99999 | RESIDENT TAXES | 1.0 | 0.55 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/21 | 4965 | 4965 Urban Street Bo | 1.0 | -2.8 |
| El Dorado Correctional Fac. - Central | 0076894 | MCCOY,DERON,JR | 2021/6/21 | 99999 | RESIDENT TAXES | 1.0 | -0.18 |

next 100 results



6/14/2022, 11:24 AM

K=Kosher
H=Halal
G/F=Gluten Free

KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU
MALE CORRECTIONAL FACILITY  COMBINED MENU
PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | GROCERIES | SUGAR | SALT | G/F | K/H | SIZE | PRICE |
|--------|-----------|-------|------|-----|-----|------|-------|
| | **BEVERAGES** | | | | | | |
| 6009 | FOLGERS COFFEE PLASTIC CONTAINER | | | | K | 8 OZ | $6.34 |
| 6013 | NESCAFE HAZELNUT COFFEE SINGLES | | | | K | 16 PK | $6.19 |
| 6025 | TASTER'S CHOICE FREEZE DRIED COFFEE SINGLES | | | | K | 1.5 GR | $0.21 |
| 6031 | BACK COUNTRY FRENCH VANILLA CAPPUCCINO | | LOW | G/F | | 10 OZ | $1.60 |
| 6033 | BACK COUNTRY DECAF COFFEE | | | | K | 4 OZ | $2.76 |
| 6053 | FOOD EXPRESS 100% COLOMBIAN COFFEE | | | | K | 3 OZ | $3.51 |
| 6054 | FOOD EXPRESS PREMIUM SELECT ESPRESSO | | | | K | 4 OZ | $2.78 |
| 6073 | SWISS MISS HOT COCOA MIX - SINGLES | | | G/F | | 1 EA | $0.14 |
| 6089 | FOOD EXPRESS TEA BAGS | | | | K | 100 CT | $2.14 |
| 6096 | FOOD EXPRESS NON-DAIRY CREAMER CANISTER | | | | K | 12 OZ | $1.76 |
| 6099 | COFFEE-MATE FRENCH VANILLA CANISTER | | LOW | | K | 15 OZ | $5.50 |
| 6131 | CRUSH ORANGE SINGLES TO GO | NO | | | | 6 CT | $1.61 |
| 6132 | CRUSH STRAWBERRY SINGLES TO GO | NO | | | | 6 CT | $1.61 |
| 6139 | LEMON JUICE WEDGE | NO | NO | G/F | K | 4 OZ | $1.04 |
| 6144 | GATORADE FRUIT PUNCH DRINK MIX | | | | K | 2.12 OZ | $1.20 |
| 6153 | HAWAIIAN PUNCH  BERRY BLUE SINGLES TO GO | NO | | | | 8 CT | $1.68 |
| 6155 | HAWAIIAN PUNCH  JUICY RED SINGLES TO GO | NO | | | | 8 CT | $1.68 |
| 6535 | BACK COUNTRY INSTANT NON FAT DRY MILK | | | | K | 5 OZ | $2.00 |
| 7708 | FAYGO COLA 20 OZ - Combined Limit 36 | | | | | 20 OZ | $0.83 |
| 7709 | FAYGO MOON MIST - Combined Limit 36 | | | | | 20 OZ | $0.83 |
| 7710 | FAYGO DR FAYGO - Combined Limit 36 | | | | | 20 OZ | $0.83 |
| 7711 | FAYGO ORANGE - Combined Limit 36 | | | | | 20 OZ | $0.83 |
| 7714 | FAYGO ROOT BEER - Combined Limit 36 | | | | | 20 OZ | $0.83 |
| 7735 | PEPSI - Combined Limit 36 | | | | | 20 OZ | $1.63 |
| 7736 | DIET PEPSI - Combined Limit 36 | | | | | 20 OZ | $1.63 |
| 7737 | MOUNTAIN DEW - Combined Limit 36 | | | | | 20 OZ | $1.63 |
| 7773 | NESTLE PURE WATER - Combined Limit 36 | | NO | G/F | | 16.9 OZ | $0.70 |
| | **PEANUT BUTTER - JELLY** | | | | | | |
| 6440 | HOME BRAND GRAPE JELLY SQUEEZE BOTTLE | | | | | 20 OZ | $2.99 |
| 6441 | HOME BRAND STRAWBERRY FRUIT SPREAD SQUEEZE BOTTLE | | | | K | 20 OZ | $3.81 |
| 6469 | FOOD EXPRESS CREAMY PEANUT BUTTER | | | | K | 18 OZ | $2.98 |
| 6470 | FOOD EXPRESS CHUNKY PEANUT BUTTER | | | | K | 18 OZ | $3.00 |
| | **CHEESE** | | | | | | |
| 6478 | EASTVIEW FARMS MOZZARELLA CHEESE STICK | | | G/F | K | 4 OZ | $1.60 |
| 6479 | EASTVIEW FARMS CHEDDAR CHEESE STICK | | | G/F | K | 4 OZ | $1.60 |
| 6492 | WISCONSIN CREAM CHEESE | | | | | 2 OZ | $0.67 |
| 6495 | KRAFT VELVEETA | | | | | 8 OZ | $4.78 |
| 6517 | HABANERO CHEESE CUP | NO | | | | 8 OZ | $1.69 |
| 6518 | JALAPENO CHEESE CUP | NO | | | | 8 OZ | $1.69 |
| 6519 | NACHO CHEESE CUP | NO | | | | 8 OZ | $1.69 |
| | **BEANS - RICE - CHILI** | | | | | | |
| 6555 | FOOD EXPRESS PRE-COOKED LONG GRAIN WHITE RICE | | | | K/H | 8 OZ | $1.06 |
| 6556 | FOOD EXPRESS PRE-COOKED LONG GRAIN BROWN RICE | | | | K/H | 6.5 OZ | $1.41 |
| 6573 | COOKQUIK INSTANT RED BEANS AND RICE CHILI FLAVORED | | | G/F | K | 4.4 OZ | $1.22 |
| 6585 | COOKQUIK REFRIED BEANS WITH JALAPENOS AND GREEN CHILES | | | G/F | K | 8 OZ | $1.57 |
| 6597 | BACK COUNTRY CHILI W/ BEANS - Combo/30 | | | | | 11.25 OZ | $2.95 |
| 6599 | BACK COUNTRY HOT CHILI W/ BEANS - Combo/30 | | | | | 11.25 OZ | $3.19 |
| | **CRACKER** | | | | | | |
| 7008 | CHEEZ-IT HOT AND SPICY | | | | | 7 OZ | $2.24 |
| 7009 | KEEBLER TOWN HOUSE CRACKERS | | | | | 13.8 OZ | $2.63 |
| 7030 | CHEEZ-IT ORIGINAL | | | | | 7 OZ | $2.24 |
| 7034 | AUSTIN CHEESE CRACKERS WITH PEANUT BUTTER | | | | K | 1.38 OZ | $0.35 |
| 7035 | AUSTIN PEPPERJACK CRACKER SANDWICH | | | | K | 1.38 OZ | $0.35 |
| 7036 | BAKER'S HARVEST WHEAT CRACKER | | | | K | 9.1 OZ | $2.85 |
| 7069 | LIL DUTCHMAID SALTINE CRACKERS | | | | K | 16 OZ | $1.87 |

K=Kosher
H=Halal
G/F=Gluten Free

**KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU**
**MALE CORRECTIONAL FACILITY  COMBINED MENU**
PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | GROCERIES | SUGAR | SALT | G/F | K/H | SIZE | PRICE |
|---|---|---|---|---|---|---|---|
| | **MEATS – SEAFOOD** | | | | | | |
| 6588 | BACK COUNTRY BEEF STEW | | | | | 11.25 OZ | $2.78 |
| 6614 | COMAL SHREDDED CHICKEN w/ GREEN SAUCE | | | G/F | | 8 OZ | $3.95 |
| 6616 | HEREFORD SEASONED BEEF CRUMBLES | | | | | 6 OZ | $4.05 |
| 6619 | HEREFORD SPICY SEASONED BEEF CRUMBLES | | | | | 6 OZ | $4.05 |
| 6621 | BACK COUNTRY CHICKEN TACO FILLING | | | | | 11.25 OZ | $2.74 |
| 6623 | PANCHO'S CANTINA SHREDDED BEEF | | | | H | 7 OZ | $3.84 |
| 6636 | MEATBALLS IN TOMATO SAUCE | | | G/F | | 10 OZ | $4.00 |
| 6639 | SIAM CHINESE PORK SAUSAGE | | | | | 4.5 OZ | $2.70 |
| 6645 | HORMEL SPAM CLASSIC SINGLE | | | | | 3 OZ | $1.84 |
| 6655 | BACK COUNTRY PREMIUM CHICKEN WHITE MEAT IN A POUCH | | | | | 4.5 OZ | $2.30 |
| 6686 | LEGENDARY MEAT SNACKS HOT BEEF SUMMER SAUSAGE | | | | | 5 OZ | $1.74 |
| 6690 | LEGENDARY MEAT SNACKS BEEF SUMMER SAUSAGE | | | | | 5 OZ | $1.74 |
| 6693 | LEGENDARY MEAT SNACKS BEEF SALAMI | | | | | 5 OZ | $1.66 |
| 6697 | BACK COUNTRY PEPPERONI PRE SLICED | | | G/F | | 3.5 OZ | $2.88 |
| 6707 | HOT SHOTS MEAT SNACKS | | | | | 1 OZ | $0.60 |
| 6830 | FISHERMAN'S PARADISE LIGHT TUNA w/ DICED JALAPENOS | LOW | | G/F | K/H | 3.53 OZ | $2.12 |
| 6836 | FISHERMAN'S PARADISE MACKEREL FILLET IN OIL | | | G/F | K/H | 3.53 OZ | $1.83 |
| 6837 | FISHERMAN'S PARADISE WHOLE MACKEREL FILLET IN WATER | | | G/F | K/H | 12 OZ | $3.75 |
| 6848 | FISHERMAN'S PARADISE SARDINES IN OIL | | | G/F | K/H | 3.53 OZ | $1.02 |
| 6868 | FISHERMAN'S PARADISE SMOKED OYSTERS | | | G/F | | 3 OZ | $2.55 |
| 6874 | FISHERMAN'S PARADISE FISH STEAKS IN LOUISIANA HOT SAUCE | | | G/F | K/H | 3.53 OZ | $1.02 |
| 6889 | FISHERMAN'S PARADISE CHUNK LIGHT TUNA IN WATER | | | G/F | K/H | 4.23 OZ | $2.06 |
| 7820 | FISHERMAN'S PARADISE YELLOWFIN TUNA SPICY THAI SAUCE | | | G/F | K/H | 3.53 OZ | $1.31 |
| | **SOUP – PASTA – TORTILLA** | | | | | | |
| 6550 | HOSPITALITY MACARONI & CHEESE DINNER | | | | K | 7.25 OZ | $0.73 |
| 6912 | NISSIN BEEF CUP - *Combined Limit 30* | NO | | | | 2.25 OZ | $0.65 |
| 6913 | NISSIN HEARTY CHICKEN CUP - *Combined Limit 30* | NO | | | | 2.25 OZ | $0.65 |
| 6925 | ALLEGRA ANGEL HAIR PASTA - *Combined Limit 30* | LOW | NO | | K | 16 OZ | $1.39 |
| 6939 | NISSIN CHILI RAMEN - *Combined Limit 30* | | | | | 3 OZ | $0.31 |
| 6940 | NISSIN PICANTE BEEF RAMEN - *Combined Limit 30* | | | | | 3 OZ | $0.31 |
| 6941 | NISSIN CHICKEN RAMEN - CLEAR - *Combined Limit 30* | | | | | 3 OZ | $0.31 |
| 6942 | NISSIN CAJUN CHICKEN RAMEN - *Combined Limit 30* | | | | | 3 OZ | $0.31 |
| 6943 | NISSIN ORIENTAL RAMEN - *Combined Limit 30* | | | | | 3 OZ | $0.31 |
| 6965 | SAYULITA 8" FLOUR TORTILLA 10 CT | LOW | LOW | | K/H | 10 OZ | $2.05 |
| 6996 | WHEAT TORTILLA 6 CT | LOW | LOW | | K/H | 7.8 OZ | $1.05 |
| 6997 | BUTTER TORTILLA 6 CT | LOW | LOW | | K/H | 7.8 OZ | $1.00 |
| | **VEGETABLES** | | | | | | |
| 6552 | HOSPITALITY INSTANT MASHED POTATOES | | | | | 13.3 OZ | $2.86 |
| 6749 | TEXAS TITO'S BIG FAT JUICY DILL PICKLE | | | | K | 6 OZ | $0.77 |
| 6756 | EL PATO SLICED JALAPENO WHEELS PLASTIC JAR | | | | K | 12 OZ | $2.13 |
| 6761 | STAR SPANISH OLIVES STUFFED WITH MINCED PIMENTO | | | G/F | | 2.5 OZ | $1.95 |
| | **SWEETENER** | | | | | | |
| 6266 | SWEETMATE PACKET - BLUE - ASPARTAME | NO | LOW | G/F | | 100 CT | $1.85 |
| 6267 | SWEETMATE PACKET - PINK - SACCHARIN | NO | LOW | G/F | | 100 CT | $1.85 |
| | **POPCORN – NUTS – TRAIL MIX** | | | | | | |
| 6992 | MR. NATURE PEANUTS ROASTED & SALTED | NO | | G/F | K | 3.5 OZ | $0.75 |
| 7005 | ACT II BUTTER LOVERS POPCORN | | | | K | 2.75 OZ | $0.64 |
| 7007 | ACT II KETTLE CORN | | | | K | 2.75 OZ | $0.61 |
| 7020 | KAR'S MIXED NUTS WITH PEANUTS | | | | K | 10 OZ | $3.90 |
| 7024 | KAR'S HONEY ROASTED PEANUTS | | | | K | 3.5 OZ | $0.85 |
| 7026 | KAR'S SUNFLOWER KERNELS | | | | K | 2 OZ | $0.79 |
| 7542 | KAR'S ALL ENERGY TRAIL MIX | | | | K | 2 OZ | $0.92 |

K=Kosher
H=Halal
G/F=Gluten Free

KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU
MALE CORRECTIONAL FACILITY  COMBINED MENU
PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | GROCERIES | SUGAR | SALT | G/F | K/H | SIZE | PRICE |
|--------|-----------|-------|------|-----|-----|------|-------|
| | **BAGELS - CEREAL - OATMEAL - POP TARTS** | | | | | | |
| 6979 | KELLOGG'S POP-TARTS STRAWBERRY | | | | | 2 PK | $0.76 |
| 6987 | TOAST'EM POP-UPS FROSTED BROWN SUGAR CINNAMON | | LOW | | | 6 OZ | $1.42 |
| 7320 | MALT-O-MEAL RAISIN BRAN | | | | K | 15 OZ | $2.85 |
| 7322 | MALT-O-MEAL FROSTED FLAKES | | | | K | 15 OZ | $2.71 |
| 7330 | MALT-O-MEAL BERRY COLOSSAL CRUNCH | | | | K | 12.5 OZ | $2.43 |
| 7340 | MALT-O-MEAL HONEY & OAT BLENDERS | | | | K | 12 OZ | $2.75 |
| 7360 | MALT-O-MEAL FROSTED MINI SPOONERS | | | | | 15 OZ | $3.16 |
| 7364 | RALSTON FOODS MAPLE BROWN SUGAR INSTANT OATMEAL | | | | K | 10 OZ | $3.53 |
| 7373 | 100% NATURAL WHOLE GRAIN QUICK OATS | NO | NO | | K | 16 OZ | $2.20 |
| 7461 | NATURE VALLEY OATS & HONEY GRANOLA BARS | | | | | 1.5 OZ | $0.75 |
| 7467 | CINNAMON RAISIN BAGEL | LOW | LOW | | K/H | 4 OZ | $0.54 |
| 7468 | WHOLE GRAIN PLAIN BAGEL | | LOW | | K/H | 4 OZ | $0.48 |
| | **PROTEIN BARS** | | | | | | |
| 7440 | PROMAX CHOCOLATE PEANUT CRUNCH BAR | | | G/F | K | 2.64 OZ | $1.64 |
| 7447 | PROMAX DOUBLE FUDGE BROWNIE BAR | | | | K | 2.64 OZ | $1.64 |
| | **CHIPS - PRETZEL** | | | | | | |
| 7513 | PEPE'S HOT AND SPICY PORK RINDS | | | | | 3 OZ | $1.09 |
| 7524 | HARVEST ROAD MINI PRETZEL | | | | K | 12 OZ | $1.60 |
| 7535 | SAYULITA CHILI CHEESE CORN CHIPS | | | | | 9.25 OZ | $2.57 |
| 7536 | SAYULITA BBQ CORN CHIPS | | | | | 12 OZ | $2.45 |
| 7538 | BACK COUNTRY CRUNCHY NUGGETS COOL RANCH | | | | | 1.65 OZ | $0.39 |
| 7540 | SAYULITA SPICY FIESTA MIX | | | | | 11 OZ | $2.87 |
| 7550 | SAYULITA CANTINA STYLE TORTILLA CHIPS | | | | K | 12 OZ | $2.96 |
| 7568 | COYOTE VALLEY TANGY BBQ POTATO CHIP | | | | | 5 OZ | $1.18 |
| 7572 | COYOTE VALLEY SOUR CREAM & ONION POTATO CHIP | | | | | 5 OZ | $1.18 |
| 7576 | COYOTE VALLEY CHEESE NIBBLES | | | | | 10 OZ | $1.82 |
| 7577 | COYOTE VALLEY CHEESE NIBBLES - EXTREME HOT | | | | | 10 OZ | $2.34 |
| 7578 | SAYULITA CANTINA STYLE NACHO TORTILLA CHIPS | | | | | 12 OZ | $2.96 |
| | **CANDY - COOKIES - PUDDING** | | | | | | |
| 6970 | SNACK PACK CHOCOLATE PUDDING | | | | K | 4 OZ | $1.93 |
| 7071 | TOOTSIE ROLL POPS | | LOW | G/F | K | 17 CT | $3.55 |
| 7097 | GRACEY'S GOODIES GUMMI BEARS | | LOW | G/F | | 4 OZ | $1.25 |
| 7099 | GRACEY'S GOODIES JELLY BEANS | | | G/F | | 4.5 OZ | $1.03 |
| 7106 | GRACEY'S GOODIES RAINBOW MIX HARD CANDY | | LOW | G/F | | 4.5 OZ | $1.14 |
| 7116 | GRACEY'S GOODIES RED LICORICE PIECES | | | | | 4.3 OZ | $1.04 |
| 7121 | STARLIGHT MINTS | | LOW | | | 4.5 OZ | $1.00 |
| 7122 | GRACEY'S GOODIES SUGAR FREE ASSORTED HARD CANDY | NO | LOW | | | 3.25 OZ | $0.94 |
| 7133 | SWEET DESIRE DARK CHOCOLATE BAR | | | G/F | | 3.5 OZ | $1.65 |
| 7135 | SWEET DESIRE MILK CHOCOLATE BAR | | | G/F | | 3.5 OZ | $1.65 |
| 7137 | SWEET DESIRE MILK AND ALMOND CHOCOLATE BAR | | | G/F | | 3.5 OZ | $1.65 |
| 7139 | GRACEY'S GOODIES ATOMIC FIREBALLS | | | G/F | | 3.25 OZ | $0.80 |
| 7149 | COLOMBINA BUTTERSCOTCH DISCS | | LOW | G/F | | 8 OZ | $1.63 |
| 7155 | OLD FASHIONED ASSORTED LEMONADE HARD CANDY | | LOW | G/F | | 10 OZ | $1.50 |
| 7157 | TWIX COOKIE BAR | | LOW | | K | 1.79 OZ | $0.95 |
| 7159 | MILKY WAY KING | | LOW | G/F | K | 3.63 OZ | $1.45 |
| 7162 | M & M'S PLAIN | | LOW | G/F | K | 1.69 OZ | $0.76 |
| 7166 | M & M'S PEANUT | | | G/F | K | 1.74 OZ | $0.81 |
| 7170 | CHICK-O-STICK | | | G/F | K | 0.7 OZ | $0.18 |
| 7176 | SNICKERS | | LOW | G/F | K | 1.86 OZ | $0.84 |
| 7222 | CHICK-O-STICK SUGAR FREE | NO | LOW | G/F | K | 3.75 OZ | $3.30 |
| 7851 | LIL' DUTCH MAID CHOCOLATE CRÈME COOKIES | | | | K/H | 11.8 OZ | $1.24 |
| 7854 | LIL' DUTCH MAID PEANUT BUTTER CRÈME COOKIES | | | | K/H | 11.8 OZ | $1.24 |
| 7855 | LIL' DUTCH MAID STRAWBERRY CRÈME COOKIES | | | | K/H | 11.8 OZ | $1.24 |
| 7858 | LIL' DUTCH MAID CHOCOLATE CHIP COOKIES | | | | K/H | 10.5 OZ | $1.38 |

K=Kosher
H=Halal
G/F=Gluten Free

KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU
MALE CORRECTIONAL FACILITY  COMBINED MENU
PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | GROCERIES | SUGAR | SALT | G/F | K/H | SIZE | PRICE |
|--------|-----------|-------|------|-----|-----|------|-------|
| | **CONDIMENTS - SPICES** | | | | | | |
| 6337 | BUBBA'A KICKIN' HOT SAUCE WITH TABASCO PEPPERS | NO | | G/F | K | 5 OZ | $1.60 |
| 6347 | EL PATO HOT SAUCE | | | | K | 12 OZ | $1.53 |
| 6357 | TAPA ROSA SALSA | | LOW | G/F | | 15.5 OZ | $3.21 |
| 6358 | DRAGON EXPRESS SOY SAUCE | | | | | 5 OZ | $0.85 |
| 6377 | HUNTS TOMATO KETCHUP | | | G/F | | 20 OZ | $3.80 |
| 6381 | SIAM SWEET & HOT ASIAN HOT SAUCE | | | | | 15.5 OZ | $2.50 |
| 6383 | DRAGON EXPRESS SRIRACHA HOT CHILI SAUCE | | | | | 8 OZ | $1.62 |
| 6404 | MOREHOUSE MUSTARD SQUEEZE BOTTLE | NO | LOW | | K | 8 OZ | $1.60 |
| 6410 | RED WING MAYONNAISE SQUEEZE BOTTLE | | | | K | 12 OZ | $2.31 |
| 6417 | HOME BRAND BBQ SAUCE ORIGINAL | | | | K | 18 OZ | $1.96 |
| 6419 | FOOD EXPRESS PURE HONEY BEAR | | | | K | 12 OZ | $3.00 |
| 6421 | HIDDEN VALLEY ORIGINAL RANCH DRESSING | | | | K | 1.5 OZ | $0.53 |
| 6480 | FOOD EXPRESS SPAGHETTI SAUCE | NO | LOW | G/F | | 15.5 OZ | $1.77 |
| 6772 | SPICE SUPREME GARLIC POWDER | | | | K | 2.5 OZ | $1.27 |
| 6773 | SPICE SUPREME SEASONED SALT | | | | | 7.25 OZ | $1.42 |
| 6780 | SPICE SUPREME MINCED ONION | | | | K | 2.75 OZ | $1.08 |
| 6795 | SPICE SUPREME VEGETABLE FLAKES | | | | K | 2 OZ | $1.25 |
| 6809 | EMPORIA SALT & PEPPER 2 PIECE SHAKERS | | | | K | 4.75 OZ | $2.30 |
| | **PASTRIES** | | | | | | |
| 7406 | MRS. FRESHLEY'S BUDDY BARS | | | | K | 12 OZ | $2.01 |
| 7407 | MRS. FRESHLEY'S SWISS ROLLS | | | | K | 12 OZ | $1.80 |
| 7411 | MRS. FRESHLEY'S GRAND HONEY BUN | | | | K | 6 OZ | $1.55 |
| 7416 | LITTLE DEBBIE DOUBLE DECKER OATMEAL CRÈME PIE | | | | K | 3.9 OZ | $0.75 |
| 7423 | CLOVERHILL APPLE DANISH | | | | K | 4 OZ | $1.01 |
| 7448 | CLOVERHILL STRAWBERRY CHEESE DANISH | | | | | 4.25 OZ | $1.14 |

