DeRon McCoy, Jr #76894
_____
Name

P.O Box 311 (E.O.C.F)
_____

Eldorado, Ks 67042
_____
Address

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

DeRon McCoy Jr _____, Plaintiff
*(Full Name)*

V.

Aramark correctional
services et al _____, Defendant (s)

CASE NO. 21-3269-slc
*(To be supplied by the Clerk)*

~~First~~ Second Amended
CIVIL RIGHTS COMPLAINT
PURSUANT TO 42 U.S.C.
§1983

## A. JURISDICTION

1) DeRon McCoy Jr _____, is a citizen of Kansas
   *(Plaintiff)*                                    *(State)*

   who presently resides at 1757 S.e highway 54
                                          *(Mailing address or place*

   Eldorado, Ks 67042 _____.
   *of confinement.)*

2) Defendant Aramark correctional services _____ is a ~~citizen of~~ corporation
              *(Name of first defendant)*

   incorporated under the laws of Kansas _____, and ~~is employed as~~ its principal place
                                      *(City, State)*

   of business is Aramark Tower 1101 Market street phil, pa At the time the
                  *(Position and title, if any)*                    19107

   claim(s) alleged in this complaint arose, was this defendant acting under the color of state

   law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

   Aramark correctional services worked in conjuction
   with K.D.O.C officials to implement the CRD lists policy,
   and custom in K.D.O.C facilities.

1

3) Defendant _Rabbi ~~Mechaubah~~ M. Fellig_ is a citizen of
(Name of second defendant)

_Florida_ , and is employed as
(City, state)

_Religious Authority for Aramack Corr Serves_ At the time the
(Position and title, if any)

claim (s) alleged in this complaint arose was this defendant acting under the color of state

law? Yes ☒ No ☐ . If your answer is "Yes", briefly explain:

_worked in conjunction with K.D.O.C officials_

_and other named defendants to create and implemented_

_CRD into policy and custom for secure in K.D.O.C facilities_

(Use the back of this page to furnish the above information for additional defendants.)

4) Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3); 42 U.S.C. §1983. (If you wish to

assert jurisdiction under different or additional statutes, you may list them below.)

_42 U.S.C. §1983; R.L.U.I.P.A_

## B.  NATURE OF THE CASE

1) Briefly state the background of your case:

_Please see Attached;_

## C. CAUSE OF ACTION

1) I allege that the following of my constitutional rights, privileges or immunities have been

   violated and that the following facts form the basis for my allegations: (If necessary you

   may attach up to two additional pages (8h" x 11") to explain any allegation or to list

   additional supporting facts.)

   A) (1) Count I: Defendants violated the plaintiffs
   First Amendment right to free exercise and
   R.L.U.I.P.A

   (2) Supporting Facts: (Include all facts you consider important, including names of

   persons involved, places and dates. Describe exactly how each defendant is involved.

   State the facts clearly in your own words without citing legal authority or argument.):

   Please see Attached!

   B) (1) Count II: _____

   (2) Supporting Facts: _____

XE-2 8/82                  CIVIL RIGHTS COMPLAINT §1983

C) (1) Count III: _____

_____

_____

(2) Supporting Facts: _____

_____

_____

## D.  PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1) Have you begun other lawsuits in state or federal court dealing with the same facts

involved in this action or otherwise relating to the conditions of your imprisonment?

Yes ☒ No ☐ . If your answer if "Yes", describe each lawsuit. (If there is more than

one lawsuit, describe the additional lawsuits on another piece of paper, using the same

outline.)

   a) Parties to previous lawsuit:

   Plaintiffs: DeRon McCoy II

   Defendants: Arampal P. Berry, C. Allen, J. Dockendorf
   Paul church

   b) Name of court and docket number US District Court district of Kansas
   5:16-CV-03027-CM-KGG

   c) Disposition (for example: Was the case dismissed? Was it appealed? Is it still
   pending?) Summary Judgement granted did not
   appeal (failure to protect conditions at EDCF)
                                          Most

   d) Issues raised violation of free exercise clause
   of 1st Amendment and R.L.U.P.A

XE-2 8/82          CIVIL RIGHTS COMPLAINT §1983

e)   Approximate date of filing lawsuit  1/27/2016

f)   Approximate date of disposition  10/2/2020

1)  I have previously sought informal or formal relief from the appropriate administrative officials regarding the acts complained of in Part C Yes ☒ No ☐. If your answer is "Yes", briefly describe how relief was sought and the results. If you answer is "No", briefly explain why administrative relief was not sought.

Please see Attached.

_____

_____

_____

## 2)  REQUEST FOR RELIEF

1)  I believe that I am entitled to the following relief:

Please see Attached.

_____

_____

_____

_____

| | |
|---|---|
| _____ | Deron McCoy II |
| Signature of Attorney (if any) | Signature of Plaintiff |

_____

_____

_____
(Attorney's full address and telephone number)

XE-2 8/82               CIVIL RIGHTS COMPLAINT §1983

DeRon McCoy, Jr #76894
P.O. Box 311
Eldorado, Ks 67042

United States District Court
For the District of Kansas

DeRon McCoy Jr, plaintiff

v.

Aramark correctional services,
Rabbi M. Fellig in his individual
and official capacity,
Rabbi B. Friedman in his
individual and official capacity,
Patricia Berry in her official and
individual capacity
Ronald Staley in his official and
individual capacity
Sharon Goats in her official and
individual capacity
Judy Hay in her official and
individual capacity
Jeff Zmuda in his official and
individual capacity, Defendants

Case No.
21-3269-SAC

second Amended

Civil rights complaint
Pursuant to 42 U.S.C.
§ 1983

## A. Jurisdiction

1) DeRon McCoy, Jr., is a citizen of Kansas
who presently resides a 1757 s.e highway 54
Eldorado, Ks 67042

2) Defendant Aramark correctional services is
a corporation incorporated under the laws of
Kansas, and it principal place of business
is Aramark Tower 1101 market street, philadelphia,
PA 19107. At the time the claim(s) alleged in this

(1)

complaint arose. This defendant was acting under the color of state Law. Aramark correctional services worked in conjuction with K.D.O.C officials to implement the certified religious diet (CRD) into policy, and custom for service upon Jewish offenders in K.D.O.C custody.

3) Defendant Rabbi M. Fellig is a citizen of Florida, and is employed as Aramarks religious Authority. At the time the claim(s) alleged in this complaint arose, This defendant acted under the color of state Law. Defendant M. Fellig worked in conjuction w/th K.D.O.C official to implement the (CRD) into policy and custom for service upon Jewish offenders in K.D.O.C custody

4) Defendant Rabbi B. Friedman is a citizen of Kansas and is employed as K.D.O.C religious Authority. At the time the claim(s) alleged in this complaint arose, This defendant was acting under the color of state Law. Defendant B. Friedman was ~~detuned~~ aware of the deferences of the CRD and failed to act to correct problems

5) Defendant Patricia Berry is a citizen of Kansas and was employed a K.D.O.C contract monitor currently retired. At the time the CRD was signed and implemented into policy Defendant Berry was state contract monitor who reveined and signed the CRD into policy and procedure for what Jewish offenders who request Kosher modified diet are served as food.

6) Defendant Randy Shakeley a citizen of Kansas and is Kansas employed as the current K.D.O.C contract monitor. At the time the claim(s) arose. This defendant acted under the color of state law. As the K.D.O.C contract Monitor Defendant Singletary is responsible reviewing and approving The CRD for service upon Jewish offender who request Kosher modified diet and ensuring Kosher Jewish dietary laws for service source and preparations are met.

7) Defendant Sharon Loats is a citizen of Kansas and is employed as the dietician for K.D.O.C. At the time the claim(s) arose. This defendant was acting under the color of state law. As the dietican for K.D.O.C Defendant Loats is responsible for reviewing the CRD menu for nutritional adequate and then sign it into policy for service to Jewish offenders who request Kosher modified diet.

8) Defendant Julie Hay is a citizen of Kansas and is employed as the A.F.O.S for Aramark correctional services. At the time the claims arose in this defendant was acting under the color of state law. As the supervisor at Eddif kitchen operated by Aramark and oversaw day to day operations of said Kitchen.

9) Defendant Jeff Zmuda is a citizen of Kansas and is employed as the K.D.O.C secretary of corrections. At the time the claims arose this defendant was acting under the color of law oversees implementing policy and procedure for K.D.O.C

10) Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3), 42 U.S.C. §1983. and L.R.L.U.I.P.A. (Religious Land Use and Institutionalized Persons Act. 42 U.S.C.§ 2000cc-1.

## B. NATURE OF THE CASE

1) The Plaintiff DeRon McCoy Jr's is a Jewish offender currently housed at Eldorado correctional facility and has been since 6-1-19

2) The Plaintiff's Jewish beliefs have a core foundation based in orthodox Judaism.

3) orthodox Judaism have Many tenants one of the central tenants being eating Kosher only foods.

4). Jewish Kosher dietary Laws encompass not only what foods may be eaten, but also how said Kosher foods may be handle, prepared, and served as well as how the pots, pans, utensills, and plates/trays are handle and washed.

5) Another central tenats of the othodox Jewish belief system is the observance of the sabbath and Jewish High holy days i.e. Passover, sukkoth, Yomm Kippur (Rosh Hassanah, shavuot) the observance of these Jewish holidays come with tru-itions of certain foods to ne eaten on these holidays. (

6) On or about 1/15/21 The plaintiff requested to be placed on Kosher modified diet via form-a to the chaplins office.

7) The plaintiff received a responce back on from the chaplins office in the form of a request for vegan or CRD diet.

8) In the space available to state why the request should be made. The plaintiff responded that he wanted a Kosher modified diet and not a CRD as (CRD)'s not Kosher.

9) The plaintiff received response back from the E.D.C.F Chaplins office that CRD and vegan are the only religious diets available.

10) The plaintiff then checked the box indicating that he would request CRD.

11) On 2/11/2021 the plaintiff was placed on a CRD diet.

## CRD Menu.

12) The CRD Menu for Kansas DOC adult males is the same for every K.D.OC facility. Kitchen operated by Aramark correctional food services. The CRD preparation procedure and service is the same at every K.D.OC facility.

13). The CRD Menu operates in the same manner as a policy as it dictates the food items, thier frequency, and the amounts of said food items will be served to offenders in K.D.O.C custody

14). The CRD Menu was developed by Aramark with the assitance and input of several persons named as defendants in this civil Action.

15) Defendant P. Berry intally during the implementing of the CRD in 2012 served as the State contract Monitor who reviewed the CRD Menu and its meal componeonts per I.M.P.P (K.D.OC) _____ and then signed it into policy and custom for what meals items would be served to offenders who request Kosher diets per Jewish beliefs.

16) Defendant R. Schleter is now the State contract Monitor who is responsible for reviewing and signing the CRD Menu and approving the CRD menu into policy/custom for what meal items are to be served to offenders who request Kosher diets per Jewish beliefs.

17) Defendant M. Fellig is the person responsible for reviewing the CRD menu and its meal components for compliance with Jewish dietary Laws. Before signing his approval.

18) Defendant M. Fellig is a resident of Flordia and has not ever overseen the preperation of the (CRD) ever, which is apparent from the disclaimer that he does not oversee the preperation of the CRD and as such cannot verify it meets Kosher dietary laws.

19) Defendant S. Laats is Aramarks dietician who is responsible for reviewing the CRD menu its meal items and the amounts to be served to ensure those meal items and amounts meet Federal guidelines for Nutational adequacy. Before approving the CRD by signature for Nutational adequacy per ACA

20) Defendant J. Hay is employed at the E.D.C.F kitchen operated by Aramark as A.F.D.S and is responsible for supervising the kitchen at E.D.C.F and how meals are prepared and that proper preperation procedures are followed.

21) Defendant Jeff Zmuda is employed as the secretary of corrections and oversees the implimenting and enforcing of K.D.O.C policy and procedure.

22) If anyone of these defendants did not sign his/her approval of the CRD menu The (CRD) menu would not and could not dictate or be used for service of meal items to offenders in K.D.O.C custody.

<u>CRD meal items</u>

22) The plaintiff has resided at L.C.F Lansing correctional facility, H.C.F Hutchinson correctional facility, and his current residence E.D.C.F Eldorado correctional facility, and obtained notarized affidavits from offenders who have been employed by Aramark as (CRD) cooks as well as affidavits based upon his own observation concerning the (CRD) at each facility.

23) The (CRD) meal components are vegan soy-patties textextured to make it look like real meat. there is no real meat or cheese served for CRD. There is no Rabbinical supervision of the preparation or service of the (CRD) and the (CRD) is prepared and served by Non-Jews

CRD preparation

24) The CRD meal items arrive at E.D.C.F (as well as H.C.F and L.C.F) in large bulk packages

25) A K.D.O.C. offender employed by Aramark opens the large bulk packages and then makes smaller portions from the bulk packages coinsiding with the (CRD) menu for what is to be served that week to offenders

26) After making smaller portions from the bulk packages the offender stores these smaller portions in a room along with other meal items used for regular meals and vegetarian meals.

27) Per custom the offender when preparing the CRD meal for that day obtains the meal components for that day from the Aramark storage locker and then obtains the pots and pans for cooking the CRD from the general area of pots and pans which are used for preparation of CRD as well as all other meal items for regular, medical, and vegetarian meals.

28) The offender CRD cook then prepares the CRD meal items in a area directly in front of the Aramark supervisor

⑦

office. There is no designated room. This area is also directly next Next to the pots and pans area

29) After the meal components for that meal are finished cooking. A offender Aranor worker makes individual trays for offenders. By lining up plastic washable re-useable trays that are reddish-brown in color.

30) The offender (CRD) cook then scoops the finished meal components onto the reddish brown trays in the proper amounts as designated by the CRD menu.

31) After all the meal components are placed onto the CRD trays. The trays are then wrapped in saran-wrap and then when the proper amount of trays are completed for service to offenders on CRD, the completed trays are stored in a food warner directly behind the main line serving area.

32) The same plastic-washable reusable trays that are reddish brown in color that are used for service of CRD are also used for Gluten restricted meals as well as Renal diet meals.

B. Service of the CRD General population

33) Once meal line is called for general population by cellhouses. Offenders proceed from there cellhouse to the dinning hall.

34) Upon arriving at the dinning hall offenders proceed through the serving line untill they reach the serving line window.

35) The serving Line is a approx 2ft by 1ft tall Opening in the Dinning hall wall that allows for completed meal trays to be handed to offenders from Kitchen serving Line area.

36) Once a offender reaches the Serving Line window he informs the Aramark worker at the window of his diet by showing his Identification card (which display diet in lower Left hand corner) while stating his diet.

37) When a offender who is on CRD reaches the serving Line window and states his Meal diet as "CRD". A offender or Aramark supervisor then proceeds to the warmer which is directly behind serving Line and grabs a CRD tray from the warmer and then hands it to the offender on CRD.

38) Renal diet trays, Gluten-free trays and CRD trays are all stored in the same serving Line warmer to await service to offenders. There is no seperation and the trays are customarily stack on top of one another.

<u>Service of CRD Restrictive housing/segregation</u>

39) Offenders housed in Restrictive housing (RH) are brought thier meal trays and are served them to the cells they are housed in.

40) Meal trays for RH offenders are prepared in the Kitchen seg Line once the meal trays are completed. The completed trays are placed in a electric Large portable warmer, there is no seperation between trays. and

Meal trays for all diets are customarily stacked one on-top of the other.

41) Once the proper number of trays are completed and placed in the electric large portable warmer. the warmers are then transported to the RH cell houses by offenders.

42) Upon reaching the cellhouses of Restrictive housing, the warmers full of fully made trays and pushed one to each side of the (RH) unit.

43) A security Staff member then takes a plastic multiple use cart and pushes it to the front of the warmer. The security Staff then takes the required amount of trays to serve each offender his required meal.

44). One tier is served at a time

45) One Security staff pushes the multiple use cart with the trays while one security staff opens the tray-hatch of the closed cell doors hands each offender in RH the required meal tray for his designated diet. And then Secures the tray-hatch afterwards.

46) After approx 30-45 min after receiving the meal trays. A security Staff member Then picks up the dirty meal trays in the Similar manner as they were handed out using the Same multiple use plastic cart.

47) The Same multiple-use plastic carts

that security staff have to use hand
out trays are also used to passe out
cleaning supplies, transport offenders personal
property as well as for what ever other
purposes security staff deems fit.

48) After picking up the dirty trays a security
staff then places the dirty trays back into
the electric warmer used to transport the meal
trays to RH. The electric warmer with dirty
meal trays contained within is then pushed
out of RH cellhouses and transported back
to kitchen for washing.

49) At various times since observing the service
of the CRD it has sometimes been served
in styrofoam trays for short periods of
times, usually during inspections but
always reverts back to being served in the
manner described above

<u>Cleaning and storage of trays</u>

50) After offenders housed in general population
are finished eating there food in the dining
hall all the dirty trays are passed through
dirty tray slot that is approx 2ft tall and
   ft wide to a offender working in the dish
washer area of the kitchen.

51) The dirty trays for all meals are passed and
stacked in the dirty tray window area and
the dirty trays often pile up. These include
CRD trays, medical trays and regular trays

52) The offender working in the dishroom takes

(11)

each dirty tray and empties the leftover contents of the trays by customarily banging the dirty trays on the rim part of a large plastic trash can until the dirty trays contents are off the dirty trays.

53) After the contents are off the dirty trays the offender dishroom worker then places each dirty tray onto the conveyor belt of the large commercial dish washer. The dirty trays then go through the washing process on the conveyor belt before arriving on the other end of the dish washer.

54) Another offender dishroom worker removes All the clean trays, CRA trays included and then stacks them onto a clean tray rack to await storage for service the next meal or next day.

55) The same process is used to wash the trays used to serve Restrictive housing. The only difference is that a offender removes the trays from the electric warmer after its re-arrival at the kitchen, after service of meals to offenders in Restrictive housing.

Code of Jewish Law Shulchan Aruch

56) There are Numerous dietary laws that deal with how meals are to be prepared, served and how pots, pans and utensils are to be stored cleaned and separated. There are also Jewish law that deal with blessings of foods, utensils. As well as the people allowed to handle food items in order to be Kosher and remain Kosher. The Book that contains these laws is called the Shulchan aruch or Jewish code of Law. ( Exhibit D page 120 of D paragraph 1-13 ) and page 122-123 prgh 1-13.

## Sabbath

57.) The sabbath is the day of rest one of Gods appointed HolyDays as dictated in Leviticus 23: 1-3

58) The Sabbath has work prescriptions that include Not being able to cook foods nor have a NonJew cook-food. This include reheating cook foods. (Exhibit D Void cnt page (a) prgh 1) Read also

59) Observing the sabbath also includes a celebatory meal that includes Meat, fish, cHallah bread, and wine or grape Juice. (Exhibit D on Vol 1 chapter 72 page 64 prgh 7

60) The Shulchan-aruch dictates that the sabbath meal be a celebration and that "Every person should pre-pare fine meat, fish, choice wine, and other delicacies for the sabbath meals to the fullest extent of his means", page 83 of Exhibit D prgh 22)

61) The commisary Menu currently does not any meat that is Kosher. Nor any Kosher Ramen noodles. offender are only provided cold meal for dinner.

