## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **DERON McCOY Jr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 21-3269-JWL** |
| | ) | |
| **ARAMARK CORRECTIONAL** | ) | |
| **SERVICES,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

In accordance with D. Kan. Rule 7.1(a), Defendant Jeff Zmuda, submits this memorandum, through Assistant Attorney General Matthew L. Shoger, in support of his motion under Fed. R. Civ. P. 12(b)(1) and (b)(6) or Fed. R. Civ. P. 56.[1] Defendant Zmuda respectfully requests that this motion be granted and this action be dismissed, or, in the alternative, summary judgment be granted in his favor. Defendant Zmuda attaches fifteen new exhibits, outlined in the table below, and states the following in support.

### INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | McCoy's grievances and KDOC staff's responses |
| B | KDOC Biography of Secretary Zmuda |
| C | Declaration of Paige Coleman |
| D | (1st) Declaration of Maria Bos<br>- Exhibit D-1 – McCoy's canteen purchases from 6/21/21 to 5/25/22<br>- Exhibit D-2 – McCoy's canteen purchases from 5/26/22 to 2/8/23<br>- Exhibit D-3 – Canteen menus |
| E | (2nd) Declaration of Maria Bos |
| F | Non-Kosher Canteen Items Purchased by McCoy from 6/30/21 to 2/8/23 |
| G | Declaration of Jesse Howes |
| H | Declaration of Keith Bradshaw |
| I | Declaration of John-Mark Albert Henke |
| J | Declaration of Amber N. Hoffman |
| K | EDCF General Orders 23-103 and 05-106  *(all versions since 11/1/10)* |
| L | IMPP 01-127D  *(version in effect since 12/21/21)* |
| M | IMPP's 10-108 and 10-108D  *(all versions since 7/2/10)* |

---

[1] Although Defendants Patricia Berry and Randy Singletary have not yet been served in this case, many of the arguments in this memorandum apply equally to them (except in section III).

| N | IMPP 10-110D *(version in effect since 1/30/18)* |
| O | IMPP 11-101A *(all versions since 4/23/19)* |

## NATURE OF THE CASE

Plaintiff Deron McCoy, Jr., an inmate currently incarcerated at El Dorado Correctional Facility (EDCF) in restrictive housing (Doc. 17-1 at 3; Doc 24-2 at 5, ¶ 2; Exhibit G ¶¶ 8-9), alleges that defendants have violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Free Exercise and Equal Protection clauses (Doc. 24 at 2, 8, 21-25, 30). McCoy alleges that the food provided to him through EDCF's Certified Religious Diet (CRD) is not kosher due to the way it is prepared and served (Doc. 24 at 21-23), and that he should be provided additional foods for Sabbaths and holidays (Doc. 24 at 23-25, 30).

McCoy previously litigated many, if not all, of these issues and lost in *McCoy v. Aramark Corr. Servs., LLC*, No. 16-3027-HLT, 2020 WL 5877613 (D. Kan. Oct. 2, 2020) [hereinafter *McCoy I*] (Docs. 175, 190). He filed this current lawsuit on November 24, 2021 (Doc. 1), and filed his Second Amended Complaint on November 16, 2022 (Doc. 24). McCoy seeks nominal and punitive damages, a declaratory judgment, injunctions mandating his desired dietary accommodations, and the costs of this action (Doc. 24 at 28-29).

On the Court's order (Doc. 4), the Kansas Department of Corrections filed a *Martinez* Report on June 15, 2022 (Doc. 7), and then later filed an amended *Martinez* Report on July 29, 2022 (Doc. 17). McCoy's Second Amended Complaint survived screening on November 16, 2022 (Doc. 23). Defendants Rabbi Fellig, Sharon Coats, Judy Hay, Randy Singletary, Patricia Berry, and Rabbi Friedman have not yet been served in this case. Although service was attempted at "c/o El Dorado Correctional Facility" for each of these defendants (Docs. 26-31), none of these defendants are current KDOC or EDCF employees (Doc. 32 at 2; Doc. 35 (sealed last known addresses of former KDOC employees)) and therefore cannot be served at EDCF. Defendant Zmuda has provided the Court with the last known addresses of Singletary and Berry "under seal for the sole purpose of effecting service of process upon them." (Doc. 37; *see also* Docs. 35 (sealed), 36, 40.)

Kansas Secretary of Corrections Jeff Zmuda and Aramark Correctional Services, Inc. ("Aramark") each waived service of process on December 15, 2022. (Docs. 32, 34.) Aramark filed a motion to dismiss on February 13, 2023 (Docs. 42-44), McCoy responded on February 28, 2023 (Doc. 47), and Aramark filed a reply

on March 13, 2023 (Doc. 50). Defendant Zmuda now files his Motion to Dismiss, or, in the Alternative, for Summary Judgment. (*See* Doc. 49 (granting extension of time).)

The Court should dismiss McCoy's claims or grant summary judgment to Zmuda because of Eleventh Amendment immunity, lack of individual capacity claims under RLUIPA, and issue and claim preclusion based on McCoy's previous lawsuit. Alternatively, the Court should dismiss McCoy's claims or grant summary judgment to Zmuda because of lack of personal participation, qualified immunity, and failure to exhaust administrative remedies. Or the Court should dismiss the claims for punitive damages for lack of the requisite subjective intent, and the claims for injunctive relief for mootness due to McCoy no longer being on the CRD.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1. McCoy was transferred to EDCF on June 8, 2019. (Doc. 17-1 at 3.)

2. McCoy was placed on the CRD at EDCF on June 24, 2022. (Exhibit J at ¶ 4.)

3. When an inmate on a special diet is transferred out of a facility, the inmate is not kept on the facility's approved list of residents for that diet. (Exhibit J); *McCoy v. Aramark Corr. Servs., LLC*, No. 16-3027-HLT, 2020 WL 5877613 (D. Kan. Oct. 2, 2020) [hereinafter *McCoy I*] (Doc. 190 at 3 n.5, 8-10); (*see also* Exhibit N, 8 (§ V(B)(2)) (policy for requesting religious accommodations); Exhibit D at ¶ 10 (practice)).

4. McCoy is not currently on the CRD after leaving EDCF, returning to EDCF, and not requesting to be placed on the CRD after returning to EDCF. (Exhibit J at ¶ 4.)

### *McCoy I*

5. McCoy has previously litigated about the CRD policy. *McCoy I* (Docs. 175, 190).

6. McCoy's previous lawsuit resulted in a final judgment against him on October 2, 2020. *McCoy I* (Docs. 190-91).

7. McCoy did not appeal from this final judgment. *See McCoy I* (docket).

8. The final judgment found the following:

   a. "The crux of [McCoy's] complaint is that Defendants have failed to provide him with a Kosher diet in accordance with his Jewish faith." *McCoy I* (Docs. 175 at 1, 190 at 1).

b. "The uncontroverted evidence shows that Defendants offer Kosher meals to inmates without charge. It further shows that Defendants have procedures in place to ensure that CRD meals are prepared in accord with Jewish dietary practices." *McCoy I* (Doc. 190 at 13).

c. "[T]he [alleged] violations do not show that Defendants . . . exhibited a conscious or intentional interference with Plaintiff's free exercise of religion. No reasonable jury could conclude otherwise." *McCoy I* (Doc. 190 at 14).

d. "Plaintiff is not entitled to 'TV dinners' from KDOC or Aramark and is not entitled to compensation for Defendants' use of the CRD menu to provide Kosher meals for inmates following Jewish dietary laws." *McCoy I* (Doc. 190 at 14).

9. In the previous lawsuit, the CRD menus indicated that most (if not all) of the meat entrees were made with Texturized Vegetable Protein (TVP). *McCoy I* (Doc. 41-3 at 3-7; Doc. 133-1 at 44-47).

10. KDOC Secretary Zmuda did not sign the CRD menus. *See McCoy I* (Doc. 175 at 4).

### *Rabbinic Contractors*

11. KDOC and Aramark have each contracted with rabbis to verify that the way the CRD food and cookware is prepared, stored, cleaned, and disposed of does not violate kosher dietary laws. (Doc. 18); *McCoy I* (Doc. 133-1 at 2-3 (¶ 9), 5 (¶ 20), and 48-50); *McCoy I* (Doc. 190 at 3-5, 12-13).

12. KDOC's contracted rabbi could come in and out of the EDCF kitchen at any time to inspect the EDCF kitchen, to monitor the administration of CRD in the EDCF kitchen, to review policies, procedures, food labels, and kitchen operations, and to give advice to the KDOC and Aramark management as may be required on how to comply with Jewish dietary laws. (Doc. 18 at ¶ 2.)

### *Availability of Kosher Foods*

13. When dietary rules change for Passover, when Jewish inmates cannot eat leavened bread, the appropriate food is provided by Aramark. (*See* Doc. 24 at ¶¶ 63-65); *see also* Exodus 12:18-20; Deuteronomy 16:3-4.

14. Jewish EDCF inmates in general population have the opportunity to purchase TV dinners with meat and

fish on Succoth with their own funds. (Doc. 24 at ¶¶ 67(1)²-68(1).)

15. Jewish EDCF inmates in general population have the opportunity to purchase cheesecake on Shavuot with their own funds. (Doc. 24 at ¶ 70.)

16. Jewish EDCF inmates in general population have the opportunity to purchase smoked fish or lox for Yom Kippur with their own funds. (Doc. 24 at ¶ 73.)

17. Jewish EDCF inmates can purchase kosher fish from the commissary. (Exhibit D-3 at 26; Exhibit D at ¶ 6 (explaining Exhibit D-3); *see also* Exhibit O, 2 (§ I(A)(5)), 4 (§ V(A)(1)), 8 (§ I(A)(5)), 11 (§ V(A)(1)) (policy regarding canteen purchases in restricted housing); Exhibit D at ¶ 10 (practice).)

18. Jewish EDCF inmates in general population at least occasionally have the opportunity to purchase kosher meats and grape juice with their own funds. (Doc. 24 at 67(1)-68(1); Exhibit A at 12-14; Doc. 24-1 at 10-11.)

19. EDCF inmates cannot purchase wine. The explanation given by EDCF is that alcoholic beverages like wine, as intoxicants, are contraband and a security risk. (Exhibit E at ¶ 4.)

### *McCoy's Non-Kosher Purchases*

20. McCoy regularly purchases non-kosher food items from the Kansas Correctional Industries Commissary (or "canteen"). (Exhibit F (citing Exhibits D-1 to D-3); Exhibit D at ¶¶ 4-9 (explaining Exhibits D-1 to D-3).) He has not stopped doing so. (Exhibit F at 3.)

21. Over the 589-day span from June 30, 2021, to February 8, 2023, McCoy purchased 261 non-kosher food items from the canteen. (Exhibit F at 3.)

22. That is equivalent to buying a non-kosher food item every 2.26 days. (*Id.*)

23. A "prison store" like McCoy claims to run (Doc. 13 at ¶¶ 8-12; Doc. 47-1 at ¶¶ 71-76) would be a violation of prison policy. (Exhibit G at ¶ 10 (citing K.A.R. 44-12-205); Exhibit D at ¶ 12.)

24. McCoy has been in restrictive housing at EDCF since December 6, 2022. (Doc 24-2 at 5, ¶ 2; Exhibit G at ¶¶ 8-9.)

---

² The Second Amended Complaint includes duplicates of some paragraphs. This "67(1)" notation indicates the first paragraph 67.

25. He was released for a court appearance on December 19, 2022, but returned to restrictive housing at EDCF on December 21, 2022. (Exhibit G at ¶ 9; Exhibit J at ¶ 4.)