| ITEM # | DENTAL | | | | | SIZE | PRICE |
|--------|--------|--|--|--|--|------|-------|
| 4731 | CREST WHITENING BAKING SODA & PEROXIDE - *Limit 2* | | | | | 4.2 OZ | $3.96 |
| 4749 | COLGATE FULL HEAD CELLO WRAPPED SOFT TOOTHBRUSH - *Limit 2* | | | | | 1 EA | $0.48 |
| 4752 | AIM CAVITY MINT GEL TOOTHPASTE - *Limit 2* | | | | | 5.5 OZ | $2.62 |
| 4757 | CLOSEUP CINNAMON RED GEL TUBE - *Limit 2* | | | | | 6 OZ | $2.18 |
| 4765 | DENTU-CREAM TOOTHPASTE - *Limit 2* | | | | | 3.9 OZ | $5.95 |
| 4770 | FRESH MINT FLUORIDE TOOTHPASTE (BIHS) - Limit 2 | | | | | 2.75 OZ | $0.52 |
| 4772 | FRESHMINT SENSITIVE TOOTHPASTE - *Limit 2* | | | | | 4.3 OZ | $2.06 |
| 4777 | TEK EXCEL TOOTHBRUSH MEDIUM - *Limit 2* | | | | | 1 EA | $1.05 |
| 4782 | SECURITY TOOTHBRUSH WHITE THUMB HANDLE (BIHS) - *Limit 2* | | | | | 1 EA | $0.15 |
| 4787 | FRESHMINT 40CT DENTURE TABLETS- *Limit 2* | | | | | 40 CT | $2.65 |
| 4788 | IODENT MINT FLOSS PIKS - Limit 2 | | | | | 60 CT | $2.08 |
| 4791 | CLOSEUP MOUTHWASH CINNAMON ALCOHOL/SUGAR FREE - *Limit 2* | | | | | 16 OZ | $2.18 |
| 4796 | MINT FLAVOR INDIVIDUAL DENTAL FLOSS - 20" Limit 7 | | | | | 1 EA | $2.18 |
| 4804 | CLEAR DENTURE CUP  - *Limit 1* | | | | | 1 EA | $0.16 |
| 4808 | EFFERGRIP DENTURE ADHESIVE ZINC FREE - *Limit 2* | | | | | 1.5 OZ | $2.80 |
| 4810 | FIXODENT ADHESIVE CREAM - *Limit 2* | | | | | 1.4 OZ | $2.73 |
| 4820 | ARM & HAMMER WHITENING TOOTHPASTE- Limit 2 | | | | | 6 OZ | $6.51 |
| 4821 | CREST SENSITIVITY TOOTHPASTE- Limit 2 | | | | | 6 OZ | $6.91 |
| 4823 | CREST PROHEALTH MOUTHWASH- limit 2 | | | | | 16.9 OZ | $9.67 |

| ITEM # | LOTION/POWDER | | | | | SIZE | PRICE |
|--------|---------------|--|--|--|--|------|-------|
| 4732 | SCENTED OIL (ETERNITY) | | | | | 0.5 OZ | $4.30 |
| 4965 | URBAN STREET HYPO ALLERGENIC BODY LOTION - *Limit 2* | | | | | 16 OZ | $2.80 |
| 5001 | COCOCARE COCOA BUTTER STICK - *Limit 2* | | | | | 1 OZ | $2.54 |
| 5011 | PERSONAL CARE LOTION ALOE - *Limit 2* | | | | | 18 OZ | $2.61 |
| 5013 | PERSONAL CARE VITAMIN E SKIN CREAM- *Limit 2* | | | | | 8 OZ | $1.60 |
| 5014 | NIVEA SHEA LOTION- Limit 2 | | | | | 8.4 OZ | $6.63 |
| 5019 | NOXZEMA ORIGINAL SKIN CREAM - *Limit 2* | | | | | 2 OZ | $3.05 |
| 5021 | JERGEN'S ULTRA HEALING LOTION - *Limit 2* | | | | | 10 OZ | $7.02 |
| 5023 | GOOD SENSE SUNSCREEN SPF 30 - *Limit 2* | | | | | 4 OZ | $4.44 |
| 5032 | SUAVE COCOA BUTTER WITH SHEA LOTION - *Limit 2* | | | | | 10 OZ | $3.75 |
| 5041 | ST. IVES FRESH SKIN INVIGORATING APRICOT SCRUB - *Limit 2* | | | | | 6 OZ | $8.98 |
| 5047 | BABY OIL - *Limit 2* | | | | | 6.5 OZ | $1.17 |
| 5049 | BABY LOVE CORNSTARCH BABY POWDER - *Limit 2* | | | | | 10 OZ | $1.16 |
| 5053 | LUCKY LAVENDER CORNSTARCH - *Limit 2* | | | | | 10 OZ | $1.73 |
| 5055 | LUCKY PETROLEUM JELLY - *Limit 2* | | | | | 6 OZ | $1.99 |

K=Kosher
H=Halal
G/F=Gluten Free

KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU
MALE CORRECTIONAL FACILITY  COMBINED MENU
PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | MEDICAL | GLUTEN | SIZE | PRICE |
|---|---|---|---|---|
| 3527 | GOOD SENSE FIBER CAPLETS | | 100 CT | $9.88 |
| 5213 | MEDIQUE GENERIC 250 MG EXCEDRIN- Combined Limit 21 | | 2 CT | $0.25 |
| 5214 | MEDIQUE ACETAMINOPHEN 500 MG - Combined Limit 21 | | 2 CT | $0.25 |
| 5215 | MEDI-FIRST IBUPROFEN 200 MG - Combined Limit 21 | | 2 CT | $0.25 |
| 5229 | SHEFFIELD'S CLEAR ZIT ACNE CONTROL CREAM 2% SALICLYLIC ACID | | 1 OZ | $2.14 |
| 5242 | ALLERGY RELIEF WITH LORATADINE - Limit 1 | | 10 CT | $2.60 |
| 5252 | PERSONAL CARE MEDICATED CHEST RUB - Limit 1 | | 4 OZ | $2.13 |
| 5244 | TRIPLE ANTIBIOTIC CREAM GENERIC NEOSPORIN - Limit 1 | | 0.5 OZ | $4.22 |
| 5254 | MILK OF MAGNESIA | | 12 OZ | $3.75 |
| 5257 | GOOD SENSE MULTI-PURPOSE SALINE SOLUTION | | 12 OZ | $6.84 |
| 5259 | GOOD SENSE COUGH DROPS HONEY LEMON 30CT | | 30 CT | $2.06 |
| 5261 | GOOD SENSE NASAL SPRAY 12 HOUR (LIKE AFRIN) - Limit 1 | | 1 OZ | $2.82 |
| 5263 | GOOD SENSE COUGH DROP SUGAR FREE BLACK CHERRY | | 25 PC | $1.87 |
| 5272 | PEOPLES'S CHOICE VITAMINS NO IRON - Limit 1 | | 100 CT | $4.40 |
| 5273 | PEOPLES'S CHOICE VITAMIN B - Limit 1 | | 50 CT | $3.61 |
| 5274 | PEOPLES'S CHOICE VITAMINS WITH IRON - Limit 1 | | 100 CT | $6.95 |
| 5276 | PEOPLES'S CHOICE VITAMIN B12 - Limit 1 | | 75 CT | $5.40 |
| 5280 | A2Z CALCIUM ANTACID ASSORTED FRUIT FLAVORS - Limit 1 | | 150 CT | $4.00 |
| 5281 | PEOPLES'S CHOICE VITAMIN E - Limit 1 | | 50 CT | $4.56 |
| 5282 | PEOPLES'S CHOICE VITAMIN C - Limit 1 | | 100 CT | $6.95 |
| 5283 | PEOPLES'S CHOICE CALCIUM - Limit 1 | | 50 CT | $4.27 |
| 5284 | HYDROCORTISONE 1% CREAM - Limit 1 | | 0.5 OZ | $1.84 |
| 5286 | MUSCLE RUB CREAM MAX STRENGTH (GENERIC BEN GAY) - Limit 1 | | 1.25 OZ | $2.07 |
| 5287 | TOLNAFTATE CREAM 1% - Limit 1 | | 1 OZ | $2.25 |
| 5293 | GOOD SENSE HEMORRHOID OINTMENT - Limit 1 | | 2 OZ | $4.78 |
| 5329 | FAMILY CARE EYE DROPS ADVANCED (GENERIC VISINE) - Limit 1 | | 0.5 OZ | $2.70 |
| 5444 | GOOD SENSE BANDAID | | 10 CT | $1.25 |
| 5482 | LEVEL 10 CLEAR LIP BALM | | 0.15 OZ | $1.03 |
| ITEM # | SHAVING SUPPLIES | | SIZE | PRICE |
| 4923 | MAGIC SHAVE RAZOR LESS SHAVE CREAM REGULAR | | 6 OZ | $5.26 |
| 4966 | PERSONAL CARE SHAVE GEL SENSITIVE | | 6 OZ | $1.92 |
| 4975 | OCEAN CLEAR ALCOHOL FREE AFTER SHAVE AQUA BLUE | | 5 OZ | $1.78 |
| 4976 | MARX TRIPLE BLADE DISPOSABLE RAZOR | | 5 EA | $2.19 |
| 4978 | SINGLE BLADE DISPOSABLE RAZOR (BIHS) | | 1 EA | $0.10 |
| 4981 | PERSONNA TWIN BLADE RAZOR | | 5 PK | $1.98 |
| ITEM # | HAIR CARE PRODUCTS | | SIZE | PRICE |
| 4814 | V05 SHAMPOO MOISTURE STRAWBERRIES & CREAM - Limit 2 | | 12.5 OZ | $2.85 |
| 4825 | SOFTEE HERBAL GRO HAIR REPAIR- Limit 2 | | 5 OZ | $9.31 |
| 4838 | LEVEL 10 2 N 1 SHAMPOO & CONDITIONER - Limit 2 | | 15 OZ | $2.58 |
| 4840 | PERSONAL CARE HERBAL HYDRATION SHAMPOO - Limit 2 | | 12 OZ | $1.32 |
| 4855 | PANTENE PRO V 2 IN 1 SHAMPOO CONDITIONER | | 12.6 OZ | $8.07 |
| 4873 | GREEN APPLE SHAMPOO - Limit 2 | | 15 OZ | $2.10 |
| 4891 | LEVEL 10 CONDITIONER DAILY MOISTURIZING - Limit 2 | | 15 OZ | $2.76 |
| 4905 | URBAN STYLING GEL - Limit 2 | | 16 OZ | $2.15 |
| 4906 | SOFTEE AFRICAN CROWN HAIR DRESSING Limit 2 | | 5 OZ | $4.00 |
| 4907 | SUAVE DANDRUFF SHAMPOO | | 12.6 OZ | $4.89 |
| 4909 | SOFTEE PROTEIN STYLING GEL DARK | | 8 OZ | $1.85 |
| 4910 | SUAVE CONDITIONER GREEN APPLE- Limit 2 | | 15 OZ | $2.18 |
| 4926 | BLUE MAGIC HAIR DRESSING - Limit 2 | | 4 OZ | $2.98 |
| 4930 | LUSTI POMADE - Limit 2 | | 4 OZ | $1.98 |
| 4932 | LUSTI HAIR FOOD - Limit 2 | | 4 OZ | $1.98 |
| 4933 | MURRAY'S POMADE - Limit 2 | | 3 OZ | $5.13 |
| 4934 | BLUE MAGIC CHOLESTEROL | | 14 OZ | $4.28 |
| 4941 | SULFUR SHAMPOO - Limit 2 | | 7.5 OZ | $4.31 |
| 4946 | REGULAR RELAXER KIT - Limit 2 | | 1 EA | $9.52 |
| 4950 | LOC TWIST BRAID BUTTER - Limit 2 | | 4 OZ | $3.98 |
| 4954 | LUSTER'S PINK MOISTERIZING OIL - Limit 2 | | 8 OZ | $5.71 |
| 5432 | CLUB BRUSH BOAR BRISTLE | | 1 EA | $2.68 |
| 5449 | COMB 5" ALL PURPOSE POLY (BIHS) - Limit 1 | | 1 EA | $0.13 |
| 5451 | SPARTEN WAVE BUILDER WAVE CAP BLACK | | 2 PK | $2.68 |
| 5452 | HAIR PIK 5" BLACK - Limit 1 | | 1 EA | $0.54 |
| 5455 | HAIR BRUSH VENTED BLACK SOFT VENT BRISTLES - Limit 1 | | 1 EA | $0.84 |
| 5483 | WIDE TOOTH COMB | | 1 EA | $1.12 |

K=Kosher
H=Halal
G/F=Gluten Free

KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU
MALE CORRECTIONAL FACILITY  COMBINED MENU
PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | SOAP | GLUTEN | SIZE | PRICE |
|---|---|---|---|---|
| 5066 | DOVE WHITE SOAP SINGLE BAR - *Combined Limit 4* | | 3.17 OZ | $3.29 |
| 5070 | DEODORANT SOAP ANIMAL FAT FREE (BIHS) - *Combined Limit 4* | | 3 OZ | $0.50 |
| 5082 | IRISH SPRING ORIGINAL BAR SOAP 3.7 OZ - *Combined Limit 4* | | 3.7 OZ | $1.32 |
| 5084 | ZEST AQUA SINGLE BAR-Combined Limit 4 | | 1 EA | $1.42 |
| 5092 | LEVEL 10 COCOA BUTTER BAR SOAP - *Combined Limit 4* | | 5 OZ | $1.20 |
| 5094 | LEVEL 10 GOLD ANTIBACTERIAL BAR SOAP - *Combined Limit 4* | | 5 OZ | $1.26 |
| 5097 | LEVEL 10 MOISTURIZING BAR SOAP - *Combined Limit 4* | | 5 OZ | $1.26 |
| 5107 | SOFTSOAP HONEYSUCKLE ORANGE BODY WASH-Combined Limit 4 | | 20 OZ | $8.07 |
| 5108 | SUAVE CITRUS & SAGE BODY WASH-Combined Limit 4 | | 15 OZ | $3.45 |
| 5124 | URBAN WASH OCEAN FRESH BODY WASH- Combined Limit 4 | | 16 OZ | $2.50 |
| 5125 | FRESH SCENT 3-IN-1 SHAMPOO/SHAVE GEL/BODY WASH - *Combined Limit 4* | | 4 OZ | $0.73 |
| 5126 | URBAN WASH ENERGIZING CITRUS -Combined Limit 4 | | 16 OZ | $2.50 |
| 5406 | SOAP DISH 2-PIECE CLEAR - *Limit 1* | | 1 EA | $0.60 |
| 5469 | BODY PUFF WHITE NET - *Limit 1* | | 1 EA | $1.79 |

| ITEM # | DEODORANT | SIZE | PRICE |
|---|---|---|---|
| 5168 | 1.6 OZ DEODORANT - *Limit 2* | 1.6 OZ | $0.55 |
| 5169 | DEGREE DEODORANT SHOWER CLEAN  - *Limit 2* | 1.6 OZ | $3.60 |
| 5171 | DEGREE EXTREME BLAST DEODORANT - *Limit 2* | 1.7 OZ | $4.18 |
| 5179 | MENNEN GEL DEOD/ANTIPERSPIRANT ULT SPORT POWER - *Limit 2* | 3 OZ | $3.75 |
| 5181 | MENNEN SPEED STICK DEODORANT ACTIVE FRESH SCENT - *Limit 2* | 1.8 OZ | $2.00 |
| 5182 | SUAVE POWDER FRESH INVISIBLE SOLID DEODORANT - *Limit 2* | 1.2 OZ | $2.76 |
| 5183 | BODY GUARD PUSH UP ANTIPERSPIRANT DEODORANT - *Limit 2* | 2.5 OZ | $1.80 |
| 5206 | LADY SPEED STICK INVISIBLE DRY SHOWER FRESH A/P | 1.4 OZ | $2.68 |

| ITEM # | PAPER/ENVELOPES/PENS | SIZE | PRICE |
|---|---|---|---|
| 5494 | LEGAL PAD 8½X14 YELLOW GUMMED TOP | 1 EA | $1.67 |
| 5496 | SKETCH PAD 8½X11 WHITE GUMMED | 1 EA | $1.34 |
| 5498 | TYPING PAPER 8½X11 PLAIN WHITE | 100 PG | $1.90 |
| 5506 | 25 SHEETS NOTEBOOK PAPER | 25 PG | $0.25 |
| 5515 | Press and Seal Envelope 10"x13"- *Limit 10* | 1 EA | $0.28 |
| 5519 | MEAD ENVELOPE #10 WHITE (SINGLE) | 1 EA | $0.05 |
| 5529 | MEAD ENVELOPE #10 WHITE 50CT | 50 EA | $1.98 |
| 5548 | LIQUIMARK COLOR PENCILS 24ct | 1 EA | $5.28 |
| 5550 | PENCIL #2 | 1 EA | $0.12 |
| 5552 | GOLF PENCIL (BIHS) | 1 EA | $0.05 |
| 5560 | CLEAR SECURITY FLEX BARREL BLACK BALL POINT PEN | 1 EA | $0.50 |
| 5561 | CLEAR SECURITY FLEX BARREL BLUE BALL POINT PEN | 1 EA | $0.51 |
| 5574 | YELLOW HIGHLIGHTER MARKER | 1 EA | $1.68 |
| 5578 | SHEET PROTECTOR (1 SHEET) | 1 EA | $0.30 |

| ITEM # | EYE GLASSES | SIZE | PRICE |
|---|---|---|---|
| 5650 | SPECTACLE CORD - *Limit 1* | 1 EA | $1.07 |
| 5651 | EYE GLASS CASE PLASTIC CLEAR | 1 PR | $1.05 |
| 5655 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 1.00 - *Limit 1* | 1 PR | $8.43 |
| 5656 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 1.25 - *Limit 1* | 1 PR | $8.43 |
| 5657 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 1.50 - *Limit 1* | 1 PR | $8.43 |
| 5658 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 1.75 - *Limit 1* | 1 PR | $8.43 |
| 5659 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 2.00 - *Limit 1* | 1 PR | $8.43 |
| 5660 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 2.25 - *Limit 1* | 1 PR | $8.43 |
| 5661 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 2.50 - *Limit 1* | 1 PR | $8.43 |
| 5662 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 2.75 - *Limit 1* | 1 PR | $8.43 |
| 5663 | READING GLASSES BLK PL FRAME W/ SPRING HINGE 3.00 - *Limit 1* | 1 PR | $8.43 |
| 5696 | SUNGLASSES BIKER BLK PLASTIC FRAME - *Limit 1* | 1 PR | $5.35 |

| ITEM # | GREETING CARDS | SIZE | PRICE |
|---|---|---|---|
| 5585 | SPANISH CHRISTMAS CARD - *Limit 10* | 1 EA | $0.50 |
| 5590 | HAPPY BIRTHDAY CARD GENERAL CARD - *Limit 10* | 1 EA | $0.50 |
| 5595 | HAPPY ANNIVERSARY CARD GENERAL - *Limit 10* | 1 EA | $0.50 |
| 5597 | SYMPATHY GREETING CARD GENERAL - *Limit 10* | 1 EA | $0.50 |
| 5598 | THANK YOU CARD - *Limit 10* | 1 EA | $0.50 |
| 5600 | FRIENDSHIP GREETING CARD - *Limit 10* | 1 EA | $0.50 |
| 5604 | LOVE GREETING CARD - *Limit 10* | 1 EA | $0.50 |
| 5605 | HAPPY MOTHER'S DAY CARD - *Limit 10* | 1 EA | $0.50 |
| 5606 | HAPPY FATHER'S DAY CARD - *Limit 10* | 1 EA | $0.50 |
| 5607 | BLANK NO WRITING CARD - *Limit 10* | 1 EA | $0.50 |
| 5609 | HAPPY HOLIDAYS GREETING CARD (DECEMBER) - *Limit 10* | 1 EA | $0.50 |
| 5615 | KIDS BIRTHDAY GREETING CARD - *Limit 10* | 1 EA | $0.50 |

K=Kosher
H=Halal
G/F=Gluten Free

KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU
MALE CORRECTIONAL FACILITY  COMBINED MENU
PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | PERSONAL MISCELLANEOUS | GLUTEN | SIZE | PRICE |
|---|---|---|---|---|
| 5398 | OCEAN CLEAR COTTON SWABS PAPER STICK | | 300 CT | $2.45 |
| 5410 | TOOTHBRUSH HEAD COVER CLEAR - Limit 2 | | 1 EA | $0.30 |
| 5416 | MIRROR ACRYLIC 4X6 - Limit 1 | | 1 EA | $3.04 |
| 5418 | OCEAN CLEAR COTTON SWABS PAPER STICK | | 40 CT | $0.78 |
| 5421 | TRIM EMERY BOARDS 4.25" CARDED | | 10 PK | $1.02 |
| 5425 | NAIL CLIPPER (NO FILE) | | 1 EA | $0.40 |
| 5426 | TRIM PUMICE STONE CARDED | | 1 EA | $2.26 |
| 5429 | SMALL TOILETRIES BAG CLEAR | | 1 EA | $2.17 |
| 5430 | EARTH FIRST FACIAL TISSUE 100 CT | | 1 EA | $1.43 |
| 5431 | SLEEP MASK | | 1 EA | $2.76 |
| 5433 | CHARMIN WHITE BIG ROLL | | 4 RL | $4.40 |
| 5436 | WASH CLOTH BEIGE 12"X12" - Limit 2 | | 1 EA | $2.00 |
| 5439 | SPARTEN RUBBER BANDS - BLACK | | 250 EA | $0.90 |
| 5461 | DISPOSABLE SHOWER CAP - Limit 2 | | 1 EA | $0.17 |
| 5468 | TRIM TWEEZER SLANT TIP | | 1 EA | $0.62 |
| 5480 | SCUNCI NO METAL PONY TAIL ELASTICS BLACK | | 18 CT | $3.93 |
| 5717 | PERSONAL SEWING KIT (NO SCISSORS) | | 1 EA | $1.38 |
| 5721 | DISPOSABLE EAR PLUGS - Limit 2 | | 1 PR | $0.28 |
| ITEM # | MISCELLANEOUS | | SIZE | PRICE |
| 4620 | SWINTEC CORRECTABLE RIBBON BLACK | | 1 EA | $10.70 |
| 4717 | FLEXIBLE PLASTIC PHOTO ALBUM HOLDS 80 PHOTOS | | 1 EA | $3.10 |
| 5527 | ADDRESS BOOK 3¾" X 2½" | | 1 EA | $1.67 |
| 5750 | BROTHER BRT  TYPEWRITER RIBBON | | 1 EA | $10.21 |
| 5761 | CORRECTION TAPE for BROTHER /SWINTEC  2/PK | | 2 PK | $6.95 |
| 9975 | PICTURE TICKET | | 1 EA | $2.50 |
| 9980 | COPY TICKET | | 20 CT | $2.00 |
| ITEM # | POSTAGE | | SIZE | PRICE |
| 5641 | USA FOREVER STAMP - Combined Limit 25 | | 1 EA | $0.58 |
| 5642 | USA FOREVER ADDITIONAL OUNCE STAMP - Combined Limit 25 | | 1 EA | $0.20 |
| 5643 | USA $.01 ADDITIONAL STAMP-Combined Limit 25 | | 1 EA | $0.01 |
| 5646 | FOREVER WORLD STAMP - Combined Limit 25 | | 1 EA | $1.30 |
| ITEM # | SHOE ACCESSORIES | | SIZE | PRICE |
| 3225 | MEN'S SHOWER SLIPPER WHT(SIZE 6-8) - Limit 1 | | SM | $4.15 |
| 3226 | MEN'S SHOWER SLIPPER (SIZE 9-10) WHT - Limit 1 | | MED | $4.15 |
| 3227 | MEN'S SHOWER SLIPPER WHT (SIZE 10--12) - Limit 1 | | LG | $4.15 |
| 3228 | MEN'S SHOWER SLIPPER WHT(SIZE 12-13)- Limit 1 | | XL | $4.15 |
| 3229 | MEN'S SHOWER SLIPPER WHT (SIZE 14-15) - Limit 1 | | 2XL | $4.15 |
| 2485 | COURTLINE ODOR STOPPER FOAM CUSHIONS ONE SIZE FITS ALL | | 1 PR | $2.76 |
| 2495 | KIWI 54" SPORT FLAT SHOE LACE WHITE | | 1 PR | $1.61 |
| 2507 | 45" OVAL LACES BLACK | | 1 PR | $2.25 |
| 2508 | 54" OVAL LACES BLACK | | 1 PR | $2.25 |
| 2512 | ANGELUS INSTANT SHINE SHOE POLISH LIQUID BLACK | | 3 OZ | $3.48 |
| 2513 | ANGELUS PERFECT STAIN SHOE POLISH WAX NEUTRAL | | 3 OZ | $3.48 |
| ITEM # | GAMES/BOOKS | | SIZE | PRICE |
| 4629 | MAVERICK PINOCHLE CARDS - Limit 2 | | 1 EA | $2.51 |
| 4630 | MAVERICK POKER CARDS - Limit 2 | | 1 EA | $1.48 |
| 4634 | PRESSMAN WOODEN DOMINOES DOUBLE SIX - Limit 1 | | 1 EA | $4.44 |
| 4636 | UNO CARDS - Limit 1 | | 1 EA | $10.35 |
| 4637 | PRESSMAN CHECKERS w/ BOARD - Limit 1 | | 1 EA | $5.99 |
| 4640 | PRESSMAN CHESS SET w/ BOARD - Limit 1 | | 1 EA | $6.99 |
| 5511 | WEBSTER'S WORLDWIDE DICTIONARY ENGLISH/SPANISH - Limit 1 | | 1 EA | $2.89 |
| 5633 | SUDOKU 6 ASSORTED NUMBER PUZZLES | | 1 EA | $2.14 |
| ITEM # | TABLEWARE / DISH SOAP | | SIZE | PRICE |
| 4596 | PLASTIC FOOD INSERT (Use with West Bend Hot Pot) | | 1 EA | $3.42 |
| 5128 | AJAX ANTIBACTERIAL ORANGE DISH SOAP | | 14 OZ | $1.82 |
| 6268 | DURALUX YELLOW 3PC SET FORK/SOUP SPOON/TEASPOON | | 1 ST | $1.61 |
| 6272 | PLIABLE SPOON | | 1 EA | $0.12 |
| 6293 | WHIRLEY MUG CLEAR SOLID BOTTOM THERMO W/BLK LID - Limit 2 | | 1 EA | $4.11 |
| 6298 | TUMBLER W/LID 22 OZ TRANSLUCENT STADIUM CUP - Limit 2 | | 22 OZ | $0.45 |
| 6301 | LEVEL 10 REUSABLE PLASTIC CONTAINER 3 CUPS - Limit 1 | | 3 CP | $5.06 |
| 6302 | CLEAR HOT BEVERAGE MUG BONE - Limit 2 | | 12 OZ | $1.34 |
| 6306 | WATER BOTTLE W/ MEASURING LINES - Limit 2 | | 32 OZ | $3.89 |