## Passover festival

62) The Passover festival is a High Holy-day to commenrate the passing over of the Hebrews household (that had the sprinkling of the passover Lambs blood on the doors) by the Angel of Death. And is a appointed high holy day as dictated in Leviticus 23: 4-14.

63) No Leaven may be eaten nor stored by any Jew during the Passover festival. No foods or food items that are not Kosher for Passover certified may be eaten and Matzos must be eaten during this time (unleavened bread)

64) Aramark provides boxes of Matzo (unleavened bread to last a offender the 8 days of the Passover festival.

65) Aramark provides factory double factory sealed Air plane-TV dinner type meals during passover that are Kosher for Passover certified. and Fresh fruit and grape Juice as beverages during Lunch and dinner. As well as Teabags and coffee packages

Succoth - General population

66) Succooth (Sukkot) is a Jewish High Holy day celebrated by Jews to commemorate when God Led the Israelites out of Egypt. It last 8 days as dictated by Leviticus 23:33-44.

67) E.D.C.F does allow offenders that religious observance to construct a sukkah and eat their meals in the sukkiah. This is the only other time that members of the Jewish callout are able to receive double wrap factory sealed kosher meals that fish and meat.

68) The items are purchased by offenders who are on Jewish callout and have the funds available to submit for purchase. The meals are purchased from Aramark correctional services.

Shavuot - General population -

67) Shavuot is a Jewish holiday which is celebrates the giving of the torah to the Jewish people.

68) On shavuot a observant Jew is required to consume dairy. The Shulhan Aruch does state the one must eat dairy, and also Meat. Exhibit D vol 3 ch 103 page 17 pyght.

69) It is the plaintiff custom to consume "dairy meranot cake" which the plaintiff means Chesse cake.

70) offenders in the Jewish callout are allowed to celebrate shavuot with the eating of cheesecake but the cheesecake must be purchased with offenders own funds from Aramack services.

Yom Kippur - General population

71) Yom Kippur is a Jewish High holiday "The Day of Atonement" during which Jews fast for 25 hours without food or water as well as other things and prayer to Adonai for there sins for the past year as dictated by Leviticus: 23: 26-32.

70) ~~offering fee attached~~

72) The Yom Kippur fast is traditionally broke by the eating of fish (Lox or smoked fish).

73) offenders are allowed to break the Yom Kippur fast with lox or smoked fish) but the items must be purchased from funds from the offenders account.

74) offenders in segregation are only allowed to participate in celebrating the Passover meals by the Kosher for passover provided by Aramark offenders in segregation are also able to to fast on fast days, but are generally only given a 'fast sack' that has sliced bread, fruit, and Kosher packaged lunch meat.

75) offenders housed in segregation are not even given the opportunity to purchase food items required to participate in celebrating the Jewish High holidays. (Like offenders in general population are).

76) The plaintiff is unable to afford to pay for the food items required to properly celebrate the Jewish high holidays and fast days when breaking fast all year around.

77) A Kosher diet cannot be prepared and served from a standard Prison Kitchen.

C. CAUSE OF ACTION.

1) I allege that the following of my constitutional rights, privileges or immunities have been violated and that the following facts form the basis for my allegations.

Count I: cross-contamination claim -
Defendants Aramark correctional services, Rabbi M. Fellig, Patricia Berry, R. Singletary, and S. Loats Intentionally, willfully, and deliberately violated the plaintiffs First Amendment rights and Religious land use and institutionalized persons Act (R.L.U.I.P.A) 42 U.S.C § 2000 cc-1

Defendants Aramark, M. Fellig, P. Berry, R. Singletary K.D.O.C state contract monitor and B. Freeman violated the plaintiffs First Amendment rights and rights under R.L.I.I.P.A. when they collectively developed and implemented policy and procedure for the preparation of the CRD. Said policy operates in a manner that has the Kosher certified Bulk packages meal components that arrive sealed being opened and then taken from the bulk package and then repackaged into smaller portions. This is not being detected. This process process invalidates the previous Kosher Certification since its is not done under direct supervision of a qualified Rabbi. The procedure also operates in a manner that has a none-Jew cooking the CRD meal components which is forbidden by Jewish law in both regards. This policy is Statewide policy and procedure for the preparation of CRD in K.D.O.C and restricts the plaintiff from properly practicing a central tenet of his religious belief of eating Kosher only foods that meet all Jewish dietary laws.

Defendants Aramark correctional services, Rabbi M. Fellig, P. Berry, Randy Singletary and S. Loats violated the plaintiffs rights when they collectively developed and implemented a policy and procedure for the service of the CRD. The policy and procedure allows for the CRD meals to be served on plastic reusable-washable

trays. This process was lead to the consistant cross-contamination of the plastic reusable trays due to them being used to serve other Non-Kosher meals and having direct contact with the transport warmer, the dish washing Machine, and various other surfaces and items that have had contact with Non-Kosher food items or items and things that have had Non-Kosher contact rendering them Non-Kosher (unholy), which is against Jewish dietary-laws and restricts the plaintiffs right to eat Kosher Only foods, which is a central tenant of Judaism. Said procedure is a statewide procedure in K.D.O.C.

Defendants Aramark, Rabbi M. Fellig, Patricia Berry, A. Singleton State contract monitor, and subsists violated the plaintiffs First Amendment rights and rights under R.L.I.U.P.A when they collectively developed and implemented the CRD preparation policy. Said policy operates in a Manner that has the CRD meal components being cooked using pots, pans, and trays (that are also used to cook Non-Kosher Meals IN, a Standard Non-Kosher Kitchen. said policy is statewide in K.D.O.C and is a violation of Jewish dietary laws and restricts the plaintiffs right to eat a fully Kosher meal that meets all Jewish dietary Laws.

count II: Failure to Supervise.
Defendants Rabbi M. Fellig and J. Hay, Rabbi Friedman Intentionally, willfully, and deliberately violated the plaintiffs First Amendment rights and plaintiffs rights under the R.L.U.I.P.A 42 U.S.C 82000 cc-1, when they failed to supervise.

B.Friedman

Defendants Rabbi, M.fellig, and J. Hay violated the plaintiffs First Amendment rights and rights under R.L.U.I.P.A when they each failed to supervise the preparation and service of the CRD. Their failure to supervise the preparation and service of the CRD. Lead to the pots, pans, and trays that are used for the preparation and service of the CRD being cross-contaminated by coming in direct contact with non-kosher food items. The CRD pots and pans, and trays are used for the preparation of other non-kosher food items while the trays are used to serve medical meals also. The pots, pans, and trays have consistant contact with warmers used to transport seg. trays. The kitchen walk in warmers, the dish washer and various other surfaces that have had direct contact with other pots, pans and trays that are used for the preparation and service of non-kosher meal components and non-kosher meals. This violates Tewish dietary laws and This it violates plaintiffs rights and Defendant fellig and Hay's failure to supervise caused this.

(c)(i) Count III. Meat and Dairy claim

Defendants Aramark correctional services, Rabbi M.fellig, Patricia Berry, R. Singletary K.D.O.C state contract Monitor, S. Loots. Intentionally, willfully, and deliberately violated the plaintiffs First Amendment rights and plaintiffs rights under the religious Land, Use and Institutionalized Persons Act (R.L.U.I.P.A) 42 u.s.c 2000 cc-1.

(2) Defendants Aramark correctional services, Patricia Berry, R. Singletary K.D.O.C state contract Monitor, M.fellig

(18)

and S.Loats. Intentionally, willfully, and deliberately violated the plaintiffs First Amendment rights and plaintiff's rights under R.L.u.I.P.A. when they collectively developed and implemented the policy of only serving a vegan CRN diet to the plaintiff and other Jewish offenders in K.D.O.C custody, said policy of serving a vegan only diet restricts the plaintiff from observing the sabbath by eating a Joyful meal complete with fine meat fish, choice wine challah bread, and other delicacies as Jewish code of law Dictates. The vegan only CRN is statewide policy in K.D.O.C and violates plaintiff right to celebrate the sabbath day a Jewish festival.

(3) Defendants Aramark correctional services, Patricia Berry ~~Rusingletary~~ K.D.O.C State contract Monitor, Rabbi M.Felliq and S.Loats. Intentionally willfully and deliberatly violated the plaintiffs First Amendment rights and plaintiffs rights under (R.L.u.I.P.A) when they collectively developed and implemented the policy of only serving a vegan CRN diet to the plaintiff and Jewish offenders instead of Kosher, said policy of serving a vegan only diet restricts the plaintiff from observing the Jewish High Holiday of shavuot. During which Members of the Jewish religion are traditionally required to eat cheesecake as Jewish code of law dictates. The vegan only CRN is a statewide policy in K.D.O.C and violates plaintiffs right to celebrate the festival of shavuot.

(4) Defendants Aramark correctional services, Patricia Berry, ~~Rusingletary~~ K.D.O.C state contract Monitor, Robbi M.Felliq and S.Loats, Intentionally, willfully, and deliberatly violated the plaintiffs ~~dates~~ First Amendment rights and

(19)

Plaintiffs rights  under R.L.U.I.P.A, when they
collectively developed and implemented the policy
of only serving a CRD vegan diet to plaintiff,
and other Jewish offenders in K.D.O.C custody,
said policy of serving a vegan only diet restricts
the plaintiff from observing the Jewish high holy
Days of succoth by eating Meat & Fish during
the festival of Succoth. The vegan only Meals
served for CRD are statewide policy in K.D.O.C
and violates plaintiffs rights to celebrate the
festival of Succoth.

(5) Defendants Aramark correctional services, Patricia
Berry Rusing dietary K.D.O.C State contract Monitor,
Rabbi McFelli, and St Joads. Intentionally,
willfully, and deliberately violated the plaintiffs
first Amendment rights and right under R.L.U.I.P.A
when they collectively developed, implemented the
policy of serving a vegan only diet to
plaintiff and other Jewish offenders in K.D.O.C
custody. Said policy of serving a vegan only
diet, prohibits the plaintiffs from observing
The tradition of Breaking the fast day of
Yom Kippur a Jewish festival by eating smoked
fish or Lox. The vegan only CRD Meals are
statewide policy in K.D.O.C and violates the
plaintiffs right to traditionally observe Yom
Kippur.

to the conditions of my imprisonment.

a) Parties to previous Lawsuit:

Plaintiff(s): DeRon McCay Jr
Defendants: Aramark correctional services, C.Allen, J. Duckendorff, P. Berry, M. Kelly, Paul Church.

b) Name of court and docket Number: United States District court for the district of Kansas: 5:16-cv-3527-HLT.

c) Disposition: Summary Judgement granted moot claims and failure to Exhaust claims at E.D.C.F. Didn't Appeal.

d) Issues raised violation of First Amendment rights and Right Land R.L.U.I.PA due to preparation and service of CRD Diet.

e) Approximate date of filing Lawsuit: January 27th, 2016.

f) Approximate date of disposition: October 2nd, 2020.

1) "Yes" I have previously sought informal and formal relief from the appropriate administrative officials regarding the acts complained of in Part C.

briefly explain: On 1-21-21 Plaintiff submitted a grievance after being informed that he would only be provided a vegan CRD since that was all that Aramark provided. The grievance submitted by the plaintiff outlined the short comings of the CRD (vegan only) diet. Due to the repacking of the bulk packages into smaller packages by a Non-Jew in a standard Non-kosher

(22)

Kitchen. The cross contamination of the
pots, pans, and trays by contact with
Non-Kosher foods and surfaces that have had
contact with Non-Kosher items. The grievance
also addressed not being served meat and
fish and other food items during the sabbath,
Not being served cheesecake during shavuot,
Not being served meat and fish during
Succoth, and Not being served smoked fish
or lox during Yom Kippur.

I received response back on 1-26-2021 from
UTS Brewer that he had spoke to chaplin
Jones who stated that K.D.o.c does not
offer Kosher modified diet and that certified
Religious diet is the meal program for the
Religious groups that need to have a Kosher
Meal (see Attached exhibit 1) I appealled
the conclusion of UTS Brewers conclusion
to the wardens office. The wardens office
determined the response by UTS Brewer
was appropriate on Feb 3, 2021 (sgm Clune)
I then appealed that conclusion to the
secretary of Corrections office on February 7, 2021
on or about March 23, 2021 I received response
back from secretary of corrections office stating
"The response rendered to the inmate by staff at
the facility is appropriate."


<u>grievance for denial of participation in</u>
<u>Jewish holy days while in segregation (RH)</u>

On 8/5/2022 I wrote a form-a to the chaplins
office at E.D.C.F after Rabbi Ben Friedman Attested
that Inmates in seg shall be allowed to purchase
or be provided challah bread and grape juice for
the sabbath. In that same form-a I requested
to be provided challah bread as well as to know what
other food items were allowed for inmates in seg

on or about 8/17/2022 I recieved response back that offenders in seg. are not supplied challah bread and grape juice. I wrote a grievance that day about the denial of challah bread to celebrate the sabbath as well as other food items to celebrate the other Jewish high holy days. I received response back from the chaplins office on 8/25/22 quoting C.D.C.F G.O 23-105 page 1 stating that banquets and refreshments are only open to inmates who are part of requesting organization and who are housed in general population. On 8/29/22 I forwarded the grievance to the wardens office at E.D.C.F. On 9/12/22 I recieved response back from Warden office at E.D.C.F stating chaplin response was appropriate. I appealed that decision to the Secretary of Correction that same day and recieved response back on October/2022 agreeing with the E.D.C.F warden.

## Request for relief

1) I believe that I am entitled to the following relief:

(a) punitive damages in excess of $75,000.00

(b) nominal damages in the amount of $1.00

(c) declatory judgement that the acts and omissions contained within plaintiffs complaint violates the plaintiffs rights

(D) permanent injunction directing named defendants to provide the plaintiff and all other Jewish Inmates in K.D.O.C with a real Kosher modified diet that meets all Jewish dietary laws for preparation and service as dictated and outlined in the Jewish code of law (shulhan aruch) Free of charge.

(E) permant injunction directing named defendants to



provide the plaintiff with Kosher Modified Meal items and Meals i.e Fish, Kosher Meat, Cheesecake, lox, etc) that would allow him and other Jewish offenders to properly observe the Jewish High holy days/ festivals (The sabbath, passover, Sukkoth, Rosh Hassunah, Yom Kippur, and Shavuot) as they are dictated and outlined in the Jewish code of law (Shulhan Oruch), Free of charge

(f) permenent injunction Directing Named defendants to provide any Jewish offender who is housed in segregation (Restrictive housing) with ~~Kosher~~ Real Kosher Meal items and Real Kosher Meals in order to properly observe every high Holy day and festival as the Observance is Dictated and Outlined in the Jewish code of law (Shulhan Oruch) Free of Charge.

(G) trial on all Issues triable.

(H) cost of suit.

(I) Any other relief the court deems Just and suitable.

Date : _____

Deron McCoy Jr
DERON McCoy Jr #76894
P.O Box 311
Eldorado KS 67042



(D) (1) Count IV: Observance of Jewish High Holy
        Days while housed in segregation

Defendant Aramark correctional services. Rabbi M.
Fellig, R. Singletary & Rabbi Ben Friedman. Intentionally,
willfully and deliberately violated the Plaintiffs First
Amendment right. His Religious land use and Institution-
lized Person Act (R.L.u.I.P.A) 42 U.S.C §2001 and
His 14th Amendment Equal protection rights as
protected by the U.S Constitution.

(2) Defendant Aramark correctional service, Rabbi M. Fellig,
R. Singletary and Rabbi Ben Friedman Intentionally
violated the Plaintiffs rights when the failed to
provide the plaintiff with real Kosher Modified meal
item while the plaintiff has been housed in
segregation (Restrictive housing) so That he could properly
observe The Jewish High holy days (Rosh Hasanah,
Yim Kippur, Succoth, passover, Sabbath, etc), said
high holy day require certain food items (Kosher meat
Kosher Fish, cheesecake, apple, Honey etc) as dictated
by Jewish code of law.

(3) Defendant Aramark correctional services, Jeff Zmudan
R. Singletary and Rabbi Ben Friedman. Intentionally,
willfully, and deliberatly violated the plaintiffs
equal protection rights when they failed to provide
or enact policy and procedure to provide the plaintiff
with Kosher meal items so that he could properly
observe Jewish high holy days /festivals while he housed
is segregation but allows Native Americans to smudge
while in segregation and also allows Jewish
inmates in General population to purchase and observe
High Holy days

                    D. Previous lawsuits and Administrative
                        relief.

1) I have had a previous lawsuit in the Federal court dealing
   with some of facts and issues that are involved in this
   action and with some of the same facts in this action.

Exhibit 1
Grievance responses

1) grievance No. CA00022101 (Kosher food & food items)
Dated: February 3, 2021 (E.D.C.F)
         February 11, 2021 (S.O.C)


2) grievance No. CA22093 (denial of food items
   to observe holy days while in seg LRH)
   Dated: Sept 8, 2022 (E.D.C.F)

EDCF ✓

B2 141

# Grievance-Response on Appeal

**FACILITY:**     **El Dorado Correctional Facility**

**INMATE:**     **0076894 MCCOY, DERON**

**GRIEVANCE NO.:** **CA00022101**

**DATE:**     **February 11, 2021**

## FINDINGS OF FACT

The response provided to the inmate by staff at the facility is incorporated herein by reference and made part of this response.

On appeal, the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong.

## CONCLUSIONS MADE

The response rendered to the inmate by staff at the facility is appropriate.

## ACTION TAKEN

None further.

Libby T. Keogh
**Libby T. Keogh**
**SECRETARY OF CORRECTIONS DESIGNEE**

cc:    Acting Warden Butler
Image: SOCRESP w/attachments

The original response on appeal and all attached documents were mailed to the inmate by way of United States Mail on _____.

RECEIVED

MAR 2 3 2021

WARDEN'S OFFICE

## APPEAL OF GRIEVANCE TO SECRETARY OF CORRECTIONS

Inmate Name: _Deron McCoy II_      Facility: _EDCF_

Inmate Number: _76894_      Grievance Serial No.: _CA2210I_

(Attach grievance report with Principal Administrator's response or explanation why Principal Administrator is bypassed.)

MAIL TO:      Kansas Department of Corrections      Date Mailed: _2/7/2021_
714 SW Jackson
Suite 300
Topeka, KS 66603

---

Tell the Secretary what you feel the Principal Administrator should have done, and state what action you believe the Secretary should take. (Use extra paper as needed.) _I feel the principal administrator should have done more into lookin into the Jewish Kosher dietary Law hinself instead of Just going with what the findings were, I believe the seccetary should direct Aramark_

_Deron McCoy II_
Signature of Inmate

---

## DECISION BY SECRETARY OF CORRECTIONS (to be completed and returned with 20 days)

If applicable -- Confidential File No. _____

Date Received in Office of Secretary of Corrections: _____

Date of Final Answer: _____      Date Sent to Inmate: _____

Finding of Fact:

RECEIVED

FEB 10 2021

Conclusions Made:      DOC Facility Management Area

Action Taken:

_____
Signature of Secretary of Corrections

---

**For D.O.C. Staff Use Only**

Type of Response (Item 6b: Code      01, 02, 08 or 09) _____

DC 090, Effective May 21, 2014



El Dorado Correctional Facility
1737 SE Hwy 54
P.O. Box 311
El Dorado, KS. 67042

**Kansas**
Department of Corrections

Phone: (316) 321-7284
Fax: (316) 322-2018
www.doc.ks.gov/facilities/edcf

Jeff Zmuda, Secretary

Laura Kelly, Governor

Sam Cline, Warden

Date:   FEB - 3 2021

To:   I/M McCoy, Deron #76894 B2-141

Subject:  Grievance dated 1/21/21, CA22101

Findings of Facts:  Your grievance was received and a review into your allegations has been completed.