26. In restrictive housing, limited interactions with other inmates and heightened security make operating a "prison store" not only against prison policy, but also infeasible. (Exhibit G.)

### Food Service Budget

27. In fiscal year 2022, KDOC spent over $17.3 million on meals for inmates. KDOC, Annual Report: Fiscal Year 2022, 43, https://www.doc.ks.gov/publications/Reports/kdoc-fy2022-annual-report (last accessed Mar. 17, 2023).

28. In January 2023, KDOC spent nearly $1.4 million for almost 800,000 inmate meals. (Exhibit H at ¶ 3.)

29. Of that amount, over $270,000 was for about 155,000 meals for inmates in EDCF. (*Id.*)

30. The price per meal charged by Aramark to KDOC in January 2023 was $1.752 per meal. (*Id.*)

### First Grievance

31. McCoy submitted a grievance on January 21, 2021, which "addressed not being served meat and fish and other food items during the Sabbath." (Doc. 24 at 26-27.)

32. The grievance complained that those food items are "not supplied under CRD." (Doc. 24-1 at 7; Exhibit A at 3; *see also* Exhibit A at 5 (demanding that KDOC "direct Aramark to supply . . . other required meal items").)

33. UTS Brewer responded on January 28, 2021, that the CRD "is the meal program for the Religious Groups that need to have a Kosher meal." (Doc. 24 at 27; Doc. 24-1 at 8; Exhibit A at 6.)

34. McCoy appealed to the warden and to the Secretary's office, who agreed with the lower responses. (Doc. 24 at 27; Doc. 24-1 at 2-4; Exhibit A at 7-10.)

35. In his administrative filings, McCoy did not offer to pay for the Sabbath food items he requested. (Doc. 24-1 at 3, 5-7; Exhibit A at 1-5, 8-9.)

### Second Grievance

36. McCoy sent a Form 9 to the chaplain on August 5, 2022, "requesting to be provided challah bread as well as to know what other food items were allowed for inmates in seg." (Doc. 24 at 27.)

37. The Form 9 said that McCoy "would like challah and grape juice" for the Sabbath and that he would like to "obtain food items" for other holidays. (Exhibit A at 11; *see also* Doc. 24-1 at 11; Exhibit A at 14.)

38. In his Form 9, McCoy did not offer to pay for the additional food items he requested. (Exhibit A at 11, 14; Doc 24-1 at 11.)

39. The chaplain responded to the Form 9 on August 17, 2022, that "offenders in seg are not supplied challah bread and grape juice." (Doc. 24 at 28).

40. McCoy filed a grievance that same day. (Doc. 24 at 28; Doc. 24-1 at 10; Exhibit A at 12-13.)

41. The chaplain responded to the grievance on August 25, 2022. (Doc. 24 at 28; *see also* Doc. 24-1 at 11; Exhibit A at 14.)

42. In explaining the reasoning for rejecting the grievance, the chaplain said, that McCoy – in his earlier Form 9 – "is asking the Chaplain to provide challah bread and grape juice to observe Shabbat, which is the Jewish Sabbath. He does not offer to purchase said items." (Doc. 24-1 at 11; Exhibit A at 14.)

43. Group food events for Jewish general population inmates to celebrate the Sabbath are paid for with funds from the group's account. (Exhibit A at 13; *see also* Exhibit M, 4-5 (§ IV(A)), 10-11 (§ IV(B)) (policy for group food events in general population); Exhibit D at ¶ 10 (practice).)

44. The chaplain's response cited EDCF General Order 23-103 to point out "that banquets and refreshments are only open to inmates who are part of [the] requesting organization and who are housed in general population." (Doc. 24 at 28; *see also* Doc. 24-1 at 11; Exhibit A at 14; Exhibit K, 1-2 ("policy" ¶ 2, § II(B)(5)), 6-7 ("policy" ¶ 2, § II(B)(5)) (policy); Exhibit D at ¶ 11 (practice).)

45. The chaplain's response also explained that, under EDCF GO 23-103, "Inmate Organization Food Events are not for an 'individual' but for a group." (Doc. 24-1 at 11; Exhibit A at 14; *see also* Exhibit K, 1-2 ("policy" ¶ 2, § II(B)(5)), 6-7 ("policy" ¶ 2, § II(B)(5)) (policy); Exhibit D at ¶ 11 (practice).)

46. McCoy appealed to the warden and to the Secretary's office, who agreed with the lower responses. (Doc. 24 at 28; Doc. 24-1 at 9; Exhibit A at 15-17.)

### *KDOC and EDCF Officials*

47. Zmuda has been the Kansas Secretary of Corrections since 2019. (Exhibit B.)

48. EDCF's General Orders are issued by the EDCF warden and are reviewed and approved by the KDOC Policy Analyst and other available staff, not by the Secretary himself. (Exhibit L, 1-2 (§ I(A), (D)), 4 (§ III) (policy); Exhibit C at ¶¶ 3-4 (practice).)

49. An EDCF official, in light of his training and experience, asserts that granting McCoy's requested accommodations would likely result in numerous inmates being jealous and requesting similar accommodations, and some inmates lashing out with bad behavior toward EDCF staff and other inmates. (Exhibit I at ¶ 3.)

## QUESTIONS PRESENTED

I.   As a matter of law, does the Eleventh Amendment bar McCoy's claims against Secretary Zmuda in his official capacity for monetary damages and for declaratory relief?

II.   As a matter of law, should McCoy's individual capacity claims under RLUIPA be dismissed?

III.   Do issue preclusion or claim preclusion bar McCoy's current claims when he either has or could have litigated these matters in his previous lawsuit, which resulted in a final judgment against him?

IV.   Should McCoy's claims against Secretary Zmuda be dismissed when McCoy has not alleged Zmuda's personal participation in the alleged violations?

V.   To the extent the Court construes McCoy's claims as preventing McCoy any access at all to the religious foods he requests, is Secretary Zmuda entitled to summary judgment because McCoy failed to exhaust his administrative remedies under the Prison Litigation Reform Act (PLRA)?

VI.   Is Secretary Zmuda entitled to qualified immunity because his actions – either as alleged or as revealed in the evidentiary record – did not violate clearly established law of which reasonable state officials would have known?

VII.   Is Secretary Zmuda entitled to summary judgment on the CRD policy when it did not substantially burden any sincerely held religious beliefs and when any such burden was appropriately justified?

VIII.   Should McCoy's equal protection claim be dismissed when the complained-of restrictions on restrictive housing residents are rationally related to the purpose of restrictive housing?

IX.   Should McCoy's request for punitive damages be dismissed when he cannot show any conduct was

motivated by evil intent or was undertaken with reckless or callous indifference to his rights?

X.      Is McCoy's request for injunctive relief moot when he is no longer on the CRD?

# ARGUMENTS AND AUTHORITIES

### *Standard on Motion to Dismiss for Lack of Subject-Matter Jurisdiction*

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims for lack of subject-matter jurisdiction. McCoy, as the party invoking the Court's jurisdiction, bears the burden of showing its existence. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018).

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) can take the form of either a facial attack, looking only to the factual allegations of the complaint, or a factual attack, presenting evidence to challenge the court's jurisdiction. *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010). For a facial attack, the same standards apply to the motion as are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action. *Id.*; *see also Garling v. EPA*, 849 F.3d 1289, 1293 & n.3 (10th Cir. 2017) ("the trial court must apply a standard patterned on Rule 12(b)(6)"). To the extent a factual attack is made, the Court is not required to assume the truth of the complaint's factual allegations, but "may consider materials outside the complaint to resolve disputed jurisdictional facts." *Williams v. United States*, 780 F. App'x 657, 660 (10th Cir. 2019); *see also Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020) (saying that resolving disputed jurisdictional facts only converts the motion to a summary judgment motion if "resolution of the jurisdictional question is intertwined with the merits").

### *Standard on Motion to Dismiss for Failure to State a Claim*

On a Rule 12(b)(6) motion to dismiss – or a facial attack under 12(b)(1), as mentioned above – a court must accept as true all well-pleaded factual allegations in the complaint, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), but a complaint must also contain enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Brownback v. King*, 141 S. Ct. 740,

749 (2021) ("a plaintiff must plausibly allege all jurisdictional elements"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Garling*, 849 F.3d at 1293 & n.3 (applying *Twombly* and *Iqbal* to a facial attack on subject-matter jurisdiction under Rule 12(b)(1)).

The court need not accept as true those allegations that state only legal conclusions. *Iqbal*, 556 U.S. at 678. Under this standard, a plaintiff's claim must cross the line from "conceivable to plausible," and "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted).

Although the sufficiency of a complaint generally rests on its contents alone, the court may also consider: (1) documents that the complaint incorporates by reference, (2) documents that the complaint references if they are central to the plaintiff's claims, and (3) documents of which a court may take judicial notice, which includes court records in any related court proceedings. *Gee v. Pacheco*, 627 F.3d 1178, 1186, 1191 (10th Cir. 2010). At the motion to dismiss stage, documents of which the court takes judicial notice "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Although courts have traditionally construed *pro se* pleadings in a liberal fashion, this "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Similarly, courts do not assume the role of an advocate for the *pro se* litigant by constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). A *pro se* litigant is expected to construct his or her own arguments or theories and adhere to the same rules of procedure that govern any other litigant in this circuit. *Id.* at 840-41.

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044

(10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to

the nonmoving party. *McCoy*, 887 F.3d at 1044. "An issue is 'genuine' if there is sufficient evidence on each

side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if

under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*,

144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When

there is no genuine dispute of material fact on an essential element of the nonmovant's claim, then summary

judgment is appropriate. *See Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002).

The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly

unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Facts must be identified by

reference to affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. Relying on mere

pleadings or conclusory allegations without supporting facts in the record is not enough. *May v. Segovia*, 929

F.3d 1223, 1234 (10th Cir. 2019).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is
> insufficient to create a genuine issue or dispute of material fact. To create a genuine issue, the
> nonmovant must present facts upon which a reasonable jury could find in favor of the
> nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (citation omitted).

What is more, "while courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on

conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002)

(citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *see also McCoy*, 887 F.3d at 1044

("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate

clearly established statutory or constitutional rights of which a reasonable person would have known. *Thomas v.

Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity is an affirmative defense that can be raised in

a motion to dismiss or in a motion for summary judgment. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309

(1996)). When a defendant raises the qualified immunity defense, it creates a presumption that the defendant is

immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.* At the motion to dismiss stage, courts look to the defendant's conduct as alleged in the complaint, while at the summary judgment stage, courts look at the defendant's conduct according to the evidence in the light most favorable to the plaintiff. *Thomas*, 765 F.3d at 1194 (citing *Behrens*, 516 U.S. at 309). "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Simply put, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). In order to overcome Zmuda's qualified immunity, McCoy must show not only that Zmuda violated his federally secured rights, but also that objectively reasonable officials could not have thought the conduct statutorily or constitutionally permissible. *Park v. Gaitan*, 680 F. App'x 724, 738 (10th Cir. 2017) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007)).  If a plaintiff fails to satisfy either prong of the qualified immunity test, a court must grant the defendant qualified immunity. *Grissom*, 902 F.3d at 1167.

Federal precedent offers two avenues for determining whether challenged conduct violates clearly established statutory or constitutional rights: "the plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (citation omitted). The Supreme Court recently re-emphasized that "the clearly established right must be defined with specificity" and not "at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

**I.**  **The Eleventh Amendment bars McCoy's claims against Zmuda in his official capacity for monetary damages and for declaratory relief.**

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v.*

*Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to arms of the state and to state officials who are sued for damages in their official capacity." *Id.* As such, employees of KDOC share the state's immunity from suits against them in their official capacities for money damages or declaratory relief. *See White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996).