K=Kosher
H=Halal
G/F=Gluten Free

KANSAS CORRECTIONAL INDUSTRIES COMMISSARY MENU

MALE CORRECTIONAL FACILITY  COMBINED MENU

PRICE DOES NOT INCLUDE SALES TAX

Revised 2/3/2022

| ITEM # | ELECTRONICS/MISC | GLUTEN | SIZE | PRICE |
|---|---|---|---|---|
| 4204 | HEADPHONE ADAPTER - 1/8" MINI TO 1/4" STEREO JACK - *Limit 1* | | 1 EA | $1.77 |
| 4207 | 6' COAXIAL CABLE BLACK (Screw-on)-Limit 2 Gen/1 Ad-Seg | | 1 EA | $3.61 |
| 4212 | ADAPTER 1/8" STEREO TO MONO - *Limit 1* | | 1 EA | $2.30 |
| 4218 | 6' HEADPHONE EXT CABLE WITH MINI STEREO PLUG & JACK | | 6 FT | $3.91 |
| 4219 | COAXIAL CABLE CONNECTOR - *Limit 2* | | 1 EA | $1.98 |
| 4230 | C-TUNES SURGE PROTECTION POWER STRIP 5 PLUG 2' CRD | | 1 EA | $19.63 |
| 4231 | CLEAR TUNES "Y" HEADPHONE ADAPTER - *Limit 1* | | 1 EA | $6.62 |
| 4233 | 6' COAX. CABLE w/ QUICK CONNECT-Limit 2 Gen/1 Ad-Seg | | 1 EA | $6.65 |
| 4249 | RCA UNIVERSAL REMOTE CONTROL - *Limit 1* | | 1 EA | $10.93 |
| 4257 | CLEAR TUNES CT-61 UNIVERSAL POWER ADAPTER - *Limit 1* | | 1 EA | $15.79 |
| 4258 | CLEAR TUNES REMOTE FOR 13" & 15" TV - *Limit 1* | | 1 EA | $7.99 |
| 4267 | EQUITY CLEAR DIGITAL ALARM CLOCK - 1 AA BATTERY *(Not included)* | | 1 EA | $12.00 |
| 4320 | JVC SPORT EARBUDS- Limit 1 | | 1 EA | $11.05 |
| 4331 | CLEAR TUNES CT-H400/R44 PLASTIC HEADPHONE, 44' CORD | | 1 EA | $5.52 |
| 4342 | CLEAR TUNES CT-38 ISO STYLE EARBUD - *Limit 1* | | 1 EA | $11.58 |
| 4354 | KOSS CL-5 CLEAR HEADPHONES - Limit 1 | | 1 EA | $12.79 |
| 4359 | JVC EAR CLIP EARBUDS - Limit 1 | | 1 EA | $13.10 |
| 4416 | VELCRO WATCH BAND (BLACK NYLON 19MM) - Limit 1 | | 1 EA | $3.25 |
| 4488 | MAXELL CR2025 WATCH BATTERY - *Limit 1* (replacement for *Timex marathon watch #4403)* | | 1 EA | $3.76 |
| 4489 | CR2016 WATCH BATTERY - *Limit 1* (replacement for *Timex analog watch #4412* ) | | 1 EA | $3.47 |
| 4493 | RAYOVAC AA BATTERY SHRINKWRAP ALKALINE - *Limit 1* | | 4 PK | $2.14 |
| 4494 | RAYOVAC AAA BATTERY SHRINKWRAP ALKALINE - *Limit 1* | | 4 PK | $2.14 |
| 4550 | CLEAR TUNES CALCULATOR SOLAR / BATTERY | | 1 EA | $4.83 |
| 4555 | LIGHT BULB 30 WATT - *Limit 1* (replacement for clip on lamp #4557) | | 1 EA | $2.11 |
| 4563 | SMALL 40 WATT HIGH-INTENSITY LIGHT BULB - *Limit 1* | | 1 EA | $2.35 |
| 4569 | MIGHTY BRIGHT CLEAR LED BOOK LIGHT - *Limit 1* | | 1 EA | $13.81 |
| 4701 | MASTER LOCK COMBO LOCK #51 - *Limit 2* | | 1 EA | $9.16 |

| ITEM # | CLOTHING / LAUNDRY SOAP | SIZE | PRICE |
|---|---|---|---|
| 2546 | GRT SPORT MEN'S BOXER 1CT WHT - *Limit 6* | SM | $3.91 |
| 2547 | GRT SPORT MEN'S BOXER 1CT WHT - Limit 6 | MED | $3.91 |
| 2548 | GRT SPORT MEN'S BOXER 1CT WHT - *Limit 6* | LG | $3.91 |
| 2549 | GRT SPORT MEN'S BOXER 1CT WHT - Limit 6 | XL | $3.91 |
| 2550 | GRT SPORT MEN'S BOXER 1CT WHT - *Limit 6* | 2XL | $4.88 |
| 2551 | GRT SPORT MEN'S BOXER 1CT WHT - Limit 6 | 3XL | $4.88 |
| 2650 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | MED | $6.95 |
| 2651 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | LG | $6.95 |
| 2652 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | XL | $6.95 |
| 2653 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | 2XL | $8.95 |
| 2654 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | 3XL | $8.95 |
| 2655 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | 4XL | $9.95 |
| 2657 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | 5XL | $9.95 |
| 2658 | PRO-5 SUPER HEAVY SHORT SLEEVE SHIRT WHITE | 7XL | $9.95 |
| 3085 | KNOCKER TUBE SOCKS (10-15) - *Combined Limit 7* | 1 PR | $2.25 |
| 3094 | QUARTER SOCKS - SMALL - *Combined Limit 7* | 1 PR | $1.45 |
| 3095 | NO SHOW SPORTS SOCK 1PK WHITE (10-13) - *Combined Limit 7* | 1 PR | $1.50 |
| 3096 | PROMO SOCK 1PK QUARTER LENGTH WHT (10-13) - *Combined Limit 7* | 1 PR | $1.80 |
| 3097 | GRT SPORTS CREW SOCK (10-13) - *Combined Limit 7* | 1 PR | $1.87 |
| 5141 | SIMLINE 3N1 LAUNDRY POWDER OCEAN SCENT | 16 OZ | $2.13 |
| 5148 | PUREX LIQUID LAUNDRY SOAP | 50 OZ | $6.53 |

**General Canteen Policies Guidelines**

1. NO CANTEEN order will be distributed until positive identification has been made as to the inmate about to receive the order; this policy ensures that everyone receives the correct order. The Inmate ID Badge must be shown in order to receive a canteen order.

2. Discrepancies within your canteen order must be identified at the time of delivery and brought to the attention of the Staff Member distributing the canteen. Issues must be dully noted on the receipt prior to signing for and accepting of the canteen order.

3. Once an order is received and signed for with no discrepancies identified, the transaction is considered closed and no later issues may be raised concerning the receiving of the order.

4. Receipts must be retained in order to follow up with a noted and recorded Canteen Order discrepancy.

5. Institution Staff are responsible for sending notification of discrepancies to Union Supply. If you have not received your discrepancies refund, please contact Unit Team.

6. There is an individual stamp limit of 25 stamps in any combination. The stamp limit for Disciplinary Segregation is 10 Stamps in any combination.

7. Questions or other issues concerning or arising from your Canteen transaction are to be directed to KCI/USG through your Unit Team.

8. Copy and Photo tickets are non-refundable.

9. No OTC medications are permitted in the infirmary.

10. All prices, package weights or brands are subject to change without notice.

11. Tax could be affected due to calculation, either increasing or decreasing the tax amount.

12. We reserve the right to limit quantities.

13. All gluten free/no sugar/ low sugar/no salt/low salt  identified products are reported by the manufacturers with no confirmation or liability by Union Supply Group or Union Supply Commissary Solutions.

14. Please refer to your IMPP regarding restricted items for KDOC restricted inmate population.

Exhibit H

Sherri Price, Legal Counsel, SC #16485
Lansing Correctional Facility
P.O. Box 2
Lansing, KS 66048
Telephone: (913) 727-3235 x57277

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **DERON MCCOY, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Case No. 16-3027-SAC-DJW** |
| **ARAMARK CORRECTIONAL SERVICES,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## REPORT IN "MARTINEZ v. AARON" INVESTIGATION
## CIVIL RIGHTS COMPLAINT

I.  **INTRODUCTION**

On January 27, 2016, Plaintiff DeRon McCoy, an inmate incarcerated in the custody of

the Secretary of Corrections of the State of Kansas and confined at El Dorado

Correctional Facility (EDCF), filed an action in the United States District Court for the District

of Kansas.  A second amended complaint was filed on August 31, 2016.  Plaintiff's second

amended complaint, filed pursuant to 42 U.S.C. § 1983 and the Religious Land Use and

Institutionalized Persons Act (RLUIPA), 42 U.S.C. 2000 cc-1, named Aramark Correctional

Services, Julie Dockendorff, Patricia Berry, Cheryl Allen, Rabbi M. Gilly, Sheri Burns, Randy

Singletary and John Doe as Defendants.  Plaintiff's claims against Sheri Burns, Randy Singletary

1

and John Doe have been dismissed by the court without prejudice.  On August 31, 2016, the

Court ordered the preparation of a *Martinez v. Aaron* report by the Kansas Department of

Corrections.

## II.   INVESTIGATION

DeRon McCoy has been an inmate in the custody of the Secretary of Corrections since

March 6, 2012.  He was housed at Lansing Correctional Facility from October 2, 2012 to June

16, 2016.  He is currently housed at El Dorado Correctional Facility.  *See* Exhibit A (KASPER

Profile for Plaintiff McCoy).

On January 22, 2014, Plaintiff changed his religious preference from Protestant to

Assembly of Yahweh and on August 25, 2014 to Judaism.  With these changes, Plaintiff was

placed on the roster to receive religious diet meals.   *See* Exhibit B (Affidavit of Don Almond).

The department's procedures relating to religious diets are set out in Internal

Management Policy and Procedure (IMPP) 10-106 and 10-119.  *See* Exhibit C (Affidavit of

Patricia Berry).  IMPP 10-106 provides that the menus shall be established by a provider under

contract with the Department to provide food service to inmates within the care and custody of

the Secretary of Corrections. *See* Exhibit D (IMPP 10-106: PROGRAMS AND SERVICES:

Standardized Menu, Ensuring Nutritional Adequacy of Diets, and Meal Service Schedules).  The

Department has contracted with Aramark Correctional Services, Inc. for the provision of provide

food service for the department's correctional facilities since 1997.  Berry Affidavit (Ex. C) at ¶

3.

These menus shall be subject to approval by the Secretary or his designee, and reviewed

every six (6) months, or whenever substantial changes in the menu are made by a registered

2

dietician.  The menus must meet basic nutritional requirements for all meals served, including any alterations, substitutions and modifications for medical, dental, mental health, religious purposes and alternative meal service.  IMPP 10-106 (Ex. D) at p. 1.

In addition, the standardized menus shall include provisions for modified diets, which conform as closely as possible to the menus and ensure the nutritional adequacy of food items substituted for standard menu items.  Instructions for modified diets shall provide for consideration of the most commonly prescribed modified diet to address the most common religious dietary laws.  IMPP 10-106 (Ex. D) at p. 3.

All religious diets shall be consistent with the approved religious diet menu.  *See* Exhibit E (IMPP 10-119:  PROGRAMS AND SERVICES:  Medical and Religious Diets and Vegetarian Alternative Diet).

Religious meals menus are reviewed by an Aramark dietitian, a KDOC dietitian, and the state contract monitor who each sign the menu if approved.  In addition, the menu is reviewed by Aramark's religious authority who also signs the menu if approved.  By signing this approval on the menu, the religious authority confirms that the menu, its meal components and preparation processes follow the Jewish dietary laws.  He, however, does not confirm that each meal being served is Kosher as he does not oversee the preparation of the meals.  *See* Religious Meals Menus (attached to Berry Affidavit, Ex. C-A).

The following provisions are included on each menu:

> "Follow all kosher preparation instructions in recipes for Entrees,
> Starches and Salads.  Utensils used for scooping, cooking and
> serving must be dedicated for kosher food use ONLY and stored in
> a special area.  No meat is served.  Serve meal on disposable or

designated kosher tray with disposable or kosher only tableware."

*Id.*

At Lansing Correctional Facility, the foods purchased for the certified religious diet (CRD) are stored in a separate area of the warehouse and in the dry storage room in the maximum facility's kitchen.   The foods for the CRD are prepared in the Max Kitchen using a steam kettle that is dedicated for CRD use only.  Inmates and staff who work in the CRD receive training as to any special procedures to follow in the preparation and serving of the CRD.   The CRD has a dedicated steam table that is only used for CRD meals.  *See* Exhibit F (Affidavit of Randall Singletary).

Dark brown colored trays are used to serve the CRD meals as opposed to the light tan trays used to serve the general population meals.   These trays are either hand washed or washed after the dishwasher has been properly sanitized.  The trays are then stored in the CRD room.  *Id.*

On March 25, 2014, Plaintiff filed a grievance in which he alleged that the religious diet meals served did not satisfy the kosher modified diet requirements in that the food items served on the religious diet were not kosher and the food was not prepared or served in a kosher manner.  *See* Exhibit G (Grievance No. AA20140433).

The initial unit team response to this grievance stated that the diet currently served was a certified religious diet (CRD) which included many items on which the term kosher was recognized.  The cooking utensils used for the CRD mean preparation were cleaned and kept in the CRD room and two steam kettles were identified and used solely for the CRD meal preparation.  The dishwasher used for cleaning the meal trays was sanitized before its use in accordance with the reasonable accommodations clause.  Soy based meals that are factory sealed were used for the CRD meals as well as tuna and eggs.  An appeal of this response to the warden

4

affirmed the initial response as appropriate regarding the issues raised in the grievance. *Id.*

Plaintiff appealed the grievance response to the Secretary of Corrections who stated that the response by the staff at the facility was appropriate. In addition, the secretary's response stated that "the Religious Diet provided by the KDOC is based on the Common Fare diet, which has been reviewed and approved by the KDOC contracted religious advisor, as evidence[d] by the Rabbi's signature on the menu, and has been found to be consistent with kosher requirements. Further inquiry to the contractor's Religious Diet food preparation indicates that expected procedures consistent with the Rabbi's recommendations, are being followed." *Id.*

Patricia Berry, a contract compliance manager with the KDOC, oversees the Aramark contract. She conducted an audit inspection of LCF's food service on February 24, 2014. In this inspection, she found that the authorized menus were being used, that the kitchen had appropriate Kosher food preparation practices, that the equipment was clean and that pest control was evident (no roaches, mice, flies, etc.) and the pest control procedure was maintained. Berry Affidavit (Ex. C) at ¶ 6.

An unannounced site visit was conducted on July 3, 2014 as a result of concerns expressed by facility management exacerbated by a recent facility lockdown. During this inspection, Ms. Berry found additional food stored in the CRD cooler because the pass through cooler on the front line was not working. No other issues were observed with regard to the CRD meal preparation, serving or storage. Berry Affidavit (Ex. C) at ¶ 7.

Subsequent audits on July 22, 2014 and December 17, 2014 found that proper religious diet food preparation and serving practices were observed, that proper religious diet food storage practices were being used and that pest control was evident and the procedure was maintained. Berry Affidavit (Ex. C) at ¶¶ 8-9.

5

While the religious diet preparation and serving practices were not observed during an audit on September 30, 2015, proper religious diet food storage practices were being used. Pest control was evident and procedure was maintained. Berry Affidavit (Ex. C) at ¶ 10.

Plaintiff was assigned to work with an electric maintenance crew from November 6, 2014 to January 25, 2015. While there is no record of the work orders with which Plaintiff assisted, a work order indicates that the electrical cord on a steam well was repaired in the Max Kitchen on November 21, 2014. There is no work order reflecting a repair of a circuit board sensor in the Max Kitchen on December 12, 2014 but work was often completed in the kitchen prior to receiving a work order. A request would have been made of the Aramark supervisor to provide a work order but often none was forthcoming. *See* Exhibit H (Affidavit of Scott Fox).

## IV.   CONCLUSION

Plaintiff's complaints with regard to the religious diet meals prepared and served at LCF appear to be based on uninformed observations and second hand knowledge. There is no evidence that the meals prepared or served were in violation of KDOC or Aramark policy and procedures. Efforts were consistently made by Aramark and staff to provide meals that complied with kosher requirements.

Respectfully submitted,

s/ Sherri Price #16485

6

# EXHIBIT LIST

A.   KASPER display for DeRon McCoy Jr.

B.   Affidavit of Don Almond

C.   Affidavit of Patricia Berry

      C-A.      Religious Meals Menus

D.   KDOC IMPP 10-106:  PROGRAMS AND SERVICES:   Standardized Menu, Ensuring Nutritional Adequacy of Diets, and Meal Service Schedules

E.   KDOC IMPP 10-119:  PROGRAMS AND SERVICES:   Medical and Religious Diets and Vegetarian Alternative Diet

F.   Affidavit of Randall Singletary

G.   Grievance no. AA20140433

H.   Affidavit of Scott Fox

7



**KASPER INTERNAL KDOC - OFFENDER POPULATION SEARCH**
**Kansas Adult Supervised Population Electronic Repository**
**Kansas Criminal Justice Information System**
OFFENDERS SHALL NOT BE ARRESTED SOLELY ON THE BASIS OF INFORMATION
DISPLAYED ON THIS SITE



Offender Search     Parole Absconders

You are logged in as sherri price   Log out

Community Correction Absconders   **MCCOY,**
**DERON JR**

(KDOC# 0076894)              **This information is current as of: Feb 20 2017 5:00AM**

## Names

| Name Type | Name |
|-----------|------|
| Conviction | MCCOY, DERON JR |
| True | MCCOY, DERON JR |
| Alias | MCCOY, DERRON |

## Identification

| KDOC # | SID Num | FBI Num |
|--------|---------|---------|
| 0076894 | 768502 | 101580PB9 |

## Birthdates

| Birthdate Type | Birthdate | Age |
|----------------|-----------|-----|
| True | ███████ | 33 |



**MCCOY, DERON JR**
**Approx Picture Date**
**2015-04-29**



**MCCOY, DERON JR**
**Approx Picture Date**
**2015-04-29**

## Demographics

| Eye Color | Hair Color | Height | Weight | Gender | Race |
|-----------|-----------|--------|--------|--------|------|
| Brown | Black | 6'-0" | 176 | Male | Black |

## Current Status reported by Dept. of Corrections

Work or Program Participation Not Working
Earliest Possible Release Date (1) Oct 23, 2035
Current Status Incarcerated
Admission Date Mar 06, 2012
Current Location (2)  El Dorado CF-Central
Custody Level Special Management
(1) This date could be affected by a parole board decision or good time and/or program credit.
(2) Click on Location for the Facility web site.



EXHIBIT
A

[ Offender Documents ]

## Convictions

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|--------|------|-----|-----|-----|-----|-----|-----|-----|-----|
| Sedgwick | 01CR266 | Aug 14, 2000 | Oct 18, 2001 | N/A | Aggravated Battery - Intentional, Bodily Harm | 1 | Non Drug-Grid Severity Level 7 | Inactive | KS |
| Sedgwick | 01CR266 | | | N/A | | 1 | | Inactive | KS |

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|--------|-----------------|--------------|-----------------|-----|-------------------------------|--------|---------------------|-----------------|-------|
| | : | Aug 14, 2000 | Oct 18, 2001 | | Aggravated Assault | | Non Drug-Grid Severity Level 7 | | |
| Reno | 07CR629 | Jul 06, 2007 | Jun 27, 2008 | N/A | Obstructing Legal Process | 1 | Non Drug-Grid Severity Level 9 | Inactive | KS |
| Sedgwick | 09CR3132 | Jul 30, 2009 | Aug 08, 2012 | N/A | Poss of depress, des stim, halluc or sel subst;1st | 1 | Class A Misdemeanor | Active | KS |
| Sedgwick | 09CR3132 | Jul 30, 2009 | Aug 08, 2012 | N/A | Poss of opiates,opium, narc drugs or desig stim | 1 | Drug-grid Severity Level 4 | Active | KS |
| Sedgwick | 02CR2192 | Jun 14, 2002 | Jan 30, 2003 | N/A | Aggravated Escape From Custody - held on Felony | 1 | Non Drug-Grid Severity Level 8 | Inactive | KS |
| Reno | 11CR178 | Mar 11, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 11, 2011 | Oct 28, 2016 | N/A | Poss of opiates,opium, narc drugs or desig stim | 1 | Drug-grid Severity Level 4 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | Solicited | Perjury; False Statement Not Felony | 1 | Non Drug-Grid Severity Level 10 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Agg. Endangering a Child | 1 | Non Drug-Grid Severity Level 9 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault on a Law Enforcement Officer | 1 | Non Drug-Grid Severity Level 6 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Aggravated Assault | 1 | Non Drug-Grid Severity Level 7 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Poss of opiates,opium, narc drugs or desig stim | 1 | Drug-grid Severity Level 4 | Active | KS |

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|--------|--------|--------|--------|------|--------|--------|--------|--------|--------|
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Criminal Possession Firearm;BarLT12", 5yr Felon | 1 | Non Drug-Grid Severity Level 8 | Active | KS |
| Reno | 11CR178 | Mar 22, 2011 | Oct 28, 2016 | N/A | Kidnapping | 1 | Non Drug-Grid Severity Level 3 | Active | KS |
| Reno | 02CR911 | Sep 20, 2002 | Nov 14, 2003 | N/A | Obstructing Legal Process | 1 | Non Drug-Grid Severity Level 9 | Inactive | KS |
| Reno | 02CR911 | Sep 20, 2002 | Nov 14, 2003 | N/A | Battery | 1 | Class B Misdemeanor | Inactive | KS |

(I) If Number includes  JV : Extended juvenile jurisdiction adjudications with adult prison sentences stayed, then imposed.

(II) If Status includes * : Denotes Active for Post Release Supervision Only.