Conclusion Made:  After a review of the applicable documentation, it was determined the response provided by UTS C. Brewer is appropriate regarding your issues.

Action Taken:  Appropriate steps have been taken to ensure the process has been properly followed.

Pursuant to K.A.R. 44-15-102 (3) (B), you may appeal this answer by submitting the appropriate form to the Secretary of Corrections by mail.

Sam Cline, Warden
El Dorado Correctional Facility

Cc:  file
     Offender
     UTS C. Brewer

# KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

## INMATE COMPLAINT

Inmate's Name _DeRon McCoy JV_  Number _76894_

Facility _E.D.C.F_  Housing Unit _B2-141_  Work Detail _____

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member).

On 1- -21 I requested to be placed on a fully Kosher Modified diet that Meets all Jewish dietary laws for preparation, service and storage, I was instead sent a form for certified religious diet or vegetarian diet, There was No place for Kosher diet. I'm the

Date this report was given to Unit Team for informal resolution (to be completed by inmate). _1-21-21_

## UNIT TEAM RESPONSE (Complete and return to inmate within 10 calendar days.)

See Attached

_UTS_ _____ Unit Team Signature  _1-29-2021_ Date

## INMATE RESPONSE (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

__X__ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). _____

_DeRon McCoy JV_ _____ Inmate Signature  _1-29-21_ Date

## WARDEN RESPONSE (Complete, attach response and return within 10 Working days.)

Date Received _FEB - 2 2021_  Date of Final Answer _FEB - 3 2021_  Date Returned to Inmate _2-5-2021_

_____  _____
Inmate's Signature  Date  Unit Team Signature  Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

## TO BE COMPLETED BY STAFF ONLY

Grievance Serial Number _CA22101_

Type of Complaint (Item 4: Code 01-75) _01_

Cause of Complaint (Item 5: Code 01-30) _04_

Type of Response (Item 6a: Code 01,02,08 or 09) _08_  _RLsm_

RECEIVED
FEB - 2 2021
WARDEN'S OFFICE

place were it asked the reason for the request I wrote that "I would like a Kosher modified diet NOT a CRN as it does NOT meet all Jewish dietary laws. I received response back that I had been placed on (CRN). The (CRN) which is used at a very large K.D.O.C facility kitchen operated by Aramark is not Kosher as does NOT meet all Jewish dietary laws for preparation, service, and storage for the following reasons.

1. The (CRN) is prepared in the same kitchen that other Non Kosher food items are prepared in.

2. The (CRN) meal items that are served are taken from large bulk package and placed into smaller portions which invalidates the meal items Kosher certification due to there being no rabinical supervision during this process

(00) (27)

3. There is only vegan soy protein served for the main course there is no meat served. Jewish dietary laws require that Jewish people eat meat and ~~fish~~ on the sabbath during sabbath meal. ~~during every~~ ~~sabbath meal~~ which is weekly. Jewish dietary laws also require that Jewish people eat cheesecake during ~~rosh~~ ~~hashana~~, fish and meat during succoth and other meal items required to break religious fast are also not supplied under CKD (Yom Kippur)

4. The CKD policy also ~~is revised~~ does not meet Jewish dietary laws for service due to it leaving a option of using washable reusable plastic trays. These trays are stored in the same areas as regular trays, washed in the same dishwasher(s) as all the other trays, and the same reddish-brown trays used to serve gluten-free special diet meals

(3)

El Dorado Correctional Facility
1737 SE Hwy 54
P.O. Box 311
El Dorado, KS. 67042



# Kansas
## Department of Corrections

Phone: (316) 321-7284
Fax: (316) 322-2018
www.doc.ks.gov/facilities/edcf

Jeff Zmuda, Secretary
Sam Cline, Warden

Laura Kelly, Governor

**Date:** 1-28-2021

**To:** McCoy, DeRon #76894

**Subject:** Grievance dated 1-21-2021 received by my office on Friday 1-22-2021
In your claim you stat that you that you are requesting the Kosher Modified diet.

**Finding Facts:**   Upon receiving this grievance, I spoke with  Chaplin Jones.  She states
that the KDOC does not off the Kosher Modified diet. The Certified Religious Diet is the
meal program for the Religious Groups that need to have a Kosher meal.

**Conclusion:** EDCF and the KDOC offer a compatible religious diet to the Kosher
Modified diet with the CRD meal.

**Actions taken:** Nothing further is required at this time.

UTS C Brewer
B2 Unit Team



El Dorado Correctional Facility
1737 SE Hwy 54
P.O. Box 311
El Dorado, KS. 67042

**Kansas**
Department of Corrections

Phone: (316) 321-7284
Fax: (316) 322-2018
www.doc.ks.gov/facilities/edcf

Jeff Zmuda, Secretary

Laura Kelly, Governor

Tommy Williams, Warden

Date:     SEP - 8 2022

To:    McCoy, Deron #76894 A2-205

Subject:  Grievance dated 8/17/22, CA22693

**Findings of Facts:**  Your grievance was received and a review into your allegations has been completed.

**Conclusion Made:**  After a review of the applicable documentation, it was determined the response provided by Chaplain's Office is appropriate regarding your issues.

**Action Taken:**  Appropriate steps have been taken to ensure the process has been properly followed.

Pursuant to K.A.R. 44-15-102 (3) (B), you may appeal this answer by submitting the appropriate form to the Secretary of Corrections by mail.

*T. SWilliams*

Tommy Williams, Warden
El Dorado Correctional Facility

Cc: file
      Offender
      UTM J. Buchanan

# KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

## INMATE COMPLAINT

Inmate's Name DeRon McCau Jr          Number 76894

Facility EdCF          Housing Unit A2-205          Work Detail _____

---

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member). On 8/5/2022 I wrote a form-9 to the chaplins office requesting that I be provided with challah bread or grape juice or be allowed to purchase challah bread and grape juice in order to celebrate the subbath. I also requested to know all other food items that are provided or available for purchase to observe the other Jewish High holy days while I'm in segregation. I received a response back via GTL tablet account that the chaplins office does not provide this for segregation offenders.    8/17/2022

Date this report was given to Unit Team for informal resolution (to be completed by inmate). 8/17/2022

---

**UNIT TEAM RESPONSE** (Complete and return to inmate within 10 calendar days.)

FORWARD TO CHAPLINS office FOR RESPONSE.

UTJ Buchanan  8-18-2022
Unit Team Signature          Date

---

**INMATE RESPONSE** (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

__X__ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff).

DeRon McCau Jr          8/27/20
Inmate Signature          Date

---

**WARDEN RESPONSE** (Complete, attach response and return within 10 Working days.)

Date Received SEP - 6 2022    Date of Final Answer SEP - 8 2022    Date Returned to Inmate _____

_____          _____
Inmate's Signature          Date          Unit Team Signature          Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

---

## TO BE COMPLETED BY STAFF ONLY

CA22693          RECEIVED

Grievance Serial Number

Type of Complaint (Item 4: Code 01-75)          08          SEP 6 2022

Cause of Complaint (Item 5: Code 01-30)          09          WARDEN'S OFFICE

Type of Response (Item 6a: Code 01,02,08 or 09)          08          Rkn

McCoy #76894 A2-205 Response to Grievance Dated 08/17/22

Attached is a copy of the form-9 that is referred to in this grievance. As you can read, he is asking the Chaplain to provide challah bread and grape juice to observe Shabbat, which is the Jewish Sabbath. He does not offer to purchase said items. His form-9 also asked for dates of upcoming holidays, which were included in GTL Message# 6908852902. According EDCF GO23-103 Page 1, Second paragraph under Policy, it states "Banquets and refreshment events shall only be open to those inmates who are members of the requesting organization at the time of the request and who are housed in the facility general population units. No meals shall be approved for delivery to inmates on segregation or RDU intake status." According to EDCF GO 23-103 Inmate Organization Food Events are not for an "individual" but for a group. Section II. Inmate Organization Food Event Scheduling, B, 5 Food from a food event shall not be delivered to any inmate not attending the banquet; i.e. inmates on segregation or RDU intake status. To my knowledge there have been no residents in restricted housing allowed to order food outside of Canteen or Aramark Fresh Favorites.

Attachment A, IMPP 04-103D
Effective 08-24-21

# Kansas Department of Corrections
## Account Withdrawal Request
(Complete One Request per Form)
**Attach letter and addressed/stamped envelope when required**

| DeRon McCoy Jr | 70004 | EDCF | A2-2x | 9/12/22 |
|---|---|---|---|---|
| Printed Name | Number | Facility | Unit/Cell Location | Date |

Please pay the following and charge to my account:
### Outgoing Funds/Donations

Payable To: _____
Name

$ _____
Check Amount

_____
Address

_____
City, State, Zip

_____
Purpose/Inmate Benefit Fund Group

Title of Publication*
Frequency – (Circle One)
Yearly Monthly Weekly Daily Other

Number of Issues _____

Expiration Date _____

Publication Price _____
*Book, Magazine or News Paper
(Per IMPP 11-101)

I request the use of Forced Savings as provided in IMPP 04-103, for:
(Documentation Required)

☐ Community Identification
☐ Civil Filing, Transcript or Subpoena Fees
☐ Reentry into the Community (Warden's Approval Required)

| (To Be Completed by Mailroom) | **Postage** – (To Be Completed by Inmate) |
|---|---|
| $ 0.81 | ☒ Postage |
| Postage Amount | To: Jeff Zmudo (S.O.(Knot) |
| | Name |
| √Ð 9-1Ð | ☒ Legal/Official Postage |
| Verified By | (Per K.A.R. 44-12-601) |
| | 714 SW Tucuba Suite 300 |
| | Address |
| | ☐ Certified |
| | (Only if Funds are Available) |
| | Topeka, KS 66603 |
| | City, State, Zip |
| | (Official Mail) |
| | Reason |

| DeRon McCoy Jr  9/12/22 | CU McCoy  9/14/22 |
|---|---|
| Resident Signature   Date | Unit Team Approval   Date |

| _____ | _____ |
|---|---|
| Handicraft Approval (If Applicable)   Date | Religious Approval (If Applicable)   Date |

|  |  |
|---|---|
| | ☐ Applies to Outgoing Funds Limit |
| | ☐ Does Not Apply to Outgoing Funds Limit |
| Exception Approval   Date | ☐ Use of Forced Savings Approval as requested above |

This withdrawal request is being returned for the following reason(s):

| ____ Insufficient Funds | ____ Payee Missing |
|---|---|
| ____ Signature Missing | ____ Insufficient Address |
| ____ Exceeds Spending Limit | ____ Amount Missing |
| ____ Incentive Level | ____ Name/Number – Do Not Match |
| ____ Envelope/Order/Stamp Missing | ____ Illegible Information |
| ____ Unauthorized Per IMPP/KAR _____ | ____ Other _____ |

| CW | 9/22/22 | 272188 |
|---|---|---|
| Account Processor | Date Withdrawn | Acct. Use |

Affidavit A
Plaintiff DeRon McCoy,Jr#76894
Dated 1/4/21

County of Butler )
                  )ss
State of Kansas  )

Affidavit of Truth
DeRon McCoy, Jr

I DeRon McCoy, Jr being of lawful age
and being duly sworn upon oath
state the following facts:

1. I am currently housed at Eldorado
correctional facility and have been
since my transfer on 6-14-19.

2. I have been on the certified religious
diet (CRD) since 4/11/2019

3. I have ascertained the following
facts from my own observations
concerning the securities and storage
of the (CRD).

4. upon entering the dinning hall
I proceeded through the meal line
untill reaching the serving line win
which a 2ft wide by 1ft tull open
in the kitchen wall.

(1)

5. Upon reaching the Serving Line window I show my inmate I.D which shows which meal I am on.

6. A inmate Aramark worker then proceeds to take a (CRD) tray from a warmer Built into the wall directly behind the Serving Line and then slides it through the Serving Line window to me.

7. The (CRD) trays are reddish-brown in color, plastic and reusable. The completed (CRD) meal trays are wrapped in Saran-wrap.

8. The same reddish-brown trays are also used for service of veg meals, Gluten-free and Renal diet meals.

9. After completing my meal I then proceed to the dirty tray window which is a approx 8ft wide by 2ft tall

(2)

Affidavit B
plaintiff DeRon McCoy,Jr#76894
Dated 1-5-21

County of Butler )
)ss.
State of Kansas )

Affidavit of truth
Deron McCoy Jr

I Deron McCoy, Jr being of lawful age and being duly sworn upon oath State the following:

1. I am currently housed at E.D.C.F in eldorado correctional facility.

2. I am currently being housed in B-cellhouse restrictive housing on Pending Investigation status and have been such status since December 16, 2020.

3. while housed in RCH I have been able to ascertain the following facts concerning the service of the certified religious diet (CRD) to offenders housed in Restrictive housing.

4. All meal trays arrive in a Large Metal electric warmer.

5. The regular meal trays are reddish-brown in color, are stackable, and plastic Reusable.

6. The veg. and medical trays are Reusable, stackable, and grey in color.

(1)

7. The CRD trays are plastic reusable trays same as G.P.
They are also wrapped in Saran-Wrap

8. The meal components served for CRD contain no meat product and are all vegan as described by CRD menu

9. There is No seperation of the trays while in the electric warmer

10. A security staff members places the required number of trays to serve each tier onto a rollable gray cart and then hands the trays out via a door hatch.

11. When offenders are finished eating there meals security staff pick the dirty trays up in the same manner.
they are

12. There is No seperation of the meal trays for CRD from other meal trays.

Further Affiant saith naught.

Date: 1-5-21

Deron McCray Jr
Deron McCray Jr

_Signature_
Notary Public

NOTARY PUBLIC - State of Kansas
MICHAEL W. ADDINGTON
My Appt Expires 10/23/21

(2)

Affidavit of Daniel
Wahquahboshkuk#87097

<u>affidavit</u>

state of Kansas    )
                   )
county of Reno     )

   I <u>DANIEL WAHQUAHBOSHKUK</u>, #<u>0087097</u> being of lawful age and being duly sworn upon oath, state the following:

1. I am currently incarcerated at Hutchinson correctional facility. (H.C.F)

2. I have previously held the position of common fare (CRD) cook at (H.C.F) from <u>01-15-2017</u> to <u>04-15-2017</u>.

3. I was responsible for serving lunch and preparing and serving Dinner. 10 to 6 shift.

4. The following is how the common fare (CRD) is prepared at (H.C.F).

5. When I would arrive at work the inmate who worked in the storage room would already have the food components to be used for the preparation of Dinner already sitting in the (CRD) room.

6. Depending on the (CRD) menu I would be supplied with flavored soy meat (chicken, turkey, or Beef)

(1)

in its own factory sealed package.

7. The factory sealed package bares no Kosher symbols or marking.

8. In a seperate factory sealed package with no Kosher symbols or Markings would be the flavorings for the soy meat (beef stroganoff, Itilan chicken, creamy chicken, etc... in accordance with (CRD) menu).

9. In a large plastic bag would be the first side item either noodles or Rice these items are portioned out from a larger bag kept in dry storage and are ~~prepared~~ packaged, portioned out by a inmate working in dry storage.

10. The same procedure is used for the side items mixed vegetables and carrots. with a inmate in storage/prep packaging the side items in a large plastic sack from a larger box in the freezer.

11. The Garden salad is the same salad used for regular meals and has no Kosher symbols or Markings on its clear plastic factory sealed package

12. The bread is sliced white bread in a clear plastic bag and niether the loaf or cardboard box that the sliced white bread comes in has any Kosher symbols or Markings.

(2)

13. The flour tortillas also come in clear factory sealed packages and have no kosher symbols or markings on them.

14. I have not personally witnessed any kosher symbols or markings on any of the food items beside the margarine, jelly and sweetner and the peanut butter used for common fare sack lunches.

15. After I check the food items to be used for LCRD) dinner to make sure all items match up with the menu, I would then proceed to the serving line to serve LCRD) lunch to general population.

16. The lunch items would already be prepared by the 2-10 A.m LCRD) cook and would be in metal serving pans ready to be served.

17. I would take one serving pan each of the meal components to be served for lunch LCRD) from the hot storage and/or cold storage and take them to the serving line to be served to general population.

18. The LCRD) is served from the same areas and serving window as all other meals.

(3)

19. The same Metal serving pans used for preparation and service of regular and veg meals are the same Metal serving pans used for LCRD) Meals

20. The same utensils used for preparation and service of regular and veg meals are the same utensils used for prep and service of LCRD) Meals. (except for one whisk).

21. After service of (CRD) Meals is complete I would then cover and date any leftovers (in accordance with my training and as I was directed by the Aramark supervisors) and then place those leftovers in the cold storage with all other meals leftovers for service on another day I then would proceed to the LCRD) room to start prep of (CRD) Dinner.

22. I would then get all the items to be used for preparation of Dinner and in accordance with my training take these items from the LCRD) room out into the steam kettle area so that I could cook them.

23. There is a steam kettle designated for (CRD), but it is directly Next to the other steam kettle(s) used for preparation of regular meals.

24. I would basically put the contents from the two factory sealed meal components for the main entree in warm water

and whisk them together while cooking until cooking time was complete.

25. The same proceedure was used for Noodles/rice and/or vegetables.

26. Once the meal components were done cooking I would then laddle the completed meal items out of the steam kettle and into individual metal serving pans and then place the serving pans into the large food warmer to await service.

27. If salad was to be served I would pour the salad out of its package into a metal serving pan and then pour italian dressing over the salad and toss it until salad greens were evenly coated. I would then cover pans and place them in cold storage to await service.

28. After all (CRD) meal components were completed I then would begin to prepare the trays to be served to the inmates in restrictive housing (segregation).

29. I would place the required amount of food in accordance with the (CRD) menu onto each section of the gray trays and then stack the trays on top of one another.

(5)

30. The same gray trays used for (CRD) are also used for veg meals at HCCF.

31. The completed trays are then placed on a metal cart along with the other trays (Reg & veg) for inmates in restrictive housing.

32. After I completed restrictive housings trays for (CRD) and after count cleared I would then proceed back to the serving line to serve (CRD) Dinner to general population.

33. The same procedure for service of lunch (CRD) is the same procedure for service of Dinner (CRD) for general population. even the procedure for any (CRD) leftovers.

34. The utensils, serving pans and pots are washed in the same area as the utensils, serving pans and pots, as they all are used for prep and service for all meals

35. The gray trays are washed in the same Dish washer as all the other trays used for service of every meal.

36. The foregoing description of preparation and service of (CRD) is how I was trained by Aramark to prepare and serve the (CRD) at

(6)

(H.C.F) and is also how I have seen the other (CRD) cooks be trained to prepare and serve the (CRD) meal and its meal components.