A narrow exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But the Eleventh Amendment bars claims for "retrospective declaratory relief" against state officials. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, McCoy requests prospective injunctive relief against Zmuda, and this particular remedy is exempt from Eleventh Amendment immunity. (Doc. 24 at 28-29.) But McCoy also requests monetary damages in the form of nominal and punitive damages (Doc. 24 at 28), which are barred by the Eleventh Amendment as asserted against Zmuda in his official capacity. McCoy further requests a declaratory judgment stating that Zmuda violated his constitutional rights. (Doc. 24 at 28.) To the extent such a declaratory judgment stands as an independent remedy apart from McCoy's requested injunctive relief, it is barred by the Eleventh Amendment. Therefore, McCoy's claims against Zmuda in his official capacity for monetary damages and for declaratory relief should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

## II.    RLUIPA does not support individual capacity claims, so McCoy's individual capacity RLUIPA claims against Defendant Zmuda should be dismissed.

Congress enacted RLUIPA under the Spending Clause of the Constitution, conditioning the application of RLUIPA on the receipt of federal funds by state agencies. *Stewart v. Beach*, 701 F.3d 1322, 1334-35 (10th Cir. 2012). Because of this, RLUIPA "operates like a contract, and individual RLUIPA defendants are not parties to the contract in their individual capacities." *Id.* at 1335. As a result, RLUIPA does not support individual capacity claims. *Id.* Here, McCoy sues Defendant Zmuda in Zmuda's individual and official capacities under RLUIPA. (Doc. 24 at 6.) But RLUIPA only supports official capacity claims, so the individual capacity claims should be dismissed.

**III.   Only one of McCoy's claims has been brought against Defendant Zmuda.**

In the alleged violations of law that McCoy lists, the only one against Zmuda alleges that Zmuda "failed to provide or enact policy and procedure to provide the plaintiff with Kosher meal items so that he could properly observe Jewish high holy days/festivals while [he was] housed [in] segregation." (Doc. 24 at 30.) None of McCoy's other alleged violations mention Zmuda (Doc. 24 at 20-25, 30), so only one claim has been brought against Zmuda. (In the alternative, however, this memorandum also addresses McCoy's other claims.[3])

**IV.   Issue preclusion and claim preclusion bar McCoy's current lawsuit because he either has or could have litigated these matters in the previous lawsuit, which resulted in a final judgment.**

The affirmative defense of issue preclusion (collateral estoppel) bars the re-litigation of an issue of law or fact after it is determined on the merits by a valid, final judgment. *Keller Tank Servs. II, Inc. v. Comm'r of Internal Rev.*, 854 F.3d 1178, 1193 (10th Cir. 2017). Similarly, the separate affirmative defense of claim preclusion (res judicata) prevents a party from litigating a legal claim that was *or could have been* the subject of a previously issued final judgment. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017). "The principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not have another chance to do so." *Johnson v. Spencer*, 950 F.3d 680, 708 (10th Cir. 2020). Federal common law governs the preclusive effect of federal court judgments. *Id.*

Under federal common law, issue preclusion applies when:

(1) the issue previously decided is identical to the present one; (2) the prior action was finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the previous adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the previous adjudication.

*Keller*, 854 F.3d at 1193. "The litigated issue must also be essential to the judgment." *Id.*

Claim preclusion has similar requirements and applies when the defendant proves three elements: "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Johnson*, 950 F.3d at 708. An exception exists to claim preclusion

---

[3] And the Court can *sua sponte* consider Zmuda's arguments with regard to other defendants. *Reece v. AES Corp.*, 638 F. App'x 755, 763 n.10 (10th Cir. 2016) (citing *McKinney v. Okla.*, 925 F.2d 363, 365 (10th Cir. 1991)).

when the plaintiff "did not have a full and fair opportunity to litigate the claim in the prior action." *Id.*
Regarding the second element, "officers of the same government" are considered in privity with one another
and "are protected from relitigation of the same issue between the plaintiff and another officer of the
government." *Yung-Kai Lu v. Univ. of Utah*, 790 F. App'x 933, 936 n.1 (10th Cir. 2019) (citing *United States v.
Rogers*, 960 F.2d 1501, 1509 (10th Cir. 1992)).[4] Regarding the third element, new actions that have occurred
due to the continuation of a previously litigated policy or custom do not count as new events for purposes of
determining the identity of the causes of action, but rather count as part of the same ongoing series of events as
before. *See Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1275 (10th Cir. 2022).

    Although some holdings in the previous case were not final adjudications on the merits (such as
dismissing without prejudice for failure to exhaust administrative remedies or dismissing for lack of jurisdiction
due to mootness), other holdings on the merits in the previous lawsuit ultimately preclude the claims McCoy
makes in his current lawsuit.

## A.  Under issue preclusion, McCoy cannot relitigate whether the CRD policy provides kosher food.

    In McCoy's previous lawsuit, the Court said that "[t]he crux of [McCoy's] complaint is that Defendants
have failed to provide him with a Kosher diet in accordance with his Jewish faith." *McCoy v. Aramark Corr.
Servs., LLC*, No. 16-3027-HLT, 2020 WL 5877613 (D. Kan. Oct. 2, 2020) [hereinafter *McCoy I*] (Docs. 175 at
1, 190 at 1). The crux of McCoy's complaint in his current lawsuit is the same. To the extent the Court
considers McCoy's affidavits from other inmates – which McCoy does not cite to or explain in his complaint –
this evidence is the same as in the last lawsuit.[5] In the previous lawsuit, the Court said:

> *Plaintiff fails to demonstrate a genuine issue of material fact . . . based on . . . the CRD*

---

[4] *See also Mambo v. Vehar*, 185 F. App'x 763, 764-65 (finding an employee to be in privity with his employer);
*Lenox*, 847 F.3d at 1241 (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 17-19 (1st Cir. 2003))
(privity exists between defendants where defendants are "treated as a single entity" or as "peas in a pod" by the
plaintiff).

[5] *Compare* Doc. 24-2 at 7-14 *with McCoy I* (Doc. 145-1); *Compare* Doc. 24-2 at 15-16 *with McCoy I* (Doc. 185
at 52-53); *Compare* Doc. 24-2 at 17-18 *with McCoy I* (Doc. 185 at 54-55). The affidavit from Tyrone Hamilton
Jr. (Doc. 24-2 at 19-21) may be new, but it does not specify which prison facility Tyrone Hamilton Jr. worked
the serving line at and so its relevance to this case regarding EDCF has not been established. Regardless,
McCoy does not cite to or explain the relevance of any of these affidavits in his complaint, so they should not
be considered. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) ("the court
cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the
record").

> *policy. . . .* Plaintiff has submitted countless conclusory allegations about what he believes is required for a Kosher diet and how Defendants have failed to provide it to him. . . . *The uncontroverted evidence shows that Defendants offer Kosher meals to inmates without charge. It further shows that Defendants have procedures in place to ensure that CRD meals are prepared in accord with Jewish dietary practices. . . . Plaintiff is not entitled to "TV dinners" from KDOC or Aramark* and is not entitled to compensation for Defendants' use of the CRD menu to provide Kosher meals for inmates following Jewish dietary laws.

*McCoy I* (Doc. 190 at 7, 12-14) (emphasis added).

McCoy has already litigated the issue and lost regarding whether the CRD policy provides kosher food. Summary judgment was granted as a final adjudication on the merits of this essential part of McCoy's claims. The party against whom the doctrine is invoked, McCoy, was a party to the previous adjudication, and he had a full and fair opportunity to litigate the issue. He amended his complaint three times,[6] and filed numerous documents[7] to support his claims, but, ultimately, he lost. McCoy cannot now have a second bite at the apple and claim that the CRD policy does not provide kosher food.

**B.   Under issue preclusion, McCoy cannot relitigate whether qualified immunity applies for KDOC employees regarding the CRD policy.**

In the previous lawsuit, the Court ruled on qualified immunity for an employee who signed the CRD menus:[8]

> Plaintiff asks the Court to find that, under these facts, every reasonable official would be on notice that Defendant Berry's limited involvement with the CRD would violate an inmate's First Amendment rights. In the absence of any authority involving similar circumstances, Plaintiff has not met his burden. Therefore, Defendant Berry is entitled to qualified immunity, and the Court dismisses Plaintiff's individual capacity claims against her under § 1983.

*McCoy I* (Doc. 175 at 18).

McCoy has already litigated the issue and lost regarding whether the signing the CRD menu overcomes qualified immunity. The Court granted summary judgment, a final adjudication on the merits of this essential issue of immunity. The party against whom the doctrine is invoked, McCoy, was a party to the previous

---

[6] *McCoy I* (Docs. 1, 11, 18, 56).

[7] *McCoy I* (Docs. 7-9, 16, 19, 21-23, 36-37, 52, 62-63, 71-73, 78-80, 108-10, 122, 125, 144-46, 148-49, 155, 157-59, 161-62, 173, 184-85).

[8] Although this ruling was with regard to a different defendant, Patricia Berry, issue preclusion does not require identity of the defendants here, but only of the plaintiff, because the plaintiff is the party against whom the doctrine is being invoked. *See Keller*, 854 F.3d at 1193.

16

adjudication, and he had a full and fair opportunity to litigate the issue. McCoy cannot now have a second bite

at the apple and claim that merely signing the CRD menu overcomes qualified immunity. Accordingly, Zmuda

allegedly signing the CRD menu (Doc. 24 at ¶ 22(1)) is not enough to overcome qualified immunity.[9]

**C. Alternatively, under claim preclusion, McCoy cannot raise new claims that he could have raised before, so he cannot now claim that he should be provided additional kosher foods.**

In McCoy's previous lawsuit, the CRD menus clearly indicated that most (if not all) of the meat entrees

were made with Texturized Vegetable Protein (TVP),[10] so the lack of meat in the CRD is not a new fact in this

case. Although McCoy's current claims that he should receive additional kosher foods such as kosher meats

"free of charge" (Doc. 24 at 23-25, 28-29) may be different in some minor ways from his earlier claims that the

CRD food was not kosher, these claims still amount to a claim that the food provided is insufficiently kosher,

which has already been litigated. And these claims still arise from the same set of facts as before regarding the

same CRD policy as before.

To the extent the Court considers McCoy's claims regarding additional kosher foods to be new claims,

McCoy could have brought these claims during the previous lawsuit. But he did not. These claims still arise out

of the same already litigated policy for which this Court has already rendered a final judgment, and so the

claims are identical for purposes of claim preclusion. *See Denver Homeless Out Loud*, 32 F.4th at 1275. And it

does not matter that this particular government official was not named as a defendant in the previous lawsuit.

*See Yung-Kai*, 790 F. App'x at 936 n.1.

**D. Also under claim preclusion, McCoy's claims regarding restricted housing policies fall under the same legal theory that he could have brought regarding additional foods, so it is also precluded.**

McCoy claims that he should be provided additional foods free of charge while housed in restrictive

housing as well. (Doc. 24 at 29-30.) He alleges that he has been in restrictive housing only since December 6,

2022 (Doc. 24-2 at 5, ¶ 2), about two months after the final judgment in the previous case. (*McCoy I* (Docs.