## KDOC Physical Location History(s)

| Location | Movement Date | Movement Reason |
|----------|---------------|-----------------|
| El Dorado CF-Central | Nov 01, 2016 | Returned From Court Appearance |
| Reno County | Oct 27, 2016 | Released For Court Appearance |
| El Dorado CF-Central | Jul 27, 2016 | Returned From Court Appearance |
| Reno County | Jul 20, 2016 | Released For Court Appearance |
| El Dorado CF-Central | Jun 16, 2016 | Inter-Facility Movement |
| Lansing CF-Central | Nov 15, 2012 | Returned From Court Appearance |
| Reno County | Oct 30, 2012 | Released For Court Appearance |
| Lansing CF-Central | Oct 02, 2012 | Inter-Facility Movement |
| El Dorado CF-RDU | Aug 09, 2012 | Returned From Court Appearance |
| Sedgwick County | Apr 11, 2012 | Released For Court Appearance |
| El Dorado CF-RDU | Apr 09, 2012 | Returned From Court Appearance |
| Reno County | Apr 05, 2012 | Released For Court Appearance |
| El Dorado CF-RDU | Mar 06, 2012 | New Court Commitment |
| Unknown or N/A | Jul 27, 2010 | Expiration Of Sentence |
| Hutchinson CF-Central | May 27, 2010 | Parole Viol. No New Sentence |
| Reno County | Apr 22, 2010 | DOC Warrant Issued |
| Reno County | Apr 22, 2010 | DOC Warrant Issued |
| Unknown or N/A | Feb 25, 2010 | Absconded |
| Sedgwick County | Jan 11, 2010 | Intra-parole/CR |
| Reno County | Jan 05, 2010 | Intra-parole/CR |
| Reno County | Jan 05, 2010 | DOC War. Wthdrwn Supervsn I/S |
| Reno County | Dec 23, 2009 | DOC Warrant Issued |
| Reno County | Dec 17, 2009 | Intra-parole/CR |
| Reno County | Nov 03, 2009 | Intra-parole/CR |
| Sedgwick County | Nov 03, 2009 | DOC War. Wthdrwn Supervsn I/S |

| Location | Movement Date | Movement Reason |
|---|---|---|
| Reno County | Oct 27, 2009 | DOC Warrant Issued |
| Unknown or N/A | Aug 06, 2009 | Absconded |
| Sedgwick County | Aug 05, 2009 | Intra-parole/CR |
| Sedgwick County | Aug 05, 2009 | DOC War. Wthdrwn Supervsn I/S |
| Sedgwick County | Jul 30, 2009 | DOC Warrant Issued |
| Sedgwick County | Jul 30, 2009 | Intra-parole/CR |
| Sedgwick County | Jun 15, 2009 | In-State Post Release |
| Lansing CF-Central | Sep 18, 2008 | Inter-Facility Movement |
| El Dorado CF-RDU | Aug 06, 2008 | New Court Commitment |
| Unknown or N/A | Jun 14, 2008 | Expiration Of Sentence |
| Reno County | Jun 14, 2008 | Intra-parole/CR |
| Reno County | Jun 14, 2008 | DOC War. Wthdrwn Supervsn I/S |
| Reno County | Apr 25, 2008 | DOC Warrant Issued |
| Unknown or N/A | Apr 17, 2008 | Absconded |
| Sedgwick County | Mar 29, 2008 | Det. Par/CR Rtnd KS Supervsn |
| Reno County | Mar 18, 2008 | Paroled To Detainer |
| El Dorado CF-Central | Nov 13, 2007 | Returned From Court Appearance |
| Reno County | Oct 25, 2007 | Released For Court Appearance |
| El Dorado CF-Central | Sep 27, 2007 | Inter-Facility Movement |
| El Dorado CF-RDU | Aug 20, 2007 | Returned From Court Appearance |
| Reno County | Aug 20, 2007 | Released For Court Appearance |
| El Dorado CF-RDU | Aug 13, 2007 | Parole Viol. No New Sentence |
| Reno County | Jul 23, 2007 | DOC Warrant Issued |
| Reno County | Jul 06, 2007 | DOC Warrant Issued |
| Reno County | Jul 06, 2007 | DOC Warrant Issued |
| Sedgwick County | May 04, 2007 | In-State Post Release |
| Lansing CF-Central | Nov 18, 2003 | Returned From Court Appearance |
| Reno County | Nov 13, 2003 | Released For Court Appearance |
| Lansing CF-Central | Oct 02, 2003 | Returned From Court Appearance |
| Reno County | Sep 25, 2003 | Released For Court Appearance |
| Lansing CF-Central | Sep 16, 2003 | Returned From Court Appearance |
| Reno County | Sep 09, 2003 | Released For Court Appearance |
| Hutchinson CF-Central | Sep 09, 2003 | Inter-Facility Movement |
| Lansing CF-Central | Aug 26, 2003 | Inter-Facility Movement |
| Norton CF-Central | Aug 12, 2003 | Returned From Court Appearance |
| Reno County | Aug 07, 2003 | Released For Court Appearance |
| Norton CF-Central | Jun 24, 2003 | Returned From Court Appearance |
| Reno County | Jun 10, 2003 | Released For Court Appearance |
| Norton CF-Central | May 06, 2003 | Inter-Facility Movement |
| Ellsworth CF | Apr 22, 2003 | Inter-Facility Movement |
| El Dorado CF-Central | Mar 18, 2003 | Probation Viol. New Sentence |

## KDOC Disciplinary Report(s) since January 1996

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| Apr 15, 2016 | 1 | Lansing Correctional Facility - Central | Fighting |
| Apr 09, 2016 | 1 | Lansing Correctional Facility - Central | Misusing Meds |
| Apr 09, 2016 | 2 | Lansing Correctional Facility - Central | Obscenity (W/O Children) |
| Apr 09, 2016 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Apr 09, 2016 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Apr 02, 2016 | 1 | Lansing Correctional Facility - Central | Interf W/Cell Oper/Visibility |
| Apr 02, 2016 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Apr 02, 2016 | 1 | Lansing Correctional Facility - Central | Interf W/Cell Oper/Visibility |
| Jan 21, 2016 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Jan 21, 2016 | 1 | Lansing Correctional Facility - Central | Battery |
| Jan 21, 2016 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Dec 25, 2015 | 1 | Lansing Correctional Facility - Central | Battery |
| Nov 29, 2015 | 1 | Lansing Correctional Facility - Central | Misusing Meds |
| Aug 02, 2015 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Aug 02, 2015 | 1 | Lansing Correctional Facility - Central | Interf W/Cell Oper/Visibility |
| Jun 16, 2015 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jan 30, 2015 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Aug 28, 2014 | 1 | Lansing Correctional Facility - Central | Fighting |
| Aug 28, 2014 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Apr 04, 2014 | 3 | Lansing Correctional Facility - Central | Answering Calls or Passes |
| Mar 09, 2013 | 1 | Lansing Correctional Facility - Central | Battery |
| Jan 27, 2013 | 1 | Lansing Correctional Facility - Central | Use of Stimulants |
| Jan 27, 2013 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jan 27, 2013 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jun 05, 2010 | 1 | Hutchinson Correctional Fac. - Central | Disobeying Orders |
| Jun 05, 2010 | 2 | Hutchinson Correctional Fac. - Central | Unauthorized Dealing or Trade |
| Jun 05, 2010 | 2 | Hutchinson Correctional Fac. - Central | Lying |
| Mar 25, 2009 | 2 | Lansing Correctional Facility - Central | Sex Explicit Mtrl, n/SexOfndr |
| Mar 16, 2009 | 1 | Lansing Correctional Facility - Central | Use of Stimulants |
| Mar 11, 2009 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Feb 25, 2009 | 2 | Lansing Correctional Facility - Central | Sex Explicit Mtrl, n/SexOfndr |
| Jan 29, 2009 | 2 | Lansing Correctional Facility - Central | Disobeying Orders |
| Dec 21, 2008 | 1 | Lansing Correctional Facility - Central | Lewd Acts |
| Dec 21, 2008 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Dec 20, 2008 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Dec 07, 2008 | 1 | Lansing Correctional Facility - Central | Fighting |
| Aug 11, 2008 | 2 | El Dorado Correctional Fac. - RDU | Unauthorized Dealing or Trade |
| Dec 24, 2007 | 2 | El Dorado Correctional Fac. - Central | Misuse of State Property |
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Battery |

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Disobeying Orders |
| Oct 01, 2007 | 1 | El Dorado Correctional Fac. - Central | Battery |
| Apr 08, 2007 | 1 | Lansing Correctional Facility - Central | Use Stimulants, Sedatives, Etc |
| Mar 26, 2007 | 1 | Lansing Correctional Facility - Central | Threaten or Intim Any Person |
| Jan 22, 2007 | 3 | Lansing Correctional Facility - Central | Violation of Published Orders |
| Sep 07, 2006 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Sep 07, 2006 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| May 24, 2006 | 1 | Lansing Correctional Facility - Central | Avoiding an Officer |
| May 24, 2006 | 2 | Lansing Correctional Facility - Central | Tatoos and Body Markings |
| May 24, 2006 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Apr 19, 2006 | 2 | Lansing Correctional Facility - Central | Falsifying Documents |
| Mar 21, 2006 | 1 | Lansing Correctional Facility - Central | Threaten or Intim Any Person |
| Mar 21, 2006 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Jan 26, 2006 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Jan 07, 2006 | 1 | Lansing Correctional Facility - Central | Threaten or Intim Any Person |
| Jul 20, 2005 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| Jul 14, 2005 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Jun 23, 2005 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Jun 21, 2005 | 1 | Lansing Correctional Facility - Central | Inmate Activity; Limitations |
| Jun 21, 2005 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| May 25, 2005 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| May 13, 2005 | 1 | Lansing Correctional Facility - Central | Use Stimulants, Sedatives, Etc |
| Apr 21, 2005 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Apr 21, 2005 | 2 | Lansing Correctional Facility - Central | Misuse of State Property |
| Mar 01, 2005 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| Mar 01, 2005 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Feb 26, 2005 | 1 | Lansing Correctional Facility - Central | Undue Familiarity |
| Feb 24, 2005 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Feb 03, 2005 | 1 | Lansing Correctional Facility - Central | Theft |
| Jan 27, 2005 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Dec 31, 2004 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Dec 31, 2004 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Dec 07, 2004 | 1 | Lansing Correctional Facility - Central | Use Stimulants, Sedatives, Etc |
| Oct 30, 2004 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| Oct 30, 2004 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Oct 30, 2004 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Sep 16, 2004 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Jul 02, 2004 | 2 | Lansing Correctional Facility - Central | Misconduct in Dining Room |
| Apr 28, 2004 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Apr 28, 2004 | 1 | Lansing Correctional Facility - Central | Avoiding an Officer |
| Mar 21, 2004 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| Mar 21, 2004 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Jan 09, 2004 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Jan 09, 2004 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Dec 23, 2003 | 3 | Lansing Correctional Facility - Central | Restr Area and Unauth Presence |
| Sep 08, 2003 | 1 | Lansing Correctional Facility - Central | Dangerous Contraband |
| Sep 08, 2003 | 2 | Lansing Correctional Facility - Central | Misuse of State Property |
| Aug 18, 2003 | 1 | Norton Correctional Facility - Central | Fighting |
| Jul 11, 2003 | 2 | Norton Correctional Facility - Central | Unauthorized Dealing or Trade |
| Jun 30, 2003 | 2 | Norton Correctional Facility - Central | Work Performance |
| Apr 27, 2003 | 3 | Ellsworth Correctional Facility | Restr Area/Unauthor Presence |

Main Site:  Kansas Department of Corrections

## AFFIDAVIT OF DON ALMOND

I, Don Almond, of lawful age, being first duly sworn, on oath depose and state as follows:

1. I am currently employed as a Chaplain at Lansing Correctional Facility. I have been employed in that position since 2013.

2. My duties as chaplain include providing for the observance of the faith practices of our inmates per policy including attendance at religious callouts and approval of any special diet requirements related to the inmate's stated religion.

3. On January 22, 2014, inmate DeRon McCoy #76894 changed his religious preference from Protestant to Assembly of Yahweh.

4. Upon receiving this change in preference, inmate McCoy would have been placed on the roster to receive religious diet meals.

5. On August 24, 2014, inmate McCoy changed his religious preference to Judaism. Further affiant saith not.

Don Almond
Chaplain
Lansing Correctional Facility


SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 27th day of February, 2017.

DEBORAH EHRET-REYES
Notary Public - State of Kansas
My Appt. Expires 8-15-19

Notary Public

My appointment expires: 8-15-19

1


EXHIBIT
B

### AFFIDAVIT OF PATRICIA BERRY

I, Patricia Berry, of lawful age, being first duly sworn, on oath depose and state as follows:

1.    I am currently employed as a contract compliance manager with the Kansas Department of Corrections.  I have been employed in my current position since 2000 and I assumed the responsibilities of the food service contract manager in 2011.

2.    My duties as contract compliance manager include the enforcement of contract requirements, the preparation and processing of contract amendments, conducting food service operation inspections and facilitating the menu review and approval process.

3.    The Department has contracted with Aramark Correctional Services, Inc. for the provision of provide food service for the department's correctional facilities since 1997.

4.    The procedures relating to religious diets are set out in Internal Management Policy and Procedure (IMPP) 10-106 and 10-119.

5.    The religious meals menus for male inmates for 2014 and 2015 are attached as Exhibit A.

6.    I conducted an audit inspection of LCF's food service on February 24, 2014.  In this inspection, I found that the authorized menus were being used, that the kitchen had appropriate Kosher food preparation practices, that the equipment was clean and that pest control was evident (no roaches, mice, flies, etc.) and pest control procedure was maintained.

7.    On July 3, 2014, I conducted an unannounced site visit as a result of concerns expressed by facility management exacerbated by a facility lockdown.  During this inspection, I found additional food stored in the certified religious diet (CRD) cooler because the pass through cooler on the front line was not working.  I did not observe any other issues with regard to the preparation, serving or storage of CRD meals.


EXHIBIT
C

8. I conducted an audit inspection on July 22, 2014. I observed that proper religious diet food preparation and serving practices. Proper religious diet food storage practices were being used. Pest control was evident and the procedure was maintained.

9. I conducted on audit inspection on December 18, 2014. I observed that proper religious diet food preparation and serving practices. Proper religious diet food storage practices were being used. Pest control was evident and the procedure was maintained.

10. I conducted a food service inspection on September 30, 2015. No religious diet preparation or serving practices were observed. Proper religious diet food storage practices were being used. Pest control was evident and procedure was maintained.

Further affiant saith not.

_Patricia Berry_
Patricia Berry

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 27th day of February, 2017.

_Tracie Gauntt_
Notary Public

My appointment expires _Aug 15 2020_

NOTARY PUBLIC - State of Kansas
TRACIE GAUNTT
My Appt Expires _Aug 15 2020_

2

Proposed 11/11
Implemented 1/12
Revised 10/12, 10/15

# KANSAS DEPARTMENT OF CORRECTIONS
## RELIGIOUS MEALS MALE MENU
Weekly Average 2200 Calories Per Day

**aramark**

**Week:** 1

**Meal Name: Breakfast**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| Fruit Juice (50%) | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup |
| Kosher Hot Cereal | 2 cup | 2 cup | 2 cup | 2 cup | 2 cup | 2 cup | Dry Cereal 1 cup |
| Kosher Peanut Butter | 1 each | Kosher Fried Cooked Egg 2 each | Kosher Peanut Butter 1 each | Kosher Peanut Butter 1 each | Kosher Fried Cooked Egg 2 each | Kosher Peanut Butter 1 each | Kosher Fried Cooked Egg 2 each |
| Kosher Bread | 3 slice | Kosher Bread 3 slice | Kosher Bread 3 slice | Kosher Bread 3 slice | Kosher Bread 3 slice | Kosher Bread 3 slice | Kosher Bread 3 slice |
| Kosher Margarine, pc | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each |
| Jelly, pc | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |
| 1% Milk (Half Pint) | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each |
| Sugar | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |

**Meal Name: Lunch**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Chunky Beef Stew | Sloppy Joe | Turkey A La King | Cheesy Chicken Dinner | Turkey Tetrazzini | Romed Tuna | Taco Meat |
| Kosher Rice | 3/4 cup | 1 1/2 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup |
| Kosher Coleslaw Vinaigrette | 1/2 cup | Kosher Pinto Beans 1/2 cup | Kosher Rice 2 slice | Kosher Rice 1 1/2 cup | Kosher Noodles 1 1/2 cup | Mayo Dressing 2 packet | Kosher Pinto Beans 1/2 cup |
| Kosher Bread | 2 slice | Kosher Bread 2 slice | Garden Salad 1 cup | Kosher Bread 2 slice | Garden Salad 1 cup | Kosher Bread 2 slice | Kosher Rice 1 1/2 cup |
| Italian Salad Dressing | 1 fl oz | Italian Salad Dressing 1 fl oz | Italian Salad Dressing 1 fl oz | Garden Salad 1 cup | Italian Salad Dressing 1 fl oz | MARINATED RICE SALAD KOSHER 1/2 cup | Shredded Lettuce 1/2 cup |
| Kosher Margarine, pc | 2 each | Kosher Margarine, pc 2 each | Kosher Margarine, pc 2 each | Italian Salad Dressing 1 fl oz | Kosher Margarine, pc 2 each | Kosher Coleslaw Vinaigrette 2 slice | Flour Tortilla (6") 1/2 cup |
| Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 2 each | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | Kosher Coleslaw Vinaigrette 2 slice | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1/2 cup |
| | | | | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | |

**Meal Name: Dinner**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Italian Chicken | Cheesy Chicken Dinner | Italian Meat Sauce | Beef Stroganoff | Sweet & Sour Chicken | | Pulled BBQ Chicken |
| Kosher Noodles | 3/4 cup | Kosher Rice 3/4 cup | Kosher Noodles 3/4 cup | Kosher Noodles 3/4 cup | Kosher Rice 3/4 cup | Kosher Peanut Butter 3/4 cup | Kosher Rice 3/4 cup |
| Kosher Green Beans | 1/2 cup | Kosher Coleslaw Vinaigrette 1/2 cup | Kosher Carrots 1/2 cup | Kosher Green Beans 1/2 cup | Kosher Rice 1 1/2 cup | Jelly, pc 1 1/2 cup | Kosher Carrots 1 1/2 cup |
| Garden Salad | 1/2 cup | Kosher Bread 2 slice | Kosher Bread 1/2 cup | Kosher Bread 1/2 cup | Kosher Mixed Vegetables 1/2 cup | Kosher Bread 1/2 cup | Kosher Bread 1/2 cup |
| Italian Salad Dressing | 1 fl oz | Kosher Margarine, pc 2 slice | Kosher Bread 2 slice | Kosher Bread 2 slice | Kosher Bread 2 slice | Kosher Macaroni Salad 2 slice | Kosher Bread 2 slice |
| Kosher Bread | 2 slice | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | Kosher Margarine, pc 2 each | Kosher Margarine, pc 2 each | Kosher Margarine, pc 2 slice | Garden Salad 1 1/2 cup | Kosher Margarine, pc 2 slice |
| Kosher Margarine, pc | 2 each | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | Italian Salad Dressing 1/2 cup | Kosher Margarine, pc 2 each |
| Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | | | | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 fl oz | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup |
| | | | | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium 1 cup | |

Side dishes are volume measurements. All entrees are made with Texturized Vegetable Protein (TVP) unless otherwise indicated with an asterisk (*). All starches, vegetables, and cooked cereal are prepared with margarine unless hydrated as LF (Low Fat). No pork is used.

**NUTRITION STATEMENT:** This menu meets the nutritional guidelines of the American Correctional Association which are based upon the current DRI's for males and females 19 to 50 years as established by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences. Adequate levels of protein, vitamin A, vitamin C, calcium, and iron are included.

General Guidelines: Follow all kosher preparation instructions in recipes for Entrees, Starches and Salads. Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. No meat is served.   Serve meal on disposable or designated kosher trays with disposable or kosher only tableware.

KDOC Dietitian's Signature of Review: *(signature)*

ARAMARK Dietitian's Signature of Nutritional Adequacy: *(signature)*

Reviewed 1/18

State Contract Monitor Signature of Approval: *(signature)*

Aramark Religious Authority's Signature of Approval: *Patricia Berry*

*(signature)* This kosher, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such can not confirm that each meal being served is Kosher

EXHIBIT
C-A
tabbies®

Proposed 11/11
Implemented 1/12
Revised 10/12, 10/15

**KANSAS DEPARTMENT OF CORRECTIONS**
RELIGIOUS MEALS MALE MENU
Weekly Average 2900 Calories Per Day

aramark

**Week: 2**

## Meal Name: Breakfast

| Item | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| Fruit Juice (50%) | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup |
| Kosher Hot Cereal | 2 each | 2 each | 2 cup | | 2 cup | Dry Cereal 1 each | Kosher Hot Cereal 1 cup |
| Kosher Peanut Butter | 2 ccw | Kosher Hard Cooked Egg 2 ccw | 1 each | Kosher Hard Cooked Egg 2 ccw | Kosher Peanut Butter 1 each | Kosher Hard Cooked Egg 1 each | Kosher Peanut Butter 1 each |
| Kosher Bread | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice |
| Kosher Margarine, pc | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each |
| Jelly, pc | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |
| 1% Milk (Half Pint) | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each |
| Sugar | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |

## Meal Name: Lunch

| Item | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| Entree | Chunky Beef Stew 3/4 cup | Sloppy Joe 3/4 cup | Turkey A La King 3/4 cup | Taco Meat 3/4 cup | Turkey Tetrazzini 3/4 cup | Kosher Peanut Butter 3/4 ccw | Turkey A La King 2 ccw |
| Kosher Rice | 1/2 cup | 1/2 cup | 2 slice | Kosher Pinto Beans 1 1/2 cup | Kosher Noodles 1 1/2 cup | Jelly, pc 1 1/2 cup | Kosher Rice 1/2 cup |
| Kosher Coleslaw Vinaigrette | 1/2 cup | Kosher Pinto Beans 1/2 cup | Garden Salad 1/2 cup | Shredded Lettuce 1 cup | Garden Salad 1 cup | Kosher Bread 1 cup | Garden Salad 2 slice |
| Kosher Bread | 2 slice | Garden Salad 2 slice | Italian Salad Dressing 1 cup | Flour Tortilla (6") 1 fl oz | Italian Salad Dressing 1 fl oz | Kosher Mustard Salad 1 fl oz | Italian Salad Dressing 1 fl oz |
| Kosher Margarine, pc | 2 each | Italian Salad Dressing 1 fl oz | Kosher Bread 1 fl oz | Kosher Margarine, pc 2 slice | Kosher Margarine, pc 1 cup | Garden Salad 1 cup | Kosher Bread 1 cup |
| Jelly, pc | 2 packet | Kosher Margarine, pc 2 each | Kosher Margarine, pc 2 each | | | Italian Salad Dressing 2 slice | Kosher Margarine, pc 2 each |
| Fruit Drink w/ Vitamins B12, C, D, E & Calcium | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup |

## Meal Name: Dinner

| Item | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| Entree | Italian Beef Sauce 3/4 cup | Cherry Chicken Dinner 3/4 cup | Italian Chicken 3/4 cup | Cherry Chicken Dinner 3/4 cup | Sloppy Joe 3/4 cup | Roast Tuna 3/4 cup | Pulled BBQ Chicken 3/4 cup |
| Kosher Noodles | 1 1/2 cup | Kosher Rice 1 1/2 cup | Kosher Noodles 1 1/2 cup | Kosher Noodles 1 1/2 cup | Kosher Bread 1/2 cup | Merry Dressing 2 slice | Kosher Noodles 2 ccw |
| Kosher Green Beans | 1/2 cup | Kosher Green Beans 1/2 cup | Kosher Green Beans 1/2 cup | Kosher Hard Vegetables 1/2 cup | Kosher Pinto Beans 1/2 cup | Kosher Bread 1/2 cup | Kosher Pinto Beans 2 packet |
| Garden Salad | 2 slice | Kosher Coleslaw Vinaigrette 1/2 cup | Kosher Bread 1/2 cup | Kosher Bread 1/2 cup | Kosher Coleslaw Vinaigrette 1/2 cup | Kosher Bread 1/2 cup | Kosher Carrots 1/2 cup |
| Salad Dressing LF | 1/2 fl oz | Kosher Bread 2 slice | Kosher Margarine, pc 2 slice | Kosher Margarine, pc 2 slice | MARIAN RICE SALAD KOSHER 1/2 cup | Kosher Bread 2 slice | |
| Kosher Bread | 2 slice | Kosher Margarine, pc 2 each | | | | Kosher Coleslaw Vinaigrette 1/2 cup | Kosher Margarine, pc 2 each |
| Kosher Margarine, pc | 2 each | | | | | | |
| Fruit Drink w/ Vitamins B12, C, D, E & Calcium | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup |

Side dishes are volume measurements. All entrees are made with Textured Vegetable Protein (TVP) unless otherwise indicated with an asterisk (*). All starches, vegetables, and cooked cereal are prepared with margarine unless indicated as LF (Low Fat). No pork is used.

NUTRITION STATEMENT: This menu meets the nutritional guidelines of the American Correctional Association which are based upon the current DRI's for males and females 19 to 60 years as established by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences. Adequate levels of protein, vitamin A, vitamin C, calcium and iron are included.