Further affiant saith not.

_Daniel W._  7-12-17
Signature

Subscribed and sworn to before me on this 12ᵀᴴ day of 2017

~~June~~
Jula

JORDAN C. BELL
Notary Public - State of Kansas
My Appt. Expires 5/23/2021

_____ 
Notary public

(7)

Affidavit of inmate Moses#56669

State of Kansas   )
                  ) :ss
County of Butler  )

Affidavit of Inmate

MOSES_____ # 57669

I ___MOSES___ being duly sworn upon oath and being of lawful age state the following:

1. I have held the position of CRD cook at E.D.C.F. From 12/18 to 6/2020.
2. I am fully aware of the CRD menu as well as preparation, storage, and secure process of the CRD at E.D.C.F.
3. There is No separate room designated as a (CRD) room at E.D.C.F. kitchen there is only a small table and rollable cart in a area by the pots and pans area.
4. After my arrival at work I had to have a Aramark supervisor let me in the dry storage area, freezer, etc..... to get the necessary items to cook the CRD with in accordance with the CRD menu for the respective date of the menu.
5. I prepared the parts of the CRD that I could in the CRD area by the pots and pans area.
6. It was common practice to use the same pots and pans for preparation and service of the CRD. The only time that there was deviation of the practice was right before the inspection by the Attorney General's Office. At which time pots and pans were separated and marked with a K. for kosher, one month later things went back to the common practice, where the same pots and pans are used for preparation and service of the regular meals and CRD meals, which I grabbed from general pots and pans area. There generally is no separation of pots and pans. The same are generally used for all diet.
7. In order to cook the CRD I had to obtain meal components (portioned from a bulk box) and then empty contents into serving pan that are situated in a steam well table, then obtain boiling water from the large steam kettle, which is used for all meals.
8. After all CRD meal components are finished cooking, I then made each CRD meal tray, the completed CRD trays are then placed in a warmer behind the serving line to await service also in this same warmer is medical diets meal trays and other meal components.
9. The reusable plastic CRD trays are reddish brown in color and are washed in the same dish washing machine as all other reusable meal trays (veg., medical., etc...). All meal trays are stored in the same area.

Further Affiant saith naught.

/s/ _Steve Moses_____

Subscribed and sworn before me on this 6th day of _July_____, 2020

NOTARY PUBLIC - State of Kansas
RICHARD D. HOOVER
My Appt Expires 7/16/2022

/s/ _Richard D. Hoover_____
Notary Public

Affidavit of Joe Hill#90373

State of Kansas )
            ) :ss
County of Butler )

### Affidavit of Inmate

_for Pein_   # 93373

I _Joe Hill_ being duly sworn upon oath and being of lawful age state the following:

1. I have held the position of CRD cook at E.D.C.F. From _9/11/20_ to _Current_.
2. I am fully aware of the CRD menu as well as preparation, storage, and secure process of the CRD at E.D.C.F.
3. There is No separate room designated as a (CRD) room at E.D.C.F. kitchen there is only a small table and rollable cart in a area by the pots and pans area.
4. After my arrival at work I had to have a Aramark supervisor let me in the dry storage area, freezer, etc..... to get the necessary items to cook the CRD with in accordance with the CRD menu for the respective date of the menu.
5. I prepared the parts of the CRD that I could in the CRD area by the pots and pans area.
6. In order to cook the CRD I had to obtain meal components (portioned from a bulk box) and then empty contents into serving pan that are situated in a steam well table, then obtain boiling water from the large steam kettle, which is used for all meals.
7. After all CRD meal components are finished cooking, I then made each CRD meal tray, the completed CRD trays are then placed in a warmer behind the serving line to await service also in this same warmer is medical diets meal trays and other meal components.
8. The reusable plastic CRD trays are reddish brown in color and are washed in the same dish washing machine as all other reusable meal trays (veg., medical., etc...). All meal trays are stored in the same area.

Further Affiant saith naught.

/s/ _Joe Pein_

Subscribed and sworn before me on this _1st_ day of _July_ , 2020

/s/ _Richard D Hoover_
Notary Public

NOTARY PUBLIC - State of Kansas
RICHARD D. HOOVER
My Appt Expires _9/16/2022_

Affidavit of Tyrone Hamilton Jr H
Dates 1/4/21

County of Butler )
                  )
State of Kansas   )

Affidavit of Truth
Tyrone Hamilton Jr.

I Tyrone Hamilton Jr. being of lawful age and being duly sworn upon oath state the following facts.

I work as a inmate Aramark from 6/19 to appcox 3/20

While working as a inmate Aramark worker I regularly work the front serving line window

When General population inmates reached the serving line window they state there diet and show I D if not regular diets.

I then would hand the inmate their corresponding meal tray from the warmer directly behind serving line if Renal, CRD, or Gluten free there is no seperation of trays.

The same reddish-brown plastic reusable meal trays are used for service of Renal, Gluten-free and CCRD

Further Affiant Saith Naught

Date 1-4-21

Notary public

NOTARY PUBLIC - State of Kansas
MICHAEL W. ADDINGTON
My Appt Expires 10/23/21

Exhibit A



El Dorado Correctional Facility
1737 SE Hwy 54
P.O. Box 311
El Dorado, KS. 67042

# Kansas
### Department of Corrections

Phone: (316) 321-7284
Fax: (316) 322-2018
www.doc.ks.gov/facilities/edcf

Jeff Zmuda, Acting Secretary
Sam, Cline, Warden

Laura Kelly, Governor

**To:**   **MCCOY,DERON,JR**                     **Date:**   **2/11/2021**

**KDOC #**   **76894**                     **Cell:**   **B2-141**

**From:**   **The EDCF Chaplaincy Department**

The Chaplain's Department has received and reviewed your request for placement on the Certified Religious Diet (CRD) list. Your request has been approved.

As of this date you have been placed on the **Certified Religious Diet list.**

**Note:** You will continue to receive the Regular diet in the main dining room until your offender identification badge has been remarked accordingly by the A&D unit. It is up to you to work with your cell house and Unit Team staff to schedule a time to recive an updated ID.

You must submit a Form 9 when you wish to be removed from this religious diet.

Per IMPP 10-119, offenders who choose to withdraw, switch religious diets, or are removed from a religious diet wait ninety (90) days before requesting readmission to a religious diet. Additionally, the third time an offender withdraws from a religious diet the waiting period will be six months, and the fourth or subsequent request for removal, the waiting period will be one year.

*Chaplains Office*

Exhibit 34:
A very abridged guide to kosher dietary laws
overview from The Aleph Institute.

# A Very Abridged Guide to Kosher Dietary Laws (an introductory overview only)

"Kosher" means far more than just "non-pork." Throughout history, observant Jews have practically starved themselves rather than consume any food or drink that was not "kosher" (the word means "proper" or "fit"). A Jew's obligation to consume only kosher food is a Biblically-mandated precept as elaborated by principles set forth by Rabbis and Sages thousands of years ago, and spelled out today. Observant Jews believe that the slightest morsel of forbidden food tanks not only the body, but the soul itself. Accordingly, the availability of nutritionally-sufficient kosher food for a Jew is not a luxury accommodation; it is an essential provision to allow that person to live.

All food and their components are divided into four categories:

**(1) MEAT; (2) DAIRY; (3) PARVE (NEUTRAL); AND (4) NON-KOSHER (INCLUDING MIXTURES OF MEAT & DAIRY, AND MIXTURES OF MEAT & FISH).**

## MEAT

Only certain Biblically-defined animals are kosher: ruminants with split hooves (generally cows and sheep), and poultry; only certain portions of those animals may be consumed. Animals must be slaughtered in a religiously-mandated humane way by skilled and learned Jews. Meats must be washed and salted in a religiously-mandated way observed by a rabbi or other skilled and learned people under his direction.

## DAIRY

Dairy products must be derived from kosher animals. Accordingly, milk products from a pig, camel, or other non-kosher animals are not kosher. Many observant Jews will not consume milk and dairy products unless they have a high level of rabbinical supervision during processing ("Cholov Yisroel").

## PARVE

Everything kosher that does not fall under the categories of meat or dairy are called "parve" ("neutral"). Included are eggs, kosher fish and plants (fruits and vegetables). Only fish with scales and fins are kosher. Accordingly, no shellfish are kosher. Parve products may be eaten with either meat or dairy products (although fish may not be mixed with meat in a single dish).

## "NON-KOSHER" FOODS

INTRINSICALLY NON-KOSHER: all non-ruminant animals and those that do not have split hooves; most birds except poultry; all animals that have not been slaughtered, soaked, salted and inspected according to Jewish law; all insects and rodents; all grape juice products (unless supervised by a Rabbi); all fish and meat mixtures; and any mixtures of meat and dairy at mixtures of meat and fish.

NON-KOSHER AS A RESULT OF PROCESSING (spray-dried products; reacted flavors; production of fatty acids; some canned foods; food prepared with equipment previously used for non-kosher products. Meat and dairy products may not be cooked or eaten together, nor may a Jew derive any benefit from such mixed foods.

## INGREDIENTS

The overwhelming majority of basic ingredients may or may not be kosher depending on their origin or processing history. Accordingly, they require Rabbinical supervision to insure that their origin is from a kosher source, that they were processed with proper equipment and whether they are meat, dairy or parve.

Even a very small amount of meat or dairy (or their derivatives) in a product renders that product "meat" or "dairy." Care must always be taken that kosher foods are prepared and served with approvable utensils (e.g., utensils that have not (1a) been used or washed together with non-kosher foods; and (2) are not kosher meat and dairy products).

Polargenic acids; fatty alcohols, aldehydes and ketones; lactones; phosphates, sorbitaes and all emulsifiers; amino acids and hydrolyzed proteins; glycerol and esters; enzymes; enzyme-modified dairy; natural and artificial flavors (using from enzyme extract); vitamins.

Products that have or may have a grape juice origin: juices; wine; enocianina; natural cognac oil; fused oil; amyl alcohol and esters; natural valeric acid; ethyl

alcohol; naturally natural) esters; natural acetaldehyde; vinegar. Products that are dairy or may have a dairy origin and will cause a product to be "dairy": milk solids; lactose, casein and derivatives; cream and derivatives; starter distillates; whey and chemicals produced from it; fatty acids from butter or cheese; butyric, caproic, propionic and myristic acids.

## THE SABBATH, HOLIDAYS AND FAST DAYS

Sabbath and holiday meals should include wine (or grape juice), two loaves of bread (for rolls or whole matzos), fish and meat. Observant Jews may not eat foods that are cooked on the Sabbath, or even kindled by Jews on the Sabbath. Accordingly, work schedules may need to be rearranged to insure that no Jewish inmates (or staff) actually reheat any of the pre-cooked foods (e.g., instant grits, hot cereal, beef or chicken entrees) on the Sabbath. Week precept allows for Biblically-mandated festivals are generally the same as for the Sabbath, except for some latitude governing the use of fire and the preparation of food. The specific prohibitions of festivals and their differences from the Sabbath laws are subject to complex and complicated rabbinical literature. Observant Jews should be aware that Jewish inmates must participate in several fasts each year, the most important of which is Yom Kippur, during which no food or drink may be consumed. In addition to a full-day fast, when an observant Jew will be called upon to not eat or drink until one hour after nightfall, there are several other fasts. The specifics of when the fast should be made, and whether the fast begins at dawn or the night before, is scheduled before then, those inmates should be given the opportunity to eat at a later, more religiously appropriate, time.

Many common products and national brands are labeled with symbols signifying that they have been prepared under rabbinical supervision and comply with kosher dietary laws.

---

## PASSOVER FOODS

In addition to all of the above, the following products and their derivatives may not be used during the Jewish eight-day holiday of Passover: wheat, rye, barley, oats, spelt, corn; legumes (soy, peanut, etc.); rice, mustard; alcohol, beer; derivatives thereof. Many products, even non-kosher products, certified (Sephardic Jews do eat food or drink that was not "kosher" (the word means "proper" or "fit"). As a general rule, Passover products may not be cooked or served in utensils that were previously used with some of these items). As a general rule, Passover certification must be manufactured under Rabbinical supervision. Matzo available year-round is generally kosher and is not kosher for Passover.

## KOSHER FOOD IN INSTITUTIONAL ENVIRONMENTS

Kosher food can be made available to Jewish inmates by: (1) preparing it on site with proper kitchen facilities under the direction of a qualified kosher food supervisor; (2) obtaining pre-packaged meals from Kosher food vendors around the country (e.g., airline dinners or shelf-stable packaging) and products with appropriate kosher certification symbols; and/or (3) obtaining fresh products through retail outlets and kosher food purveyors. The size of disposable plastic or paper goods is an easy, cost-effective and religiously-acceptable alternative when providing Kosher food in an institutional environment.

## Kosher Certification of Commercially-Available Products

All food and their components are divided into four categories:

(1) Meat (which may not be prepared with the same utensils, or consumed with, dairy products);
(2) Dairy (which may not be prepared with the same utensils, or consumed with, meat products);
(3) Parve (neutral products, which may be prepared or consumed with either meat or dairy products); and
(4) Non-Kosher (which includes non-kosher foods, mixtures of meat and dairy, and mixtures of meat and fish).

Observant Jews will eat most food products only when they know that highly-competent skilled and learned Jews have supervised the entire process; the source, preparation and service of the product. Ingredients listed on food packaging is not a reliable indicator as to whether the product is kosher. Many ingredients do not list their components (e.g., "gelatin" does not indicate whether it was derived from animal products or vegetable matter; "flavorings" does not indicate source) and ingredients used in minute amounts are not necessarily listed. Many thousands of common commercially-available products and national brands are labeled with trademarked symbols signifying that they have been prepared under rabbinical supervision and comply with kosher dietary requirements.

The letter "K" alone printed on a product provides no meaningful assurance. A generic letter that may be placed on most anything, and does not signify that there was responsible supervision by a reliable kosher-certifying organization has provided any oversight at all.

Six of the most-commonly accepted national kosher certification symbols are:



| | |
|---|---|
| The Union of Orthodox Jewish Congregations (The "O-U") | "KOF-K" Kosher Supervision |
| 11 Broadway | 201 The Plaza |
| New York, NY 10004 | Teaneck, NJ 07666 |
| Tel.: (212) 563-4000 | Tel.: (201) 837-0500 |
| Fax: (212) 564-9058 | Fax: (201) 837-0126 |
| Publication: The "OU" Kashrus Directory | Publication: The Kosher Outlook |
| | |
| The Organized Kashrus Laboratories (The "O-K") | Central Rabbinical Congress (The "CRC") |
| 391 Troy Ave. | 85 Division Avenue |
| Brooklyn, NY 11213 | Brooklyn, NY 11211 |
| Tel.: (718) 756-7500 | Tel.: (718) 384-6765 |
| Fax: (718) 756-7503 | Fax: (718) 486-5574 |
| Publication: The Jewish Homemaker | Publication: CRC Kashrus Directory |
| | |
| "Star-K" Kosher Certification | Khal Adath Jeshurun |
| 11 Warren Road | ("Breuer's" or the "KAJ") |
| Baltimore, MD 21208-5234 | 85-93 Bennett Avenue |
| Tel.: (410) 484-4110 | New York, NY 10033 |
| Fax: (410) 653-9294 | Tel.: (212) 923-3582 |
| Publication: Kashrus Kurrents | Fax: (212) 781-4275 |
| | Publication: KAJ Newsletter |

The letter "D" following some of these symbols signifies that the product contains dairy products (and may not be used with meat products). The butter "P" following the symbol generally means that the product is "Parve" (and may be used with either meat or dairy), but the letter "P" alone may also mean that the product is "Kosher for Passover," but not necessarily Parve. Always check with the certifying agency itself if you have any questions.

There are nearly two hundred kosher symbols and corresponding agencies that certify ingredients and packaged foods throughout the United States. Kashrus Magazine, a magazine for kosher consumers, periodically publishes lists and updates of the logos of products and manufacturers preparing kosher food, and other news and information. Subscriptions are $18 per year; $32/2 yrs., and may be obtained from Kashrus Magazine, POB 204, Brooklyn, NY 11204. Tel: (718) 336-8544.

If you have any questions regarding the laws of Kashrus, or are in need of assistance, or would like more information on the laws of Kashruth, please feel free to call us. We can also try to direct you to Kosher food sources and provide information on available Kosher products.

**THE ALEPH INSTITUTE • 9540 Collins Avenue • Surfside, Florida 33154 • (305) 864-5553**

*Adapted from "A Guide to Kosher Dietary Laws," by Dr. J. Levi, Ph.D.*

Exhibit C

# PROCEDURES FOR CERTIFIED RELIGIOUS DIETS (CRD)

PURPOSE:  To establish standard operating procedures for all CRD small wares to insure their integrity.

WHO:  All ARAMARK employees to include foodservice supervisors and managers

1.   The following small wares are designated for CRD use only:
     A.   Orange compartment trays
     B.   Brown tumblers
     C.   Brown sporks
     D.   Rubbermaid totes
     E.   Prep tools that are labeled as CRD tools
     F.   Brown bus containers

2.   All designated CRD small wares will be stored separately from small wares used on the regular meal line.  At no time will they be integrated with the small wares used for the general population.
     A.   All trays, tumblers, sporks, totes will be stored on a separate rack in the CRD prep area.
     B.   All CRD prep tools will be stored in the supervisor's office when not being used.

3.   Cold trays will be made up as needed for each meal and stored in the CRD cooler.  Hot food items will be placed in the separate CRD pass through warmer and kept separate from the general population food.

4.   The bus container is placed in the dish room.  There is an opening in the wall for CRD inmates to put their dirty small wares through and into the CRD bus container.  These containers are solely for the purpose of collecting dirty CRD small wares.  The containers are not to be used for anything else.

5.   All CRD small wares will be washed and sanitized separately in the CRD three compartment sink.  They will be washed in hot water (at least 110F) with a detergent solution and then rinsed in a hot water with sanitizer.  You should not use any of the equipment that is used to wash general population small wares and pots and pans to wash CRD small wares and pots and pans.

6.   After washing, all CRD small wares are to then be rinsed one more time in cold water and then stored in the designated CRD areas, separate from the general population small wares.

7.   The serving line needs to be cleaned and sanitized and have all general population food products cleared before beginning to serve CRD meals.  Only CRD trained personnel should be used to serve CRD meals.  If there is a break in serving CRD meals, the serving line must be resanitized before serving CRD meals again.

8.   It is extremely important that these procedures be strictly followed.  Compromising these procedures could result in inmate grievances and possible lawsuits.  Violations could results in disciplinary actions including termination.

The Certified Religious Diet (CRD) is intended and expected to meet all special religious diet guidelines as established by the KDOC's rabbinical authority. All products are required to be certified Kosher with such certification on the package unless the product itself in inherently Kosher, such as raw fruits and vegetables. Aramark has obtained the approval for the CRD menu from the rabbinical authority, which means that in the opinion of the Rabbi, the menu is Kosher when prepared according to proper CRD procedures.