---

[9] Alternatively, Zmuda could have been named as a defendant in the previous lawsuit, so claim preclusion applies. McCoy already had a chance to litigate this claim and should not be allowed to continue litigating it ad nauseum just by naming a new official each time that he failed to name before. *See Yung-Kai*, 790 F. App'x at 936 n.1.

[10] *McCoy I* (Doc. 41-3 at 3-7 ("All entrees are made with Texturized Vegetable Protein (TVP) unless otherwise indicated with an asterisk."), Doc. 133-1 at 44-47 ("All entrees made with Texturized Vegetable Protein (TVP) are noted with an asterisk.")).

190-91) (final judgment on Oct. 2, 2020).) Any change in status from general population to restrictive housing is legally insignificant to McCoy's claim. The claim still falls under the same legal theory discussed above that he could have brought in the previous case: that he should be provided additional kosher foods free of charge. Although he mentions an EDCF General Order regarding restrictive housing, the underlying basis for the claim remains the same: that he should be provided additional kosher foods free of charge under federal law regardless of any prison policy. Therefore, McCoy's claims regarding restrictive housing still arise out of the same series of underlying events.

McCoy could have brought forward this legal theory in the last lawsuit regarding the CRD policy, but he did not. Merely mentioning a different policy that has the same general effect does not mean McCoy's claims evade claim preclusion. A minor factual change that makes an additional policy apply is not a change in law, and McCoy's move to restrictive housing is immaterial for purposes of claim preclusion here.

What is more, to the extent that McCoy brings a claim regarding the way CRD food is *served* in segregation, he was already experiencing those issues during the previous lawsuit. (Doc. 14); *McCoy I* (Docs. 159 at 3-7; Doc. 161 at 3-6; Doc. 162 at 2-4). So he could have amended his complaint to bring such a claim, but he failed to do so. Therefore, claim preclusion would preclude any such claims here.

## V.    **Alternatively, McCoy fails to state the requisite personal participation of Defendant Zmuda.**

"Liability under § 1983 requires personal participation in the unlawful acts." *Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005). Liability is not authorized under a theory of respondeat superior. *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018). Rather, McCoy must show an "affirmative link" between a defendant's actions and the alleged constitutional injury. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). To establish the affirmative link, McCoy must show: (1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind. *Id*. McCoy must show the same affirmative link for his RLUIPA claims.[11]

Here, Defendant Zmuda cannot be liable under McCoy's § 1983 claim because McCoy has not plausibly

---

[11] *Ciempa v. Jones*, 745 F. Supp. 2d 1171, 1200 (N.D. Okla. 2010); *see also Wilkinson v. Sec'y*, 622 F. App'x 805, 812 (11th Cir. 2015) (finding claims to be "cognizable" under RLUIPA because they "were predicated on a theory of direct liability rather than of vicarious liability").

alleged that Zmuda was personally involved in McCoy's alleged injury. McCoy alleges that he was harmed by policies and procedures that prevented him from receiving certain food items while housed in restrictive housing. (Doc. 24 at ¶¶ 74-75, pgs. 27-30.) McCoy points to only one particular policy, EDCF General Order (G.O.) 23-103, which was replaced with G.O. 05-106 on October 10, 2022. (Doc. 24 at 28; Exhibit K.)

But the Secretary of Corrections does not personally sign or approve facility G.O.'s. The EDCF warden signed G.O.'s 23-103 and 05-106 in 2010 and 2022, respectively. (Exhibit K at 1, 5-6.)[12] Zmuda has only been the Secretary of Corrections since 2019,[13] so he could not have signed or approved G.O. 23-103 in 2010. Under IMPP 01-127D, General Orders are issued by the warden and reviewed and approved by the KDOC Policy Analyst and other available staff, not by the Secretary himself.[14] So Zmuda would not have directly reviewed or approved G.O. 05-106 either. McCoy has not provided any specific facts to make any inference plausible that Secretary Zmuda directly reviewed or approved G.O. 23-103 or G.O. 05-106 himself. So McCoy has not adequately alleged personal participation by Secretary Zmuda, and the claim should be dismissed. Alternatively, McCoy has not provided evidence to that effect, so Zmuda is entitled to summary judgment on those grounds.

To the extent that the Court construes McCoy's other claims as being against Zmuda, McCoy does not allege personal participation by Zmuda for those claims either. Although McCoy alleges that Zmuda, as the Secretary of Corrections, broadly oversees the enactment and implementation of KDOC policy and procedure (Doc. 24 at ¶¶ 9(1), 21), this only shows general supervisory authority and does not establish personal involvement. McCoy also alleges that all defendants generally signed and approved making the CRD menu available to inmates as an option (Doc. 24 at ¶ 22(1)), but he does not provide any specific facts to move this beyond pure speculation and on to plausibility. Further, the Court can take judicial notice of records from the

---

[12] The Court may consider General Order 23-103 on a motion to dismiss because the complaint references it and it is central to the plaintiff's claims. *See Gee*, 627 F.3d at 1186. It is also admissible under Federal Rule of Evidence 901, especially 901(b)(4). *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170-71 (10th Cir. 2009).

[13] (Exhibit B.) The court can take judicial notice of when Secretary Zmuda took office – which can be found on KDOC's website – under Federal Rule of Evidence 201. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

[14] (Exhibit L, 1-2 (§ I(A), (D)), 4 (§ III).) The Court can take judicial notice of IMPP 01-127D – which can be found on KDOC's website – under Federal Rule of Evidence 201. *See O'Toole*, 499 F.3d at 1225. In addition, if the Court reaches this issue on summary judgment, the Court can consider Exhibit C (at ¶¶ 3-4).

past court case where the Court made factual findings (applicable here through issue preclusion) regarding which officials signed past CRD menus, and the KDOC Secretary was not one of them. *McCoy I* (Doc. 175 at 4); *see also Gee*, 627 F.3d at 1191.[15] McCoy does not allege any specific facts – or provide evidence – showing that the signature process for the CRD menus has somehow changed, so Zmuda's personal participation for these claims has not been shown.

What is more, McCoy does not claim that the *addition* of the CRD option violated his rights, but rather the *lack* of McCoy's proposed menu, a separate matter for which Zmuda's involvement has not been alleged.

## VI.   Alternatively, to the extent McCoy claims policies at EDCF prevent him any access at all to the religious foods he requests, he failed to exhaust administrative remedies.

McCoy has admitted the ability to purchase many food items he requests, at least while in general population. (Doc. 24 at ¶¶ 67(1)-68(1) (Succoth), 70 (Shavuot), 73 (Yom Kippur).) To the extent the Court construes McCoy's claim regarding food on the Sabbath (Doc. 24 at 23-24; *see also* Doc. 24 at ¶¶ 57-61) or his claim regarding restrictive housing policies (Doc. 24 at 30; *see also* Doc. 24 at ¶¶ 74-75) as preventing McCoy any access at all to the religious foods he requests, McCoy has not exhausted his administrative remedies. McCoy may have exhausted administrative remedies with regard to whether EDCF should provide him with additional foods on the Sabbath *"free of charge"* and with religious foods *from group-funded group meals "free of charge"* while in restrictive housing. (Exhibit A; Doc. 24 at 27-28; Doc. 24-1; *see also* Doc. 24 at 28-29 ("free of charge").) But McCoy has not exhausted administrative remedies with regard to whether EDCF would *allow him to purchase religious foods with his own funds*, which is a completely different matter.

### A.  Exhaustion of administrative remedies is mandatory under the PLRA.

The PLRA requires an inmate to exhaust all available administrative remedies before bringing a § 1983 or RLUIPA claim about prison conditions. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 520 (2002) (§ 1983 claims); *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022) (RLUIPA claims). "An inmate properly exhausts a claim by utilizing each step the prison holds out for resolving the claim internally and by abiding

---

[15] Although normally at the motion to dismiss stage, the Court cannot only take judicial notice of court records to show their contents, not for the truth of matters asserted, in this case issue preclusion applies as well. The issue of those CRD menus has already been litigated and the Court made final factual findings on who had signed those menus, so the Court can consider that factual finding. *See Keller*, 854 F.3d at 1193.

'with an agency's deadlines and other critical procedural rules.'" *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). "To exhaust administrative remedies an inmate must properly comply with grievance procedures; substantial compliance is insufficient." *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007).

In a suit governed by the PLRA, failure to exhaust is an affirmative defense, and the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007). The issue of McCoy's failure to exhaust his available remedies prior to filing his lawsuit must be determined before addressing the merits of his suit. *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010).

The KDOC Grievance Procedure for Inmates is set forth in K.A.R. § 44-15-101 *et seq*., and applies "to a broad range of matters that directly affect the inmate, including . . . [c]omplaints by inmates regarding policies and conditions within the jurisdiction of the facility or the department of corrections; and . . . actions by employees and inmates, and incidents occurring within the facility." K.A.R. § 44-15-101a(d)(1). Here, McCoy's claims fall under this regulation because his complaint involves a policy within the jurisdiction of EDCF or KDOC or the alleged actions of EDCF or KDOC employees. *See Lindsey v. Cook*, No. 19-3094-HLT, 2021 WL 483855, at *2 (D. Kan. Feb. 4, 2021). An inmate must take four steps to complete the grievance process: (1) attempt an informal resolution with unit team members; (2) submit a grievance to an appropriate unit team member; (3) submit a grievance to the warden of the facility; and (4) appeal to the secretary of corrections. *Id.*; K.A.R. 44-15-101(b), (d), 44-15-102(a)-(c).

**B. McCoy did not complete the grievance process on the appropriate subjects prior to filing suit.**

*1. Additional foods on the Sabbath*

To the extent that the Court construes McCoy's claim regarding additional foods on the Sabbath as preventing him any access at all to the religious foods he requests, McCoy did not administratively exhaust that issue. According to the complaint, McCoy submitted a grievance on January 21, 2021, which "addressed **not being served** meat and fish and other food items during the Sabbath." (Doc. 24 at 26-27 (emphasis added).) UTS Brewer responded on January 28, 2021, that the CRD "is **the meal program** for the religious groups that need to have a kosher meal." (Doc. 24 at 27 (emphasis added).) McCoy appealed to the warden and to the

Secretary's office, who agreed with the lower responses. (Doc. 24 at 27; Doc. 24-1 at 2-4; Exhibit A at 7-10.) McCoy allegations show he wanted to be served the additional items as part of the meal program. And the evidence shows he did not offer to pay in his administrative filings. (Doc. 24-1 at 3, 5-7; Exhibit A at 1-5, 8-9.) McCoy did not properly exhaust the issue of purchasing religious foods for the Sabbath with his own funds. As such, that issue is not properly before this Court.

2.  *Restrictive housing policies*

To the extent that the Court construes McCoy's claim regarding restrictive housing policies as preventing him any access at all to the religious foods he requests, McCoy did not administratively exhaust that issue. According to the complaint, McCoy sent a Form 9 to the chaplain on August 5, 2022, in which McCoy "requested **to be provided** challah bread as well as to know what other food items were allowed for inmates in seg." (Doc. 24 at 27 (emphasis added).) The chaplain responded on August 17, 2022, that "offenders in seg **are not supplied** challah bread and grape juice," and McCoy filed a grievance that same day. (Doc. 24 at 28 (emphasis added).) The chaplain responded to the grievance on August 25, 2022. (Doc. 24 at 28.) The chaplain pointed out "that banquets and refreshments are only open to inmates who are part of [the] requesting organization and who are housed in general population." (Doc. 24 at 28.) McCoy appealed to the warden and to the Secretary's office, who agreed with the lower responses. (Doc. 24 at 28; Doc. 24-1 at 9; Exhibit A at 15-17.) McCoy does not allege that he offered to pay for the additional items during the administrative process, but rather that he wanted "to be provided" with those additional items. In fact, the evidence shows that he did not offer to pay in his Form 9 (Exhibit A at 11) and this was given as a reason why his grievance was rejected (Doc. 24-1 at 11; Exhibit A at 14). McCoy did not properly exhaust the issue of purchasing religious foods with his own funds while in restrictive housing. As such, that issue is not properly before this Court.