General Guidelines: Follow all kosher preparation instructions in recipes for Entrees, Starches and Salads. Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. No meat is served. Serve meal on disposable or designated kosher trays with disposable or kosher only tableware.

KDOC Dietitian's Signature of Review:

ARAMARK Dietitian's Signature of Nutritional Adequacy:

State Contract Monitor Signature of Approval:

Aramark Religious Authority's Signature of Approval: _Patricia Berry_

This menu, all meal components and preparation processes follow Jewish dietary laws. It is undersigned that I am overseeing the preparation of these meals and as such can not confirm that each meal being served is Kosher

Reviewed 1/13

Proposed 11/11
Implemented 1/12
Revised 10/12, 10/15

# KANSAS DEPARTMENT OF CORRECTIONS
## RELIGIOUS MEALS MALE MENU
Weekly Average 2500 Calories Per Day


aramark

**Week:** 3

### Meal Name: Breakfast

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| Fruit Juice (50%) | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup |
| Kosher Hot Cereal | 2 cup | 2 cup | 2 cup | 2 cup | 2 cup | 2 cup | 2 cup |
| Kosher Peanut Butter | 2 any | 2 any | 1 each | 2 cup | 1 each | 1 each | 2 any |
| Kosher Hard Cooked Egg | | | | | | | 2 each |
| Kosher Bread | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice |
| Kosher Margarine, pc | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each |
| Jelly, pc | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |
| 1% Milk (Half Pint) | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each |
| Sugar | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |

### Meal Name: Lunch

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Cheery Chicken Dinner | Sweet & Sour Chicken | Italian Meat Sauce | Cheery Chicken Dinner | Turkey Tetrazzini | Kosher Peanut Butter | Taco Meat |
| Kosher Noodles | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup |
| Kosher Rice | 1 1/2 tsp | | 1/2 cup | 1 1/2 tsp | | | |
| Kosher Coleslaw Vinaigrette | 1/2 cup | 1/2 cup | 1/2 cup | 1/2 cup | 1/2 cup | 1/2 cup | Kosher Fried Beans |
| Garden Salad | | 1 cup | | | | 1 cup | 1 cup |
| Italian Salad Dressing | 1 oz | 1 oz | | | | Kosher Mozzarel Salad | Kosher Rice |
| Kosher Bread | 2 slice | 1 oz | 2 slice | 2 slice | 2 slice | 2 slice | Shredded Lettuce |
| Kosher Margarine, pc | 2 each | 2 slice | 2 slice | 2 each | 2 each | 2 slice | 1/2 cup |
| | | 2 each | 2 each | | | | Flour Tortilla (9") |
| Jelly, pc | | | | | | | 1 each |
| Fruit Drink w/ Vitamins B12, C, D, E & Calcium | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | Salad Salad Dressing | 2 each |
| | | | | | | 1 cup | 1 cup |

### Meal Name: Dinner

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Italian Chicken | Beef Stroganoff | Chunky Beef Stew | Beef Stroganoff | Pulled BBQ Chicken | Stewed Tuna | Creamy Chicken Dinner |
| Kosher Rice | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup |
| Kosher Noodles | 1 1/2 tsp | 1 1/2 tsp | | 1 1/2 tsp | 1 1/2 tsp | 1 1/2 tsp | 1 1/2 tsp |
| Kosher Green Beans | 1/2 cup | | Kosher Carrots | Kosher Noodles | Kosher Rice | Mayo Dressing | Kosher Noodles |
| Kosher Coleslaw Vinaigrette | | 1/2 cup | 1/2 cup | Kosher Mixed Vegetables | 1 1/2 tsp | 1 1/2 tsp | Kosher Carrots |
| Garden Salad | 1/2 cup | 1/2 cup | 2 slice | 1/2 cup | Kosher Mixed Vegetables | MARINATED RICE SALAD KOSHER | 1 1/2 tsp |
| Kosher Bread | 2 slice | | Garden Salad | Garden Salad | 1/2 cup | 2 slice | Kosher Mixed Vegetables |
| Salad Dressing LF | 1/2 fl oz | Kosher Bread | 1/2 cup | Salad Dressing LF | Kosher Bread | Kosher Coleslaw Vinaigrette | 1/2 cup |
| Kosher Bread | 2 slice | 2 slice | Salad Dressing LF | 1/2 fl oz | 2 slice | 1/2 cup | Kosher Bread |
| Kosher Margarine, pc | 2 each | Kosher Margarine, pc | 1/2 fl oz | 2 slice | Kosher Margarine, pc | Kosher Bread | Kosher Margarine, pc |
| | | 2 each | Kosher Bread | Kosher Margarine, pc | 2 each | 2 slice | 2 each |
| Fruit Drink w/ Vitamins B12, C, D, E & Calcium | 2 each | 2 each | 2 slice | 2 each | | Kosher Margarine, pc | Fruit Drink w/ Vitamins B12, C, D, E & Calcium |
| | 1 cup | 1 cup | Kosher Margarine, pc | Fruit Drink w/ Vitamins B12, C, D, E & Calcium | Fruit Drink w/ Vitamins B12, C, D, E & Calcium | 2 each | 1 cup |
| | | | 2 each | 1 cup | 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium | |
| | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium | | | 1 cup | |
| | | | 1 cup | | | | |

Side dishes are volume measurements.   All entrees are made with Textured Vegetable Protein (TVP) unless otherwise indicated with an asterisk (*).   All starches, vegetables, and portioned cereal are prepared with margarine unless indicated as LF (Low Fat). No pork is used.

NUTRITION STATEMENT:   This menu meets the nutritional guidelines of the American Correctional Association which are based upon the current DRI's for males and females 19 to 50 years as established by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences.   Adequate levels of protein, vitamin A, vitamin C, calcium, and iron are included.

General: Quick&erve: Follow all kosher preparation instructions in recipes for Entrees, Starches, Starches and Salads.   Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. No meat is served.   Serve meal on disposable or designated kosher trays with disposable or kosher only tableware.

KDOC Dietitian's Signature of Review: _Chrystine Amino_

ARAMARK Dietitian's Signature of Nutritional Adequacy: _____

Reviewed 1/13

State Contract Monitor Signature of Approval: _____

Aramark Religious Authority Signature of Approval: _Patricia Berry_

_M. Jolley_

This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am overseeing in the preparation of these meals and as such can not confirm that each meal being served is Kosher.

# KANSAS DEPARTMENT OF CORRECTIONS
## RELIGIOUS MEALS MALE MENU
Weekly Average 2500 Calories Per Day


aramark

Week: 4

**Meal Name: Breakfast**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Fruit Juice (50%) — 1 cup | Fruit Juice (50%) — 1 cup | Fruit Juice (50%) — 1 cup | Fruit Juice (50%) — 1 cup | Fruit Juice (50%) — 1 cup | Fruit Juice (50%) — 1 cup | Fruit Juice (50%) — 1 cup |
| | Kosher Hot Cereal — 2 cup | Kosher Hot Cereal — 2 cup | Kosher Hot Cereal — 2 cup | Kosher Hot Cereal — 2 cup | Kosher Hot Cereal — 2 cup | Dry Cereal — 1 cup | Kosher Hot Cereal — 1 cup |
| | Kosher Peanut Butter — 1 each | Kosher Hard Cooked Egg — 2 each | Kosher Peanut Butter — 1 each | Kosher Hard Cooked Egg — 2 each | Kosher Peanut Butter — 1 each | Kosher Hard Cooked Egg — 2 each | Kosher Peanut Butter — 2 each |
| | Kosher Bread — 3 slice | Kosher Bread — 3 slice | Kosher Bread — 3 slice | Kosher Bread — 3 slice | Kosher Bread — 3 slice | Kosher Bread — 3 slice | Kosher Bread — 3 slice |
| | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each |
| | Jelly, pc — 1 packet | Jelly, pc — 1 packet | Jelly, pc — 1 packet | Jelly, pc — 1 packet | Jelly, pc — 1 packet | Jelly, pc — 2 packet | Jelly, pc — 2 packet |
| | 1% Milk (Half Pint) — 1 each | 1% Milk (Half Pint) — 1 each | 1% Milk (Half Pint) — 1 each | 1% Milk (Half Pint) — 1 each | 1% Milk (Half Pint) — 1 each | 1% Milk (Half Pint) — 1 each | 1% Milk (Half Pint) — 1 each |
| | Sugar — 2 packet | Sugar — 2 packet | Sugar — 2 packet | Sugar — 2 packet | Sugar — 2 packet | Sugar — 2 packet | Sugar — 2 packet |

**Meal Name: Lunch**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Chunky Beef Stew — 3/4 cup | Sloppy Joe — 3/4 cup | Turkey A La King — 3/4 cup | Taco Meat — 3/4 cup | Turkey A La King — 3/4 cup | Kosher Peanut Butter — 3/4 cup | Turkey Tetrazzini — 3/4 cup |
| | Kosher Rice — 1 1/2 cup | Kosher Rice — 1 1/2 cup | Kosher Rice — 2 slice | Kosher Pinto Beans — 1 1/2 cup | Kosher Rice — 1 1/2 cup | Jelly, pc — 1 1/2 cup | Kosher Broccoli — 2 packet |
| | Kosher Coleslaw Vinaigrette — 1/2 cup | Kosher Coleslaw Vinaigrette — 1/2 cup | Garden Salad — 1 cup | Shredded Lettuce — 1 8 oz | Garden Salad — 1 cup | Kosher Bread — 2 packet | Garden Salad — 1 cup |
| | Garden Salad — 2 slice | Garden Salad — 2 slice | Italian Salad Dressing — 1 8 oz | Flour Tortilla (7") — 2 slice | Italian Salad Dressing — 1 8 oz | Kosher Macaroni Salad — 1 cup | Italian Salad Dressing — 1 1/2 oz |
| | Kosher Margarine, pc — 2 each | Italian Salad Dressing — 1 cup | Kosher Bread — 1 8 oz | Kosher Bread — 2 slice | Kosher Bread — 1 8 oz | Garden Salad — 1 8 oz | Kosher Bread — 1 cup |
| | Kosher Bread — 1 8 oz | Kosher Bread — 1 8 oz | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Italian Salad Dressing — 1 1/2 oz | Kosher Margarine, pc — 2 each |
| | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | Kosher Bread — 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup |
| | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | | | | Kosher Margarine, pc — 2 each | |
| | | | | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | |

**Meal Name: Dinner**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Italian Meat Sauce — 3/4 cup | Sweet & Sour Chicken — 3/4 cup | Italian Chicken — 3/4 cup | Creamy Chicken Dinner — 3/4 cup | Sloppy Joe — 3/4 cup | Roast Tuna — 3/4 cup | Italian Chicken — 3/4 cup |
| | Kosher Noodles — 1 1/2 cup | Kosher Rice — 1 1/2 cup | Kosher Noodles — 1 1/2 cup | Kosher Rice — 1 1/2 cup | Kosher Rice — 1/2 cup | Mayo Dressing — 2 each | Kosher Rice — 2 cup |
| | Kosher Green Beans — 1/2 cup | Kosher Coleslaw Vinaigrette — 1/2 cup | Kosher Carrots — 1/2 cup | Kosher Mixed Vegetables — 1/2 cup | Kosher Pinto Beans — 2 slice | Kosher Pinto Beans — 1/2 cup | Kosher Potato Beans — 2 each |
| | Garden Salad — 1/2 cup | Garden Salad — 1/2 cup | Kosher Bread — 2 slice | Kosher Bread — 2 slice | Kosher Bread — 1/2 cup | Kosher Bread — 2 slice | Kosher Bread — 1/2 cup |
| | Salad Dressing LF — 1/2 oz | Kosher Bread — 2 slice | Kosher Margarine, pc — 2 each | Kosher Margarine, pc — 2 each | Kosher Coleslaw Vinaigrette — 1/2 cup | MARINATED RICE SALAD/KOSHER — 1/2 cup | Kosher Carrots — 1/2 cup |
| | Kosher Bread — 2 slice | Kosher Margarine, pc — 2 each | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | Kosher Margarine, pc — 2 each | Kosher Coleslaw Vinaigrette — 1/2 cup | Kosher Margarine, pc — 2 each |
| | Kosher Margarine, pc — 2 each | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | Kosher Margarine, pc — 2 each | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup |
| | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 2 each / 1 cup | | | | | Fruit Drink w/ Vitamins B12, C, D, E & Calcium — 1 cup | |

Side dishes are volume measurements. All entrees are made with Textured Vegetable Protein (TVP) unless otherwise indicated with an asterisk (*). All starches, vegetables, and cooked cereal are prepared with margarine unless indicated as LF (Low Fat). No pork is used.

NUTRITION STATEMENT: This menu meets the nutritional guidelines of the American Correctional Association which are based upon the current RDAs for males and females 19 to 50 years as established by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences. Adequate levels of protein, Vitamin A, Vitamin C, calcium, and iron are included.

General Guidelines: Follow all kosher preparation instructions in recipes for Entrees, Starches and Salads. Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. No meat is served. Serve meal on disposables or designated kosher trays with disposables or kosher only flatware.

KDOC Dietitian's Signature of Review: _____

ARAMARK Dietitian's Signature of Nutritional Adequacy: _____

State Contract Monitor Signature of Approval: _____

Aramark Religious Authority's Signature of Approval: Patricia Berry

This menu and its components and preparation processes follow Jewish dietary laws. It is understood that I am not confessing the preparation of these meals and as such can not confirm that each meal being served is Kosher.

Proposed 11/11
Implemented 9/12
Revised 10/12, 10/15

Reviewed 1/13



# KANSAS DEPARTMENT OF CORRECTIONS
## RELIGIOUS MEALS MALE MENU
Weekly Average 2500 Calories Per Day

**aramark**

Week: **5**

Proposed 11/11
Implemented 11/12
Revised 10/12; 10/15

**Meal Name: Breakfast**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| Fruit Juice (50%) | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup | 1 cup |
| Kosher Hot Cereal | 2 cup | 2 cup | 2 cup | 2 cup | 2 cup | Dry Cereal | 2 cup |
| Kosher Peanut Butter | 1 each | Kosher Hard Cooked Egg 2 ea | Kosher Peanut Butter 2 ea | Kosher Hard Cooked Egg 2 ea | Kosher Hard Cooked Egg 1 each | Kosher Peanut Butter 2 ea | Kosher Hard Cooked Egg 2 ea |
| Kosher Bread | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice | 3 slice |
| Kosher Margarine, pc | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each | 2 each |
| Jelly, pc | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |
| 1% Milk (Half Pint) | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each | 1 each |
| Sugar | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet | 2 packet |

**Meal Name: Lunch**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Cherry Chicken Dinner | Sweet & Sour Chicken | Italian Meat Sauce | Creamy Chicken Turner | Turkey Tetrazzini | Kosher Peanut Butter | Taco Meat |
| Kosher Rice | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 3/4 cup | 2 cup | 3/4 cup |
| Kosher Coleslaw Vinaigrette | 1/2 cup | Kosher Rice 1 1/2 cup | Kosher Noodles 1 1/2 cup | Kosher Rice 1 1/2 cup | Kosher Noodles 1 1/2 cup | Jelly, pc 2 packet | Kosher Twist Beans 1 1/2 cup |
| Garden Salad | 1/2 cup | Garden Salad 1/2 cup | Kosher Coleslaw Vinaigrette 1/2 cup | Garden Salad 1/2 cup | Garden Salad 1 cup | Kosher Rice 3 slice | Kosher Rice 1 cup |
| Kosher Bread | 2 slice | Italian Salad Dressing 1 fl oz | Kosher Bread 1 fl oz | Italian Salad Dressing 1 fl oz | Italian Salad Dressing 1 fl oz | Kosher Macaroni Salad 1 fl oz | Shredded Lettuce 1 cup |
| Kosher Margarine, pc | 2 each | Kosher Margarine, pc 2 slice | Kosher Bread 2 slice | Kosher Bread 2 slice | Kosher Bread 2 slice | Kosher Coleslaw Vinaigrette 1/2 cup | Flour Tortilla (6") 1/2 cup |
| Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | | Kosher Margarine, pc 2 each | Kosher Margarine, pc 2 each | Kosher Margarine, pc 2 each | Kosher Margarine, pc 2 each | Kosher Coleslaw Vinaigrette 2 each | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup |
| | | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | |

**Meal Name: Dinner**

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| | Beef Stroganoff | Baked BBQ Chicken | Cherry Beef Stew | Beef Stroganoff | Sweet & Sour Chicken | Roast Tuna | Baked BBQ Chicken |
| Kosher Noodles | 3/4 cup | Kosher Noodles 3/4 cup | Kosher Rice 3/4 cup | Kosher Stroganoff 3/4 cup | Kosher Rice 3/4 cup | 3/4 cup | Kosher Rice 3/4 cup |
| Kosher Green Beans | 1 1/2 cup | Kosher Coleslaw Vinaigrette 1 1/2 cup | Kosher Noodles 1 1/2 cup | Kosher Noodles 1 1/2 cup | Kosher Rice 1/2 cup | Mayo Dressing 1 1/2 cup | Kosher Noodles 1 1/2 cup |
| Garden Salad | 1/2 cup | Kosher Carrots 1/2 cup | Kosher Carrots 1/2 cup | Kosher Mixed Vegetables 1/2 cup | Kosher Green Beans 1/2 cup | 2 packet | Kosher Carrots 1/2 cup |
| Salad Dressing LF | 1 fl oz | Kosher Bread 2 slice | Garden Salad 2 slice | Kosher Bread 1/2 cup | Kosher Bread 1/2 cup | MARINATED RICE SAUCE W/KOSHER 2 slice | Kosher Bread 1/2 cup |
| Kosher Bread | 2 slice | Kosher Margarine, pc 2 each | Salad Dressing LF 2 slice | Kosher Bread 1/2 each | Kosher Bread 2 each | Garden Salad 1 1/2 cup | Kosher Bread 2 slice |
| Kosher Margarine, pc | 2 each | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | Kosher Bread 2 each | Kosher Margarine, pc 2 each | Kosher Margarine, pc 1 cup | Italian Salad Dressing 1/2 cup | Kosher Margarine, pc 2 each |
| Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | | | Kosher Margarine, pc 2 each | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 fl oz | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 fl oz | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup |
| | | | Fruit Drink w/ Vitamin B12, C, D, E & Calcium 1 cup | | Calcium 1 cup | Calcium 1 cup | |

Side dishes are volume measurements.

**NUTRITION STATEMENT:** This menu meets the nutritional guidelines of the American Correctional Association which are based upon the current DRIs for males and females 19 to 50 years as established by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences. Adequate levels of protein, vitamin A, vitamin C, calcium and iron are included.

*All entrees are made with Textured Vegetable Protein (TVP) unless otherwise indicated with an asterisk (*). All starches, vegetables, and cooked cereal are prepared with margarine unless indicated as LF (Low Fat, No pork's [No pork's]*

**General Guidelines:** Follow all kosher preparation instructions in recipes for Entrees, Starches and Salads. Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. No meat is served. Serve meal on disposable or designated kosher trays with disposable or kosher only tableware.

KDOC Dietitian's Signature of Review: _Chispello_ Pippins

ARAMARK Dietitian's Signature of Nutritional Adequacy: _____

Revised 1/13

State Contract Monitor Signature of Approval: _____

Aramark Religious Authority's Signature of Approval: _Patricia Berry_

This menu, its meal components and preparation processes follow Jewish dietary laws. It is understood that I am not overseeing the preparation of these meals and as such can not confirm that each meal being served is Kosher

## KANSAS DEPARTMENT OF CORRECTIONS

| | **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | **SECTION NUMBER** 10-106 | **PAGE NUMBER** 1 of 7 |
|---|---|---|---|
| | | **SUBJECT:** PROGRAMS & SERVICES: Standardized Menu, Ensuring Nutritional Adequacy of Diets, and Meal Service Schedules | |

| **Approved By:** | **Original Date Issued:** | **08-15-82** |
|---|---|---|
| | **Current Amendment Effective:** | **03-12-10** |
| **Secretary of Corrections** | **Replaces Amendment Issued:** | **02-26-10** |
| **Reissued By:** | The substantive content of this IMPP has been reissued as per the appropriate provisions of IMPP 01-101. The only modifications within the reissue of this document concern technical revisions of a non substantive nature. | |
| **Policy & Procedure Coordinator** | **Date Reissued:** | **05-20-11** |

## POLICY

All departmental food service operations shall follow a standardized menu, which shall incorporate the principles expressed in the United States Department of Agriculture and Human Services Food Guide Pyramid and be in compliance with recommended dietary allowances published by the National Academy of Sciences for adult men and women. (NCCHC P-46) The menu shall be established by a provider under contract with the Department to provide food service to inmates within the care and custody of the Secretary of Corrections, shall be subject to approval by the Secretary or designee, and reviewed every six (6) months, or whenever substantial changes in the menu are made (NCCHC P-46) by a registered dietician. (ACI 3-4298)  The menu shall ensure basic nutritional requirements for all meals served, to include alterations, substitutions and modifications for medical, dental, mental health, (NCCHC P-46) religious purposes, (ACI 3-4299, 3-4300) and alternative meal service.  A rotating cycle of the daily menu shall be established to provide for sufficient advance planning and preparation, consistent with applicable health, sanitation, and safety codes.  Meal preparation and service shall also take into consideration the quality and presentation of the food. (ACI 3-4298)  Quarterly meal evaluations shall be conducted by the contracted food service director, at the request of the Food Service Contract Administrator, to ensure adherence to the approved diet. (ACI 3-4297)  Facilities provided meal service by other governmental agencies shall be exempt from adherence to the KDOC standardized menu but shall require documentation that the menu utilized meets the requirements of this policy.

With the exception of variations for weekend or holiday service schedules approved by the Deputy Secretary of Facility Management, at least three (3) meals (including two hot meals) shall be served at regular times during each 24-hour period, with no more than fourteen (14) hours between the evening meal and breakfast. (ACI 3-4309)  Meals served to facility staff, guests, and visitors shall consist of the same menu items, be of the same quantity and quality as those served to inmates.  Accurate records shall be maintained of all meals served. (ACI 3-4296)

Food shall not be withheld from inmates as a disciplinary sanction. Alternative meal service may be provided to an inmate who used food or food service equipment in a manner that is hazardous to self, staff or other inmates. Alternative meal service shall be based on health and safety considerations only and shall be approved in writing by the Warden and Health Authority. (ACI 3-4252)

## DEFINITIONS

Alternative meal service:  Food or foodware served with consideration made for health and safety, i.e., food items free of bones or other potentially harmful objects, and meals not requiring utensils such as finger foods or meat/meal loaf.

EXHIBIT D

Crisis Level Placement:  An inmate who, based upon a report and recommendation of a mental health practitioner, is housed in Administrative Segregation for purposes of monitoring / observing behaviour and actions to prevent self injury or harm.

Contract Monitor: The staff member designated by the Deputy Secretary of Programs, Research and Support Services to monitor the quality and quantity of food service contract delivery, provide input with regard to the development of modified diets, and to facilitate decisions and coordinate standardized departmental food service management.

Individualized diet:  An adaptation of the medical or religious-type modified diet prescribed to meet specific needs, which are not addressed by the standardized modified diet.

Modified diets:  Diets most commonly prescribed to meet inmates medical, dental, therapeutic or religious needs, developed from written instructions provided by the treating physician, dentist, facility health authority, and/or chaplain and which conform as closely as possible to the standardized menu.  More specific modified diets are prescribed as individualized diets.

Registered Licensed Dietician:  A person registered by the American Dietetic Association or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education, and who is licensed by the State of Kansas to practice dietetics.

Standardized menu:  A listing of the dishes to be served at all KDOC facilities for a particular meal, on a particular day; the same meal items, quantity and quality, served to inmates and to staff, and official visitors who purchase meals.

## PROCEDURES

I.      **Contract Staff and Responsibilities**

    A.      The contractor staff shall be responsible for the following:

        1.      The contractor staff shall be responsible to plan and develop a standardized menu. (ACI 3-4298)

            a.      The finalized menu shall be reviewed and approved by the Deputy Secretary of Facility Management, with input from the Food Service Administrator.

        2.      The Food Service Contractor shall also:

            a.      Ensure, via a quarterly review, that the established basic servings per menu at the contracting facility meet required dietary allowances;

                (1)     To facilitate evaluations, the KDOC Meal Evaluation Form(Attachment "A") may be used by appropriate staff.

            b.      Poll inmate preferences and acceptance of menu items on an annual basis, and report findings as guidance for the revision of the standardized menu;

            c.      Document substitutions and modifications to the menu, and request approval for any permanent changes; and,

            d.      Provide drafts of any generated standardized menus to appropriate Departmental staff for review, comments and approval.