**Kansas DOC – Certified Religious Meal Procedure**

Breakfast

1. All fresh fruit will be of the same type and size as the regular menu.
2. Dry cereal will be the same type as the regular meal line and served in the CRD tray or a disposable bowl.
3. Muffin/Danish will be prepared at each facility in a kosher pan.
4. Coffee will be the same as the regular meal line.
5. Milk will be the same as the regular meal line.
6. Grits and oatmeal will be prepared at each facility in a kosher pan.
7. Kosher white bread will be served.
8. Regular substitute sugar packets will be served.
9. Same jelly packets will be used as used on the regular meal line.
10. Same unsalted kosher margarine is used on both meal lines.

Lunch & Dinner

1. All raw vegetables will be prepped at each facility separately from raw vegetables used on regular meal line.
2. All beans will be prepared at each facility in a kosher pan.
3. Kosher white bread will be served with each meal.
4. Regular jelly packets will be used
5. Regular unsalted margarine will be used.
6. Peanut butter will be portioned directly onto tray or in a disposable cup for small quantities.
7. Regular packets of mustard and mayonnaise will be served.
8. The vitamin fortified fruit drink is used for CRD.
9. Regular substitute sugar packets will be used.
10. All CRD hot meal items are to be cooked in separate kosher pans.
11. All CRD deli meats are prepackaged and are to be served in the sealed package.

Exhibit D
Shulhan Arukh
( code of Jewish law )
relevant excerpts
concerning Jewish Kosher
Dietary laws as well as
laws for properly observing
High Holy days and fast

# Code of Jewish Law

## KITZUR SHULḤAN ARUKH

A Compilation of Jewish Laws and Customs

By Rabbi Solomon Ganzfried

Translated by Hyman E. Goldin

## Contents

| Chapter | | Page |
|---|---|---|
| 24 | Laws Concerning Errors and Defects in a Sefer Torah | 78 |
| 25 | Rules Concerning Ashre, Uva Letziyon, etc. | 82 |
| 26 | The Mourner's Kaddish | 83 |
| 27 | The Study of the Torah | 87 |
| 28 | The Scroll and Other Holy Books | 89 |
| 29 | Moral Laws | 91 |
| 30 | Talebearing, Slander, Vengeance, and Bearing a Grudge | 97 |
| 31 | All of Man's Intentions Must be for the Sake of Heaven | 100 |
| 32 | Rules Concerning Physical Wellbeing | 101 |
| 33 | Things Forbidden Because They are Dangerous | 108 |
| 34 | Laws Concerning Charity | 110 |
| 35 | The Separation of Hallah (First Portion of the Dough) | 115 |
| 36 | The Salting of Meat | 116 |
| 37 | The Immersion of Vessels | 119 |
| 38 | Laws Concerning Bread, Cooked Food, and Milk of a Non-Jew | 121 |
| 39 | Eating and Drinking Before the Regular Meals | 124 |
| 40 | Washing the Hands Before Meals | 125 |
| 41 | The Breaking of Bread and Hamotzi | 130 |
| 42 | Laws Concerning Meals | 132 |
| 43 | Benedictions Over Special Courses During Meals | 135 |
| 44 | Laws Concerning the Washing of Hands and the Saying of Grace After Meals | 137 |
| 45 | Formal Grace (of Three or More) | 141 |
| 46 | Forbidden Foods | 146 |
| 47 | Non-Jewish Wine and Making the Vessels Fit for Use | 152 |
| | Notes to Volume I | 1 |

## CONTENTS

### VOLUME 2

| Chapter | | Page |
|---|---|---|
| 48 | Benedictions Over the Five Species of Grain | 1 |
| 49 | The Benediction Over Wine and "Hator Vehametiv" | 4 |
| 50 | Benedictions Said Before Enjoying Food and Drink | 6 |
| 51 | The Concluding Benediction | 10 |
| 52 | The Benedictions, "Bore Peri Haetz," "Bore Peri Haadamah," and "Shehakol" | 13 |
| 53 | Benedictions Over Soup, Fruit and Vegetable Extracts | 17 |
| 54 | Principal and Accessory Foods | 18 |
| 55 | Order of Precedence Relating to Benedictions | 20 |
| 56 | Benedictions Pronounced Erroneously | 21 |
| 57 | Benediction Over Food Served more than Originally Intended | 22 |
| 58 | Benediction Over Fragrance | 24 |
| 59 | Benedictions Over Joy and Grief | 26 |
| 60 | Benedictions Over Sights in Nature | 30 |
| 61 | The Benediction "Hagomel" | 33 |
| 62 | Concerning Commerce | 36 |
| 63 | Wronging by Means of Words | 39 |
| 64 | Dealing in Forbidden Objects | 40 |
| 65 | Interest on Loans | 41 |
| 66 | Agreements to Trade in Business | 48 |
| 67 | Vows and Oaths | 51 |
| 68 | Prayers When Traveling | 54 |
| 69 | The Minhah (Afternoon) Service | 57 |
| 70 | The Maariv (Evening) Service | 59 |

## CONTENTS

| CHAPTER | | PAGE |
|---|---|---|
| 71 | The Order of the Night | 60 |
| 72 | The Holiness of The Sabbath | 63 |
| 73 | Work Done by a Non-Jew on The Sabbath | 68 |
| 74 | Embarking on a Vessel on The Sabbath | 70 |
| 75 | The Sabbath Candles | 71 |
| 76 | Prayers on Sabbath and Festivals | 75 |
| 77 | The Kiddush and The Sabbath Meals | 79 |
| 78 | The Torah Reading on The Sabbath and Festivals | 84 |
| 79 | Laws Concerning Maftir | 87 |
| 80 | Some Labors Forbidden on The Sabbath | 89 |
| 81 | The Four Premises With Regard to Sabbath Laws | 104 |
| 82 | The Prohibition Against Removing Thing from One Domain Into Another | 105 |
| 83 | The Enclosure of Spaces | 108 |
| 84 | Carrying Garments or Ornaments on The Sabbath | 110 |
| 85 | If a Fire Breaks Out on The Sabbath | 113 |
| 86 | Bathing on The Sabbath | 114 |
| 87 | The Resting of Cattle on The Sabbath | 116 |
| 88 | *Muktzah*, Things Forbidden to Be Handled on The Sabbath | 120 |
| 89 | Concerning a Base for Things Forbidden | 124 |
| 90 | Doing Things That Are Not Actual-Work by a Non-Jew | 125 |
| 91 | One in Pain, and One Not Critically Ill | 130 |
| 92 | One Who Is Critically Ill—Forced to Transgress a Precept | 133 |
| 93 | Concerning Childbirth | 135 |
| 94 | Inter-Community of Courts | 136 |
| 95 | Inter-Community of Boundaries | 141 |
| 96 | The Maariv Service and the Havdalah | 145 |
| 97 | Laws Concerning Rosh Hodesh (New Moon) | 148 |
| | Notes to Volume II | XIII |

## CONTENTS

### Volume 3

| CHAPTER | | PAGE |
|---|---|---|
| 98 | Laws Concerning Festivals | 1 |
| 99 | Things Forbidden to Be Handled on Festivals | 7 |
| 100 | The Benediction of the Priests (Birkat Kohanim) | 8 |
| 101 | The Preparation of Foods on the First Day of a Festival for the Second Day | 13 |
| 102 | "Eruv Tavshilin" (Combination of Dishes) | 14 |
| 103 | Rejoicing on a Festival | 16 |
| 104 | Hol Hammoed (Intermediate Days of a Festival) | 19 |
| 105 | Things Forbidden, Because They Require Exertion | 21 |
| 106 | Buying and Selling During Hol Hammoed | 22 |
| 107 | The Month of Nisan | 23 |
| 108 | The Wheat and Flour for the Matzah | 23 |
| 109 | The Water Used for Kneading Matzah | 24 |
| 110 | The Kneading and Baking of Matzah | 26 |
| 111 | The Search for Leaven | 28 |
| 112 | Leaven Which May and Which May Not Be Retained on Pesah | 31 |
| 113 | The Day Before Pesah and the Baking of Matzot | 32 |
| 114 | The Selling of Hametz | 34 |
| 115 | If the Day Before Pesah Occurs On a Sabbath | 39 |
| 116 | The Ceremonial Purification of Vessels | 40 |
| 117 | Various Laws Concerning Pesah | 43 |
| 118 | The Seder (Program) For Pesah Nights | 43 |
| 119 | Pesah Night—Continued | 45 |
| 120 | Sefirah (Counting of the Omer) | 52 |

# CONTENTS

| CHAPTER | | PAGE |
|---|---|---|
| 121 | Public Fast Days | 54 |
| 122 | The Interval Between the Seventeenth of Tammuz and the Ninth of Av | 56 |
| 123 | The Day Preceding the Ninth of Av | 60 |
| 124 | The Ninth of Av | 60 |
| 125 | When the Ninth of Av Occurs on Saturday or Sunday | 65 |
| 126 | Commemorating the Destruction of the Temple | 66 |
| 127 | Private Fast Days | 67 |
| 128 | The Month of Elul | 70 |
| 129 | Rosh Hashanah | 74 |
| 130 | The Ten Days of Penitence | 80 |
| 131 | The Day Before Yom Kippur | 81 |
| 132 | Yom Kippur Eve | 86 |
| 133 | Yom Kippur | 87 |
| 134 | The Sukkah (Tabernacle) | 93 |
| 135 | Dwelling in the Sukkah | 96 |
| 136 | The Lulav and the Other Species | 101 |
| 137 | The Taking of the Lulav and the Hakkafot (Procession) | 103 |
| 138 | Hoshana Rabbah; Shemini Atzeret; Simhat Torah | 106 |
| 139 | Hanukkah | 108 |
| 140 | The Four Parshiyot | 114 |
| 141 | The Reading of the Megillah | 115 |
| 142 | The Sending of Portions—Gifts to the Needy—Purim Seudah (Feast) | 119 |
| | Notes to Volume III | XVIII |

# CONTENTS

## VOLUME 4

| CHAPTER | | PAGE |
|---|---|---|
| 143 | Honoring Father and Mother | 1 |
| 144 | Honor Due the Teacher, Scholar, Aged and Priest | 4 |
| 145 | Laws Concerning Marriage | 6 |
| 146 | The Fast of the Bridegroom and Bride | 9 |
| 147 | The Nuptial Ceremony | 10 |
| 148 | The Privacy Following the Nuptial Ceremony | 11 |
| 149 | Grace at Weddings and Entertaining the Groom and the Bride | 11 |
| 150 | Laws of Chastity | 13 |
| 151 | The Sin of Discharging Semen in Vain | 17 |
| 152 | Prohibition Against Being Alone With Women | 19 |
| 153 | A Woman who is Menstrually Unclean | 21 |
| 154 | Regulations Concerning the Menses | 24 |
| 155 | Separation Before Menstrual Term | 26 |
| 156 | Perception of Blood as the Result of Cohabitation | 30 |
| 157 | Prenuptial Laws | 31 |
| 158 | Childbirth and Miscarriage | 32 |
| 159 | Putting On White Linen and Counting the Clean Days | 33 |
| 160 | How to Shampoo the Hair | 35 |
| 161 | What Constitutes Interposition | 36 |
| 162 | Immersion | 40 |
| 163 | The Law of Circumcision | 43 |
| 164 | The Redemption of the Firstborn | 45 |
| 165 | The Training of Children | 47 |
| 166 | Enchantment and Superstition | 49 |
| 167 | Laws Concerning Idolatry | 51 |

commanded us concerning the immersion of *a vessel*," (or "*vessels*" if more than one are immersed)).

2. Since the vessels must be immersed in a stream valid for the ritual immersion of women, therefore, care should be taken not to immerse in streams at the time they are swelled by excessive rain or by the thaw. It occurs very frequently that people do immerse vessels in streams before the Passover when the rivers swell up; this is an improper practice. (See chapter 162:12-13.)

3. Wooden vessels need not be immersed, but if they have metal hoops, they are to be immersed without pronouncing the benediction. Clay vessels need not be immersed, but if they are glazed on the inside, they are to be immersed without pronouncing the benediction; the same law applies to porcelain vessels.

4. An old vessel which has been used by a non-Jew and it is necessary to put it in boiling water or made red hot, must be done before it is immersed.

5. Vessels hired or borrowed from a non-Jew need not be immersed; but vessels hired or borrowed from Jewish dealers should be immersed without pronouncing the benediction. The dealer must make the fact of the immersion known to the one who subsequently buys the vessels, so that the latter might not immerse them again and pronounce the benediction in vain.

6. Glassware manufactured by an Israelite who employs non-Jewish workmen, should be immersed without pronouncing the benediction.

7. If an Israelite has given silver or any other kind of metal to a non-Jewish artisan to make a vessel out of it, or he has given to repair a leaky vessel not large enough to hold a fourth of a *log* (a quantity equal to the capacity of one and one-half egg shells), such vessels should be immersed without the benediction.

8. Only vessels used to hold food ready to be eaten without any further preparation need be immersed. The iron tools with which the *matzos* are prepared, and with which the dough is cut, and the needle with which stuffed birds or parts of animals are sewn, need not be immersed. A slaughtering knife, or a knife with which animals are skinned, since it may be used to cut with it food fit to eat without any further preparation, also trays upon which *matzot* are placed, should be immersed but without pronouncing the benediction. A tripod upon which cooking utensils are placed, because it

is not touched by the food, need not be immersed. A metal spit used for roasting meat, must be immersed and the benediction pronounced. Some authorities hold that large glass bottles in which liquids are kept to be poured out into drinking glasses, are not classed as table utensils, and need not be immersed; while other authorities hold that they should be immersed; they should, therefore, be immersed without the benediction.

9. Pepper grinders should be immersed, because they have some metal parts, but their lower parts which receive the ground pepper need not be immersed since they are made of wood. Coffee grinders should be immersed without the benediction.

10. Before immersing the vessel, it must be thoroughly cleansed, so that neither rust nor dirt be found on it. (A small particle of rust or a black spot, usually found on such vessels, and regarding which people are not fastidious, may be disregarded). The whole vessel must be submerged at one time, so that the whole of it should be in the water. A vessel with a handle, must be submerged with the handle and all at one time. If the vessel is held in the hand during the immersion, the hand should first be dipped into the water; and the vessel be held not tightly, but with an ordinary grip. If the vessel is immersed by means of a cord, as when it is in a well, the cord should be knotted loosely, so that the water may reach every part of the vessel.

11. If we immerse vessels with narrow openings, we must keep them in the water until the water fills them entirely.

12. A minor, whether male or female, may not be entrusted with the ritual of immersing vessels.

13. It is forbidden to immerse vessels either on the Sabbath or on a festival. If we neglect to immerse a vessel before those days, we should give it as a gift to a non-Jew, and then borrow it from him. If it is a vessel fit to carry water in it, and we live in a community where it is permissible to carry things on the Sabbath, we should draw water with it and bring the water into the house, so that it may not appear as if we have immersed it, but we should not say the benediction.

## CHAPTER 38

*Laws Concerning Bread, Cooked Food, and Milk of a Non-Jew*

1. The sages have forbidden us to eat the bread of a non-Jew. In some localities, they do buy bread of a non-Jewish baker, either when there is no Jewish baker in that locality, or when there is one, but his bread is inferior to

that of the non-Jewish baker. However, they are more strict regarding the bread of a non-Jewish private person, and they permit the use of such bread only in cases of emergency. When we are on the road, we should wait for *kosher* bread, if it can be obtained within the distance of a mile. Only bread baked especially for the family, is called *private bread*, but if it is made for the purpose of being sold, it is called a *baker's bread*, even though ordinarily he does not bake for the trade; if a baker bakes bread for his own family, it is called *private bread*. One authority holds that in a locality where no baker can be found, it is even permissible to partake of the bread of a non-Jewish private person, and one need not wait for *kosher* bread; and this opinion is generally followed.

2. If a Jew has thrown even one piece of wood into a non-Jewish oven at the time it was heated, the bread baked in that oven is no longer considered as the bread of a non-Jew.

3. The bread of a non-Jew is forbidden only when it is made of one of the five species of grain: wheat, barley, spelt, rye and oats, but bread made of pulse, like beans, peas, etc., is not considered bread; neither can it be forbidden as food cooked by a non-Jew, since such food is not to be served on "the table of a king."

4. Non-Jewish bread smeared over with eggs is forbidden on account of the eggs, for it is then considered as the cooking of a non-Jew. Those cakes which are baked on iron pans are forbidden in any event, because there is a possibility that the iron has been smeared with some kind of forbidden fat, and that the pan has absorbed some of the fat.

5. Jewish bread baked by a non-Jew is much worse than the bread of a non-Jew, and it is forbidden as food cooked by a non-Jew, unless the owner of the bread has prepared the oven by throwing a piece of wood in it. When we send something to be baked or roasted in an oven of a non-Jewish baker, we must be careful to have a Jew throw a piece of wood into the oven, or that a Jew put the bread or the pan into the oven.

6. An article of food that is not eaten raw and is also fit to be served at the table of a king, either as a relish eaten with bread or as a dessert, if cooked or roasted by a non-Jew, even in the vessels and in the house of a Jew, is forbidden, inasmuch as it was cooked by a non-Jew. However, an article of food that is eaten when raw, or if it is not a delicacy fit to be served at the table of a king, is not forbidden as the cooking of a non-Jew. Nor need any scruples be felt regarding the gentile's vessels, because it is assumed that ordinarily no cooking had been done in them in the past twenty-four hours.

7. A Jewish household employing a non-Jewish servant who also does the cooking, the cooking is not forbidden, since it seems unlikely that some member of the household will not rake the fire while the cooking is being done.

8. However, if the servant cooks food for herself only, it is not likely that any member of the Jewish family would rake the fire—and it is not possible that even raking the fire would be of no avail; it is worse than when she cooks for a Jew. Therefore, if she cooks food which is subject to the rules of non-Jewish cooking, then not only the food but also the use of the pots is forbidden, and if we happen to use them, we must consult a competent rabbi about it.

9. The food cooked by a non-Jew for a sick person on the Sabbath, may not be eaten at the close of the Sabbath even by the sick person himself, if it is possible to cook other food for him. The vessels, however, may be used after the expiration of twenty-four hours.

10. Although an egg is fit to be swallowed raw, yet if it is cooked by a non-Jew, it becomes forbidden food. This rule of law applies also to anything similar to it.

11. Fruits, not fully ripened and are eaten raw only in cases of emergency, are forbidden as food cooked by a non-Jew, if they are expertly preserved in sugar.

12. It is customary to permit the drinking of beer made either of grain or of honey, even when sold in the house of a non-Jew. This is not subject to the law of non-Jewish cooking, because the grain loses its identity in the water. It is only necessary to investigate whether or not it has been made with wine-yeast. In a locality where Jews trifle with the law and permit the use of non-Jewish wine, a scrupulous person should refrain from the use of beer. A scrupulous Jew should avoid the drinking of coffee (without milk, for with milk it is surely forbidden), chocolate or tea of a non-Jew. Some authorities permit to drink the above only occasionally, but not to make it a regular practice.