**VII.**    **Alternatively, the Court should dismiss any claims against Zmuda for failure to state a claim because qualified immunity applies when the alleged conduct did not violate clearly established law.**

Zmuda is entitled to qualified immunity because there was no clearly established law within this Circuit, or a robust consensus of cases outside of it, that his alleged actions violated clearly established law, particularized to the facts of this case. Specifically, McCoy has not shown any law that put Zmuda on notice

that the CRD policy violated McCoy's federal rights. Because qualified immunity applies, it bars McCoy's claims.

At the time of the alleged actions, while it was clearly established that prison officials must provide inmates kosher or halal foods under certain circumstances,[16] no binding precedent in this circuit clearly established that (1) failure to provide *specific* kosher foods or (2) failure to abide by an inmate's idiosyncratic views regarding kosher food preparation caused a substantial burden to religious exercise. And showing a substantial burden to religious exercise is a required element of RLUIPA claims and of Free Exercise Clause claims.[17] The Tenth Circuit has left open the question of whether providing halal meats (or kosher meats) is required under RLUIPA.[18] At least one court outside of the Tenth Circuit has found no violation of RLUIPA for failing to provide halal meats.[19] The Tenth Circuit has addressed and allowed a potentially idiosyncratic request by a Muslim inmate to eat kosher food instead of halal food, *Williams v. Wilkinson*, 645 F. App'x 692, 700, 703 (10th Cir. 2016), but has not yet addressed idiosyncratic views by Muslims or Jews regarding food preparation requirements that deviate from both kosher and halal norms (as approved by religious leaders and not complained about by any other inmates).[20] And the Tenth Circuit has not addressed the sincerity of an inmate's beliefs when that inmate consistently consumes non-kosher food.[21]

Further, although RLUIPA claims do not require discriminatory purpose, to establish a § 1983 claim for a violation of the Free Exercise Clause and receive monetary damages (which are not available under

---

[16] *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) ("prisoners have a constitutional right to a diet conforming to their religious beliefs"); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317 (10th Cir. 2010) ("failure to provide a halal diet either prevents Mr. Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice—either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat").
[17] RLUIPA claims and Free Exercise Clause claims share the same substantial burden standard. *Blair v. Raemisch*, 804 F. App'x 909, 917 (10th Cir. 2020); *Tenison v. Byrd*, 826 F. App'x 682, 690-91 (10th Cir. 2020).
[18] *Abdulhaseeb*, 600 F.3d at 1325-26 (Gorsuch, J., concurring) ("We thus have no opportunity to consider whether a prisoner who may eat ODOC's vegetarian diet but who is denied any access to halal-certified meats can state a RLUIPA claim."); *Id.* at 1320 (majority opinion) (finding a potentially substantial burden based on a finding that no vendors of halal meat had been approved for a Muslim inmate to purchase from for a holiday).
[19] *Boyd v. Lehman*, No. C05-0020, 2006 WL 1442201, at *10 (W.D. Wash. May 19, 2006).
[20] *See Abdulhaseeb*, 600 F.3d at 1324 (Gorsuch, J., concurring) (citation omitted) ("[T]he defendants in this case do not contest the religiosity or the sincerity of Mr. Abdulhaseeb's beliefs. Accordingly, we have no opportunity to decide when a prisoner's beliefs qualify as religious or when they are sincerely held.").
[21] *Id.*

RLUIPA[22]), the Tenth Circuit has left open the question of whether the plaintiff must show discriminatory purpose,[23] which has not been shown here. To show discriminatory purpose, McCoy must show defendants "adopted and implemented the . . . policies at issue not for a neutral . . . reason but for the purpose of discriminating on account of . . . religion."[24] McCoy has not alleged specific facts to make it plausible that defendants had such a discriminatory purpose. Even if the question is resolved such that a "discriminatory purpose" need not be shown, the law was not clearly established that anything less than a discriminatory purpose would result in a constitutional violation. And McCoy has not alleged or established any facts showing a discriminatory purpose in this case. In fact, he is precluded here from alleging even the lower standard of conscious or intentional interference. *See McCoy I* (Doc. 190 at 14) ("[T]he [alleged] violations do not show that Defendants . . . exhibited a conscious or intentional interference with Plaintiff's free exercise of religion. No reasonable jury could conclude otherwise.").

Accordingly, no clearly established law would have put Zmuda on notice that his alleged actions were unlawful under these circumstances. Looking only to the conduct as alleged in the complaint, Zmuda is entitled to qualified immunity as a matter of law. McCoy's claims should be dismissed for failure to state a claim.

## VIII.   Alternatively, the CRD policy did not violate McCoy's rights because it did not substantially burden any sincerely held religious beliefs and because any such burden was appropriately justified.

### A.   The CRD policy does not impose a substantial burden on McCoy because it does not coerce McCoy into violating any religious beliefs.

For an RLUIPA claim, the plaintiff "must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010). Here, McCoy has failed to show all three elements. And a failure to meet the standard for the heightened protections of RLUIPA necessarily means that McCoy's First Amendment claim fails as well.[25]

---

[22] *Sossamon v. Texas*, 563 U.S. 277, 293 (2011).
[23] *Ralston v. Cannon*, No. 19-1146, 2021 WL 3478634, at *5 to *6 (10th Cir. 2021) [hereinafter *Ralston II*] (citing *Ralston v. Cannon*, 884 F.3d 1060, 1063 n.3 (10th Cir. 2018) [hereinafter *Ralston I*]).
[24] *Ralston I*, 884 F.3d at 1063 n.3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).
[25] *Dorman v. Aronofsky*, 36 F.4th 1306, 1313 (11th Cir. 2022); *see also Ramirez v. Collier*, 142 S. Ct. 1264,

The Tenth Circuit has held that:

> a religious exercise is substantially burdened under 42 U.S.C. § 2000cc–1(a) when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice—an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief.

*Abdulhaseeb*, 600 F.3d at 1315.

Existing case law is unclear on whether providing kosher food in general falls under the second scenario or the third scenario.[26] And in a similar case to this one where a prisoner requested halal food to comport with his Islamic faith, the Tenth Circuit expressly did not address whether prisons must provide halal meats in addition to vegetarian halal food.[27] But in cases not involving food, the case law is more clear: "RLUIPA requires governments to refrain from substantially burdening religion, *not to affirmatively subsidize religion.*" *Abdulhaseeb*, 600 F.3d at 1320 (emphasis added) (finding RLUIPA did not require a prison to pay for an inmate's Islamic books or to hire a full-time Muslim minister); *Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005) ("RLUIPA does not require a State to pay for an inmate's devotional accessories."); 42 U.S.C. § 2000cc-

---

1277 (2022) ("RLUIPA . . . . aim[s] to ensure greater protection for religious exercise than is available under the First Amendment.").

[26] *See Abdulhaseeb*, 600 F.3d at 1316-17 ("ODOC's failure to provide a halal diet either prevents Mr. Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice."); *Williams v. Wilkinson*, 645 F. App'x at 702 ("the failure to provide Mr. Williams with a kosher diet will either prevent him from exercising his sincerely held religious belief or force him to make the Hobson's choice of eating a diet contrary to his beliefs or not eating at all"); *Beerheide*, 286 F.3d at 1189 (referring to forcing prisoners to pay a large percentage of the cost of kosher food as "a Hobson's choice rather than a true alternative"); *Chichakli v. Samuels*, No. CIV-15-687-D, 2017 WL 9250722, at *7 (W.D. Okla. Aug. 15, 2017) ("If, as Plaintiff alleges, the meals provided to him at the Grady County Jail were not kosher, Plaintiff faced a Hobson's choice"); *Smith v. Williams*, No. 20-cv-00841, 2021 WL 4947353, at *12 (D. Colo. Oct. 13, 2021) (likening failure to provide a halal diet to the Hobson's choice language in *Abdulhaseeb*). *But see Williams v. Wilkinson*, 645 F. App'x at 703 ("the prison's denial of Mr. Williams's religiously motivated request for a kosher-diet, whether or not shared by other Muslims, falls easily within Abdulhaseeb's second category—flatly prohibiting Mr. Williams from participating in an activity motivated by a sincerely held religious belief").

[27] *Abdulhaseeb*, 600 F.3d at 1325-26 (Gorsuch, J., concurring) ("We thus have no opportunity to consider whether a prisoner who may eat ODOC's vegetarian diet but who is denied any access to halal-certified meats can state a RLUIPA claim."); *Id.* at 1320 (majority opinion) (finding a potentially substantial burden based on a finding that no vendors of halal meat had been approved for a Muslim inmate to purchase from for a holiday).

3(c) ("Nothing in this chapter shall create ... a right of . . . any person to receive government funding for a religious activity").

The best way to synthesize these cases is that a difficulty for religious exercise is not a substantial burden when the primary obstacle is the inmate's own funds *unless* the prison creates a Hobson's choice leading to effective coercion to violate religious beliefs. Under this synthesis, religious dietary restrictions fall under the third scenario (the Hobson's choice scenario). An inmate only has to make the Hobson's choice between eating spiritually unclean food and not eating at all when the food provided is spiritually unclean. A lack of kosher (or halal) meats, for example, would not render an inmate unable to eat without spiritually contaminating oneself, as the inmate would still be able to eat the other kosher (or halal) food provided. To the extent a Hobson's choice is not presented, the government need not affirmatively subsidize religion, so any additional kosher or halal foods an inmate wishes to consume should be purchased by the inmate with the inmate's own funds. To hold otherwise would be to require the government to foot the bill for "fine meat . . . choice wine, and other delicacies"[28] for inmates at taxpayer expense (and only for religious claimants, which could raise establishment clause concerns[29]).

1. *Failure to provide delicacies does not present a Hobson's choice.*

Here, McCoy asserts that the KDOC violates the law if it does not provide him "free of charge" (Doc. 24 at 28-29) with "fine meat, fish, choice wine, and other delicacies" weekly on the Sabbath (Doc. 24 at ¶¶ 57-60, pgs. 23-24), TV dinners with meat and fish on Succoth (Doc. 24 at ¶¶ 66-68(1)[30], pgs. 24-25), cheesecake on Shavuot (Doc. 24 at ¶¶ 67(2)-70, pg. 24), and smoked fish or lox for Yom Kippur (Doc. 24 at ¶¶ 71-73, pg. 25). As discussed above, McCoy did not properly exhaust the issue of whether he can purchase the requested additional foods with his own funds, so that issue is not properly before this Court. Additionally, for each of the holidays, McCoy admits that Jewish inmates can purchase the items with their own funds. (Doc. 24 at ¶¶ 67(1)-

---

[28] (Doc. 24 at ¶ 60.)

[29] This case does not involve circumstances such as exclusion on religious grounds from a generally available benefit program, such as in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017) or *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 793 (5th Cir. 2012), but rather seeks additional funding for certain religious claimants above and beyond that provided to nonreligious inmates.

[30] The Second Amended Complaint includes duplicates of some paragraphs. This "68(1)" notation indicates the first paragraph 68.