II.      **Provisions Ensuring Nutritional Adequacy and Variety in the Menu**

A.  The menu shall be developed by the contractor in conjunction with the Department's contract monitor, and the Department's contracted registered-licensed dietician (ACI 3-4297)

B.  Menus shall be developed according to the following minimum dietary requirements:

1.  The diets for inmates shall consist of not less than a weekly average of 2900 calories per day for men and a similarly computed average of 2200 calories per day for women.

    a.  Notwithstanding the preceding provisions, inmates undergoing medical treatment may receive a diet of a higher or lower average caloric content based upon the prescriptive authority of their attending physician or other health care professional.

2.  The daily menus supplied by contractor shall satisfy the current nutritional requirements for adult men and women as called for by the National Academy of Sciences.

C.  Menu planning and production shall employ standardized recipes provided by the contractor.

1.  All food items shall be prepared in accordance with the stated ingredients of the recipes, with adjustments made for yields appropriate to the facility. (ACI 3-4298)

2.  The planning and preparation of all meals shall take into consideration food flavor, texture, temperature, appearance, and palatability. (ACI 3-4298)

D.  In conjunction with the development of the cyclical menus (Fall/Winter menu and Spring/Summer menu) or whenever substantial changes in the menu are made, the Department's contracted registered dietician shall review the menu. Once the Department's contracted registered dietician verifies that the menu meets the nutritional requirements stipulated in the food service contract, the contract monitor will sign it certifying that those requirements have been met.(ACI 3-4297)

1.  Copies of all menus, including modified and individualized diets, shall be retained by the facilities for the contract monitor's review, along with documentation of deviations from the menu as served. (ACI 3-4296)

2.  Facility food service supervisory staff shall conduct meal evaluations on a quarterly basis to verify the facility's adherence to the established basic daily servings. (ACI 3-4297)

III.  **Provisions Ensuring Nutritional Adequacy in Modified Diets**

A.  The standardized menu shall include provisions for modified diets, which conform as closely as possible to the menu and ensure the nutritional adequacy of food items substituted for standard menu items.

1.  Instructions for modified diets shall provide for consideration of the most commonly prescribed modified diet for medical purposes or to address the most common religious dietary laws.

B.  Individualized diets may be written and prescribed by the treating physician, dentist, and/or facility health authority when the inmate's specific need cannot be met by a standardized modified medical diet. (ACI 3-4299, 3-4300; NCCHC P-46)

1.  All individualized diet prescriptions shall be specific and as complete and as simple as possible while adhering as closely as possible to the standardized modified menu.

    2.    All individualized diet prescriptions shall be reviewed monthly.

**IV.**      **Identification and Tracking of Approved Modified Diets**

    A.    Facility personnel shall ensure that a list of names of inmates receiving a modified diet of any type shall be prepared by the facility health authority or designee and chaplain, as appropriate, consistent with IMPP 10-119, and forwarded, within 24 hours, to the food service manager and chief of security or designee.

        1.    Crisis level placements shall receive alternative meal service in the form of finger food for the duration of their crisis level placement, but not to exceed seven days.

            a.    Alternative meals for crisis level inmates shall meet basic nutritional requirements.

        2.    The facility health authority shall be responsible to approve all prescriptions for modified diets for medical reasons and shall maintain a current list of inmates authorized to receive such diets.

        3.    The daily list of modified diets for medical prescriptions or religious needs shall include:

            a.    The name of the inmate;

            b.    The type of modified diet prescribed; and,

            c.    A designation as to whether to add or to remove the inmate's name to the list of modified diets.

        4.    The food service manager shall refer to the list of modified diets to:

            a.    Adjudge the amount of modified foods to serve and control food waste; and,

            b.    Aid in the identification of inmates placed on modified diets.

        5.    The chief of security or designee shall refer to the list of modified diets to affix the appropriate color coded sticker to the inmates' identification badge, per IMPP 12-131, indicating the type of diet the inmate is approved to receive.

        6.    Facility personnel shall provide for the removal of inmates' names from the list of modified diets.

            a.    The removal of inmate names from the list of modified diets shall be effected within twenty-four (24) hours of the determination of the health authority or the facility chaplain.

            b.    See IMPP 10-119 for the refusal process for medical diets and procedures to remove inmates' names from the medical diet list.

        7    Names of inmates receiving modified diets shall be forwarded within 24 hours by a copy of the list provided to the food manager and the chief of security or designee to facilitate an inmate's visual badge identification of a modified diet prescription.

            a.    Inmates receiving medical diet prescriptions shall sign for them as they pass through the food line.

**V.**      **Preparation and Serving of Modified Diets**

A.  Medical clinic staff shall be trained by the facility health authority as to the suggested prescription routine determining the use of each diet type and departmental policy and procedure surrounding medical diet prescriptions.

B.  Senior food service staff shall be trained in the provision of the medical diets by the contractor's Registered Dietician.

C.  Senior food service staff shall be trained by the contractor's Registered Dietician concerning the policy and procedure for provision of the standardized religious diet types.

D.  Facility chaplains shall be trained by the Secretary's designee for chaplaincy programs concerning the policy and procedure for provision of the standardized religious diet types.

## VI.  Provisions Ensuring Nutritional Adequacy for Segregation Inmates

A.  Segregation inmates shall receive the same menu items served to the general population and shall be served these items at a temperature similar to that served to the general population, unless an inmate uses food or food service equipment (to include obstructing closure of the food pass), in a manner that is hazardous to the inmate, staff or other inmates.

   1.  Alternative meal service for a segregation inmate shall be on an individual, case-by-case basis and shall be based on health and safety considerations.

      a.  Such alternative meals shall be served in accordance with the General Orders of the facility.

      b.  Alternative meal service shall not exceed seven (7) consecutive days.

   2.  Alternative meals for segregation inmates shall meet basic nutritional requirements.

   3.  Alternative meal service shall be approved in writing by the warden and the responsible facility health authority.

B.  Inmates who have obstructed closure of the food pass shall not receive meal service, including alternative meal service, until relinquishing control of the food pass and positioning themselves in a manner that does not endanger staff. Meal service, which may include alternative meal service, SHALL be initiated when delivery of the meal does not place staff in danger (i.e. inmate has moved to the rear of the cell and is not holding any objects).

## VII.  Establishing Meal Schedules

A.  The menu shall be established on a five-week rotating cycle. (ACI 3-4298)

B.  Each facility shall establish routine meal service schedules consistent with the policy established by this IMPP.

C.  Facilities shall be allowed to adopt and use a Standardized Brunch Menu if a variation is authorized by the Deputy Secretary of Facility Management and if:

   1.  Staff can better manage the food service demands of the facility for weekends and holidays.

   2.  Inmate visiting hours for weekends and holidays can be better managed by adjusting the food service schedule.

   3.  Weekend or holiday brunch meal schedules shall be arranged so that no more than eight (8) hours elapse between the brunch and the evening meal.

    4.    The Standardized Brunch Menu is reviewed by the contractor's Registered Dietician to certify that it will meet all the nutritional requirements of three (3) regular meals.

## VIII.    Food Production Order Sheet Monitoring

A.    The contractor shall establish a Food Production Order Sheet, which may be used as a daily addendum to the standardized menus, which include portion-sizing controls.

    1.    The Food Production Order Sheet, when utilized, shall be completed each day to record all substitutions, alterations, or changes made to the standardized menu.

    2.    Facilities, which do not utilize a Food Production Order Sheet, shall maintain a separate record of all substitutions made to the standardized menu.

    3.    The Food Production Order Sheet or other contractor-supplied record shall be maintained to monitor the number of meals served and record information on leftover portions. (ACI 3-4296)

B.    Alterations and substitutions of food items and the shifting of the daily menu to another day in the cycle shall be allowed for in the Standardized Menu, at the discretion of the senior facility food service staff member, for the following reasons: (ACI 3-4309)

    1.    Unavoidable changes due to spoilage or contamination;

        a.    Substitutions should be equivalent in nutritional value and from the same food group.

    2.    Changes to accommodate purchasing patterns necessary to take full advantage of commodities;

    3.    Changes due to equipment failure; and/or,

    4.    Special holiday meal planning.

## IX.    Purchase of Meals by Staff and Official Visitors

A.    Staff members and official visitors may purchase meals from the contractor at the cost established by the contractor unless personnel provisions have established preemptive policy and procedure.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

None.

**REFERENCES**

K.S.A. 75-5210
IMPP 10-119, 12-131
ACI 3-4252, 3-4296, 3-4297, 3-4298, 3-4299, 3-4300, 3-4301, 3-4309
NCCHC P-46
*Recommended Dietary Allowances,* Tenth Edition, National Research Council, 1989

**ATTACHMENTS**

Attachment A – KDOC Meal Evaluation Form, 1page

Attachment A, IMPP 10-106
Effective 03-12-10

## KDOC Meal Evaluation Form

Date: _____     Evaluator: _____

(Please Print Name & Title)

| Breakfast ___ | Lunch ___ | Dinner ___ | Facility: | Unit: | Segregation: ___ Y ___ N |
|---|---|---|---|---|---|

| ITEM | YES | NO | COMMENTS |
|---|---|---|---|
| WAS TRAY NEATLY ARRANGED? | | | |
| DID SUPERVISOR SERVE ENTRÉE? | | | |
| **PORTIONS ADEQUATE PER MENU** | | | |
| ENTREE: | | | |
| POTATO/STARCH: | | | |
| VEGETABLE: | | | |
| DESSERT: | | | |
| BEVERAGE: | | | |
| OTHER ITEMS: | | | |
| **SUBSTITUTIONS** | | | |
| WERE THERE MENU SUBSTITUTIONS?   SPECIFY | | | |
| WERE THERE ANY RUNOUTS?   SPECIFY | | | |
| ARE MENU SUBSTITUTIONS RECORDED BY THE CONTRACTOR | | | |
| **FOOD TEMPERATURES** | | | |
| WERE HOT FOODS SERVED HOT?   SPECIFY | | | |
| WERE COLD FOODS SERVED COLD?   SPECIFY | | | |
| WAS FOOD TASTE APPROPRIATE TO THE ITEM? | | | |
| **FOOD SERVICE WORKERS** | | | |
| CLEAN AND IN PROPER UNIFORM? | | | |
| WEARING HAIR NET/HAT AND/OR BEARD NET? | | | |
| USING GLOVES? | | | |
| **DINING AREA** | | | |
| CLEAN AND SANITARY? | | | |

INMATE EVALUATION:  Did inmates generally like the meal? _____ Yes _____ No  COMMENTS:

CC:   Aramark F/S Director
      Facility Warden or Designee

# KANSAS DEPARTMENT OF CORRECTIONS

| | **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | **SECTION NUMBER** 10-119 | **PAGE NUMBER** 1 of 7 |
|---|---|---|---|
| **DOC** Service Kansas | | **SUBJECT:** PROGRAMS AND SERVICES: Medical and Religious Diets and Vegetarian Alternative Diet | |
| **Approved By:** *Ray Robert* **Secretary of Corrections** | | **Original Date Issued:** 04-15-92 | |
| | | **Current Amendment Effective:** 06-19-13 | |
| | | **Replaces Amendment Issued:** 04-25-12 | |

## POLICY

Inmates at any facility within the Department of Corrections may receive or refuse medical and/or dental diets. (ACI 4-4317, 4-4318,4-4316, NCCHC P-F-02)

All modified diets shall be consistent with instructions developed and authorized by a registered dietician and in accordance with the provisions of IMPP 10-106.

The facility health authority shall be responsible for determining an individual inmate's medical need for a diet that deviates from the standardized menu.  Such a medical diet shall be provided only upon prescription by the facility health authority.

Nutrition and medical diets are provided that enhance inmate health and are modified when necessary to meet specific requirements related to clinical conditions.

Inmates approved for modified diets shall be identified through the use of a two- or three-character alphabetical or alphanumeric code enclosed in a black bordered box on the front of their inmate identification badges.  Implementation procedures shall be specified in facility General Orders.

## DEFINITIONS

Chronic care clinic:  That portion of medical services in the facility that treats chronic illnesses by use of preventive medical care, monitoring the patient's condition, and educational efforts.

Departmental Health Authority:  The medical director of the agency or organization responsible for the provision of health care services for the Kansas Department of Corrections.

Facility health authority:  The physician or health administrator responsible for the provision of health care services at a facility.  The facility health authority works under direction of the Departmental Health Authority.

Medical diet:  A diet with certain specific items included or excluded as prescribed by medical or dental personnel for medical purposes.

Modified Diets: Diets most commonly prescribed to meet inmates' medical, dental, therapeutic or religious needs, developed from written instructions provided by the treating physician, dentist, facility health authority, and/or chaplain and which conform as closely as possible to the standardized menu. More specific modified diets are prescribed as individualized diets.

Religious diet:  A diet based on a program intended to comply with religious dietary requirements.

Vegetarian Alternative Diet:  A diet approved by a registered dietitian, that contains a meal pattern consisting of nuts, vegetables, fruits, legumes, grains, eggs and milk products.

**EXHIBIT** E

**PROCEDURES**

I.  **Medical Modified Diets**

    A.    The Departmental Health Authority shall be responsible for determining the types of medical diets to be made available to inmates.

        1.    Unless a facility obtains its food service from another governmental agency, all medical diets prescribed shall be consistent with the standardized menu modified diets and:

            a.    Be specific;

            b.    Be kept as simple as possible;

            c.    Conform as closely as possible to foods served other inmates; and,

            d.    Meet the medical needs of the inmate.

        2.    In those instances when food service is obtained from another governmental agency, the facility shall accommodate the need for a medical diet to the extent possible within the menu plan of the providing agency.

        3.    Before a medical diet prescribed by the facility health authority goes into effect, the inmate shall sign a Consent to Submit to Treatment by Medical Diet form (Attachment A, form #010-119-001). (ACI 4-4397, NCCHC P-I-05)

            a.    The medical diet shall begin not later than twenty-four (24) hours after the execution of the consent form.

            b.    The effective period of the medical diet shall be specifically set out in the consent form by the facility health authority or designee and shall be documented in the inmate's medical record in accordance with this IMPP.

                (1)    The effective period of the medical diet shall not exceed 90 days.

        4.    When a medical diet is prescribed for an inmate, the facility health authority shall, within twenty-four (24) hours, provide written notification to the facility's chief of security (or warden's designee) and food service manager.

            a.    Such notification shall specify the type of modified diet prescribed and its duration.

    B.    Any deviation from the standard modified medical diets must be approved by the Regional Medical Director.

II.  **Religious Modified Diets**

    A.    The chaplain shall be responsible to approve inmate requests for modified diets to comply with religious dietary laws and shall maintain a current list of inmates approved to receive such modified diets. (ACO 2-5E-01, ACI 4-4319)

    B.    Unless a facility obtains its food service from another governmental agency, all religious diets shall be consistent with the approved religious diet menu.

        1.    In those instances when food is obtained from another governmental agency, the facility shall accommodate the inmate's request for a religious diet to the extent possible within the menu plan of the providing agency.

C. Inmate requests for a religious diet shall be made via Form 9 to the chaplain.

    1. Approval of the request shall be based on the inmate's declaration that he/she wishes to eat from the modified diet.

    2. Each inmate wishing to follow a religious diet shall sign a statement to that effect. (ACI 3-4372)

    3. Each inmate requesting a religious diet shall be advised that failure to adhere to the modified diet may result in the inmate's removal from the modified diet program. Failure to adhere to the modified diet shall include taking a meal tray from or eating items from the standardized menu, or any menu other than that of the religious diet.

## III.  Vegetarian Alternative Diet

A. The Chaplain, or other staff person designated by the Warden, shall be responsible to process and allow inmate requests for the vegetarian alternative diet and shall maintain a current list of inmates approved to receive the vegetarian alternative diet.

B. Inmate requests for the vegetarian alternative diet shall be made via Form 9 to the chaplain or other designated staff.

    1. Approval of the request shall be based on the inmate's declaration that he/she wishes to eat the vegetarian alternative diet.

    2. Each inmate requesting the vegetarian alternative diet shall be advised that failure to adhere to the vegetarian alternative diet may result in the inmate's removal from the vegetarian alternative diet. Failure to adhere to the vegetarian alternative diet shall include taking a meal tray from or eating items from the standardized menu, the religious diet menu, or any menu other than that of the vegetarian alternative diet.

    3. Inmates approved for the vegetarian alternative diet shall be served the vegetarian alternative diet prepared by food service at each meal.

## IV.  Implementation Procedures

A. Inmates approved for a modified diet for medical or religious reasons shall be served the modified diet prepared by food service at each meal.

    1. Such inmates shall not have the option of eating from the regular menu during the period the individual is placed on the modified diet listunless and until that inmate executes a refusal of medical treatment pursuant to Section V. of this IMPP, or submits a request to the chaplain regarding a desire to terminate the modified diet for religious reasons.

        a. Inmates who are removed or who elect to withdraw from the modified diet for religious reasons must wait ninety (90) days before requesting readmission to the modified diet.

        b. The third (3rd) time a given inmate is removed or elects to withdraw from the modified diet for religious reasons, the inmate must wait six (6) months before requesting readmission to the modified diet.

        c. The fourth (4th) time a given inmate is removed or elects to withdraw from the modified diet for religious reasons, the inmate must wait one (1) year before requesting readmission to the modified diet.

B. Within 24 hours of receiving a list of inmates approved for modified diet from the facility health authority or chaplain or for the vegetarian alternative diet from the chaplain or other designated staff, the food service manager shall forward a copy of the list to the chief of

security or his/her designee to facilitate preparation or modification of the inmate's I.D. badge to reflect a modified diet or vegetarian alternative diet.

    1.    Inmates who have been placed on a medical diet and have consented to that item of medical treatment, a religious diet, or a vegetarian alternative diet shall be identified by a coded printed dietary symbol on the inmate's identification badge.

    2.    Inmates shall be served the diet indicated on the identification badge.

C.    Facility general orders shall establish procedures for:

    1.    The coding of inmate I.D. badges, including responsibilities for the initial issuance of the coded identification badges;

    2.    Notification to the chief of security (or warden's designee) and the food service manager, within a 24-hour period, of all modified diets for medical or religious purposes or for purposes of a vegetarian alternative diet;

    3    Preparation of the type of diet for each inmate, a beginning date and/or meal, and a termination date, if known; ,

    4.    Process for the removal of an inmate from a modified or alternative diet and for communicating that removal to applicable facility staff and/or chaplain;

    5.    Process for communicating and/or ensuring that medical diet designations follow the inmate when transferred to a different facility; and,

    6.    The method of serving such meals to inmates, if special service or assistance is required due to the inmate's condition.

D.    Facility general orders shall establish procedures that ensure that the chief of security or designee:

    1.    Receives lists of inmates' names that require a coded-symbol to designate a modified diet for medical or religious preference purposes or for a vegetarian alternative diet;

    2.    Ensures the timely contact with inmates to issue identification badges bearing the appropriate coded symbol prior to the beginning date/meal indicated, per written instructions from the facility health authority, chaplain, or other designated staff; and,

    3.    Ensures the reissue of inmate identification cards within twenty-four (24) hours of the notification by the facility health authority, chaplain, or other designated staff to terminate an inmate's medical or religious diet or vegetarian alternative diet.

        a.    Receives lists of inmates' names which require a coded symbol to designate a religious preference requiring a modified diet.

            (1)    The contact with inmates for religious preference indicators should be made within twenty-four (24) hours of the written notification by the facility chaplain.

E.    The following codes shall be used for medical, religious, and vegetarian alternative diets.

    1.    Medical diets shall always be identified by a two- or three-character alphanumeric code enclosed in a black bordered box on the front of the inmate identification badge.

        a.    Cardiovascular – CA

    b.      Diabetic 2500 calories (3 meals + bedtime snack) – D25

    c.      Diabetic 2300 calories (3 meals + bedtime snack) – D23

    d.      Diabetic 1800 calories (3 meals + bedtime snack) – D18

    e.      Pregnancy – PR

    f.      GI Soft/Bland – SO GI

    g.      Dental Soft – SO D

    h.      High Fiber - HF

    i.      High Protein / High Calorie (includes bedtime snack) – HP

    j.      High Protein/ High Calorie (includes bedtime snack) Vegetarian – HP VE

    k.      Renal diet I – RD1 (Pre-Dialysis)

    l.      Renal diet II – RD2 (Dialysis)

    m.      Cardiovascular Vegetarian – CA VE

    n.      Cardiovascular Religious – CA REL

    o.      Cardiovascular Diabetic/2500 – D25 CA

    p.      Cardiovascular Diabetic/2300 – D23 CA

    q.      Cardiovascular Diabetic/1800 – D18 CA

    r.      Diabetic/2500 Vegetarian – D25 VE

    s.      Diabetic/2300 Vegetarian – D23 VE

    t.      Diabetic/1800 Vegetarian – D18 VE

    u.      Pregnancy Vegetarian – PR VE

    v.      Diabetic/ 2500 Religious – D 25 REL

    w.      Diabetic/2300 Religious – D23 REL

    x      Diabetic/1800 Religious – D18 REL

    y.      Full Liquid (Broken Jaw) Diet - FL

    z.      Clear Liquid Diet (3 to 4 day maximum duration) - CL

    aa.      Severe Food Allergy Diet – SFA

    bb.      Milk Intolerance Diet – MI

    cc.      Finger Food Diet – FF

    dd.      Gluten Restricted Diet – GR

    ee.      Hospice - HO

    2.    Religious diets shall always be identified by the three character alphabetical code "REL" enclosed in a black bordered box on the front of the inmate identification badge:

    3.    A vegetarian alternative diet shall always be identified by the two character alphabetical code "VE" enclosed in a black bordered box on the front of the inmate identification badge.

F.    When an inmate ID badge with a printed dietary symbol is initially issued or reissued, the inmate's previous badge shall be retrieved from the inmate and either destroyed or maintained in a secure area for possible reissue/reuse at a later time. Procedures for the issuance, retrieval, and disposition of retrieved badges shall be established by facility general order.

## V.    Refusal of Treatment by Medical Diet

A.    Each inmate shall have the right to refuse a medical diet as an item of medical treatment pursuant to IMPP 10-127.

B.    In the event an inmate elects not to consent to the medical diet, the inmate shall be asked to execute a Refusal to Submit to Treatment by Medical Diet Form (Attachment B, Form #10-119-002).

    1.    If the inmate refuses to sign, staff shall write "Refused to Sign" in the inmate's signature block; the staff member making such a notation shall sign the form as a witness to the inmate's decision.

    2.    The refusal form, signed or unsigned by the inmate, shall be filed in the inmate's medical file.

C.    The refusal shall become effective not later than twenty-four (24) hours after the inmate executes the refusal form.

    1.    In the event an inmate has previously executed a consent form and is partaking of a medical diet, the inmate shall be required to continue with the medical diet for twenty-four (24) hours after the inmate's execution of the refusal form.

    2.    The facility health authority shall provide immediate written notification to the facility chief of security and the food service manager to:

        a.    Ensure the removal of the inmate's name from the food service Department's list of medical diets.

D.    If an inmate refuses medical treatment by medical diet for any condition, such refusal shall not waive the right to other medical care for the same condition, and the inmate shall continue to be entitled to such necessary medical care, including medication or otherwise, unless a Refusal of Treatment form, pursuant to IMPP 10-127, is executed by the inmate.

E.    If an inmate refuses medical treatment by medical diet, food service staff shall be informed of the inmate's refusal, pursuant to procedures established by facility general order.

F.    If an inmate refuses medical treatment by medical diet and executes a refusal form pursuant to section V.B. above, the inmate shall be bound by that refusal form and that decision until the next examination by the facility health authority who recommended the medical diet.

G.    If an inmate indicates the intent to refuse treatment by medical diet, the facility health authority or designee shall counsel the inmate about the consequences of refusing the medical diet and shall explain to the inmate that other medical care may or will be less effective without the medical diet.

    1.    In the discretion of the facility health authority or designee, if it appears that mental health counseling would assist the inmate in the decision about the medical diet, the health authority or staff may refer the inmate for mental health counseling in accordance with the Departmental Health Authority's mental health procedures.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

None.

## REFERENCES

K.S.A. 65-28,101, et seq.
IMPP 10-106, 10-122, 10-127
ACI 4-4319, 4-4316, 4-4317, 4-4318, 4-4397
NCCHC P-F-02, P-I-05
BOP OM 4700

## ATTACHMENTS

Attachment A - Consent to Submit to Treatment by Medical Diet, 1 page
Attachment B - Refusal to Submit to Treatment by Medical Diet, 1 page

Page 1 of 1, Attachment A, IMPP 10-119
Effective 06-19-13

## CONSENT TO SUBMIT TO TREATMENT BY MEDICAL DIET

DATE: _____  TIME: _____, _____.M.