13. It is forbidden to use the milk which has been milked by a non-Jew, not under the supervision of a Jew; and it is even forbidden to make cheese from it. It is necessary that a Jew be present when the milking is begun and

# CODE OF JEWISH LAW

22. If women eat together with men who are obliged to unite in saying Grace, they must listen to its recital. It is the custom not to include a minor in the quorum for reciting the formal Grace, unless he is thirteen years and one day old, even though it has not been ascertained whether or not he brought forth at least two hairs indicating puberty.

23. A person who does not read the *Shema* morning and evening, or the one who publicly violates the Divine Commands should not be counted in with those who unite in saying Grace. A true proselyte may join others to recite Grace, and he may also recite the verse: "Who has caused our fathers to inherit," for it is written concerning Abraham (Genesis 17:5): "For a father of many nations have I made thee," and this verse is interpreted to mean: In the past he had been the father of Assyria only, but thenceforth the father of all nations.

## CHAPTER 46

### Forbidden Foods

1. The blood found in eggs is forbidden. Occasionally it is forbidden to eat the entire eggs on account of blood-spots. Therefore, the egg should be examined before using it in the preparation of food.

2. The use of the blood of fish is permitted, but if it is collected into a vessel, its use is forbidden for the sake of appearance, because people might think that it is forbidden blood. If, however, it is evident that it is the blood of a fish, as when it contains scales, then its use is permissible.

3. If we bite off a piece of bread or any other food, and blood from our gums is upon it, we must cut off the tinted part and throw it away. The blood from the gums may be soaked up on a weekday; since it has not discharged itself, but not on a Sabbath. (See chapter 80, section 54, below).

4. Blood is sometimes found in milk, which comes out of the cow's udder together with the milk; when that occurs, a rabbi should be consulted.

5. Meat and dairy products may not be eaten or cooked together, nor is it permissible to derive any benefit from such mixed foods. If, therefore, meat and dairy products happen to become mixed together, a rabbi should be consulted, as in certain instances a benefit may be derived from it, while in others it may not.

6. Two Jewish acquaintances may not eat at one table, if one eats meat and the other dairy products, even though they are at odds, unless they make a noticeable mark between them, for instance, by having a separate cover laid for each, or by placing upon the table a certain article that generally does not belong there, between their respective food. They must be careful not to drink any liquid out of the same vessel, as the food clings to it.

[146]

# CODE OF JEWISH LAW

7. We must not eat of the same loaf of bread with both meat and dairy products. It is customary to have two salt-cellars, one for meat and another for dairy products, because at times the food is dipped into the salt, and part of the food may have remained in it.

8. It is customary to mark all utensils used for dairy foods, so that they might not be interchanged with those used for meat.

9. After eating meat or a dish prepared with meat, we should wait six hours before eating dairy food, and the one who masticates food for an infant is also obliged to wait that length of time. If after waiting six hours, we still find particles of meat between our teeth, we must remove it, but we need not wait thereafter. We should cleanse our mouth and rinse it, that is, we should eat a little bread to cleanse our mouth with it, and then rinse our mouth with water or any other liquid.

10. If one has eaten food which contained neither meat nor animal fat, but was cooked in a pot used for boiling meat, even if that pot has not been cleansed beforehand, it is permissible to eat dairy food immediately thereafter.

11. After eating cheese, we may eat meat immediately thereafter at another meal, but we must carefully examine our hands to make sure that no particles of cheese cling to them; we must also cleanse the teeth and rinse the mouth. If the cheese was hard, that is to say, it was curdled by rennet and was six months old, or if it had worms, we must wait six hours before eating meat.

12. If we desire to eat meat after eating cheese, we must remove from the table the rest of the bread of which we ate with the cheese. Cheese should not be eaten upon the tablecloth on which we have eaten meat, and conversely, no meat should be eaten upon the tablecloth upon which we have eaten cheese; nor should we cut bread to eat with cheese, with a knife used for cutting meat, or vice versa, even if the knife is clean. However, in an emergency, as when we are on a journey, we are allowed to cut the bread to eat with cheese with a knife that has been used for cutting meat, or vice versa, if the knife is thoroughly clean.

13. If we cut onions or some other pungent things with a knife used for cutting meat, and put it in food made of milk, or vice versa, a rabbi should be consulted as to the fitness of its use.

14. If we prepare a dish of meat with the extract of almonds, we must put whole almonds in it on account of its deceptive appearance (because it looks like milk, thus averting the suspicion of having transgressed the law, by having boiled meat and milk together).

[147]

## CODE OF JEWISH LAW

15. It is not customary ritually to purify utensils used for dairy food, to make them fit for use of meat, or vice versa.

16. If we give wine, meat or a piece of fish into the care of a non-Jew, without making any special mark (by which it may be recognized, and especially so when given to an Israelite who is suspected of tampering with it,) either to store it or to forward it, we must put a double seal on it. But one seal suffices for boiled wine, wine-vinegar, bread or cheese.

17. If we give something in a sack to a non-Jew, either to be forwarded or to be stored, it is necessary that the stitches of the sack be on the inside and it must be tied and sealed.

18. If we happen to forward, through a non-Jew, a slaughtered beast or fowl or anything else without a seal, then we must consult a rabbi about it.

19. Cheese or other articles of food which are in the hands of a non-Jew, although they are sealed or stamped, stating that they are ritually fit for food, are, nevertheless, unfit for use as long as we do not know who has sealed them.

20. Care should be taken that a Jew and a non-Jew should not cook or fry, together in uncovered pots or frying pans, one pot containing food which is ritually fit, and the other containing ritually unfit food. Care should also be taken not to leave any pots in the care of non-Jewish servants, when there is no Jew in the house, or when there is no Jew going in and out.

21. It is forbidden to purchase wine or any food, the ritual fitness of which may be doubtful, from one who does not have a reputation for complying with the dietary laws. However, if we become such a person's guest, we may eat with him as long as we are not certain that there is ground for suspicion.

22. Care must be taken not to leave culinary utensils in the house of a non-Jew, lest he make use of them. Even when we give such utensils to a non-Jew to be repaired, we must consult a rabbi, if there is a possibility that he has made use of them.

23. Occasionally people buy a live fowl with its legs trussed, they throw it to the ground, and subsequently have it ritually killed. It is strictly forbidden to eat of such fowl; because when a beast or a fowl has fallen, its meat is unfit for use unless we see it walk thereafter at least four cubits (six feet). It is well to be extremely careful in regard to this matter with lambs and calves as well.

24. During the summer, slight swellings like warts are at times found upon the intestines of ducks and many of them become ritually unfit for food because of that. It is, therefore, advisable to examine the intestines, and if such swellings are found, a rabbi should be consulted.

[148]

## CODE OF JEWISH LAW

25. We must not knead dough with milk, lest it be eaten with meat, and for this reason it is even forbidden to eat the bread itself, if it has been entirely prepared in that manner. If, however, it was only in a small quantity, sufficient only for one meal, or if the bread has been shaped in such a manner that it can be easily discerned that it is not to be eaten with meat, it is permissible to prepare it with milk. The same law applies to the use of animal fat in the kneading of dough. We must not bake bread with pancakes or pies in one oven, as the butter or the fat may flow under the bread, and if it is so baked, it may not be used even by itself, as though it were kneaded with it.

26. If bread has been baked and meat has been roasted in the same oven and the oven was closed while the meat was uncovered, it is forbidden to eat that bread with dairy foods. It is permitted, however, to eat the bread with milk if the roasted meat was covered, or if the oven is as large as our modern ovens and has been open. Care should, however, be taken not to roast meat in an oven in which bread is being baked, as the grease may flow under the bread, and this may happen even if the roast is in a frying pan.

27. If milk or grease overflows on the bottom of an oven, the oven must be cleansed by means of glowing heat in accordance with the law, that is to say, glowing coal should be spread upon the entire surface so that it is heated white.

28. Castrated cocks may be eaten, because we rely on the presumption that the non-Jewish castrator is an expert, and would not cause any defect in the entrails of the cock by sewing it up. But if any defect is found, be it only a dislocation of the entrails, they may not be eaten.

29. In some communities, non-Jews raise geese for the purpose of selling them to Jews, and they generally stab them with a needle or the like under their wings, so that the flesh becomes swollen and the geese may look fat. A rabbi should be consulted as to whether or not such geese are fit to eat. It happens also that when the life of an animal is endangered by being overfed, it is stuck with an awl beneath its belly as a cure, and a rabbi should be consulted whether or not such an animal is fit for use.

30. In preserving fruit, it is customary to place them in a jar which is covered and tied with a bladder skin over the opening, and it is thus placed into a hot oven so that the fruit may be preserved. The bladder skin must be from an animal that is ritually fit for food, and it must also be salted and properly rinsed to make it fit for use.

[149]

with very small insects, round as a lentil which are upon their bodies, by and upon their fins, in their mouths, and behind their ears; they should be examined in such places and well scraped off.

44. The worms found in cheese, may be eaten with the cheese if they are not loathsome to him, as long as they are not separated from it.

45. Many Divine Commands are contained in the Torah, forbidding the eating of creeping things. Many Divine Commands are violated upon eating them and they also defile the body, as it is written (Leviticus 11:43): "That ye should be defiled thereby." Therefore, one must be very careful not to become a victim of that sin.

46. If we have consulted a rabbi and he has forbidden the use of a subject in question, we must not consult another rabbi about the same matter, unless we notify him of the decision of the first rabbi.

## CHAPTER 47

### Non-Jewish Wine and Making the Vessels Fit for Use

1. Nowadays the ordinary wine of a non-Jew, or Jewish wine that has been touched by a non-Jew, is, according to the opinion of some authorities, forbidden only for drinking purposes, but not forbidden to derive any benefit from it. Therefore, we are permitted to take non-Jewish wine in payment of a debt due us, for it is equivalent to saving it from a loss. The same law applies to a case, when we have violated the law and have purchased wine from them. But it is forbidden in the first instance to buy wine from them in order to make a profit by it. Other authorities are lenient even as regards the latter case, but it is best to follow the stricter opinion.

2. It is permissible to make a bath out of non-Jewish wine for a sick person although he is not critically ill.

3. If *kosher* wine that has been boiled until its quantity was reduced by evaporation, is touched by a non-Jew, it may be used even for the purpose of drinking it. Wine, into which spices have been put, as long as it is still retains the name wine and has not been boiled, becomes forbidden when touched by a non-Jew.

4. Victuals mixed with wine, the presence of which is not discernable, even if the victuals have not yet been brought to a boiling point, do not become unfit for use if they have been touched by a non-Jew.

5. If wine is adulterated with six parts of water, the wine becomes nullified and does not become forbidden by the touch of a non-Jew. However, raisin wine, that is, when water is poured upon the raisins, is considered as true wine.

6. If water is poured upon the kernels of pressed grapes, or upon the lees of wine, as long as it is improved for the purpose of drinking by doing so, it becomes forbidden when touched by a non-Jew.

7. If some wine has been extracted from the grapes pressed in a tank, be it even only a small quantity, or if some wine has been taken out of it into a vessel, the entire contents of the tank is legally called wine, and it becomes forbidden by the touch of a non-Jew even if only the kernels or the husks have been touched. It is, therefore, forbidden to make use of the tanks of grapes found in the house of a non-Jew, for it is likely that the non-Jew has already extracted some wine from it. It is forbidden to let a non-Jew press grapes in a tank, even if such a tank is provided with a stopper.

8. We must also be careful not to let a non-Jew remove the kernels and the husks from the wine-press, even after we have already extracted the first and second wine from it, as they might still be moist with wine.

9. If a non-Jew has poured water into wine with the intention of diluting it, we are not allowed to drink from it. But if he had not intended to dilute it, or even if it is only doubtful whether he has intended to do so, its use is permissible.

10. If vinegar is made out of *kosher* wine, and it is so strong that it seethes when poured upon the ground, it no longer becomes forbidden by the touch of a non-Jew. But if vinegar is made out of non-Jewish wine, it always remains forbidden.

11. Brandy that is made out of non-Jewish wine, or of kernels and husks or of lees, is considered like the wine itself. But brandy made out of *kosher* wine, is no longer rendered unfit for use by the touch of a non-Jew.

12. It has become a prevailing custom to permit the use of Tartaric acid, since it is not tasteful.

13. If a non-Jew touches wine by means of something else (not a part of his body), or if it is touched through his power, a rabbi should be consulted as to the fitness of the wine.

14. When we send wine through a non-Jew, we must take the precaution of doubly sealing the mouth or the faucet of the vessel.

15. There are many diverse laws regarding the wine that a Jew makes for a non-Jew, for the purpose of selling it to Jewish consumers. In certain instances, even double seals and a lock are of no avail. It is necessary to consult an ordained rabbi as to what procedure to follow in such a case. The scrupulous should avoid the use of such wine.

prayers, provided we do not lose thereby the opportunity of joining in public prayer with the congregation. It is preferable to make the purchases for the Sabbath on Friday rather than on Thursday. However, articles of food requiring preparation, should be procured on Thursday. While making the purchases, we should say: "It is in honor of the Sabbath." In accordance with the ordinances of Ezra, the clothes for the Sabbath should be washed on Thursday, not on Friday, as on that day all attention is needed for the preparation of the Sabbath needs.

6. Every man, even one who has many servants, must do something himself in honor of the Sabbath, thereby doing homage unto it, as it was the habit of the *Amoraim* (authors of the Talmud, or the Gemara). Rab Hisda, for instance, used to cut the vegetables very thin. Rabbah and Rab Joseph used to chop wood for cooking. Rab Zera was in the habit of lighting the fire over which the Sabbath food was cooked. Rab Nahman put the house in order, bringing in all the utensils needed for the Sabbath and putting away the things used during the weekdays. We should emulate their example and not regard it as undignified, for by honoring the Sabbath, we honor ourselves.

7. We should procure meat, fish, dainties, and good wine for the Sabbath, in accordance with our means. It is proper to eat fish at every Sabbath meal. But if it does not agree with us, we should not eat it, because the Sabbath is given us for pleasure and not for suffering. The cutlery should be sharpened and polished, and fresh coverings should be put on the beds. We should also have the household furniture nicely arranged, and the table covered with a fresh cloth, which is to remain on the table the entire Sabbath day. Some people place two cloths on the table. We should rejoice with the coming of the Sabbath. The expectation of a dear and distinguished guest would cause us to hustle and bustle. How much more so should we act when the guest is Queen Sabbath! There is a custom in some places to make pies for the Friday evening meal, in commemoration of the manna, which lay as

[64]

it is a prevailing custom among all Jews to bake some loaves of bread in their homes in honor of the Sabbath. If a person eats non-Jewish bread on weekdays, he shall make it a point to eat Jewish bread on the holy Sabbath. Even if he eats Jewish bread during the week, he should have bread baked in the house for the Sabbath, so that the mistress of the house be given the opportunity to perform the precept requiring her to separate the *Hallah* (the first of the dough). For Adam was created on Friday, and he was destined to be the *Hallah*, the choice of the world, but this excellence was lost by the woman's sin, therefore, she has to make amends (by separating the first of the dough). Three loaves should be baked, a large one, a medium one, and a small one; the medium one for the Friday evening meal, the large one for the daytime meal, to indicate that the day is of greater importance, and the small loaf for the third meal.

if in a box, with dew on the top and dew at the bottom. It is well to taste the Sabbath food on Friday.

8. Even the poorest man in Israel should endeavor with all his might to luxuriate in the Sabbath. He should economize the whole week to save enough money for the Sabbath meals. If necessary, one should even borrow money on a pledge in order to provide for the Sabbath. Of such a person, our Rabbis, of blessed memory, say (Betzah 15a): "Said the Holy One, blessed be He, to His people Israel: 'My children, borrow for My sake and I will repay you.'" A man's needs for the year are apportioned on *Rosh Hashanah*, with the exception of his expenses for Sabbath and festivals, for which—if he spends more he is given more. If, however, one is in dire straits, one should be guided by the maxim of the Sages (Shabbot 118a): "Make thy Sabbath as a weekday, rather than depend on men." Nevertheless, if at all possible, one should do at least some minor thing in honor of the Sabbath, like procuring small fishes, or something similar. If something edible is sent to someone for the Sabbath, he should eat it on the Sabbath and not leave it for a weekday.

9. No regular work should be done on Friday from the *Minhah ketanah* (small *minhah*; 3:30 p.m.) on. But casual work is permissible. It is forbidden to make clothes for someone else. But when a person is poor and he desires to earn enough for the Sabbath meals, he may work all day Friday, just the same as on *Hol Hammoed* (Intermediate Days of the festivals). Giving a haircut to a Jew is permissible all day on Friday; even if one is a professional barber and he does it for pay, inasmuch as it is obvious that the hair cutting is for the sake of the Sabbath. It is customary to close shops an hour before the Sabbath sets in.

10. From the ninth hour (3:30 p.m.) on, we should abstain from having a regular meal, even the kind we are accustomed to have on weekdays. A feast, which we do not generally have on weekdays, even if it is on the occasion of performing a religious act, is forbidden even on Friday morning, if it can be postponed for another day. However, if it must be given on that day, like one on the occasion of a circumcision, or the redemption of a first-born, may be held. Nevertheless, it is proper to have it in the morning and not eat too much, certainly not to eat to excess, so that we may eat the Sabbath meal with relish.

11. A Jew must read every week the entire weekly portion of the Torah; that is, he must read the Scriptural text twice, and the *Targum* once. The reading may begin on Sunday. However, it is best to do so Friday afternoon. One should read twice each *Parshah* (subdivision), whether it ends a chapter or not, or even when it ends in the middle of a verse, and then read the *Targum* once. After finishing the *Targum*, one must read one verse of the

[65]

Case 5:21-cv-03269-JWL-JPO   Document 21   Filed 10/12/22   Page 83 of 90

tain whether a needle is stuck in them, or if there is anything in the pockets. This must be done even in places where there is an *eruv* (see chapter 94, below), because the pockets might contain something *muktzeh* (an article untouchable on the Sabbath).

## CHAPTER 73

### Work Done by a Non-Jew on the Sabbath

1. A Jew is forbidden to allow a non-Jew to do work for him on the Sabbath. This law is based upon the Biblical verse (Exodus 12:16): "No manner of work shall be done," which implies even by a non-Jew. However, if the work is delivered to the non-Jew on Friday, it is permissible even if he does it on the Sabbath, but only on the following conditions: (a) The non-Jew should take the work before the Sabbath, but not on the Sabbath day.

2. (b) The amount of compensation should be stipulated in advance, then the non-Jew does the work for his own sake, in order to get paid. Therefore, one who employs a non-Jewish servant, is forbidden to allow the latter to do any work on the Sabbath, as the work is done solely for the benefit of the Jew. If a non-Jew travels to a certain place (before the Sabbath), and a Jew asks him to deliver a letter, which will have to be carried on the Sabbath, he should be given some reward. Then he does it for compensation and not gratis.

3. (c) The non-Jew should be paid a stipulated amount for the entire work and not hired by the day.