68(1) (Succoth), 70 (Shavuot), 73 (Yom Kippur).) The commissary menu includes kosher fish that inmates can purchase. (Exhibit D-3 at 26; Exhibit D at ¶ 6 (explaining Exhibit D-3).) Jewish inmates in general population at least occasionally have the opportunity to purchase kosher meats and grape juice with their own funds. (Doc. 24 at 67(1)-68(1); Exhibit A at 12-14; Doc. 24-1 at 10-11.) Inmates cannot purchase wine because it is contraband as an intoxicant and a security risk. (Exhibit E at ¶ 4.)

2. *When dietary rules change for a holiday, like for Passover, the appropriate food is provided.*

When dietary rules change for a holiday, like for Passover, when Jewish inmates cannot eat leavened bread, the appropriate food is provided by Aramark. (Doc. 24 at ¶¶ 62-65); *see also* Exodus 12:18-20; Deuteronomy 16:3-4.

3. *McCoy does not provide any admissible evidence of EDCF kitchen practices, and even if he does, RLUIPA was not violated.*

To the extent McCoy addresses statewide policy in his claims, the Court has already ruled on that. (*See* section IV(A) above.) To the extent McCoy addresses practices at EDCF in his claims, McCoy has not provided any admissible evidence of the practices within the EDCF kitchen. (*See* footnote 5 above.) Should the Court find that McCoy has provided admissible evidence of the practices he alleges – such as cooking by non-Jews, lack of supervision by a rabbi, cross-contamination, and mixing of cookware – these alleged practices could arguably violate McCoy's *individual* conscience. But McCoy's beliefs on these subjects would still not be subject to the protections of RLUIPA or the First Amendment because they are not religious and are not sincerely held, or the government actions are appropriately justified.

**B. No reasonable jury could find that McCoy's asserted beliefs are sincerely held.**

The Tenth Circuit has not addressed the sincerity of an inmate's beliefs when that inmate consistently consumes non-kosher food, or whether that issue can be addressed at the motion to dismiss or summary judgment stages. *See Abdulhaseeb*, 600 F.3d at 1324 (Gorsuch, J., concurring) (citation omitted) ("[T]he defendants in this case do not contest the religiosity or the sincerity of Mr. Abdulhaseeb's beliefs. Accordingly, we have no opportunity to decide when a prisoner's beliefs qualify as religious or when they are sincerely held."). On the one hand, courts should be careful not to make determinations of orthodoxy versus apostasy with regard to the whole of a plaintiff's claimed religion. *See Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir.

1988) ("the fact that a person does not adhere steadfastly to every tenet of his faith does not mark him as insincere. . . . who is to say at what precise point orthodoxy becomes apostasy?"). As some appellate courts have noted, "[a] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?" *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 791-92 (5th Cir. 2012) (quoting *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012)); *see also Ackerman v. Washington*, 16 F.4th 170, 181 (6th Cir. 2021) (adding the word "completely" before the word "scrupulous").

This has several implications. When a plaintiff violates some parts of a religious system other than the specific belief claimed, that can often be irrelevant to the sincerity of the specific belief in question. *See Reed*, 842 F.2d at 963 (eating of meat did not render insincere a Rastafarian's belief that he should not cut his hair).[31] When a plaintiff has only a "few lapses in perfect adherence" with regard to the specific belief, that may not make the belief insincere. *See Moussazadeh*, 703 F.3d at 791-92 (buying a "few" non-kosher items "from time to time" did not make an inmate's belief in kosher dietary rules insincere). A plaintiff similarly need not have a perfect understanding of their religion. If a plaintiff "struggles" with how to define exactly the line that they believe is being crossed,[32] that should not be viewed with "exacting incredulity."[33]

But still, "[c]ourts need not take a prisoner at his word and can filter out insincere requests." *Ackerman*, 16 F.4th at 181. "Evidence of nonobservance is relevant on the question of sincerity, and is especially important in the prison setting, for an inmate may adopt a religion merely to harass the prison staff with demands to accommodate his new faith." *Reed*, 842 F.2d at 963. At the very least, when a plaintiff blatantly, repeatedly, and consistently fails at the very belief that the plaintiff claims the government should accommodate, no reasonable

---

[31] Although in *Reed* the district court also found that the plaintiff had shaved his beard and combed his hair, *Reed*, 842 F.2d at 962, the court of appeals called those findings significantly into question in its opinion. The court of appeals said those inferences were "odd" and "hard to credit" and that it was unclear whether the district court had taken those inferences as "conclusive evidence of insincerity." *Id.* at 962-63. The court of appeals vacated and remanded the issue back to the district court. *Id.* at 964. *Reed* certainly does not show that a plaintiff must be taken as sincere who blatantly, repeatedly, and consistently violates the very belief the plaintiff claims the government should accommodate.

[32] This is a different question than being able to show the religious nature of a line that has been clearly articulated, which is addressed in the next section of this memorandum.

[33] *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981); *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 262 (5th Cir. 2010).

jury could find such a belief to be sincere.[34] *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (saying the nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole). Courts can also consider factors like "length of adherence [and] knowledge about the belief system." *Ackerman*, 16 F.4th at 181.

Here, McCoy regularly purchases non-kosher food from the prison commissary (or canteen). (Exhibit F (citing Exhibits D-1 to D-3); Exhibit D at ¶¶ 4-9 (explaining Exhibits D-1 to D-3).) He has not stopped openly and notoriously purchasing non-kosher foods (Exhibit F) even while pursuing lawsuits demanding that the government provide him "fine meat . . . choice wine, and other delicacies" (Doc. 24 at ¶ 60) at taxpayer expense (Doc. 24 at 28-29 ("free of charge")) and that the government apparently should build and staff a separate kitchen just for him (*see* Doc. 24 at ¶ 77, pgs. 28-29; Doc. 24-1 at 6; Doc. 47-1 at ¶ 51). In the 589-day span from 6/30/21 to 2/8/23, McCoy bought not just a few, but **261 non-kosher food items from the canteen.** (Exhibit F at 3.) This is equivalent to buying **a non-kosher food item every 2.26 days.** (*Id.*) And again, McCoy has not stopped doing so. (*Id.*)

McCoy's purchasing of non-kosher foods has previously been pointed out and McCoy has not denied it. *McCoy I* (Doc. 159 at 8). His current explanation for his continued purchases of non-kosher foods is that he somehow runs a "prison store" for other inmates. (Doc. 13 at ¶¶ 8-12; Doc. 47-1 at ¶¶ 71-76.) That would not only be prohibited by prison policy, *but McCoy is in restrictive housing where such interactions with other inmates are not even feasible due to limited interaction with other inmates and due to heightened security.* (Exhibit G (citing K.A.R. 44-12-205); Exhibit D at ¶ 12; Doc. 24-2 at 5, ¶ 2.)

Further, to the extent that the Court construes McCoy's claims as alleging infringements on McCoy's beliefs for allowing others to do work for him on the Sabbath (Doc. 24 at ¶ 58, pg. 21), his requested accommodation shows this belief to be plainly insincere. Unlike the plaintiff in *Love v. Reed*, 216 F.3d 682, 691 (8th Cir. 2000), McCoy has not suggested any workable alternatives, such as being provided with peanut butter and bread for him to use to prepare sandwiches to consume in his cell on the Sabbath. This lack of proposed

---

[34] A possible exception to this could exist in the case of a struggle with a genuine addiction, but no addiction is relevant to the facts here.

alternatives is especially apparent considering that McCoy actually asks for *additional* foods (Doc. 24 at 24 ("fine meat, fish, choice wine, challah bread, and other delicacies")) to be provided to him by food service workers on the Sabbath rather than less. Because McCoy requests the Court issue an injunction requiring *even more* work be done for him on the Sabbath (Doc. 24 at 28-29) as his proposed solution, McCoy's alleged belief that others should not do work for him on the Sabbath is plainly insincere.

While credibility determinations are generally a matter for trial, this is a clear case where McCoy's "version of events is so utterly discredited by the record that no reasonable jury could . . . believe[] him." *See Scott*, 550 U.S. at 380. Specifically, McCoy's alleged beliefs that he should eat a kosher diet and that others should not do work for him on the Sabbath are clearly insincere.

**C. Many of McCoy's asserted beliefs are not religious in nature.**

As the Supreme Court has stated:

A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based on purely secular considerations; **to have the protection of the Religion Clauses, the claims must be rooted in religious belief.** Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.

*Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972) (emphasis added). And as the Third Circuit stated in a case where an inmate unsuccessfully requested a diet that conformed closer to his beliefs:

Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion within the meaning of the first amendment. Judges are ill-equipped to examine the breadth and content of an avowed religion; we must avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs. "Religions now accepted were persecuted, unpopular and condemned at their inception." *United States v. Kuch*, 288 F.Supp. 439, 443 (D.D.C.1968). **Nonetheless, when an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, we are required to make such uneasy differentiations.**

*Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981) (emphasis added).

Similarly, although RLUIPA "shall be construed in favor of a broad protection of *religious* exercise," 42 U.S.C. § 2000cc-3(g) (emphasis added), the RLUIPA (or RFRA[35]) plaintiff bears the burden to show "that his

---

[35] The Religious Freedom Restoration Act (RFRA) is a sister statute to RLUIPA. *Holt v. Hobbs*, 574 U.S. 352, 356. "RLUIPA . . . allows prisoners to seek religious accommodations pursuant to the same standard as set forth

sincerely held beliefs are *religious* in nature, rather than a philosophy or way of life." *Hale v. Fed. Bureau of Prisons*, 759 F. App'x 741, 746 (10th Cir. 2019) (emphasis added) (citing *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996)). The Tenth Circuit applies a factor test to determine whether beliefs are religious in nature – and therefore protected by federal law. *Hale*, 759 F. App'x at 746-49 (citing *Meyers*, 95 F.3d at 1482-84). Specifically, the Tenth Circuit looks at five factors in evaluating the religiosity of a belief system: ultimate ideas (whether it addresses fundamental questions about life, purpose, and death), metaphysical beliefs (whether it addresses a reality that transcends the physical and immediately apparent world), moral or ethical system (whether it prescribes a right way of living), comprehensiveness of beliefs (whether it provides the believer with answers to many, if not most, of the problems and concerns that confront humans), and accoutrements of religion (whether it exhibits external signs that resemble other religions). *Meyers*, 95 F.3d at 1483. The fifth factor, accoutrements of religion, has numerous subfactors, including the prescription of dietary or fasting rules. *Id.* at 1483-84.

Under this factor test, the Tenth Circuit has rejected RFRA protections for some claims to religious belief, such as when a man sought protections for marijuana use, claiming he was "the founder and Reverend of the Church of Marijuana," and when an inmate in a federal prison sought protections for his white-supremacist "Church of the Creator." *Id.* at 1479, 1484; *Hale*, 759 F. App'x at 743, 748. Here, hypothetically, if McCoy simply made up a new "church" and claimed that the prison must provide him with certain foods and must cook his food in a different way, those particular beliefs, on their own, would not satisfy the factor test. They relate only to one subfactor, "diet or fasting," and, on their own, would not meet at least the first four factors: ultimate ideas, metaphysical beliefs, moral or ethical system, and comprehensiveness of beliefs. In other words, McCoy's assertions in this case only appear to potentially merit protection under RLUIPA because he claims his beliefs are an interpretation of Judaism, and Judaism meets all five factors.