I have been advised by Dr. _____ that it is necessary for me to undergo medical treatment by medical diet for the condition of _____during the time period from _____ to _____.

I understand that this medical diet will not go into effect for twenty-four (24) hours from the time I sign this consent form.

The effect and nature of this treatment have been explained to me. Further, I have been advised that my refusal of this medical care by medical diet will not cause me to waive other medical care for the above identified condition.

I hereby agree and consent to the medical diet prescribed, and hereby agree, by my signature below, to follow said medical diet, and to select said special diet at mealtime in lieu of regular menu meals. I reserve the right to refuse further medical treatment or surgical treatment for said condition without further consent.

_____
Inmate

KDOC #:_____

WITNESS:_____

Form # 10-119-001

Page 1 of 1, Attachment B, IMPP 10-119
Effective 06-19-13

## REFUSAL TO SUBMIT TO TREATMENT BY MEDICAL DIET

DATE: _____ TIME: _____, _____.M.

     I have been advised by Dr. _____ that it is necessary for me to undergo

medical treatment by medical diet for the condition of _____,

during the time period from _____ to _____.

     The effect and nature of this treatment have been explained to me.  Further, I have been advised

that my refusal of this medical care by medical diet does not constitute a waiver of other medical care or

treatment for the above identified condition.

     Although my failure to follow the advice I have received may seriously imperil my life or health,

and although I have been counseled about the potential decreased effectiveness of other medical care for

this condition in the absence of this medical diet, I nevertheless refuse to submit to the recommended

treatment of a medical diet for the condition stated.  I assume the risks and consequences involved and

release the above named physician, the _____, the Kansas Department

                                               (Name of Facility)

of Corrections,  the Kansas Department of Corrections' Health Care Provider, and their agents and

employees from any liability.

     I have been informed and hereby acknowledge that I understand that this refusal does not go

into effect for twenty-four (24) hours from the time I sign this form.  If I have previously consented to a

medical diet, I must continue to follow that diet for twenty-four (24) more hours.  I have been informed

and further acknowledge that I understand that I shall be bound by the refusal of treatment by medical

diet until the next scheduled examination by the health authority who recommended the medical diet.

                                            _____

                                          Inmate

                                          KDOC #:_____

WITNESS:_____

WITNESS:_____

Form # 10-119-002

## AFFIDAVIT OF RANDALL SINGLETARY

I, Randall Singletary, of lawful age, being first duly sworn, on oath depose and state as follows:

1. I am currently employed by Aramark Correctional Services, Inc. as the Food Service Director for Lansing Correctional Facility.  I have been employed in that position since March 16, 2015. I previously held the position of Food Service Manager from May 12th 2014 until March 15, 2015.

2. My duties as Food Service Director include developing teams to maximize their contributions, including recruiting, training, coaching and managing performance; ensuring safety and sanitation standards in all operations; developing and maintaining effective client and customer rapport for mutually beneficial business relationship; identifying client needs and effectively communicating operational progress; building revenue and managing budget, including cost controls with regard to food, beverage and labor; creating value through efficient operations, appropriate cost controls and profit management; gull compliance with Operational Excellence fundamentals, including food and labor; directing and overseeing operations related to food service; and maintaining a safe and healthy environment for clients, customers and employees. The purchase of the foods used to prepare the religious diet meals are coordinated by Aramark's dietician to assure that they meet Kosher requirements.



EXHIBIT
F

3.      At Lansing Correctional Facility, the foods purchased for the certified religious diet (CRD) are stored in a separate area of the warehouse and in the dry storage room in the maximum facility's kitchen.

4.      The foods for the CRD are prepared in the Max Kitchen using a steam kettle that is dedicated for CRD use only.

5.      Inmate and staff who work in the CRD receive training as to any special procedures to follow in the preparation and serving of the CRD.

6.      The CRD has a dedicated steam table that is only used for serving the CRD meals.

7.      Dark brown colored trays are used to serve the CRD as opposed to the light tan trays used to serve the general population meal. These trays are either hand washed or washed after the dishwasher has been properly sanitized. The trays are then stored in the CRD room.

Further affiant saith not.

Randall Singletary

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 27th day of February, 2017.

DEBORAH EHRET-REYES
Notary Public - State of Kansas
My Appt. Expires 8-15-19

Deborah Ehret-Reyes
Notary Public

My appointment expires: _8-15-19_

2

Case 5:21-cv-03269-SAC Document 17-1 Filed 05/28/22 Page 42 of 59

# Grievance-Response on Appeal

**FACILITY:**          Lansing Correctional Facility

**INMATE:**          McCoy, Deron #76894

**GRIEVANCE NO.:**  AA20140433

**DATE:**          April 25, 2014

## FINDINGS OF FACT

The response provided to the inmate by staff at the facility is incorporated herein by reference and made part of this response.

On appeal, the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong.

## CONCLUSIONS MADE

The response rendered to the inmate by staff at the facility is appropriate.

The Religious Diet provided by the KDOC is based on the Common Fare diet, which has been reviewed and approved by the KDOC contracted religious advisor, as evidence by the Rabbi's signature on the menu, and has been found to be consistent with kosher requirements. Further inquiry to the contractor's Religious Diet food preparation indicates that expected procedures consistent with the Rabbi's recommendations, are being followed.

## ACTION TAKEN

None further.

*Patricia Berry*

Patricia Berry
Secretary of Corrections Designee

cc:   Grievance File, SOCRESP w/attachments

The original response on appeal and all attached documents were mailed to the inmate by way of United States Mail on APR 2 9 2014 .



EXHIBIT
6

## APPEAL OF GRIEVANCE TO SECRETARY OF CORRECTIONS

Inmate Name: DeRow McCoy, JT          Facility: LCF

Inmate Number: 76894          Grievance Serial No. AA-20140433

(Attach grievance report with Principal Administrator's response or explanation why Principal Administrator is bypassed.)

MAIL TO:    Secretary of Corrections          Date Mailed: 4/19-14
            Landon State Office Building
            900 Jackson, 4th Floor
            Topeka, Kansas 66612

Tell the Secretary what you feel the Principal Administrator should have done, and state what action you believe the Secretary should take. (Use extra paper as needed.)

( See attached pages 1-2)

_DeRow McCoy, JT_
Signature of Inmate

---

**DECISION BY SECRETARY OF CORRECTIONS** (to be completed and returned within 20 days)

If applicable - Confidential File No. _____

Date Received in Office of Secretary of Corrections: _____

Date of Final Answer: _____          Date Sent to Inmate: _____

Finding of Fact:

Conclusions Made:

RECEIVED
APR 23 2014
DOC Facility Management Area

Action Taken:

_____
Signature of Secretary of Corrections

---

### For D.O.C. Staff Use Only

Type of Response (Item 6b:  Code    Ø1,    Ø2,    Ø8    or    Ø9)   __ __

DC Ø9Ø, Effective May 1, 1988

P-157n

I feel that the principal administrator
should make Aramark provide me & the other
inmates who are on a Judaic type callouts
with proper Kosher meals year round. the
certified religious diet is not Kosher when
served to the inmates if it were Kosher it
would be called Kosher diet & not certified
religious diet. Portice states "in his response that
the soy based meals are factory sealed as well
as the tuna & eggs" That may be so when
those items I recieved by Aramark but
once these food items are to be served they
are taken out what ever packaging the are
in and cook in the stem kettles then the open
pot is to the air food items are poured into
a steel pan to be scooped onto the brown
plastic trays. In order for the meal to be
Kosher. The whole meal would have to
be factory sealed and un-open when the
inmate recieves it in his hand just like
the Kosher meals served during the passover
celebration. To eat meals or food items that are
not - Kosher is basically a sin & to be forced
to have to eat unclean meats or unclean
meals or starve, because the company supplying
K.D.O.C with food doesn't want to serve kosher
meals is unlawful and I believe the secretary of

(1)

corrections should force Aramark to provide actual
Kosher meals to those (including myself) whose
are approved for Kosher modified diet; or find
a different company to serve K.D.O.C.

Respectfully submitted,

Dated 4-15-14                    Deron Mclay, II

Case 5:21-cv-03269-SAC-KGG Document 841 Filed 06/15/22 Page 46 of 9



P. O. Box 2
301 East Kansas
Lansing, KS 66043

**Kansas**
Department of Corrections
*Lansing Correctional Facility*

Phone: (913) 727-3235
Fax: (913) 250-2762
www.doc.ks.gov/facilities/lcf

Ray Roberts, Secretary
Rex Pryor, Warden

Sam Brownback, Governor

**DATE:**      April 9, 2014

**TO:**        Deron McCoy #76894

**FROM:**      Rex Pryor, Warden

**SUBJECT:**   Grievance # AA20140433

**Findings of Fact:**  Your grievance was received and an investigation into your allegations has been completed.

**Conclusions Made:**  After an investigation by the Grievance Officer, and a complete review of the applicable documentation, it was determined the response provided by Unit Team Manager Portice is appropriate regarding your issues.

**Action Taken:**  No further action is deemed necessary.

Pursuant to K.A.R. 44-15-102 (3) (B), you may appeal this answer by submitting the appropriate form to the Secretary of Corrections.

RP: CBR/cr

Cc: File

## KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

### INMATE COMPLAINT

Inmate's Name DeRon McCoy Jr    Number 70894

Facility LCF    Housing Unit C2-313    Work Detail Clinic aide

### NATURE OF COMPLAINT

BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member). (See attached pages) pg 1-3

Date this report was given to Unit Team for informal resolution (to be completed by inmate). March 25, 2014

### UNIT TEAM RESPONSE (Complete and return to inmate within 10 calendar days.)

I have reviewed your complaint with the following findings:
Your grievance issue concerns being placed on a Modified Diet of Kosher, in accordance with your religious beliefs. Currently there is only a Certified Religious Diet (CRD). The term Kosher is recognized on many of the items that are served on the Certified Religious Diet. The cooking utensils used for the (CRD), meal preparation are cleaned and kept in the (CRD) Room, and two steam kettles have been identified and used solely for the (CRD) meal preparation. The dish washer machine is used for the cleaning of the trays but it is sanitized before its use in accordance with the reasonable accommodations clause. The soy based meals are all factory sealed as well as the tuna and eggs. No further action is deemed necessary at this time.

D Pattie UTM 04/02/2014

Unit Team Signature                           Date

### INMATE RESPONSE (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

__X__ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). _____

DeRon McCoy JC 70894    4.4.14
Inmate Signature                           Date

### WARDEN RESPONSE (Complete, attach response and return within 10 Working days.)

Date Received APR 0 8 2014 Date of Final Answer APR 11 2014 Date Returned to Inmate _____

_____    _____
Inmate's Signature          Date    Unit Team Signature          Date
If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

### TO BE COMPLETED BY STAFF ONLY

Grievance Serial Number AA 20140433

Type of Complaint (Item 4: Code 01-75) 01

Cause of Complaint (Item 5: Code 01-30) 27

Type of Response (Item 6a: Code 01,02,08 or 09) 01

On approx March 13, 2014 I spoke to
chaplin Dunn concerning being placed on
a modified diet of Kosher to be in
accordance with the practicing of my
religious beliefs. I was told that there
was no Kosher meat diet currently
provided by acamark for K.D.O.C.
I was told to be by chaplin Dunn that
the only modified diet currently provided
was the Religious Diet Meals. I asked
if the religious Diet was Kosher. chaplin
Dunn told me that he was not even
allowed able to to say that the religious Diet was
Kosher. I have personally observed the
serving of the religious Diet by acamark.
the Religious Diet Meal is served on Dark
brown plastic trays the food items are
served from the same warmer were the
regular diet meals are served. once a person
on religious diet is finished eating the
reusable trays are placed through the
same dirty tray slot as regular diet trays
these religious diet trays are then washed in
the same dishwasher as all the other dirty
diet trays. I have on more then one occassion
personally witnessed a regular diet meal served
on a tray that is supposed to be for only

①

religious diets per my religious beliefs once eating utensils, containers & cooking utensils come in contact, or touch, or are touched by things or foods that are unclean by scripture then they also become unclean and cannot be used for food preperation as the useing of unclean cooking containers or cooking or eating utensils make the food items unclean and no longer Kosher. I have also been told by culinary kitchen workers that the religious diet meals are prepared in the same areas as regular diet meals and not in the room built for the preparation of Kosher diet Meals. The food items served for religious diets are also not Kosher due to the food items not being factory packaged when a person on religious diet is served the food items. For all these reasons and More (i.e. the blessing of utensils by a Rabbi) the religious diet meals do not sustify the Kosher modified diet requirements protected by Impp-10-110 Attachment D. I would like for Kosher meals to immediately be provided to me and for all religious callouts that are approved for Kosher modified diet requirements (A.O.Y., H.O.Y, i Judaic). To not do so is a direct violation of my

⓺

constitutional right to religious practice.

Respectfully submitted,
Jerus McCoy, Jr

AFFIDAVIT OF SCOTT FOX

I, Scott Fox, of lawful age, being first duly sworn, on oath depose and state as follows:

1.      I am currently employed as the supervisor of the physical plant at Lansing Correctional Facility.  I have been employed in that position since December of 2011.

2.      My duties as physical plant supervisor include the oversight for maintenance of the max and medium facilities, issuing work orders to the supervisors, hiring inmate workers for the crew supervisors and other duties as assigned by the Chief of Maintenance.

3.      Inmate DeRon McCoy #76894 was assigned to work with an electrical crew from November 6, 2014 to January 25, 2015.

4.      There is no record of the work orders with which he assisted while so assigned.

5.      On November 21, 2014, a work order relating to the electrical cord on the steam well in the max kitchen was completed.

6.      There is no work order for December 12, 2014 relating to the repair of a circuit board sensor.   On some occasions, however, repairs are performed in the max kitchen for which a work order is never provided despite a request being made of the Aramark supervisor.

Further affiant saith not.

_____

Scott Fox
Physical Plant Supervisor Sr.

1


EXHIBIT
H

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 28th day of February, 2017.

DEBORAH EHRET-REYES
Notary Public - State of Kansas
My Appt. Expires 8-15-19

_____
Notary Public

My appointment expires: _____8-15-19_____

Exhibit I

El Dorado Correctional Facility
1737 SE Hwy 54
P.O. Box 311
El Dorado, KS. 67042



# Kansas
## Department of Corrections

Phone: (316) 321-7284
Fax: (316) 322-2018
www.doc.ks.gov/facilities/edcf

Jeff Zmuda, Secretary
Sam Cline, Warden

Laura Kelly, Governor

**Date:** 1-28-2021

**To:** McCoy, DeRon #76894

**Subject:** Grievance dated 1-21-2021 received by my office on Friday 1-22-2021
In your claim you stat that you that you are requesting the Kosher Modified diet.

**Finding Facts:**    Upon receiving this grievance, I spoke with  Chaplin Jones.  She states that the KDOC does not off the Kosher Modified diet. The Certified Religious Diet is the meal program for the Religious Groups that need to have a Kosher meal.

**Conclusion:** EDCF and the KDOC offer a compatible religious diet to the Kosher Modified diet with the CRD meal.

**Actions taken:** Nothing further is required at this time.

UTS C Brewer
B2 Unit Team

Exhibit J

# Preparing a Kosher Environment

*The procedures outlined below follow Jewish dietary laws for Kosher food preparation\* and must be adhered to when serving religious meals.  If there are questions, STOP and contact your NOSS Director or Manager.*

**HAND WASHING**
- ALL staff, workers and visitors MUST wash hands upon entry to the Kosher environment.  Aramark Staff shall redirect anyone who fails to do so.

**DELIVERY**
- Ensure Kosher products are delivered in sealed containers to prevent contact with non-Kosher food, items or surfaces
- Reject Kosher products if damaged or shows signs of time/temperature abuse.

**KOSHER CERTIFYING SYMBOLS**
- Kosher products must contain a certifying symbol from the manufacturer verifying its Kosher status.
  - Fresh fruit, fresh vegetables, foam and paper goods do not require kosher certification.
- Common symbols are shown here:

    

- The Rabbi approves all new certification symbols and must be notified when we receive a new or different certification symbol/certification.
  - If accompanied by a "D" the symbol indicates the item is Dairy and can only be consumed with Dairy meals.
  - If accompanied by a "P" it indicates Pareve and therefore considered "Neutral" containing neither Dairy nor Meat ingredients.

**STORAGE**
- Confirm a Kosher symbol is present on all product packaging.   If a product does not contain a Kosher symbol or a new product is received that has not been verified for use, scan the label or take picture of packaging, email your regional NOSS contact and await confirmation that the product can be used.  Some certifiers are more liberal than others and the Rabbi will determine if they can be used or not.  Place the email confirmation with the item until a certificate can be obtained.
- Separate storage areas must be designated **"For Kosher Use Only"** and may consist of a separate room or designated shelf.
- Shelves must be dedicated top shelves or the uppermost used shelves on a unit.  Kosher food must not be stored below other foods to protect against cross contamination.
  - This includes but is not limited:
    - ✓ dry storage
    - ✓ cooler
    - ✓ freezer
    - ✓ mop closet and/or chemical dispensing units
- Kosher areas must be inspected weekly for cleanliness and to verify that no items for general population are stored in those areas.
- Full cases of items in their original packaging may be stored with General Population food until needed for Kosher use.  Once taken for Kosher use, the unopened/unused case must be checked for Kosher symbol and labeled **"For Kosher Use Only"** prior to taking it into the designated Kosher environment or storage area.
    - ✓ Examples: whole fruit, bread, drink packets, dry cereal, peanut butter, vinegar, oil, spices, paper/foam goods, gloves, etc.
  - If a case of Kosher product is removed from the Kosher area for use with General Population, it cannot be returned to the Kosher area.
  - No items from an open case used for General Population can be brought into the Kosher area and used for Kosher use.
  - If a case of product designated **"For Kosher Use Only"** is needed for General Population, mark out **"For Kosher Use Only"** and move to General Population storage until gone.  It cannot be returned for Kosher use.
  - Pre-Printed Labels with **"For Kosher Use Only"** may be used.

**DOCUMENTATION**

Revised 9/18

- A file containing kosher certification for local items (bread, salad mix etc.) must be kept in the food service operation. Expired records must be archived and kept per contract requirements.
- Separate Results Worksheets and recipes are used for Kosher meals and are filed separately for ease of reference to verify not only correct food production but also maintenance of Kosher Procedures.
- A weekly inspection should be conducted and kept on file to ensure the integrity of the Kosher program is maintained.

## CLEANING
- Kosher dish soap should be used to wash pots, pans and smallwares. For a complete list of Kosher cleaning products, click here: Diversey Kosher Certified Items or contact your NOSS manager or Director.

| ECOLAB ITEM Description | ECOLAB SKU No | DIVERSEY ITEM DESCRIPTION | DIVERSEY SKU No |
|---|---|---|---|
| DIGICLEAN E2 FOAM SOAP | 23673 | SOFT CARE ALL PURPOSE FOAM 6X1.3L W5150 | 100907877 |
| OASIS 146 MULTI QUAT | 17708 | SUMA FINALSTEP 1024 D4 JFILL 2X2.5L W5239 | 100897736 |
| PANTASTIC | 12963 | SUMA LIGHT D1.2  DISH DET 4X1G | 957229280 |

- Thoroughly clean and sanitize all surfaces immediately prior to Kosher food preparation.
  - If a dedicated food preparation table or counter is not available (or in the case of an emergency loss of Kosher prep area) the designated alternative working surface is to be washed and sanitized, then covered with food quality deli paper or double wrapped with plastic wrap.
- Equipment used for the kosher program must be washed, rinsed and sanitized in designated Kosher labeled tubs and are to be placed inside clean three compartment sinks. Items being washed must not come into contact with the sink.
- Dry on a separate and dedicated rack.

## PREPARATION
- No food or beverages, other than those labeled **"For Kosher Use Only"** are to be prepared in the designated Kosher area.
  - Only dedicated Kosher pots, pans, and smallwares shall be used for Kosher food prep and must stay in the Kosher environment.
  - Disposable utensils may be used to prepare food, but must be stored in the Kosher environment.
  - Specially marked kosher cookware or utensils must not be used on non-kosher food
  - Specially marked kosher cookware and utensils must be washed and stored separately from all other cookware.
- Clean, disposable gloves must be worn at all times during any part of the meal preparation.
- After meals are inspected by staff to verify correct portions, these containers should be sealed in plastic wrap to prevent misuse or trafficking.
  - Wrap the hot container, wrap the cold container, then wrap the two containers together to provide 2 layers of wrap.
  - If trays are delivered separately, both containers should be double wrapped prior to transport.

## MEAL SERVICE SPECIFICS
- **Fruit:** Fruits are washed, wrapped and served whole.
- **Vegetables:** Vegetables are washed and processed.
  - If the vegetable requires cutting, i.e. cabbage wedge, lettuce salad, onions, whole green pepper, whole zucchini, whole cucumber, use the kosher cutting utensils only. Otherwise, gloved hands may be used to tear leafy greens i.e. lettuce.
  - Pre-cut salad mix is not allowed unless it is marked Kosher.
- **Water:** Water from any faucet designed to dispense water for cooking or drinking is considered Kosher according to industry standards.
  - If serving water in bulk, it needs to be in a designated Kosher dispenser or pitcher.
- **Bulk Kosher entrees:** If kosher entrees are prepared in bulk, food is measured with a clean, disposable or designated utensil/cup and placed in disposable cups, sealed and double wrapped.
- **Frozen/Shelf Stable Kosher meals:** If frozen/shelf stable Kosher meals are served, they must remain in their original packaging. Do not remove the covering from the frozen/shelf stable kosher meals before heating. Follow specific heating instructions listed on the box.
- **Breakfast:** No meat is served. Serve a cold tray only, on paper with a disposable cup and utensils.
  - Cold tray: individually wrap fruit, bowls of cereal, bread, margarine, jelly, peanut butter, sugar, plastic ware & napkin together on disposable tray. Serve dry cereal in disposable bowls with lids.
- **Lunch and dinner:** Serve a cold tray and a hot tray on paper with a disposable cup and utensils.
  - Cold tray: individually wrap cookies, fruit, and bowl of salad, bread, margarine, plastic ware & napkin together on disposable tray.  Top salad with dressing, use a disposable spoon or cup to transfer dressing from container to salad.

pg. 2

Serve salad in a disposable bowl.
- o   Hot tray: Store, cook and serve sealed.  A non-dairy beverage is served.

**HEATING METHODS:**
- **Oven:** If each individual Kosher entrée is double wrapped in foil, placed on dedicated Kosher sheet pan, any oven may be used. NO NON-KOSHER COOKING is to be done at the same time in the same equipment or any adjacent equipment.
- **Microwave:**
  - o   Designated "Kosher Use Only" Microwave:  Entrees should be double wrapped in plastic wrap in the event steam escapes and breaks the seal.
  - o   Undesignated Microwave:  Entrees should be double wrapped in plastic wrap in the event steam escapes and breaks the seal.
  - o   Should there be a question about the kosher status of the microwave, it may be made acceptable using the following procedure:
    1. The microwave should not have been used for the past 24 hours.
    2. Clean and sanitize the oven thoroughly.
    3. Fill a completely clean container that was not used for 24 hours, with water.
    4. Turn the microwave oven on and let it steam heavily.
    5. Turn it off and wipe out the inside.
- **Steamer Preparation:**
  - o   Entrees should be double wrapped in plastic wrap in the event steam escapes and breaks the seal.
  - o   Should there be a question about the kosher status of the steamer, it may be made acceptable using the following procedures:
    1. The steamer should be cleaned inside and outside.
    2. Fill with water to its normal use level.
    3. Let it steam for 15 minutes.
- **Temping Food:** Use a designated kosher probe thermometer to record all food temperatures. Place the thermometer over the protein item and record temp. Do not puncture seal.

I have been trained and understand the importance of the proper storage, handling and service of kosher foods.

Trainee Printed Name:_____   Signature_____   Date:_____

Trainer Printed Name:_____   Signature_____   Date:_____

*Disclaimer: The steps outlined above are considered best practices towards creating a kosher environment suitable for kosher food preparation.  Although preparation processes follow Jewish dietary laws, it should be understood that a Rabbi is not overseeing the preparation of meals and as such, cannot confirm that each meal being served is Kosher.*

Aramark Religious Authority's Signature of Approval: ___Rabbi M Kelly___
*These procedures follow Jewish dietary laws.  It is understood that I am not overseeing the preparation of the meals nor conducting site visits, and as such cannot confirm that meals served meet kosher dietary laws.*

Exhibit K

# KANSAS DEPARTMENT OF CORRECTIONS

| | | | |
|---|---|---|---|
| **Kansas** Department of Corrections | **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | **SECTION NUMBER**  10-119D | **PAGE NUMBER**  1 of 7 |

| | |
|---|---|
| | **SUBJECT:**  **PROGRAMS AND SERVICES:** Medical and Religious Diets and Vegetarian Alternative Diet |

| **Approved By:** | | |
|---|---|---|
| | **Original Date Issued:** | **03-08-16** |
| | **Replaces Version Issued:** | **03-08-16** |
| Secretary of Corrections | **CURRENT VERSION EFFECTIVE:** | **12-12-17** |

| APPLICABILITY: | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

Offenders at any facility within the Department of Corrections may receive or refuse medical and/or dental diets. (ACI 4-4316, 4-4317, 4-4318, NCCHC P-F-02, Y-F-02)

All modified diets shall be consistent with instructions developed and authorized by a registered dietician and in accordance with the provisions of IMPP 10-106D.