4. (d) A Jew is forbidden to engage a non-Jew to complete some work before a certain time if it is clear that the non-Jew cannot complete it unless he worked on the Sabbath. If a Jew sends a written message through a non-Jew and tells him: "See to it that you deliver it on such and such a day," and it is obvious that he cannot reach there on that day unless he travels on the Sabbath, this is likewise forbidden. If a fair is to be held on the Sabbath, a Jew is not allowed to give money to a non-Jew on Friday to buy things for him, if he knows that the non-Jew cannot obtain it on any other day except on the Sabbath. Likewise, he is forbidden to give him anything to sell. However, if he does not explicitly tell the non-Jew to do the work on the Sabbath, it is forbidden only when he delivers the work to him on Friday, but before that day he is permitted to give him some work, or some money to make a pur-

chase. It is best not to live in a community where the fair takes place on a Sabbath, for it is impossible to avoid violations. But if it is held in a non-Jewish quarter, it does not matter.

5. (e) The work should not be connected with the soil, such as building, or farm work. We are not allowed to have a non-Jew work on a building on the Sabbath, even if we have agreed to pay him a certain amount for the entire work. In case of urgent necessity, we should consult a rabbi. On the Sabbath, it is forbidden even to let a non-Jew quarry stones or prepare lumber for building purposes, if it is known that they belong to a Jew, and if the non-Jew works on it publicly in the street. This rule applies also to farming, such as ploughing or reaping, even if the non-Jew is hired at a stipulated price for the whole task. If, however, the non-Jew has a share in the crops, and it is customary in that region for a farm worker to receive a share in the crops, it is permissible. If the farm is far away, where there is no Jew in the vicinity within two thousand cubits (three thousand feet), it is permissible, if the non-Jew performs the work at a stipulated sum, so long as he is not hired by the day.

6. If a non-Jew has illegally built a house for a Jew on the Sabbath, it is well to be scrupulous and not move into it. (There are many divergent opinions about this).

7. The owner of a farm or a mill may rent it to a non-Jew on the Sabbath, although he will work there on the Sabbath. But it is forbidden to rent a bathing establishment to a non-Jew. If the Jew does not own the bathing establishment, but only rented it from a non-Jew, he should consult a rabbi on how to act. The owner of a hotel, a glass factory, a brick factory, and the like, should also consult a rabbi how to act.

8. A Jew is forbidden, under any circumstances, to allow a non-Jew to do work at his house on the Sabbath. Even if a non-Jewish servant desires to do some work for himself on the Sabbath, he should be forbidden by the Jewish employer.

9. If a non-Jewish tailor made a garment for a Jew and brought it to him on the Sabbath, he is permitted to put it on. If, however, it is known that the tailor has completed it on the Sabbath, it should not be worn, unless in a case of extreme necessity. It is forbidden to take utensils or garments from the house of a artisan, even a Jewish artisan, on a Sabbath or on a festival. From a non-Jew who is not a manufacturer, but owns a shop where

## CODE OF JEWISH LAW

has not as yet recited the *kiddush*, should first drink a mouthful from the cup, and then an additional quarter of a *log*. This may be done also before praying the *Musaph* service, if one's heart is faint.

15. After praying the *Shaḥariṭ* (morning) service, a person who feels faint, may partake of some food before praying the *Musaph*, that is, he may eat bread no more than the size of an egg; but he may eat plenty of fruit to refresh himself. He must, however, first recite the *kiddush*, and drink a mouthful of wine, and then an additional quarter of a *log*—for in an emergency, the drinking of that much wine may be considered as having a meal—or he may drink that quantity of wine, and then eat the size of an olive of food made of one of the five species of grain.

16. Every Jew, man or woman, is duty bound to eat three meals on the Sabbath, one on Sabbath-eve and two during the day. At each of the three meals, one must eat bread (and since the hands are washed and the benediction *Al netilat yaddayim* is pronounced, one must eat of the bread no less than the size of an egg). Therefore, one should not eat to excess at the morning meal. If, however, one finds it impossible to eat bread at the third meal, he should, at least, eat pastry or any food made of one of the five species of grain over which the benediction *Bore mine mezonot* is pronounced. If this, too, is impossible, one should at least eat something that is eaten with bread, such as meat or fish. And if this too is impossible, one should, at any rate, partake of cooked fruit. The time for eating the third meal begins at one and one-half hours past noon.

17. On the Sabbath we must say the benediction *Hamozi* over two loaves of bread at every meal. While saying the *Hamozi*, we hold both loaves in our hands, and we cut one of them. Before saying the *Hamozi*, it is customary to make a mark with the knife upon that part of the loaf we desire to cut, the reason for it being, as stated in chapter 41, paragraph 3, above, that on weekdays we are required to cut a little around the bread before saying the benediction, but on the Sabbath it cannot be done, because the loaves must be whole when the *Hamozi* is said. Therefore, we should at least mark the place to be cut, in order that we may know the exact spot where it is to be cut and not pause too long before deciding where to cut. We should place the loaves in such a way that the one we desire to cut should be closer to us, so that we would not (by passing one loaf) act as if we are ignoring a potential object of a *mitzvah*. We must have two whole loaves at every meal, even if we eat many meals during the day. In the morning when saying the *kiddush*, and we partake of pastry, we should also have two whole cakes.

## CODE OF JEWISH LAW

18. If only one of those seated at the table is provided with double loaves, he should say the *Hamozi* and exempt the others, who need not say the *Hamozi* themselves. Before reciting the *Hamozi*, he should say, *Bireshut maranan verabbotai* (with the permission of my teachers and masters), and after eating some of the bread, he gives each one a slice.

19. If we have neglected to read the weekly portion of the Pentateuch on Friday, we must read it in the morning before the meal. If we forget to read it before the morning meal, we should read it at least before the *Minḥah* service, and post facto it may be read at any time before Tuesday evening.

20. On the Sabbath, it is forbidden to abstain from food, even for a short time for the purpose of fasting. And it is forbidden to abstain from eating until noontime, even if it is not intended as a fast.

21. It is forbidden to grieve over any distress, God forbid, but one should pray for mercy to the Master of Mercy.

22. On the Sabbath one should partake generously of fruits and delicacies, and inhale sweet odors, in order to complete the total of one hundred benedictions. Indeed, it is meritorious to partake of everything that provides one with pleasure, as it is written (Isaiah 58:13): "And thou shalt call the Sabbath a delight."

23. If one is accustomed to take a nap after the meal, he shall do so. But one shall not say: "I will sleep so that I may do some work or start on a journey at the conclusion of the Sabbath."

24. After such sleep, a time should be set aside for the study of the Torah. For, relating to the Sabbath, it is written (Exodus 35:1): "And Moses assembled." And our Rabbis, of blessed memory, asked (Tanhuma, Vayak-hel): "Why is in this portion written, 'And he assembled,' and not elsewhere in the Torah? God said to Moses: 'Go down, make assemblies on the Sabbath, so that the generations to come will also convoke assemblies for the study of the Torah.'" They further said (Yerushalmi, Shabbat 15:13): "Sabbaths and festivals were given to Israel for the studying of the Torah. For many are too occupied with their daily tasks during the week to study the Torah regularly, but on Sabbaths and festivals, being relieved from their work, they can study the Torah properly." Hence, those who are unable to study the Torah during the week, are especially obliged to study on the holy Sabbath, each man according to his knowledge and ability.

flour, meat and their concomitants, to the latter as a gift, who acquires possession of these things by lifting them, and then he cooks and bakes for him and it may be done even in the house of the one who had forgotten to make the Eruv.

6. Every householder is required to make an *Eruv tavshilin* for himself. Even a woman who has no husband is required to do so, if she knows how to perform it. One must not rely on the *Eruv* made by the leader of the town. If by accident, a person failed to make an *Eruv*, or if he has made one but it was lost, then if there is one in town who makes an *Eruv* for all the town people (that is, he gives them a share in the victuals and in the bread, as is explained in *Shulhan Aruh*), he may rely upon such a *Eruv*. If, however, it was due to negligence, or because he had relied upon the *Eruv* of the leader, it will not avail him, and his case is to be governed by the laws laid down in section 5, above.

7. If a festival occurs on Thursday and Friday, and on Thursday we become aware that we have neglected to make an *Eruv*, we may make it that day, say the prescribed benediction, and thereafter say: "If this day is holy, then I need not make the *Eruv*, and if this day is not holy, then, 'By this *Eruv*,' etc." But this cannot be done on *Rosh Hashanah*.

## CHAPTER 103

### Rejoicing on a Festival

1. It is our duty to honor all the festivals and take delight in them, just as we are to honor and take delight in the Sabbath, as it is written (Isaiah 58:13): "And the holy of the Lord honorable," and concerning all the festivals, it is written: "A holy convocation."

2. What constitutes honor? As our Rabbis, of blessed memory, said: On the day before the festival we must cut our hair, in order not to usher in the festival in an untidy appearance. We should also bathe in warm water, wash the head, and pare the nails on the day before the festival, even as we do on the day before the Sabbath. We should also bake *halot* (white loaves of bread) in our homes in honor of the festival, just as we do on the day before the Sabbath. On the day before a festival, we are also forbidden to eat after the time set for the *Minhah* service (3:30 p.m.), just as on the day before the Sabbath, so that we may eat the festival meal with a good appetite. If the day before the festival occurs on the Sabbath, the third meal should be eaten before the small *Minhah* (see chapter 59.2, above) that is, 3:30 p.m. This law also applies to the first day of a festival, as that is the eve of the second day of the festival.

3. What is meant by delight? As our Rabbis, of blessed memory, said: On each day of a festival, we must have two meals, one at night and one during the day, but no third meal is required. We should also recite the

[116]

*kiddush* over a cup of wine before the meal, and utter the benediction *Hamotzi* over two *halot*, as we do on the Sabbath. We should be as lavish with meat, wine, and dainties as our means permit.

4. On concluding the evening *kiddush* on every festival, we say the benediction *Sheheheyanu* (who hath kept us in life), except on the seventh and eighth nights of Passover when this benediction is omitted, because these two days are not a distinct festival in themselves. When lighting the candles, women should not say the benediction *Sheheheyanu* on any festival. Some women, however, say *Sheheheyanu* on all festivals (except on the seventh and eighth nights of Passover), and they should not be interfered with.

5. Every man is obliged to gladden the hearts of his wife, his children, and all his dependents, in a manner appropriate to each. Thus, we should give nuts and dainties to the little children, apparel and ornaments to the women, and meat and wine to the men. It is the custom to fare more sumptuously on a festival than on the Sabbath, because concerning the festival, the Torah mentions "rejoicing" (Deuteronomy 16:14), but it is not mentioned concerning the Sabbath. The holiday garments should also be costlier than those of the Sabbath.

6. On the second day of Passover, we should add some extra dish to the regular meal, commemorative of the feast of Esther which took place on this day, for it was on this day that Haman was hanged.

7. It is customary to eat dairy food on the first day of *Shavuot*. There are many reasons for that. A hint of this custom is found in the phrase words spell out חלב ("of milk"). Also honey should be eaten on this day, because the Torah (given on this day on Sinai) is compared to honey and milk, as it is written (Song 4:11): "Honey and milk are under thy tongue." Now, inasmuch as dairy food is eaten on this holiday, while it is also necessary to partake of meat, the eating of meat being mandatory on every holiday, great care should be taken not to mix the dairy and the meat foods.

8. Although eating and drinking on a festival is a positive precept, we should not spend the entire day indulging in food and drink, because it is written (Deuteronomy 16:8): "A holy assembly to the Lord your God," and it is also written (Numbers 29:35): "A holy assembly it shall be to you." The Rabbis, of blessed memory, explained it thus (Betzah 15b): "We should divide the day into two parts, devoting one-half to the service of God, and the other half to our own pleasures." Therefore, it is our duty to engage also in the study of the Torah.

9. When a man eats and drinks on a festival, it is his duty to take care also of the orphan and the widow, as well as others who are in need. He who looks the doors of his house in order to eat and drink with his wife and children, and gives nothing to the poor and the mournful souls, is not rejoicing in a precept, but merely indulging in gluttony. Concerning such people, it is

[117]

need not repeat any part of the Shemoneh esreh. If we have forgotten to say Uvtein ten, poddāta (now, therefore, bestow Thy awe) and concluded the blessing with Hammelech hakkadosh, even if we have only said, Baruk attá adonai (blessed art Thou, O Lord), we conclude Hammelech hakkadosh, and then say Attah vebartanu (Thou hast chosen us), etc.

6. Some people conclude the Shemoneh esreh, with Oseh hashalom (who maketh "the" peace), while others conclude it as usual with, Hamevarek ammo yisrael bashalom (who blesseth His people Israel with peace), and only in the kaddish do they say, Oseh hashalom bimeromav (He who maketh the peace in His high places).

say Lehu neranenah (O come, let us sing; the same as on any other Sabbath-in other communities they begin with Mizmor ledavid (a Psalm of David), while in still others, they begin with Mizmor shir leyom hashabbat (a Psalm, a song for the Sabbath-day). Every community should abide by its own customs.

8. After the Maariv service, on the first night of Rosh Hashanah, it is customary to exchange greetings by saying Leshanah tovah tikatev vetehatem (be thou inscribed and sealed for a happy year), and to a woman it is said in the feminine form, tikatevi vetehatemi; but these greetings are not exchanged in the daytime, because the writing had been finished in the forenoon. Some are accustomed to exchange greetings on the second night, because the heavenly judgment is occasionally also passed on the second day.

9. At the evening meal, it is customary to perform symbols as omens for a good year; we dip in honey a portion of the hallah over which we have said the Hamotzi (who bringeth forth), and after eating a piece the size of an olive, we say: "May it be Thy will to renew for us a happy and pleasant year;" after this we dip a piece of sweet apple in honey and say the benediction Bore peri haetz (who createth the fruit of the tree), and after eating it, we again say: "May it be Thy will to renew for us a happy and pleasant year." It is also customary to eat the head of some animal, and say: "May it be Thy will that we be a head (master)." It is preferable to obtain the head of a sheep which will also serve as a reminder of the ram substituted for Isaac. We also eat some vegetables, the names of which have the connotation of good fortune, like carrots in our country, called mehren (meaning "increase"), and we say: "May it be Thy will that our merits increase." It is also meritorious to procure for this occasion, fish which symbolizes fertility. But it should not be cooked in vinegar, for no sour or bitter foods are eaten on Rosh Hashanah. Also meat and confectioneries should be partaken of. It is also customary to refrain from eating any nuts or almonds, because the numeric value of the Hebrew word חטא (sin), not counting the א of חטא, is 17, the same as that of the Hebrew word גוֹ (sin). Also, nuts increase the saliva and cause coughing which interferes with praying. It is well to study the Torah while at the table. Some make it a practice to study the Mishnah tractate Rosh Hashanah (dealing with the New Year).

10. It is proper to abstain from cohabitation during the two nights of Rosh Hashanah, even if they occur on the Sabbath. But if it is the night of her ritual immersion, one should not fail to perform his marital duty, and in the morning one should cleanse himself from his defilement.

11. On Rosh Hashanah, when saying, Avinu malkenu ludanu lefaneka (our Father, our King, we have sinned before Thee), we must not beat our

---

heads as on a weekday and on Yom Kippur, because no confessions are to be recited on Rosh Hashanah, which is a festival. Hence, we interpret "Our Father, our King, we have sinned before Thee," thus: "Our fathers sinned before Thee because they worshiped idols, but as for us, we have no other king but Thee," therefore, "Our Father, our King, deal with us for the sake of Thy name."

12. When the Scrolls of the Law are taken from the Holy Ark, it is customary to recite the "thirteen attributes" (Adonai, adonai, el raḥum veḥannun). And it is proper to begin with Vayaavor (and He passed), and we say it thus: "And the Lord passed on before him, and He called," etc. In some communities, neither the "thirteen attributes" nor Ribbono shel olam (Master of the universe) is recited when the festival occurs on the Sabbath.

13. The shofar should be preferably sounded as follows: The Teruah consists of nine short sounds; the Shevarim is of three successive sounds, each being as long as three Teruah sounds so that the Shevarim is equal to nine sounds. One should be very careful not to protract the Shevarim until each one equals nine sounds, for in such an event the precept is not fulfilled, even post facto. The Tekiot are simple sounds. In the order of Tekiah, Shevarim, Teruah, Tekiah, the sound of each Tekiah should be as long as the Shevarim and the Teruah, that is, the length of eighteen sounds. In the order of Tekiah, Shevarim, Tekiah, each Tekiah should be as long as the Shevarim, that is, the length of nine sounds; the same is in the order of Tekiah, Teruah, Tekiah. In the Tekiot preceding the Musaph service, the Shevarim and the Teruah, when they follow one another, should be sounded in one breath; the prompter should, therefore, announce them together Shevarim-teruah. But in the Tekiot during the repetition of the Shemoneh esreh, they should be sounded in two breaths. Nevertheless, no undue pause should be made between them, but they should be sounded in immediate succession, and the prompter should likewise announce them at one time.

14. When the one sounding the shofar pronounces the benedictions, the congregation should not respond, Baruk hu uvaruk shemo (blessed be He and blessed be His name), but merely listen attentively and after each benediction respond Amen. (See chapter 6:9, above.) From there on it is forbidden to make any interruption till after the Tekiot during the Shemoneh esreh. Therefore, the sexton should not announce, Shekkiah yafiah bisheat halefillah (silence is proper when praying), although he customarily does so at other times.

15. After each set of shofar blasts during the repetition of the Shemoneh esreh, people generally recite, Yehi ratzon (may it be Thy will), as it is printed in the festival prayer books. Care should be taken not to pronounce the names of the angels given there. In many communities this prayer is not recited at all, and this is preferable. The principal reason for blowing the shofar is to exhort the people to wholehearted repentance. As Maimonides, of blessed memory, said: "Although the blowing of the shofar on Rosh Ha-

## CODE OF JEWISH LAW

it is fitting to take pity upon living creatures on that day, so that pity may be shown to us from Heaven; and for the further reason that fowl generally feed on crops they steal, we therefore, throw away their innards to show our resolve to keep away from stolen goods. If chickens cannot be obtained for *kapporoth*, a goose or some other living thing, which was not acceptable as a sacrifice in the Temple may be taken for that purpose. Some authorities are of the opinion that even fish may be used. But no turtle-doves or pigeons may be used because these were valid as sacrifices in the Temple, and it would appear as if we were sacrificing offerings outside the Temple. Some people are accustomed to give the *kappara* fowl to the poor; but it is best to redeem the fowl with money and give the money to the poor.

2. Neither *Mizemor ledavid* (A Psalm of thanksgiving), nor *Tahanun* (petition for Grace), nor *Lamenatzeah* (For the chief musician), nor *Avinu malkenu* (our Father, our King) is recited on the day before *Yom Kippur*. But when *Yom Kippur* falls on the Sabbath, then *Avinu malkenu* is recited in the *Shaharit* service on the day before *Yom Kippur*.

3. It is mandatory to feast sumptuously on the day before *Yom Kippur*, and the person who does it for the purpose of fulfilling this precept, is credited with having fasted also on that day. It is fitting to eat fish at the first meal.