So the connection of McCoy's beliefs to Judaism is a central issue in this case. Although RLUIPA excludes consideration of whether "religious exercise" is "compelled by, or central to, a system of religious belief," the exercise must still be an exercise "of religion," which means a connection to a system of religious

---

in RFRA." *Id.* at 358.

belief (such as Judaism) must still be shown. *See* 42 U.S.C. § 2000cc-5(7)(A). For example, if McCoy (or another inmate) claims tomorrow that his interpretation of kosher dietary rules requires him to eat ribeye steaks and caviar every day, surely such ad hoc beliefs would not be what Congress intended to protect with RLUIPA. (This hypothetical is ultimately not far removed from McCoy's actual request for "fine meats" and "delicacies" every week.) Rather, to be religious in nature, the beliefs must have a connection to the claimed system of religious beliefs.[36]

Certainly, the Court should not determine whether religious beliefs are ultimately true or false.[37] Further, some degree of varying opinions on what constitutes kosher food may exist within Judaism,[38] and it is not the courts' role to determine which of those opinions is correct and so to become "arbiters of scriptural interpretation."[39] But McCoy still bears a burden – albeit a low burden – of demonstrating that his beliefs are in fact an "interpretation" and therefore "religious." While the Court should not determine whether a belief is, in the Court's opinion, "unreasonable," or, in the opinion of other followers of the religion, even "illogical,"[40] the Court must still determine whether the belief is at least rationally connected to the protected system of religious beliefs a plaintiff lays claim to. *See Yoder*, 406 U.S. at 215; *Africa*, 662 F.2d at 1031.

The plaintiff could show this by citing to a religious text.[41] He could cite to a religious authority.[42] He

---

[36] *See Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022) (emphasizing that the exercises of religion sought were "traditional forms of religious exercise" in finding a likelihood of success under RLUIPA); *Tucker v. Collier*, 906 F.3d 295, 301 (5th Cir. 2018) (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)) ("Congress passed RFRA and RLUIPA to reclaim the compelling-interest test of *Yoder*"); *Yoder*, 406 U.S. at 215 ("to have the protection of the Religion Clauses, the claims must be rooted in religious belief").

[37] *United States v. Ballard*, 322 U.S. 78, 86-88 (1944) ("we conclude that the District Court ruled properly when it withheld from the jury all questions concerning the truth or falsity of the religious beliefs or doctrines of respondents").

[38] *See, e.g.,* Doc. 24-3 at 14-15 (ch. 38, ¶ 1) ("In some localities," "One authority holds," "this opinion is generally followed"), 18 (ch. 47, ¶ 1) ("according to the opinion of some authorities," "Other authorities are lenient"); *see also* Doc. 24 at ¶ 56; Doc. 19 at ¶ 1; Doc. 47-1 at ¶ 36.

[39] *Williams v. Wilkinson*, 645 F. App'x 692, 700 (10th Cir. 2016); *see also Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981).

[40] *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).

[41] *See Yoder*, 406 U.S. at 216 (finding Amish daily life and religious practice was "in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, 'be not conformed to this world'"); *Williams*, 645 F. App'x at 700, 703 (mentioning a quotation from the Qur'an provided by a Muslim inmate to support his possibly idiosyncratic belief that eating kosher food was a proper exercise of Islamic faith).

[42] *See Ramirez*, 142 S. Ct. at 1277 (discussing a pastor's statement that an activity was "a significant part of our

could perhaps reference his own experience with a religious group that so practiced.[43] Or for some matters a plaintiff could even rely on common knowledge about religious beliefs.[44] In other words, to be considered part of a religious system of belief, a religious view cannot simply be arbitrary but must bear at least a rational connection to that system of belief.[45]

Here, McCoy started practicing Judaism while in prison (Doc. 17-1 at 131 (¶ 5) (change to Judaism), 3-4 (location history)), so his experience with Judaism has always been limited to that which has been allowed for inmates. He cannot therefore point to as evidence his own experiences exercising Judaism in a way contrary to prison policy as he has never been able to act contrary to those prison policies. McCoy has not suggested prison policies have changed so that he could have had such experiences. He does not mention any religious leaders that he learned the specific beliefs in question from.[46] And the intricacies of kosher dietary laws are not common knowledge (apart, perhaps, from not eating pork), so McCoy cannot appeal to common knowledge.

Although McCoy cites to the Code of Jewish Law (Kitzuk Shulhan Arukh) to support some of his beliefs, he fails to demonstrate the religious nature of many beliefs relevant to this case.

### 1. McCoy's separate-kitchen rule

McCoy cites a rule regarding the importance of covering pots and pans when cooking kosher food in proximity to non-kosher food (Doc. 19 at ¶¶ 5-6; Doc. 24-3 at 17, ¶ 20), but McCoy does not even allege (much less prove) that kosher food is cooked uncovered at EDCF. He says without further citation that this uncovered-

---

faith tradition as Baptists" in finding a likelihood of success under RLUIPA); *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir. 1999) ("Plaintiff submitted evidence . . . that a vegetarian diet is highly recommended by the [Seventh Day Adventist] Church.").

[43] *See Yoder*, 406 U.S. at 207-09 (discussing how the plaintiffs who claimed Amish beliefs went to an Amish church and lived in an Amish community that practiced those beliefs).

[44] *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1140 n.15 (10th Cir. 2013) ("The assertion that life begins at conception is familiar in modern religious discourse, although of course not universally held. Moral culpability for enabling a third party's supposedly immoral act is likewise familiar."); Fed. R. Evid. 201(b)(1).

[45] Alternatively, some courts consider a lack of connection to the system of belief as evidence against sincerity. *See Ackerman v. Washington*, 16 F.4th 170, 181 (6th Cir. 2021). But that effectively does away with the plaintiff's burden to show the religious nature of the plaintiff's beliefs, which is a required element for RLUIPA claims. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010); *see also Yoder*, 406 U.S. at 215; *Africa*, 662 F.2d at 1031.

[46] *See McCoy I* (Doc. 190 at 6) ("Plaintiff has not offered testimony of a rabbi or an expert on Jewish dietary practices to support his claims that the processes utilized by Aramark violate Kosher dietary laws. Nor is Plaintiff himself a rabbi, and he has offered no evidence that he or anyone providing an affidavit on his behalf has rabbinical training.").

pots rule is "the basis of the Jewish law that Kosher food and non-Kosher food cannot be prepared and cook[ed] in the same kitchen." (Doc. 19 at ¶ 6.) But the two rules are considerably different in impact, and McCoy does not cite any religious source for the much broader separate-kitchen rule he espouses.[47]

### 2. *McCoy's no-cooking-by-non-Jews rule*

McCoy cites a rule stating that food that is cooked and "fit to be served at the table of a king" cannot be cooked by a non-Jew. (Doc. 3 at ¶ 6; Doc. 24-3 at 15, ¶ 6.) But McCoy appears to have invented a much broader rule saying that "a non-Jew may not cook **any** Kosher food item." (Doc. 3 at ¶ 6 (emphasis added); *see also* Doc. 24 at 21.) But the very paragraph he cites plainly states that food that is not a "delicacy fit to be served at the table of a king" *can* be cooked by a non-Jew. (Doc. 3 at ¶ 6; Doc. 24-3 at 15, ¶ 6.) McCoy does not even attempt to explain how all food in the CRD is blanketly fit for a king's table or how *any* of the food served in the CRD is fit for a king's table.[48] McCoy's much broader no-cooking-by-non-Jews rule is plainly considerably different in impact than the one he cites, and McCoy does not cite any religious source for the much broader no-cooking-by-non-Jews rule he espouses.

### 3. *McCoy's no-benefits-on-the-Sabbath rule*

McCoy cites to a requirement that Jews, because they cannot work on the Sabbath, also cannot have an agent work for them on the Sabbath (such as by hiring a worker to work on the Sabbath, delivering work to a worker on the Sabbath, or directing an employed servant to work on the Sabbath). (Doc. 3 at ¶ 11; Doc. 24 at ¶ 58; *see* Doc. 24-3 at 20, ¶¶ 1-3.) McCoy appears to extend this rule considerably beyond a command that he should follow to broadly cover any services that provide a benefit to him regardless of whether the worker is his agent. (*See* Doc. 3 at ¶ 11; Doc. 24 at ¶ 58.) And so he implies that the rule applies to KDOC and Aramark workers, whom he does not hire, direct, or employ or deliver work to. McCoy's much broader no-benefits-on-the-Sabbath rule is plainly considerably different in impact than the one he cites, and McCoy does not cite any

---

[47] It might be a different matter if McCoy cited to a broad principle and then explained how he believed that principle should be worked out. *See Yoder*, 406 U.S. at 216 (finding Amish daily life and religious practice was "in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, 'be not conformed to this world'"). But here, McCoy cites to specific rules of application, not to general, abstract rules of principle, and then attempts to alter those specific rules of application.

[48] McCoy also does not suggest that all food in the CRD is cooked.

religious source for the much broader no-benefits-on-the-Sabbath rule he espouses.

### 4. *McCoy's constant-rabbinic-supervision rule*

McCoy cites to a requirement that non-Jews entrusted with kosher cookware either need to have a Jew present or a Jew "going in and out." (Doc. 19 at ¶¶ 5-6; Doc. 24-3 at 17, ¶ 20.) But McCoy does not believe that is sufficient, and says that the Jew must be a rabbi, and that the rabbi cannot simply be present or "going in and out," but must be actively and directly supervising the cooking the whole time. (Doc. 19 at ¶ 6; Doc. 24 at 21.) McCoy's much broader constant-rabbinic-supervision rule is plainly considerably different in impact than the one he cites, and McCoy does not cite any religious source for the much broader constant-rabbinic-supervision rule he espouses. Further, the possibility of a rabbi going in and out is present in this case. (Doc. 18 at ¶ 2.)

### 5. *McCoy's double-sealing rule*

McCoy cites to a requirement in certain circumstances to double-seal "wine, meat or a piece of fish" and to single-seal "boiled wine, wine-vinegar, bread or cheese," but he expands this well beyond the cited rule to require double-sealing all "kosher food or food item[s]." (Doc. 19 at ¶¶ 3-4; Doc. 24-3 at 17, ¶ 16-17; *see also* Doc. 24 at 21.) He also adds without explanation or citation that it must be sealed until it's in his hands (as opposed to in the kitchen). (Doc. 19 at ¶ 4; *see also* Doc. 24 at ¶ 21.)

### 6. *McCoy's cookware rules*

McCoy blanketly cites to the general existence of a category of rules regarding cookware (and its cleaning, separation, and blessing). (Doc. 24 at ¶ 56; Doc. 3 at ¶ 4; Doc. 24-3 at 14). But McCoy does not identify which of these rules has been allegedly broken at EDCF. Instead, McCoy simply states that the cookware at EDCF has been contaminated. (Doc. 24 at 21-22.) The burden is on McCoy to show the religious nature of his purported rule by demonstrating a connection to Jewish cookware rules, not simply to say that Jewish law has cookware rules as a category and to expect the Court to peruse and decipher pages of those rules on his behalf to see if any of them apply.

**D. Any substantial burden on any sincerely held religious belief of McCoy's is justified by compelling government interests in meeting budgetary constraints, ensuring an orderly, simplified food service, and maintaining discipline.**

For RLUIPA's "compelling governmental interest" standard, "context matters" when appropriately

balancing the government's interest. *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005). "Lawmakers supporting RLUIPA . . . anticipated that courts would apply [RLUIPA's] standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 723 (emphasis added). Further, although RLUIPA covers "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), the need to balance government interests against religious practices may be greater with regard to optional practices than with regard to mandatory practices. *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012). With regard to food service specifically, the government has legitimate interests in: "simplified food service" (compare to "good order" in *Cutter*) and "staying within the prison's budget" (compare to "consideration of costs and limited resources" in *Cutter*). *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003).