The Health Care Practitioner shall be responsible for determining an individual offender's medical need for a diet that deviates from the standardized menu. Such a medical diet shall be provided only upon prescription by the Health Care Practitioner.

Nutrition and medical diets are provided that enhance offender health and are modified when necessary to meet specific requirements related to clinical conditions.

Offenders approved for modified diets shall be identified through the use of a two (2) or three (3) character alphabetical or alphanumeric code enclosed in a black bordered box on the front of their offender identification badges. Implementation procedures shall be specified in General Orders.

## DEFINITIONS

Chronic Care Clinic: That portion of medical services in the facility that treats chronic illnesses by use of preventive medical care, monitoring the patient's condition, and educational efforts.

Director of Health Care Services: Acts as the administrative health authority for the Department. This position manages health care systems, directs the health care services model, and has final approval on all policies and procedures in the health care system.

Facility Health Authority: The Health Services Administrator responsible for the provision of health care services at a facility. The Health Services Administrator works under the direction of the Regional Medical Director and the Regional Vice President or designee administratively.

Health Care Practitioner: A person who has met the requirements of and is engaged in the practice of medicine, dentistry or nursing.

Medical Diet: A diet with certain specific items included or excluded as prescribed by KDOC facility medical or dental personnel for medical purposes.

Modified Diets: Diets most commonly prescribed to meet offenders' medical, dental, therapeutic or religious needs, developed from written instructions provided by the treating physician, dentist, facility health authority, and/or chaplain and which conform as closely as possible to the standardized menu. More specific modified diets are prescribed as individualized diets.

Religious Diet:  A diet based on a program intended to comply with religious dietary requirements.

Vegetarian Alternative Diet:  A diet approved by a registered dietitian, that contains a meal pattern consisting of nuts, vegetables, fruits, legumes, grains, eggs and milk products.

## PROCEDURES

I.    **Medical Modified Diets**

    A.    The Regional Medical Director shall be responsible for determining the types of medical diets as approved by the Director of Health Care Services, to be made available to offenders.

        1.    Unless a facility obtains its food service from another governmental agency, all medical diets prescribed shall be consistent with the standardized menu modified diets and:

            a.    Be specific;

            b.    Be kept as simple as possible;

            c.    Conform as closely as possible to foods served other offenders; and,

            d.    Meet the medical needs of the offender.

        2.    In those instances when food service is obtained from another governmental agency, the facility shall accommodate the need for a medical diet to the extent possible within the menu plan of the providing agency.

        3.    Before a medical diet prescribed by the facility health authority goes into effect:

            a.    The offender shall sign the Consent to Submit to Treatment by Medical Diet form (Attachment A). (ACI 4-4397, 4-JCF-4C-44, NCCHC P-I-05)

                (1)    The medical diet shall begin no later than twenty-four (24) hours after the execution of the consent form.

            b.    The facility health authority shall, within 24 hours, complete the Medical Diet Order form (Attachment B) and provide a copy, along with the medical diet list, to the facility's chief of security or warden/superintendent's designee and food service manager.

            c.    The effective period of the medical diet shall be specifically set out in the consent form and the Medical Diet form by the facility health authority or designee and shall be documented in the offender's health record in accordance with this IMPP.

                (1)    The effective period of the medical diet shall not exceed 90 days.

    B.    Any deviation from the standard modified medical diets must be approved by the Regional Medical Director.

II.    **Religious Modified Diets**

    A.    The chaplain shall be responsible to approve offender requests for modified diets to comply with religious dietary laws and shall maintain a current list of offenders approved to receive such modified diets. (ACO 2-5E-01; ACI 4-4319)

B.    Unless a facility obtains its food service from another governmental agency, all religious diets shall be consistent with the approved religious diet menu.

   1.    In those instances when food is obtained from another governmental agency, the facility shall accommodate the offender's request for a religious diet to the extent possible within the menu plan of the providing agency.

C.    Offender requests for a religious diet shall be made via Form 9 to the chaplain.

D.    Approval of the request shall be based on the offender's declaration that he/she wishes to eat from the modified diet.

   1.    Each offender wishing to follow a religious diet shall sign a statement to that effect. (ACI 3-4372)

   2.    Each offender requesting a religious diet shall be advised that failure to adhere to the modified diet may result in the offender's removal from the modified diet program.  Failure to adhere to the modified diet shall include taking a meal tray from or eating items from the standardized menu, or any menu other than that of the religious diet.

III.    **Vegetarian Alternative Diet**

A.    The Chaplain, or other staff person designated by the warden/superintendent, shall be responsible to process and allow offender requests for the vegetarian alternative diet and shall maintain a current list of offenders approved to receive the vegetarian alternative diet.

B.    Offender requests for the vegetarian alternative diet shall be made via Form 9 to the chaplain or other designated staff.

C.    Approval of the request shall be based on the offender's declaration that he/she wishes to eat the vegetarian alternative diet.

   1.    Each offender requesting the vegetarian alternative diet shall be advised that failure to adhere to the vegetarian alternative diet may result in the offender's removal from the vegetarian alternative diet.  Failure to adhere to the vegetarian alternative diet shall include taking a meal tray from or eating items from the standardized menu, the religious diet menu, or any menu other than that of the vegetarian alternative diet.

   2.    Offenders approved for the vegetarian alternative diet shall be served the vegetarian alternative diet prepared by food service at each meal.

IV.    **Implementation Procedures**

A.    Offenders approved for a modified diet for medical or religious reasons shall be served the modified diet prepared by food service at each meal.

   1.    Such offenders shall not have the option of eating from the regular menu during the period the individual is placed on the modified diet list unless and until that offender executes a refusal of medical treatment pursuant to Section V. of this IMPP, or submits a request to the chaplain regarding a desire to terminate the modified diet for religious reasons.

      a.    Offenders who are removed or who elect to withdraw from the modified diet for religious reasons must wait 90 days before requesting readmission to the modified diet.

      b.    The third time a given offender is removed or elects to withdraw from the modified diet for religious reasons, the offender must wait six (6) months before requesting readmission to the modified diet.

    c.    The fourth time a given offender is removed or elects to withdraw from the modified diet for religious reasons the offender must wait one (1) year before requesting readmission to the modified diet.

B.    Within 24 hours of receiving a list of offenders approved for modified diet from the facility health authority or chaplain or for the vegetarian alternative diet from the chaplain or other designated staff, the food service manager shall forward a copy of the list to the chief of security or his/her designee to facilitate preparation or modification of the offenders' I.D. badges to reflect a modified diet or vegetarian alternative diet.

    1.    Offenders who have been placed on a medical diet and have consented to that item of medical treatment, a religious diet, or a vegetarian alternative diet shall be identified by a coded printed dietary symbol on the offender's identification badge.

    2.    Offenders shall be served the diet indicated on the identification badge.

C.    General Orders shall establish procedures for:

    1.    The coding of offender I.D. badges, including responsibilities for the initial issuance of the coded identification badges;

    2.    Notification to the chief of security (or warden's or superintendent's designee) and the food service manager, within a 24-hour period, of all modified diets for medical or religious purposes or for purposes of a vegetarian alternative diet;

    3    Preparation of the type of diet for each offender, a beginning date and/or meal, and a termination date, if known;

    4.    Process for the removal of an offender from a modified or alternative diet and for communicating that removal to applicable facility staff and/or chaplain;

    5.    Process for communicating and/or ensuring that medical diet designations follow the offender when transferred to a different facility; and,

    6.    The method of serving such meals to offenders, if special service or assistance is required due to the offender's condition.

D.    General Orders shall establish procedures that ensure that the chief of security or designee:

    1.    Receives lists of offenders' names that require a coded-symbol to designate a modified diet for medical or religious preference purposes or for a vegetarian alternative diet;

    2.    Ensures the timely contact with offenders to issue identification badges bearing the appropriate coded symbol prior to the beginning date/meal indicated, per written instructions from the facility health authority, chaplain, or other designated staff; and,

    3.    Ensures the reissue of offender identification cards within 24 hours of the notification by the facility health authority, chaplain, or other designated staff to terminate an offender's medical or religious diet or vegetarian alternative diet.

        a.    Receives lists of offenders' names which require a coded symbol to designate a religious preference requiring a modified diet.

        (1)    The contact with offenders for religious preference indicators should be made within 24 hours of the written notification by the facility chaplain.

E.    The following codes shall be used for medical, religious, and vegetarian alternative diets.

1.     Medical diets shall always be identified by a two (2) or three (3) character alphanumeric code enclosed in a black bordered box on the front of the offender identification badge.

    a.     Cardiac – CA

    b.     Diabetic 2800 calories (3 meals + evening/PM snack) – D28

    c.     Diabetic 2500 calories (3 meals + evening/PM snack) – D25

    d.     Diabetic 2200 calories (3 meals + evening/PM snack) – D22

    e.     Diabetic 1800 calories (3 meals + evening/PM snack) – D18

    f.     Pregnancy (includes snack) – PR

    g.     GI (Gastro-Intestinal) Soft/Bland – SO GI

    h.     Dental Soft – SO D

    i.     High Fiber - HF

    j.     High Protein / High Calorie (includes snack) – HP

    k.     Renal Pre-Dialysis – RD1 (Restricted Protein)

    l.     Renal Dialysis – RD2 (Increased Protein)

    m.     Full Liquid (Broken Jaw) Diet - FL

    n.     Clear Liquid Diet - CL

    o.     Severe Food Allergy Diet – SFA

    p.     Milk Intolerance Diet – MI

    q.     Finger Food Diet – FF

    r.     Gluten Restricted Diet – GR

    s.     Hospice - HO

2.     Approved Medical and Religious combined diets are referenced on the Medical and Religious Diet Combination Matrix and shall be identified by the following codes:

    1.     Diabetic 1800/Religious Diet – D18 REL

    2.     Diabetic 2200/Religious Diet – D22 REL

    3.     Diabetic 2500/Religious Diet – D25 REL

    4.     Diabetic 2800/Religious Diet – D28 REL

    5.     Cardiac/Religious Diet (no snack) – CA REL

    6.     Pregnancy/Religious Diet – PR REL

    7.     High Calorie High Protein/Religious Diet – HP REL

3.     Religious diets shall always be identified by the three (3) character alphabetical code "REL" enclosed in a black bordered box on the front of the offender identification badge:

4.     A vegetarian alternative diet shall always be identified by the two (2) character alphabetical code "VE" enclosed in a black bordered box on the front of the identification badge.

F.     When an offender ID badge with a printed dietary symbol is initially issued or reissued, the offender's previous badge shall be retrieved from the offender and either destroyed or maintained in a secure area for possible reissue/reuse at a later time. Procedures for the issuance, retrieval, and disposition of retrieved badges shall be established by General Order.

## V.    Refusal of Treatment by Medical Diet

A.     Each offender shall have the right to refuse a medical diet as an item of medical treatment pursuant to IMPP 10-127D.

B.     In the event an offender elects not to consent to the medical diet, the offender shall be asked to execute a Refusal to Submit to Treatment by Medical Diet Form (Attachment C).

    1.     If the offender refuses to sign, staff shall write "Refused to Sign" in the offender's signature block; the staff member making such a notation shall sign the form as a witness to the offender's decision.

        (a)    **JUVENILE:** The offender's parent or legal guardian shall be contacted in the event he/she refuses a medically prescribed diet.

    2.     The refusal form, signed or unsigned by the offender, shall be filed in the offender's health record.

C.     The refusal shall become effective not later than 24 hours after the offender executes the refusal form.

    1.     In the event an offender has previously executed a consent form and is partaking of a medical diet, the offender shall be required to continue with the medical diet for 24 hours after the offender's execution of the refusal form.

    2.     The facility health authority shall provide immediate written notification to the facility chief of security and the food service manager to:

        a.    Ensure the removal of the offender's name from the food service department's list of medical diets.

D.     If an offender refuses medical treatment by medical diet for any condition, such refusal shall not waive the right to other medical care for the same condition, and the offender shall continue to be entitled to such necessary medical care, including medication or otherwise, unless a Refusal of Treatment form, pursuant to IMPP 10-127D, is executed by the offender.

E.     If an offender refuses medical treatment by medical diet, food service staff shall be informed of the offender's refusal, pursuant to procedures established by General Order.

F.     If an offender refuses medical treatment by medical diet and executes a refusal form pursuant to section V.B. above, the offender shall be bound by that refusal form and that decision until the next examination by the facility health authority who recommended the medical diet.

G.     If an offender indicates the intent to refuse treatment by medical diet, the facility health authority or designee shall counsel the offender about the consequences of refusing the medical diet and shall explain to the offender that other medical care may or will be less effective without the medical diet.

Page 7 of 7, IMPP 10-119D
Effective 12-12-17

1.   An offender may at any time be referred for behavioral health counseling in circumstance where it may be beneficial to the offender in their decisions regarding the medical diet. Referral shall be completed in accordance with established medical and behavioral health policy and procedure.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS REQUIRED**

None.

**REFERENCES**

K.S.A. 65-28,101, *et seq.*
IMPP 10-106D, 10-127D
ACO 2-5E-01
ACI 3-4372, 4-4316, 4-4317, 4-4318, 4-4319, 4-4397
JCF 4-JCF-4A-06, 4-JCF-4C-44
NCCHC P-F-02, P-I-05, Y-F-02, Y-I-04

**ATTACHMENTS**

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | Consent to Submit to Treatment by Medical Diet | 1 page |
| B | Medical Diet Order form | 1 page |
| C | Refusal to Submit to Treatment by Medical Diet | 1 page |

Attachment A, IMPP 10-119D
Effective 12-12-17

**CONSENT TO SUBMIT TO TREATMENT BY MEDICAL DIET**

DATE: _____     TIME: _____, _____.M.

      I have been advised by HCP _____ that it is necessary for me to undergo medical treatment by medical diet for the condition of _____during the time period from _____ to _____.

      I understand that this medical diet will not go into effect for twenty-four (24) hours from the time I sign this consent form.

      The effect and nature of this treatment have been explained to me.  Further, I have been advised that my refusal of this medical care by medical diet will not cause me to waive other medical care for the above identified condition.

      I hereby agree and consent to the medical diet prescribed, and hereby agree, by my signature below, to follow said medical diet, and to select said special diet at mealtime in lieu of regular menu meals.  I reserve the right to refuse further medical treatment or surgical treatment for said condition without further consent.

_____
Offender

KDOC #: _____

WITNESS: _____

Attachment B, IMPP 10-119D
Effective 12-12-17

## MEDICAL DIET ORDER FORM

### KANSAS DOC MEDICAL ORDER FORM

INMATE'S NAME (LAST NAME, FIRST NAME)     INMATE'S DOC NUMBER

INMATE'S BIRTH DATE     INMATE'S LOCATION

DIET START DATE     DIET END DATE

| | Code | |
|---|---|---|
| ☐ | CA | CARDIAC DIET |
| ☐ | D18 | 1800 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | D22 | 2200 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | D25 | 2500 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | D28 | 2800 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | SO GI | GI (Gastro-Intestinal) SOFT DIET |
| ☐ | PR | PREGNANCY DIET (SNACK INCLUDED) |
| ☐ | HP | HIGH PROTEIN / HIGH CALORIE DIET (SNACK INCLUDED) |
| ☐ | HF | HIGH FIBER |
| ☐ | SO D | DENTAL SOFT |
| ☐ | RD1 | RENAL PRE-DIALYSIS (Restricted Protein) DIET |
| ☐ | RD2 | RENAL DIALYSIS (Increased Protein) DIET |
| ☐ | CL | CLEAR LIQUID DIET |
| ☐ | MI | MILK INTOLERANCE DIET |
| ☐ | FL | FULL LIQUID (BROKEN JAW) DIET |
| ☐ | FF | FINGER FOODS DIET |
| ☐ | GR | GLUTEN RESTRICTED DIET |
| ☐ | SFA | SEVERE FOOD ALLERGY DIET |
| ☐ | HO | HOSPICE |
| ☐ | | OTHER _____ |

Comment:

AUTHORIZATION SIGNATURE

DATE REQUESTED

Revised 6/17

Attachment C, IMPP 10-119D
Effective 12-12-17

**REFUSAL TO SUBMIT TO TREATMENT BY MEDICAL DIET**

DATE: _____   TIME: _____, _____.M.

I have been advised by HCP _____ that it is necessary for me to undergo medical treatment by medical diet for the condition of _____, during the time period from _____ to _____.

The effect and nature of this treatment have been explained to me.  Further, I have been advised that my refusal of this medical care by medical diet does not constitute a waiver of other medical care or treatment for the above identified condition.

Although my failure to follow the advice I have received may seriously imperil my life or health, and although I have been counseled about the potential decreased effectiveness of other medical care for this condition in the absence of this medical diet, I nevertheless refuse to submit to the recommended treatment of a medical diet for the condition stated.  I assume the risks and consequences involved and release the above-named physician, the _____, the Kansas Department of Corrections, the Kansas
(Name of Facility)
Department of Corrections' Health Care Provider, and their agents and employees from any liability.

I have been informed and hereby acknowledge that I understand that this refusal does not go into effect for twenty-four (24) hours from the time I sign this form.  If I have previously consented to a medical diet, I must continue to follow that diet for twenty-four (24) more hours.  I have been informed and further acknowledge that I understand that I shall be bound by the refusal of treatment by medical diet until the next scheduled examination by the health authority who recommended the medical diet.

_____
Offender

KDOC #: _____

WITNESS: _____

WITNESS: _____

Exhibit L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DERON MCCOY II, #76894** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 21-CV-03269-SAC** |
| **v.** | ) | |
| | ) | |
| **ARAMARK , et al** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DECLARATION OF RANDALL SINGLETARY

Comes now, Randall Singletary, and declares under the penalty of perjury as follows:

1. My name is Randall Singletary. I am of lawful age to make this declaration and have personal knowledges of the matters stated below.

2. I am the Contracted Services Manager for Kansas Department of Corrections ("KDOC") and have been so employed since 2019.

3. My duties include reviewing each approved menu, monitoring compliance with contract requirements, preparing and processing contract amendments, and conducting food service operation inspections.  I do not make policy decision for the KDOC.  In my capacity as Contracted Services Manager, I maintain business records relating to the food service operations at KDOC's facilities, including certificates, policies, procedures, and documents used by KDOC related to food service operations.  To my knowledge, these records were made at or near the times by KDOC, by someone with knowledge, the records being kept in the course of a regularly conducted activity of a business, and making the record was a regular practice of KDOC's business.

4. I am familiar with Aramark Correctional Services ("Aramark"), which, in 1997 was awarded the contract with the exclusive right to provide food services in all KODC facilities. A copy of the Aramark is attached as Exhibit 1 hereto. Under the contract, Aramark is responsible for all aspects of food operations, including approving the menu, providing rabbinical review of the menu, supervising food service staff and inmate workers, preparation and service of food, and ordering menu items.

5. All kitchen employees are employed and/or supervised by Aramark.

6. None of the food service employees at El Dorado Correctional Facility ("EDCF") are KDOC employees.

7. I am not present for day-to-day food preparation and service at EDCF.

8. I do not supervise or oversee Aramark staff or inmate workers in the KDOC kitchens.

9. The relevant contract provisions as to the Certified Religious Diet ("CRD")

    a. "When approved for individual cases by DEPARTMENT'S medical provider and chaplaincy, CONTRACTOR shall provide religious meals modified to adhere to medical guidelines as set forth in the document titled "KDOC Medical/Religious Diets"…" (Aramark Contract, Foodservice Amendment Number 12, Exhibit 1 at 5, ¶ 5).

    b. "…CONTRACTOR shall provide other special diets as mutually agreed upon by the CONTRACTOR and DEPARTMENT to include, by not limited to a certified religious diet and certain standardized medical diets. CONTRACTOR shall be responsible for obtaining review of the certified religious diet by appropriate religious advisor to insure that the diet meets the requirements of a certified

           religious diet as defined by the DEPARTMENT, and shall provide proof of the

           review to the DEPARTMENT."

10. I conduct biannual inspections of the food service operations performed by Aramark at

      KDOC facilities.  I also perform or conduct additional inspections at KDOC facilities as

      the need arises. These inspections seldom show any violations by Aramark or its staff of

      the CRD policies and procedures.

11. The last two inspections were conducted on November 30, 2021, and February 16, 2022.

      (Exhibit 8)

12. If violations are found during my inspections, I bring them to the attention of Aramark.

      Corrections are conducted on the spot, or Aramark then sends me a correction action plan

      for future compliance with the CRD policies and procedures.

13. During my inspection at EDCF, I made the following observations:

      a.  All food used in the preparation of the CRD menu is sourced from manufacturers

          that use kosher manufacturing processes and Aramark maintains certificates for

          the food items verifying that they are kosher-certified.  A copy of the current

          certificates is hereto attached as Exhibit 2.

      b.  All entrée items in the CRD arrive at EDCF factory-sealed, are portioned out of

          bulk boxes, and are stored on separate shelving units from non-CRD food.

      c.  All CRD food items have kosher symbols either on the outer bulk packaging, or

          on the individual packaging, with the exception of sliced bread and milk.

          Aramark maintains certificates from the manufacturers for the sliced bread and

          milk verifying they are kosher-certified.  Copies of the bread and milk certificates

          are attached hereto as Exhibit 3.

    d.   EDCF utilizes a separate oven for the preparation of warm CRD food, marked with a large, red sign that reads "kosher only."

    e.   The stove is cleaned and sanitized prior to being used for the CRD.

    f.   No steam kettles are used in the preparation of CRD food.

    g.   EDCF utilizes disposable trays, reusable, disposable eating utensils called sporks, and cups for all CRD meals.

    h.   CRD-designated utensils are used for the service of the CRD menu.  These utensils are engraved with a "K" and are kept in a locked cabinet accessible only by Aramark supervisors.

    i.   The CRD for general population residents is plated in a separate area of the kitchen line.

    j.   Cold CRD items are prepared separately on a table wrapped in plastic.

    k.   Warm CRD menu items are heated in a CRD-designated steam well.

    l.   CRD meals for residents in segregation are prepared in the CRD-designated area of the kitchen and stacked in a separate area of the food warmer after being wrapped in plastic. EDCF implemented the use of disposable trays for CRD meals served to residents in segregation. These trays are discarded after use.  The CRD meals in the warmer do not touch non-CRD meals.

    m.   Menu items used in the CRD are stored separately from non-CRD food items.

    n.   CRD-designated cooking utensils, pots and pans are washed and stored separately from non-CRD items in a locked CRD-designated cabinet.

17.    Exhibit 4, attached hereto, fairly and accurately represents photos taken July 26, 2022, of the CRD-designated area of the EDCF kitchen.

18.    A true and correct copy of CRD menus approved by Aramark's Religious Authority, Rabbi Fellig, are attached hereto as Exhibit 5.

19.    A true and correct copy of the Preparing a Kosher Environment document approved by Aramark's Religious Authority, Rabbi Fellig, is attached hereto as Exhibit 6.  I have also provided signature pages of kitchen staff acknowledging "I have been trained and understand the importance of the proper storage, handling, and service of kosher foods," attached hereto as Exhibit 7.

20.    I am familiar with the allegations made by Deron McCoy, Jr. in this lawsuit. I have investigated these allegations and concerns. Based upon my personal knowledge, including my inspections, as well as well as the documentation received from Aramark, I have no reason to believe that the CRD menu, certified by Aramark's Rabbi as per the contract, does not comply with kosher dietary laws as stated on the menu.  Based upon my review of the certificates and other information from Aramark, I have no reason to believe that the food being supplied at KDOC facilities, including EDCF, for the CRD diet is not in fact kosher.  Based upon my review of the procedures, as well as the training materials and the signatures of kitchen staff working under Aramark's supervision, I have no reason to believe that the CRD menu as actually delivered by Aramark at EDCF is not compliant with the kosher dietary requirements.

Pursuant to 28 U.S.C SECTION 1746, I declared under penalty of perjury that the foregoing is true and correct.

Executed on July 29, 2022.

/s/ Randall Singletary
Randall Singletary