4. *Yom Kippur* does not atone for transgressions committed against a fellow man unless we conciliate him, for it is written (Leviticus 16:30): "For on this day He shall atone you of all your sins, you shall be cleansed before God," which means, that only sins against God shall be atoned on *Yom Kippur*, but not sins committed against our neighbor, unless we conciliate him. We should, therefore, be very careful to return to others what lawfully belong to them and to obtain their pardon. If we have some property of which we are not certain whether it lawfully belongs to us, we must inform our neighbor that immediately after *Yom Kippur* we desire to appear with him before a court conducted according to the laws of our holy Torah, and sincerely resolve to abide by the verdict rendered by such tribunal. If we have sinned against others, even if only by means of words, we are also obliged to conciliate them. It is our duty to go personally to them. If, however, it is difficult for us to do so, or if we understand that they will be easily reconciled even if approached by another, we may conciliate them through a mediator. The person whose forgiveness is sought should grant forgiveness willingly and wholeheartedly, and not be obstinate, for this is not a characteristic of Israel, but of Esau, concerning whom it is written (Amos 1:11): "And he kept his wrath forever." It is also said concerning the Gibeonites, because they would not forgive and would not be conciliated (II Samuel 21:2): "Now the Gibeonites were not of the children of Israel." The way of the children of Israel is slow to become angry and easy to be pacified, and when the offender asks for forgiveness, they grant it wholeheartedly and willingly. Even if one has been grievously wronged, one should not seek vengeance, nor bear a grudge against the one that had wronged him. On the contrary, if the offender does not come to him to beg forgiveness, the offended person should present himself

[82]

## CODE OF JEWISH LAW

to the offender in order that the latter might ask his pardon. If a person shown to us his enmity in his heart, his prayers on *Yom Kippur* will not be accepted, God forbid, but the one who is magnanimous and forgiving, will have all his sins forgiven.

5. If the offended has since died, the offender should assemble ten men at the grave, and say: "I have sinned against the God of Israel and against this man (so and so)" and they pronounce three times: "Thou art forgiven." He should also be barefoot and recount in detail the nature of the offense, if it does not reflect on the dead. If the grave is more than three parasangs (Persian miles) distant from the place where he had malignantly slandered him, he need not go there in person; he may delegate someone else who shall assemble ten men at the grave, and say: "I, the agent of (so and so), publicly declare that he has been sent me to beg forgiveness for his sin." If one has vilified a dead person, he is not required to go to his grave; he may beg his forgiveness in the place where he had vilified him. If, however, he had maliciously slandered him, he must do penance for having transgressed a ban of the ancients, forbidding to slander the dead.

6. Every man is in duty-bound to immerse on the day before *Yom Kippur*, to cleanse himself from nocturnal pollution, and also as a prerequisite to repentance, just as a convert to Judaism is required to immerse. Therefore, even young men and virgin girls are required to immerse. The most appropriate time for the bath of purification is after midday. One should make sure before the immersion, that there is no interposition on the body. A woman after intercourse, is apt to discharge the semen virile within three days. She is then considered like one who has had a nocturnal pollution, and the mere immersion would not suffice in such a case. She must, therefore, first wash herself well with warm water before making the immersion, so that she would have no further discharge. If, however, she has had intercourse immediately after her ritual bath of immersion, or immediately before her period of menstruation when she generally becomes pregnant, then she is not allowed to destroy the semen virile of conception, and therefore, she is not permitted to wash herself in warm water. She should, however, bathe in cold water. A mourner, even during the first seven days, may wash and bathe about one or two hours before dark, even if it is before the *Minhah* service. He must, however, observe all the other laws concerning mourners, that is, he must sit on the ground, and not put on leather shoes till nightfall.

7. In accordance with custom, every householder prepares two candles, one for the house, symbolizing the Torah, which is called "light" because on *Yom Kippur*, Moses descended from Mount Sinai with the second tablets and the other candle is for the souls of his departed father and mother, to make atonement for them. In pursuance to custom, the candle lit in the

[83]

house, burns till the following night, and is used for the *havdalah* light. These candles should not be made out of the wax taken from a house of idolatry. Since there are some people who take it as a bad omen if their candle is extinguished during *Yom Kippur*, although in reality there is no foundation for this apprehension, it is best to avoid it, by giving the candle to the *Shamash* who will put it among other candles so that the person will not know the identity of his candle. One should take the candle to the synagogue when going there for the *Ma'ariv* service to be put in its proper place and to be lit thereafter, because when people come to the synagogue for *Ma'ariv* service, they are pressed for time.

8. It is our custom to put on the Sabbath garments when we go to the synagogue to pray the *Minchah* service before *Yom Kippur*. Before reciting *Elohai netzor* (O my God, guard), at the end of *Shemoneh esreh* of *Minchah*, we say *Viduy teraizen* (let the words of my mouth), and then we recite *Al het* (confession), beginning with, *Elohenu velohe avolenu, tavo lefanecha* (Our God and God of our fathers, let our prayers come before Thee), to *Vedalgom raim* (and score diseases), when we repeat the verse *Yiheyu leraizon*. If while we still recite *Al het*, the *hazan* repeats the *Shemmeh esreh*, we may respond *Amen*, say the *Kedushah*, and *Modim* (we give thanks), since we have already said *Viheyu leraizon*.

9. *Al het* should be recited while standing and in a bowed posture as when reciting *Modim*. At the mention of each sin, we beat our breasts, as if to say: "You were the cause of my sins." *Al het* should be recited by all alike, according to the version given in the Prayer Books. One, however, who has committed a sin which is not mentioned in the formula *Al het*, inasmuch as he recites it inaudibly, he should mention that sin and acknowledge his guilt with a contrite heart, and with copious tears. If that sin is one that is mentioned in *Al het*, he should, when coming to it, sob bitterly as he mentions it. Even when he is certain that sin for which he had made confession the previous year was not repeated by him since then, he should, nevertheless, repeat this confession. This is a praiseworthy practice, for it is written (Psalms 51:5): "And my sin is ever before me."

10. *Avinu malkenu* (our Father, our King) is not recited after *Minchah*, whether *Yom Kippur* occurs on a weekday or on the Sabbath.

11. After *Minchah* it is customary to receive *malkot* (flagellation). Although this flagellation is merely nominal, it is conducive to make one aware of the need for repentance. It is best to take for this purpose a strap of calf's leather, even though it is not a handbreadth (four inches) wide. The one receiving the stripes should bend, leaning on his knees, with his face towards the North. It is customary to recite some confession while being struck. The

one who administers the stripes, repeats three times the verse *Vehu rachum* (and He being merciful), etc., (which contains thirteen Hebrew words), making it a total of thirty-nine words, representing the thirty-nine stripes that used to be administered to sinners.

12. Towards evening, we eat the final meal before the fast, at which it is customary to dip in honey the piece of *hallah* over which the *Hamotzi* has been pronounced, as we do on *Rosh Hashanah*. Only food which is easily digestible should be eaten at this meal, such as the flesh of fowl. It is the custom not to partake of fish during this meal. One should not partake of food or drink which tend to generate heat, such as victuals seasoned with spices and saffron. We must be exceedingly careful to add from the profane to the sacred, that is, we should conclude the meal while it is yet day, a little before nightfall. The zealous are prompt to end their meal about an hour before twilight. If we finish the meal long before sunset and we intend to eat or drink after that, we must make a declaration, or at least have it in mind, before reciting Grace after meals, that we do not yet inaugurate the fast.

13. It is the custom in these parts not to put away any food in a hot oven on the day before *Yom Kippur* to be used at the conclusion of *Yom Kippur*, as it is done on Friday for the Sabbath, because it is the equivalent of preparing food on *Yom Kippur* for a weekday, and for the further reason that it has the appearance of gluttony.

14. It is written (Isaiah 58:13): "And the holy of the Lord honored," and the Rabbis (Shabbat 119) said that this refers to *Yom Kippur* on which day there is neither eating nor drinking. It is our duty to honor this day with clean apparel and with lights; hence, in the synagogue we spread beautiful covers and light many candles, which are called "honor," for it is written (Isaiah 24:15): "Therefore, '*bazrim*' glorify ye the Lord," and the Targum renders it: "With lights glorify ye the Lord." Before twilight, the tablecloths are spread upon the tables and the candles are lit in the house, as on Friday. It is proper to light a candle in the wife's bedroom as a reminder not to cohabit. The benediction, *Lehadlik ner shel yom hakkippurim* (to kindle the light of *Yom Kippur*) is uttered over the candles. If *Yom Kippur* occurs on the Sabbath, we say in the benediction: *Lehadlik ner shel shabbat veshel yom hakkippurim* (to kindle the light of the Sabbath and of *Yom Kippur*).

15. It is the custom to put on a *kittle* (white robe), which resembles shrouds. It is calculated to humble the arrogant heart of man. A mourner may also put it on. Since it is a garment specifically made to be worn at prayers, it must be removed before entering a lavatory. Women also wear clean white clothes in honor of the day; but they should not wear any jewelry, in view of the awe-inspiring day of judgment.

16. It is the custom of fathers and mothers to bless their children before going to the synagogue on *Yom Kippur* eve, because the holiness of the day has already begun and the gates of mercy are already open. They implore in

## CODE OF JEWISH LAW

us), because the heavenly judgment is not concluded until Israel concludes the order of prayers below. If the stars have already become visible, we should not say, *Hayyom yifneh* (the day is nearly past), because that would be speaking falsehood. We should say instead: *Hayyom panah, kashemesh ba yifnah* (the day has passed, the sun has set and is gone). But the *hazan* recites *birkat kohanim* (the priestly benediction), and *sim shalom* (bestow peace), even if it is already night.

25. We should abolish the custom to have a non-Jew light candles for the purpose of reciting the liturgic poetry of *Neilah*, but he should distribute the burning candles throughout the synagogue, because that is merely disregarding a Rabbinical enjoinder in a secondary and indirect manner.

26. When the *Neilah* service is concluded, we say *Avinu malkenu* (our Father, our King), even if it is a Sabbath and still day. Then we say once, *Shema yisroel* (hear, O Israel); three times, *Baruch shem kevod malchuto leolam vaed* (blessed be His name whose glorious kingdom is forever and ever) and seven times, *Adonai hu haelohim* (the Lord, He is God). It is to send off the Divine Presence, to the higher spheres of the seventh heaven. The *hazan* then chants the whole *kaddish* in a joyous tone, after which the *shofar* is sounded once, symbolic of the ascension of the Divine Presence, as it was when the Torah was given on Sinai. For when the Divine Presence ascended, it is written (Exodus 19:13): "When the ram's horn soundeth long," etc., and it is also the sound of the horn." (Psalms 47:6): "God is gone amidst shouting, the Lord amidst the sound of the horn.") It also commemorates the sounding of the *shofar* on the *Yom Kippur* of the Jubilee year. The *shofar* may be sounded even at twilight when the stars are not yet visible, even on the Sabbath, but it should not be sounded in the daytime. After the sounding of the *shofar*, all say three times, *Leshanah habaah birushalayim* (Next year in Jerusalem).

27. After the stars become visible, we pray the *Maariv* service, and it is well to delegate as *hazan* a reputable man. The prayers should be recited slowly and devoutly. Those who pray hurriedly should be rebuked. In the *Shemoneh esreh*, we include, *Attah honantanu* (Thou hast bestowed upon us). If it is Saturday night, we recite *Vayiten leha* (and God give thee), but we only *Vihi noam* (may the pleasantness), and *Veattah kadosh* (and Thou art holy). After the prayers, the sanctification of the moon is performed, and friendly greetings are exchanged with merriment and joy as on a festival.

28. In the *havdalah* of *Yom Kippur* night, the benediction for light must be said over a candle that had been kindled before *Yom Kippur*, and not over a light that is now produced by means of a match and the like. The most preferable way is to light a candle from the light of another candle that had been lit in the house the day before, and say the benediction over both. If there is no burning candle in the house, one should bring a burning candle from the synagogue, light another candle from this one, and say the benediction over both. In an emergency, we may say the benediction over a candle lit from the candle of a non-Jew, or by a match, and the like. We do not begin the *havdalah* with *Hineh el yeshuati* (behold the God of my salvation), but we say the benedictions over a goblet of wine, over the light, and *Hamavdil* (who hath made a distinction); no benediction is pronounced over spices. If it is Saturday night, we also say the benediction over spices, and we begin with *Hineh el yeshuati*, as we also do on the conclusion of an ordinary Sabbath.

## CODE OF JEWISH LAW

29. On the conclusion of *Yom Kippur*, we eat and drink and rejoice; for it is stated in the *Midrash Rabbah* (Koheleth 9): "On the conclusion of *Yom Kippur* a heavenly voice goes forth and says: 'Go, eat thy bread with joy, and drink with a merry heart thy wine, for God has already accepted thy deeds heretofore.'"

30. The meticulously devout begin the construction of the *Sukkah* immediately after *Yom Kippur*, in the spirit of the verse (Psalms 84:8): "They go from strength to strength."

31. On the day after *Yom Kippur*, it is customary to rise early and go to the synagogue to pray. We do not fast, between *Yom Kippur* and *Sukkot*; even on the occasion of a *Jahrzeit*. We also omit the *Tahanun* (petition for Grace) on these days, because they are days of rejoicing, during which the altar was dedicated in the days of Solomon. In this interval we are to engage in the building of the *sukkah*, preparing the *etrog* (citron) and the other accessory species, in honor of the Lord of Lords, who hath sanctified Israel and the seasons.

## CHAPTER 134

### The Sukkah (Tabernacle)

1. It is a meritorious act to start building the *sukkah* immediately after *Yom Kippur*, even if it is a Friday; because a chance to perform a precept should not be put off. One should choose for it a clean site. Every one should personally build the *sukkah*, even if one is an eminent person. For it is an honor to perform a precept in person. By right, the benediction *Shehecheyanu* (who hath kept us in life) should be said upon erecting the *sukkah*, but the *Shehecheyanu* benediction said in the *kiddush* also includes the construction. One should embellish the *sukkah* and adorn it by placing in it fine furniture and beautiful spreads to the full extent of one's means.

2. There are many different opinions regarding the walls of the *sukkah*, in which not everybody is well versed. It is essential, therefore, to make the walls of the *sukkah* compact and strong, so that the wind could not shake them or blow out the candles. If one has not enough material with which to make four walls, one should rather erect three complete walls than four incomplete ones. A person who can afford it, should build a *sukkah* with a roof that can open and close on hinges, so that he can close it in case of rain and reopen it when the rain is over. Thus the covering of the *sukkah* can be kept dry, and the precept properly observed.

3. There are also many different opinions regarding the roofing of the *sukkah*. However, since we generally cover it with the branches of trees, or with reeds, which are detached products of the soil, and not subject to defilement, and are not tied together, there is no cause for scruples.

# CODE OF JEWISH LAW

out further preparations, such as boiled meat, fish, confectionery, fruits, wine, mead, or something similar.

3. Everybody, even the poorest in Israel who is himself dependent on charity, is to give at least one gift each to two poor persons, for it is written (Esther 9:22): "And gifts to the poor," which means, two gifts to two poor persons. One should not make any inquiries in giving to the poor. Whoever puts out his hand and begs, should be given alms. If one lives in a community where there are no poor people, one must either keep the *Purim* money until one meets poor persons, or send it to some needy persons that he knows.

4. Women, too, must send gifts to their friends and contribute to charity on this day. Women should send gifts to women, and men to men, but as regards charity to the needy, women may help men, and men may help women. Some women depend on their husbands that they give for them as well, but this is improper; they should be more exacting about it.

5. *Purim* must be celebrated by eating, drinking, and making merry. Also on the night of the fourteenth of *Adar*, one must be joyful and eat somewhat more abundantly. If *Purim* occurs on Saturday night, although one must have a third meal on the Sabbath, one should eat a little less during the day in order to be able to enjoy the *Purim* repast. Nevertheless, the obligation of feasting on *Purim* is not fulfilled by the feast that we make at night. So the principal *Purim* feast is to be held in the daytime. For it is written (Esther 9:22): "Days of feasting." It is appropriate to light candles as becomes a festival occasion, even though the meal is held in the daytime. On the night of the fifteenth, there should also be some rejoicing. The giving of charity and the sending of gifts to friends also should be performed during the daytime. And because people are concerned with sending out portions, a part of the repast is had in the night time. The *Minhah* prayer is, therefore, said while it is yet broad day, and the feast is held after *Minhah*. But at least the greater part of the feast should be had while it is yet day. When *Purim* occurs on a Friday, the feast is held in the morning, in deference to the Sabbath. It is well to engage in the study of the Torah for a short time before beginning the feast. A support for this view is found in the verse (Esther 8:16): "The Jews had light," and "light" is defined as having reference to the Torah. Some authorities say that it is appropriate to eat some seeds on *Purim*, to recall the seeds which Daniel and his comrades ate in Babylon, and also to recall the seeds that Esther had eaten. For the *Talmud* says (Megillah 16b): "The verse (Esther 2:9): "And he advanced her and the maidens to the best," means that he permitted her to have seeds for her food."

[1120]

# CODE OF JEWISH LAW

6. Since the whole miracle of *Purim* was occasioned through wine; Vashti met her fate at the wine feast and Esther took the crown in her stead; the downfall of Haman was due to wine, therefore, the Sages, of blessed memory, made it obligatory on every one to become drunk, and ordained: "One is obliged to regulate himself on *Purim*, until one is unable to differentiate between "Cursed be Haman," and "Blessed be Mordecai:"" At least to commemorate the great miracle, one should drink more than he is accustomed, until he falls asleep, and while asleep, he will be unable to differentiate between "Cursed be Haman" and "Blessed be Mordecai." However, if one has a delicate constitution, likewise if one knows that drunkenness may cause him, God forbid, to slight some precept, a benediction or a prayer, or that it will lead him, God forbid, to levity, it is best for him not to become intoxicated; for all our deeds must be for the sake of Heaven.

7. A mourner, even during the first seven days of mourning, is obliged to send gifts to the needy and portions to his friends; he should not, however, send them anything that will cause joy. But we do not send anything to a mourner the entire twelve months, even a thing that is not of a joy-provoking nature. If the mourner is a poor man, it is permissible to send him money or any article that is not calculated to cause joy. If only the mourner and one other person dwell in that place, a gift must be sent to him, in order to observe the precept of sending portions. (For the law regarding an *onan*, see chapter 141.21, above).

8. No labor may be performed on *Purim*, and whoever performs any labor on that day, will never derive any benefit from it. But it is permissible to have work done for us by a non-Jew. It is also permissible to attend to business, to write even a social letter, to make a note of debts due, and to do anything that does not require much concentration. Especially is it permissible to write something of a religious nature or do some work for the performance of a precept. For the requirements of *Purim* it is permissible to perform any labor.

9. The fifteenth day of *Adar* is known as *Shushan Purim*. On this day we do not say *Tahanun* (petition for Grace), nor *El ereh appayim* (O God, Thou art long-suffering), nor *Lamenatzeah* (To the chief musician). On this day it is also forbidden to deliver funeral orations or to fast. It is customary to make rather festive meals and to be merry on *Shushan Purim*, but no *Al ha-nissim* (We thank Thee for the miracles) is said. Marriages are permitted on this day, but not on the fourteenth of *Adar*, when the *Megillah* is read, for it is a joyous event, and we do not join one festive event with another.

10. On the fourteenth and fifteenth days of the first *Adar* (in a leap-year), neither *Tahanun*, nor *El ereh appayim*, nor *Lamenatzeah* is said, and it is also forbidden to deliver funeral orations or to fast on those days. On the fourteenth, our meals are more or less of a festive nature.

[121]