Here, providing meals to inmates constitutes a major cost to KDOC. In fiscal year 2022, KDOC spent over $17.3 million on meals for inmates.[49] Recently, in one month, in January 2023, KDOC spent nearly $1.4 million for almost 800,000 meals for inmates. (Exhibit H at ¶ 3.) Of that amount, over $270,000 was for 155,000 meals for inmates in EDCF. (*Id.*) With such high numbers of meals, the price per meal makes a large difference in the overall cost. If KDOC serves about 800,000 meals per month, then that is 9.6 million meals per year. So a mere $1 increase in the cost per meal would cost KDOC $9.6 million dollars, or more than half of their fiscal year 2022 food service expenditures. Accordingly, the price per meal charged by Aramark to KDOC in January 2023 is made relatively low, at just $1.752 per meal. (*Id.*)[50]

The Court can take judicial notice of commonly known financial facts. *See Halfen v. United States*, 324 F.2d 52, 56 (10th Cir. 1963); Fed. R. Evid. 201(b)(1). Surely it is a matter of common knowledge beyond dispute – clear to any ordinary person who has ever purchased food – that "fine meats . . . choice wine, and other delicacies" would cost more than $1.752 per person. Because "[q]ualified immunity protects officers from

---

[49] KDOC, Annual Report: Fiscal Year 2022, 43, https://www.doc.ks.gov/publications/Reports/kdoc-fy2022-annual-report (last accessed Mar. 27, 2023).

[50] Any additional costs with regard to the CRD are accounted for in the general per-meal price charged by Aramark to KDOC.

the burdens of pre-trial discovery," *Thomas v. Kaven*, 765 F.3d 1183, 1197 n.9 (10th Cir. 2014), it should protect Defendant Zmuda against the burden of gathering price quotes for a multitude of food and beverage items just to prove the obvious, that "fine meats . . . choice wine, and other delicacies" are expensive.[51]

Surely it is another matter of common knowledge beyond dispute that building and staffing an entirely separate kitchen just to meet McCoy's unique food-service demands (*see* Doc. 24 at ¶ 77, pgs. 28-29; Doc. 24-1 at 6; Doc. 47-1 at ¶ 51) would be expensive as well. Because of the nature of qualified immunity, Zmuda should not have to procure quotes from construction or remodeling companies just to prove this obvious fact.

An EDCF official, in light of his training and experience, asserts that granting McCoy's requested accommodations would likely result in numerous inmates being jealous and requesting similar accommodations, and some inmates lashing out with bad behavior toward EDCF staff and other inmates. (Exhibit I at ¶ 3.) In light of qualified immunity, his declaration along with common sense should be sufficient evidence for this. For example, Defendant Zmuda should not have to conduct a survey of KDOC inmates to show that other inmates would be jealous and that a ripple effect would occur.

Because KDOC has compelling government interests in managing costs and resources, as well as in maintaining order and discipline through a simplified food service, this Court should not require KDOC – at taxpayer expense – to build a separate kitchen for McCoy or to purchase "delicacies" for McCoy. KDOC already provides a separate cooking process and separate food menu to provide kosher fare according to generally accepted kosher standards. *McCoy I* (Doc. 190 at 13); (Doc. 17-1 at 183-87; Doc. 18). KDOC should not be required to provide a separate cooking process and separate food menu for each and every idiosyncratic belief that inmates may have or claim. Rather, even if the method of cooking or the lack of McCoy's requested additional foods somehow infringes on McCoy's religious exercise, the balancing of interests required by RLUIPA, *see Cutter*, 544 U.S. at 723, still tips in favor of KDOC's "simplified food service," *see Morton*, 343 F.3d at 218, including broader accommodation of religious diets through the CRD rather than requiring fine-tuned accommodation of McCoy's idiosyncratic requested diet. *See McCoy I* (Doc. 190 at 14) (holding that

---

[51] *See Beerheide v. Suthers*, 286 F.3d 1179, 1189, 1191 (10th Cir. 2002) (citing *Turner v. Safley*, 482 U.S. 78, 98 (1987)) (holding that federal courts can rely on their own "common sense" in evaluating the record and how it applies to the *Turner* factors).

McCoy "is not entitled to 'TV dinners' from KDOC or Aramark").

**E.   Alternatively, McCoy has failed to demonstrate a violation of his First Amendment rights under § 1983.**

If McCoy's claims under RLUIPA fail, his § 1983 claims also fail.[52] But even if McCoy's RLUIPA

claims succeed, his § 1983 claims would still fail. First, McCoy fails to show conscious or intentional

interference with his free exercise of religion as required for free exercise claims.[53] Further, a substantial burden

on an inmate's free exercise rights by "restrictive prison regulations" can be "permissible if . . . reasonably

related to legitimate penological interests, and . . . not an exaggerated response to such objectives." *Tenison v.*

*Byrd*, 826 F. App'x 682, 691 (10th Cir. 2020) (quoting *Beard v. Banks*, 548 U.S. 521, 528 (2006)). In *Turner v.*

*Safley*, 482 U.S. 78 (1987), the Supreme Court set forth four factors to consider in assessing reasonableness:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

*Tenison*, 826 F. App'x at 691 (citing *Wardell v. Duncan*, 470 F.3d 954, 960 (10th Cir. 2006)).

Regarding the first factor, the CRD policy, as discussed above, helps the prison keep an orderly,

simplified food service and to stay within the budget.[54] So the first factor weighs in favor of Zmuda.

Regarding the second factor, the CRD policy and the ability of inmates to purchase additional kosher

foods with their own funds provide adequate access to kosher foods. McCoy may not consider the lack of

delicacies in the CRD policy or having to pay for his own delicacies to be the best methods, but that does not

---

[52] *Dorman*, 36 F.4th at 1313; *see also Ramirez*, 142 S. Ct. at 1277 ("RLUIPA . . . . aim[s] to ensure greater protection for religious exercise than is available under the First Amendment.").
[53] *See McCoy I* (Doc. 190 at 14) ("[T]he [alleged] violations do not show that Defendants . . . exhibited a conscious or intentional interference with [McCoy's] free exercise of religion. No reasonable jury could conclude otherwise."); *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (discussing conscious or intentional interference standard); *Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006) (same). *See also* section VII above, which discusses the higher "discriminatory purpose" standard that McCoy must also meet.
[54] *See Hammons v. Saffle*, 348 F.3d 1250, 1254-55 (10th Cir. 2003) ("maintaining prison order and safety"); *Twyman v. Crisp*, 584 F.2d 352, 359 (10th Cir. 1978) (cited approvingly by *Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir. 1996)) ("budgetary considerations"); *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003) ("simplified food service" and "staying within the prison's budget").

undercut the challenged restrictions.[55] The second factor weighs in favor of Zmuda.

Regarding the third factor, providing McCoy's requested accommodations would likely result in jealousy amongst other inmates, who would likely clamor for similar benefits, and some would act out with bad behaviors towards EDCF staff or other inmates. (Exhibit I at ¶ 3.) This would compromise order and discipline, further raise food service costs, and further complicate food service. The third factor weighs in favor of Zmuda.

Regarding the fourth factor, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. Here, McCoy wants "delicacies" and a separate kitchen at taxpayer expense, which are not alternatives with only de minimis cost to valid penological interests. The fourth factor weighs in favor of Zmuda.

All four factors, then, weigh in favor of Zmuda. All of the restrictions against which McCoy raises claims serve a legitimate penological interest, such as in having an orderly, simplified food service, staying within budgetary limits, and maintaining prison order generally. A reasonable officer could in good faith rely on these reasons to support the restrictions, especially in light of the lack of an unequivocal judicial holding in the Tenth Circuit holding any of these restrictions to be a violation. Accordingly, even if the Court does not grant summary judgment on the RLUIPA claims, it should still grant summary judgment on the § 1983 claims.

## IX. **McCoy fails to state an equal protection claim because the claimed discrimination on the basis of restrictive housing status is rationally related to a legitimate end.**

A state actor may discriminate on the basis of a non-suspect classification if rationally related to some legitimate end. *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2021). Here, restrictive housing residents being excluded from group holiday activities for general population residents (Doc. 24 at 30; Exhibit A at 11-14) is rationally related to the whole point of restrictive housing: preventing violence, contraband, and the coordination of security threats. (Exhibit G at ¶¶ 3-7.) Therefore, McCoy fails to state an equal protection claim.

## X. **Even if McCoy states a claim that survives summary judgment with regard to nominal damages, the Court should dismiss McCoy's claims for punitive damages and injunctive relief.**

RLUIPA claims cannot be brought for monetary damages, *Sossamon v. Texas*, 563 U.S. 277, 293

---

[55] *See Wardell*, 470 F.3d at 961-62.

(2011), such as punitive damages. McCoy is not entitled to punitive damages against Defendant Zmuda under § 1983 for want of the requisite subjective intent. He has not alleged or provided any evidence that Defendant Zmuda acted with the required maliciousness, evil motive, or with reckless indifference to McCoy's civil rights, or that he subjectively knew his actions were unconstitutional under clearly established law.[56]

In order to suffer an actual and continuing injury under a religious diet policy and have a live, non-moot controversy regarding that policy, a plaintiff must submit himself to the policy.[57] Here, McCoy has not currently submitted himself to the CRD policy at EDCF. (Exhibit J.) He no longer suffers an actual and continuing injury under the CRD policy, so no live controversy exists. Therefore, the requested injunctions regarding the CRD policy are moot.

## CONCLUSION

For the above reasons, Zmuda requests that the Court dismiss McCoy's claims against him for lack of subject-matter jurisdiction and failure to state a claim or, in the alternative, grant Zmuda summary judgment.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
785-296-2215
Fax: (785) 291-3767
*Attorney for Defendant Jeffrey Zmuda*

---

[56] *See Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) (citing *Smith v. Wade,* 461 U.S. 30, 56 (1983)); *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (barring punitive damages for lack of requisite subjective intent).
[57] *McCoy I* (Doc. 190 at 10) (holding McCoy "lacks standing to sue for prospective relief about the CRD (either its composition or its execution) because he is no longer under the CRD"); *Burnett v. Okla. Dep't of Corr.*, 737 F. App'x 368, 374-75 (10th Cir. 2018); *see also Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997) (cited approvingly by *United States v. Hardman*, 297 F.3d 1116, 1121 (10th Cir. 2002) (stating that "[a]s a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy")); *Arizonans for Off. Eng. v. Arizona,* 520 U.S. 43, 67 (1997) ("[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.").

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of March, 2023, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Dylan L. Murray
Baker, Sterchi, Cowden & Rice, LLC - Pershing
2400 Pershing Road, Suite 500
Kansas City, MO 64108-2533
dmurray@bscr-law.com
*Attorney for Aramark Correctional Services, Inc.*

James Scott Kreamer
Baker, Sterchi, Cowden & Rice, LLC - Pershing
2400 Pershing Road, Suite 500
Kansas City, MO 64108-2533
kreamer@bscr-law.com
*Attorney for Aramark Correctional Services, Inc.*

Natasha Carter
Kansas Department of Corrections
714 SW Jackson, Suite 300
Topeka, KS 66603
Natasha.Carter@ks.gov
*Attorney for Kansas Department of Corrections, Interested Party*

I also certify that a copy of the above was served by means of first-class mail, postage prepaid, addressed to:

Deron McCoy, Jr. #76894
El Dorado Correctional Facility-Central
P.O. Box 311
El Dorado, KS 67042
*Plaintiff, pro se*

/s/ Matthew L. Shoger
Matthew L. Shoger
Assistant Attorney General