EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DERON McCOY Jr.,                           ) | |
|                                ) | |
|         **Plaintiff,**           ) | |
|                                ) | |
| **v.**                             ) | **Case. No. 21-3269-TC-ADM** |
|                                ) | |
| **ARAMARK CORRECTIONAL**    ) | |
| **SERVICES,** *et al.*,          ) | |
|                                ) | |
|         **Defendants.**      ) | |

## MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants Jeff Zmuda, Patricia Berry, and Sharon Coats (the "KDOC Defendants") respectfully request, through Assistant Attorney General Matthew L. Shoger, that this Court dismiss all claims against them pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). In the alternative, the KDOC Defendants ask this Court to grant summary judgment pursuant to Fed. R. Civ. P. 56. In accordance with D. Kan. Rule 7.1(a), a memorandum in support is filed with this motion.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH

/s/ Matthew L. Shoger
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for the KDOC Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DERON McCOY Jr.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case. No. 21-3269-TC-ADM** |
| ) | |
| **ARAMARK CORRECTIONAL** ) | |
| **SERVICES,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

In accordance with D. Kan. Rule 7.1(a), Defendants Jeff Zmuda, Patricia Berry, and Sharon Coats (the "KDOC Defendants") submit this memorandum in support of their motion under Fed. R. Civ. P. 12(b)(1) and (b)(6) or Fed. R. Civ. P. 56. They respectfully request that this motion be granted and this action be dismissed or, in the alternative, summary judgment granted in their favor. They attach fourteen exhibits and state the following in support.

### INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | McCoy's grievances and KDOC staff's responses |
| B | KDOC Biography of Secretary Zmuda |
| C | Declaration of Paige Coleman |
| D | (1st) Declaration of Maria Bos |
| |    -   Exhibit D-1 – McCoy's canteen purchases from 6/21/21 to 5/25/22 |
| |    -   Exhibit D-2 – McCoy's canteen purchases from 5/26/22 to 2/8/23 |
| |    -   Exhibit D-3 – Canteen menus |
| E | (2nd) Declaration of Maria Bos |
| F | *(not used)* |
| G | Declaration of Jesse Howes |
| H | Declaration of Keith Bradshaw |
| I | Declaration of John-Mark Albert Henke |
| J | Declaration of Amber N. Hoffman |
| K | EDCF General Orders 23-103 and 05-106 *(all versions since 11/1/10)* |

| L | IMPP 01-127D *(version in effect since 12/21/21)* |
| M | IMPP's 10-108 and 10-108D *(all versions since 7/2/10)* |
| N | IMPP 10-110D *(version in effect since 1/30/18)* |
| O | IMPP 11-101A *(all versions since 4/23/19)* |

## NATURE OF THE CASE

Plaintiff Deron McCoy, Jr., an inmate currently incarcerated at El Dorado Correctional Facility (EDCF) in restrictive housing (Doc. 17-1 at 3; Doc 24-2 at 5, ¶ 2; Exhibit G ¶¶ 8-9), alleges that defendants have violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Free Exercise and Equal Protection clauses (Doc. 24 at 2, 8, 21-25, 30). McCoy alleges that food provided to him through EDCF's Certified Religious Diet (CRD) is not kosher due to the way it is prepared and served (Doc. 24 at 21-23), and that he should be given additional foods for Sabbaths and holidays (Doc. 24 at 23-25, 30).

McCoy previously litigated many, if not all, of these issues and lost in *McCoy v. Aramark Corr. Servs., LLC*, No. 16-3027-HLT, 2020 WL 5877613 (D. Kan. Oct. 2, 2020) [hereinafter *McCoy I*] (Docs. 175, 190). He filed this current lawsuit on November 24, 2021 (Doc. 1), and filed his Second Amended Complaint ("Complaint") on November 16, 2022 (Doc. 24). McCoy seeks nominal and punitive damages, a declaratory judgment, injunctions mandating his desired dietary accommodations, and the costs of this action (Doc. 24 at 28-29).

On the Court's order (Doc. 4), the Kansas Department of Corrections filed a *Martinez* Report on June 15, 2022 (Doc. 7), and then later filed an amended *Martinez* Report on July 29, 2022 (Doc. 17). McCoy's Complaint survived screening on November 16, 2022 (Doc. 23). Four of eight defendants have waived service or been served in this case. (Docs. 32, 34, 66, 71.) Aramark plans to accept waivers of service for Defendants Rabbi Fellig and Judy Hay. (Doc. 64.) Defendants Randy Singletary and Rabbi Friedman have not yet been served in this case. Although service was attempted at "c/o El Dorado Correctional Facility" for both of these

defendants (Docs. 28, 31), neither are current KDOC or EDCF employees (Docs. 32 at 2; 35 (sealed last known addresses of former KDOC employees); 68 (clarification of KDOC's relationship with defendants)) and therefore cannot be served at EDCF. The KDOC Defendants have provided the Court with the last known address of Singletary "under seal for the sole purpose of effecting service of process." (Doc. 37; *see also* Docs. 35 (sealed), 36, 40, 72.)

Aramark has filed a motion to dismiss that has been fully briefed. (Docs. 42-44, 47, 50.) The KDOC Defendants now file their Motion to Dismiss, or, in the Alternative, for Summary Judgment. (*See* Doc. 63 (setting deadline).) The Court should dismiss McCoy's claims because of Eleventh Amendment immunity, lack of individual capacity claims under RLUIPA, and preclusion. Alternatively, the Court should dismiss McCoy's claims or grant summary judgment to the KDOC Defendants because of lack of personal participation, failure to exhaust administrative remedies, qualified immunity (especially in light of the factual context), lack of a substantial burden, beliefs not being religious in nature, or appropriate justification. Or the Court should dismiss claims for punitive damages for lack of the requisite subjective intent, and some claims for injunctive relief for mootness due to McCoy no longer being in restrictive housing.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1. McCoy was transferred to EDCF on June 8, 2019. (Doc. 17-1 at 3.)

2. McCoy was placed on the CRD at EDCF on June 24, 2022. (Exhibit J at ¶ 4.)

3. When an inmate on a special diet is transferred out of a facility, the inmate is not kept on the facility's approved list of residents for that diet. (Exhibit J); *McCoy v. Aramark Corr. Servs., LLC*, No. 16-3027-HLT, 2020 WL 5877613 (D. Kan. Oct. 2, 2020) [hereinafter *McCoy I*] (Doc. 190 at 3 n.5, 8-10); (*see also* Exhibit N, 8 (§ V(B)(2)) (policy for requesting religious accommodations); Exhibit D at ¶ 10 (practice)).

4. McCoy is not currently on the CRD after leaving EDCF, returning to EDCF, and not requesting to be placed on the CRD after returning to EDCF. (Exhibit J at ¶ 4.)

***McCoy I***

5. McCoy has previously litigated about the CRD policy. *McCoy I* (Docs. 175, 190).

6. McCoy's previous lawsuit resulted in a final judgment against him on October 2, 2020. *McCoy I* (Docs. 190-91).

7. McCoy did not appeal from this final judgment. *See McCoy I* (docket).

8. The final judgment found the following:

    a. "The crux of [McCoy's] complaint is that Defendants have failed to provide him with a Kosher diet in accordance with his Jewish faith." *McCoy I* (Docs. 175 at 1, 190 at 1).

    b. "The uncontroverted evidence shows that Defendants offer Kosher meals to inmates without charge. It further shows that Defendants have procedures in place to ensure that CRD meals are prepared in accord with Jewish dietary practices." *McCoy I* (Doc. 190 at 13).

    c. "[T]he [alleged] violations do not show that Defendants . . . exhibited a conscious or intentional interference with Plaintiff's free exercise of religion. No reasonable jury could conclude otherwise." *McCoy I* (Doc. 190 at 14).

    d. "Plaintiff is not entitled to 'TV dinners' from KDOC or Aramark and is not entitled to compensation for Defendants' use of the CRD menu to provide Kosher meals for inmates following Jewish dietary laws." *McCoy I* (Doc. 190 at 14).

9. In the previous lawsuit, the CRD menus indicated that most (if not all) of the meat entrees were made with Texturized Vegetable Protein (TVP). *McCoy I* (Docs. 41-3 at 3-7; 133-1 at 44-47).

10. KDOC Secretary Zmuda did not sign the CRD menus. *See McCoy I* (Doc. 175 at 4).

***Rabbinic Contractors***

11. KDOC and Aramark have each contracted with rabbis to verify that the way the CRD food and cookware is prepared, stored, cleaned, and disposed of does not violate kosher dietary laws. (Doc. 18); *McCoy I* (Doc. 133-1 at 2-3 (¶ 9), 5 (¶ 20), and 48-50); *McCoy I* (Doc. 190 at 3-5, 12-13).

12. KDOC's contracted rabbi could come in and out of the EDCF kitchen at any time to inspect the EDCF kitchen, to monitor the administration of CRD in the EDCF kitchen, to review policies, procedures, food labels, and kitchen operations, and to give advice to the KDOC and Aramark management as may be required on how to comply with Jewish dietary laws. (Doc. 18 at ¶ 2.)

***Availability of Kosher Foods***

13. When dietary rules change for Passover, when Jewish inmates cannot eat leavened bread, the appropriate food is provided by Aramark. (*See* Doc. 24 at ¶¶ 63-65); *see also* Exodus 12:18-20; Deuteronomy 16:3-4.

14. Jewish EDCF inmates in general population have the opportunity to purchase TV dinners with meat and fish on Succoth with their own funds. (Doc. 24 at ¶¶ 67(1)[1]-68(1).)

15. Jewish EDCF inmates in general population have the opportunity to purchase cheesecake on Shavuot with their own funds. (Doc. 24 at ¶ 70.)

16. Jewish EDCF inmates in general population have the opportunity to purchase smoked fish or lox for Yom Kippur with their own funds. (Doc. 24 at ¶ 73.)

17. Jewish EDCF inmates can purchase kosher fish from the commissary. (Exhibit D-3 at 26;

---

[1] The Complaint includes duplicates of some paragraphs. This "67(1)" notation indicates the first paragraph 67.

Exhibit D at ¶ 6 (explaining Exhibit D-3); *see also* Exhibit O, 2 (§ I(A)(5)), 4
(§ V(A)(1)), 8 (§ I(A)(5)), 11 (§ V(A)(1)) (policy regarding canteen purchases in
restricted housing); Exhibit D at ¶ 10 (practice).)

18. Jewish EDCF inmates in general population at least occasionally have the opportunity to
purchase kosher meats and grape juice with their own funds. (Doc. 24 at 67(1)-68(1);
Exhibit A at 12-14; Doc. 24-1 at 10-11.)

19. EDCF inmates cannot purchase wine. The explanation given by EDCF is that alcoholic
beverages like wine, as intoxicants, are contraband and a security risk. (Exhibit E at ¶ 4.)

### *Food Service Budget*

20. In fiscal year 2022, KDOC spent over $17.3 million on meals for inmates. KDOC,
Annual Report: Fiscal Year 2022, 43, https://www.doc.ks.gov/publications/Reports/kdoc-
fy2022-annual-report (last accessed Mar. 17, 2023).

21. In January 2023, KDOC spent nearly $1.4 million for almost 800,000 inmate meals.
(Exhibit H at ¶ 3.)

22. Of that amount, over $270,000 was for about 155,000 meals for inmates in EDCF. (*Id.*)

23. The price per meal charged by Aramark to KDOC in January 2023 was $1.752. (*Id.*)

### *First Grievance*

24. McCoy submitted a grievance on January 21, 2021, which "addressed not being served
meat and fish and other food items during the Sabbath." (Doc. 24 at 26-27.)

25. The grievance complained that those food items are "not supplied under CRD." (Doc. 24-
1 at 7; Exhibit A at 3; *see also* Exhibit A at 5 (demanding that KDOC "direct Aramark to
supply . . . other required meal items").)

26. UTS Brewer responded on January 28, 2021, that the CRD "is the meal program for the
Religious Groups that need to have a Kosher meal." (Docs. 24 at 27; 24-1 at 8; Exhibit A

at 6.)

27. McCoy appealed to the warden and to the Secretary's office, who agreed with the lower responses. (Docs. 24 at 27; 24-1 at 2-4; Exhibit A at 7-10.)

28. In his administrative filings, McCoy did not offer to pay for the Sabbath food items he requested. (Doc. 24-1 at 3, 5-7; Exhibit A at 1-5, 8-9.)

### Second Grievance

29. McCoy sent a Form 9 to the chaplain on August 5, 2022, "requesting to be provided challah bread as well as to know what other food items were allowed for inmates in seg." (Doc. 24 at 27.)

30. The Form 9 said that McCoy "would like challah and grape juice" for the Sabbath and that he would like to "obtain food items" for other holidays. (Exhibit A at 11; *see also* Doc. 24-1 at 11; Exhibit A at 14.)

31. In his Form 9, McCoy did not offer to pay for the additional food items he requested. (Exhibit A at 11, 14; Doc 24-1 at 11.)

32. The chaplain responded to the Form 9 on August 17, 2022, that "offenders in seg are not supplied challah bread and grape juice." (Doc. 24 at 28.)

33. McCoy filed a grievance that same day. (Docs. 24 at 28; 24-1 at 10; Exhibit A at 12-13.)

34. The chaplain responded to the grievance on August 25, 2022. (Doc. 24 at 28; *see also* Doc. 24-1 at 11; Exhibit A at 14.)

35. In explaining the reasoning for rejecting the grievance, the chaplain said, that McCoy – in his earlier Form 9 – "is asking the Chaplain to provide challah bread and grape juice to observe Shabbat, which is the Jewish Sabbath. He does not offer to purchase said items." (Doc. 24-1 at 11; Exhibit A at 14.)

36. Group food events for Jewish general population inmates to celebrate the Sabbath are

7

paid for with funds from the group's account. (Exhibit A at 13; *see also* Exhibit M, 4-5 (§ IV(A)), 10-11 (§ IV(B)) (policy for group food events in general population); Exhibit D at ¶ 10 (practice).)

37. The chaplain's response cited EDCF General Order 23-103 to point out "that banquets and refreshments are only open to inmates who are part of [the] requesting organization and who are housed in general population." (Doc. 24 at 28; *see also* Doc. 24-1 at 11; Exhibit A at 14; Exhibit K, 1-2 ("policy" ¶ 2, § II(B)(5)), 6-7 ("policy" ¶ 2, § II(B)(5)) (policy); Exhibit D at ¶ 11 (practice).)

38. The chaplain's response also explained that, under EDCF GO 23-103, "Inmate Organization Food Events are not for an 'individual' but for a group." (Doc. 24-1 at 11; Exhibit A at 14; *see also* Exhibit K, 1-2 ("policy" ¶ 2, § II(B)(5)), 6-7 ("policy" ¶ 2, § II(B)(5)) (policy); Exhibit D at ¶ 11 (practice).)

39. McCoy appealed to the warden and to the Secretary's office, who agreed with the lower responses. (Docs. 24 at 28; 24-1 at 9; Exhibit A at 15-17.)

### *KDOC and EDCF Officials*

40. Zmuda has been the Kansas Secretary of Corrections since 2019. (Exhibit B.)

41. EDCF's General Orders are issued by the EDCF warden and are reviewed and approved by the KDOC Policy Analyst and other available staff, not by the Secretary himself. (Exhibit L, 1-2 (§ I(A), (D)), 4 (§ III) (policy); Exhibit C at ¶¶ 3-4 (practice).)

42. An EDCF official, in light of his training and experience, asserts that granting McCoy's requested accommodations would likely result in numerous inmates being jealous and requesting similar accommodations, and some inmates lashing out with bad behavior toward EDCF staff and other inmates. (Exhibit I at ¶ 3.)

## QUESTIONS PRESENTED

I.      As a matter of law, does the Eleventh Amendment bar claims against the KDOC
        Defendants in their official capacities for monetary and declaratory relief?

II.     As a matter of law, should individual capacity claims under RLUIPA be dismissed?

III.    Can the KDOC Defendants raise their substantial interests in claims before this Court,
        even regarding claims against other defendants?

IV.     Are McCoy's claims precluded when he either has or could have litigated these
        matters in his previous lawsuit, which resulted in a final judgment against him?

V.      Should McCoy's claims against Secretary Zmuda be dismissed when McCoy has not
        alleged Zmuda's personal participation in the alleged violations?

VI.     To the extent the Court construes McCoy's claims as saying McCoy is prevented any
        access at all to certain foods, are the KDOC Defendants entitled to summary
        judgment because McCoy failed to exhaust his administrative remedies?

VII.    Are the KDOC Defendants entitled to qualified immunity because their actions –
        either as alleged or as revealed in the evidentiary record – did not violate clearly
        established law of which reasonable state officials would have known?

VIII.   Are the KDOC Defendants entitled to summary judgment on the CRD policy when it
        did not substantially burden any sincerely held religious beliefs and when any such
        burden was appropriately justified?

IX.     Are the KDOC Defendants entitled to summary judgment on the equal protection
        claim when the restrictions are rationally related to the purpose of restrictive housing?

X.      Should claims for punitive damages be dismissed for lack of the requisite intent?

XI.     Are McCoy's requests for injunctive relief regarding restrictive housing policies moot
        when he is no longer in restrictive housing?

## ARGUMENTS AND AUTHORITIES

### *Standard on Motion to Dismiss for Lack of Subject-Matter Jurisdiction*

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims for lack of subject-matter jurisdiction. McCoy, as the party invoking the Court's jurisdiction, bears the burden of showing its existence. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018).

### *Standard on Motion to Dismiss for Failure to State a Claim*

On a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pleaded factual allegations in the complaint, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), but a complaint must also contain enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Although the sufficiency of a complaint generally rests on its contents alone, the court may also consider: (1) documents that the complaint incorporates by reference, (2) documents that the complaint references if they are central to the plaintiff's claims, and (3) documents of which a court may take judicial notice, which includes court records in any related court proceedings. *Gee v. Pacheco*, 627 F.3d 1178, 1186, 1191 (10th Cir. 2010). At the motion to dismiss stage, documents of which the court takes judicial notice "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Although courts have traditionally construed *pro se* pleadings in a liberal fashion, this "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized

legal claim could be based." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Similarly, courts do not assume the role of an advocate for the *pro se* litigant by constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). A *pro se* litigant is expected to construct his or her own arguments or theories and adhere to the same rules of procedure that govern any other litigant in this circuit. *Id.* at 840-41.

### Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "[W]hile courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). Facts must be shown through affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671.

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. [citation omitted] To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021).

### Qualified Immunity Standard

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity is an affirmative defense that can be raised in a motion to dismiss or in a motion for summary

judgment. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). When a defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.* "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The right must be clear from applicable case law, *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019), and must be defined with specificity, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

## I.   The Eleventh Amendment bars McCoy's claims against the KDOC Defendants in their official capacities for monetary damages and for declaratory relief.

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to arms of the state and to state officials who are sued . . . in their official capacity." *Id.*  As such, KDOC employees share the state's immunity from suits against them in their official capacities for monetary or declaratory relief. *See White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996).

A narrow exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But the Eleventh Amendment bars claims for "retrospective declaratory relief" against state officials. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a

bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, McCoy requests prospective injunctive relief against the KDOC Defendants, and this particular remedy is exempt from Eleventh Amendment immunity. (Doc. 24 at 28-29.) But McCoy also requests monetary damages in the form of nominal and punitive damages (Doc. 24 at 28), which are barred by the Eleventh Amendment as asserted against the KDOC Defendants in their official capacities. McCoy further requests a declaratory judgment stating that the KDOC Defendants violated his constitutional rights. (Doc. 24 at 28.) To the extent such a declaratory judgment stands as an independent remedy apart from McCoy's requested injunctive relief, it is barred by the Eleventh Amendment. Therefore, McCoy's claims against the KDOC Defendants in their official capacities for monetary damages and for declaratory relief should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

## II.  **RLUIPA does not support individual capacity claims, so McCoy's individual capacity RLUIPA claims against the KDOC Defendants should be dismissed.**

McCoy sues the KDOC Defendants in their individual and official capacities under RLUIPA. (Doc. 24 at 6.) But RLUIPA only supports official capacity claims, *Stewart v. Beach*, 701 F.3d 1322, 1334-35 (10th Cir. 2012), so the individual capacity claims should be dismissed.

## III.  **Issue preclusion and claim preclusion bar McCoy's current lawsuit because he either has or could have litigated these matters in the previous lawsuit, which resulted in a final judgment.**

Federal common law governs the preclusive effect of federal court judgments. *Johnson v. Spencer*, 950 F.3d 680, 708 (10th Cir. 2020). The affirmative defense of issue preclusion (collateral estoppel) bars the re-litigation of an issue of law or fact after it is determined on the merits by a valid, final judgment. *Keller Tank Servs. II, Inc. v. Comm'r of Internal Rev.*, 854 F.3d 1178, 1193 (10th Cir. 2017). Under federal common law, issue preclusion applies when:

(1) the issue previously decided is identical to the present one; (2) the prior action

was finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the previous adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the previous adjudication.

*Keller*, 854 F.3d at 1193. "The litigated issue must also be essential to the judgment." *Id.*

Similarly, the separate affirmative defense of claim preclusion (res judicata) prevents a party from litigating a legal claim that was *or could have been* the subject of a previously issued final judgment. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017). "The principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not have another chance to do so." *Johnson*, 950 F.3d at 708. Claim preclusion applies when the defendant proves three elements: "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Id.* An exception exists to claim preclusion when the plaintiff "did not have a full and fair opportunity to litigate the claim in the prior action." *Id.*

Regarding the second element, "officers of the same government" are considered in privity with one another and "are protected from relitigation of the same issue between the plaintiff and another officer of the government." *Yung-Kai Lu v. Univ. of Utah*, 790 F. App'x 933, 936 n.1 (10th Cir. 2019) (citing *United States v. Rogers*, 960 F.2d 1501, 1509 (10th Cir. 1992)).[2] Regarding the third element, new actions that have occurred due to the continuation of a previously litigated policy or custom do not count as new events for purposes of determining the identity of the causes of action, but rather count as part of the same ongoing series of events as

---

[2] *See also Mambo v. Vehar*, 185 F. App'x 763, 764-65 (finding an employee to be in privity with his employer); *Lenox*, 847 F.3d at 1241 (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 17-19 (1st Cir. 2003)) (privity exists between defendants where defendants are "treated as a single entity" or as "peas in a pod" by the plaintiff).

before. *See Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1275 (10th Cir. 2022).

Although some holdings in the previous case were not final adjudications on the merits
(such as dismissing without prejudice for failure to exhaust administrative remedies or
dismissing for lack of jurisdiction due to mootness), other holdings on the merits in the previous
lawsuit ultimately preclude the claims McCoy makes in his current lawsuit.

### A. Under issue preclusion, McCoy cannot relitigate whether the CRD policy provides kosher food.

In McCoy's previous lawsuit, the Court said that "[t]he crux of [McCoy's] complaint is
that Defendants have failed to provide him with a Kosher diet in accordance with his Jewish
faith." *McCoy v. Aramark Corr. Servs., LLC*, No. 16-3027-HLT, 2020 WL 5877613 (D. Kan.
Oct. 2, 2020) [hereinafter *McCoy I*] (Docs. 175 at 1, 190 at 1). The crux of McCoy's Complaint
in his current lawsuit is the same. To the extent the Court considers McCoy's affidavits from
other inmates – which McCoy does not cite to or explain in his Complaint – this evidence is the
same as in the last lawsuit.[3] In the previous lawsuit, the Court said:

> *Plaintiff fails to demonstrate a genuine issue of material fact . . . based on . . . the
> CRD policy*. . . . Plaintiff has submitted countless conclusory allegations about
> what he believes is required for a Kosher diet and how Defendants have failed to
> provide it to him. . . . *The uncontroverted evidence shows that Defendants offer
> Kosher meals to inmates without charge. It further shows that Defendants have
> procedures in place to ensure that CRD meals are prepared in accord with
> Jewish dietary practices. . . . Plaintiff is not entitled to "TV dinners" from KDOC
> or Aramark* and is not entitled to compensation for Defendants' use of the CRD

---

[3] *Compare* Doc. 24-2 at 7-14 *with McCoy I* (Doc. 145-1); *Compare* Doc. 24-2 at 15-16 *with
McCoy I* (Doc. 185 at 52-53); *Compare* Doc. 24-2 at 17-18 *with McCoy I* (Doc. 185 at 54-55).
The affidavit from Tyrone Hamilton Jr. (Doc. 24-2 at 19-21) may be new, but it does not specify
which prison facility Tyrone Hamilton Jr. worked the serving line at and so its relevance to this
case regarding EDCF has not been established. Regardless, McCoy does not cite to or explain
the relevance of any of these affidavits in his Complaint, so they should not be considered. *See
Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) ("the court cannot
take on the responsibility of serving as the litigant's attorney in constructing arguments and
searching the record").

menu to provide Kosher meals for inmates following Jewish dietary laws.

*McCoy I* (Doc. 190 at 7, 12-14) (emphasis added).

McCoy has already litigated the issue and lost regarding whether the CRD policy provides kosher food. Summary judgment was granted as a final adjudication on the merits of this essential part of McCoy's claims. The party against whom the doctrine is invoked, McCoy, was a party to the previous adjudication, and he had a full and fair opportunity to litigate the issue. He amended his complaint three times,[4] and filed numerous documents[5] to support his claims, but, ultimately, he lost. McCoy cannot now have a second bite at the apple and claim that the CRD policy does not provide kosher food.

**B. Under issue preclusion, McCoy cannot relitigate whether qualified immunity applies for KDOC employees regarding the CRD policy.**

McCoy has already litigated the issue and lost regarding whether signing the CRD menu overcomes qualified immunity. *McCoy I* (Doc. 175 at 18). The Court granted summary judgment, a final adjudication on the merits of this essential issue of immunity. The party against whom the doctrine is invoked, McCoy, was a party to the previous adjudication, and he had a full and fair opportunity to litigate the issue. McCoy cannot now have a second bite at the apple and claim that merely signing the CRD menu overcomes qualified immunity. Accordingly, a defendant allegedly signing the CRD menu (Doc. 24 at ¶ 22(1)) is not enough to overcome qualified immunity.

---

[4] *McCoy I* (Docs. 1, 11, 18, 56).
[5] *McCoy I* (Docs. 7-9, 16, 19, 21-23, 36-37, 52, 62-63, 71-73, 78-80, 108-10, 122, 125, 144-46, 148-49, 155, 157-59, 161-62, 173, 184-85).

**C.  Alternatively, under claim preclusion, McCoy cannot raise new claims that he could have raised before, so he cannot now claim that he should be provided additional kosher foods.**

The lack of meat in the CRD is not a new fact in this case.[6] McCoy's current claims that he should receive additional kosher foods such as kosher meats "free of charge" (Doc. 24 at 23-25, 28-29) still amount to a claim that the food provided is insufficiently kosher, which has already been litigated, and which arises from the same set of facts regarding the same policy.

But to the extent the Court considers McCoy's claims regarding additional kosher foods to be new claims, McCoy could have brought these claims during the previous lawsuit. He did not. These claims still arise out of the same already litigated policy for which this Court has already rendered a final judgment, and so the claims are identical for purposes of claim preclusion. *See Denver Homeless Out Loud*, 32 F.4th at 1275. And it does not matter that some officials were not defendants in the previous lawsuit. *See Yung-Kai*, 790 F. App'x at 936 n.1.

**D.  Also under claim preclusion, McCoy's claims regarding restricted housing policies fall under the same legal theory that he could have brought regarding additional foods, so it is also precluded.**

Although no longer in restrictive housing, McCoy claims that he should be provided additional foods free of charge while housed in restrictive housing as well. (Docs. 24 at 29-30; 59 at 5-6.) The claim still falls under the same legal theory discussed above that he could have brought before: that he should be provided additional kosher foods free of charge under federal law regardless of any prison policy. It arises out of the same series of underlying events.

What is more, to the extent that McCoy brings a claim regarding the way CRD food is *served* in segregation, he was already experiencing those issues during the previous lawsuit.

---

[6] *McCoy I* (Doc. 41-3 at 3-7 ("All entrees are made with Texturized Vegetable Protein (TVP) unless otherwise indicated with an asterisk."), Doc. 133-1 at 44-47 ("All entrees made with Texturized Vegetable Protein (TVP) are noted with an asterisk.")).

(Doc. 14); *McCoy I* (Docs. 159 at 3-7; Doc. 161 at 3-6; Doc. 162 at 2-4). He could have amended his complaint to bring such a claim, but did not. Claim preclusion precludes such claims here.

**IV.**     **The KDOC Defendants have standing to challenge all of McCoy's claims.**

McCoy has suggested the KDOC Defendants lack standing to challenge some of his claims because they are not named on those claims. (Doc. 59 at 32.) Some non-precedential case law exists to support that defendants cannot argue the interests of other defendants.[7] But the KDOC Defendants do not argue the interests of other defendants here but rather their own. Zmuda in particular should be allowed to present arguments on claims he is not named on in order to express his **substantial** interest in the outcome of those claims. Zmuda represents his own official interests in doing so, not those of Aramark, Fellig, or Hay (the "Aramark Defendants"). If the Aramark Defendants lose the claims against them, they would not have to foot the bill, but rather KDOC would **and at taxpayer expense**. The Aramark Defendants' expenses in fulfilling any injunction would likely be billed to KDOC as the cost of services provided. Those expenses could include the expenses of providing additional foods, building a separate kitchen, hiring additional staff, or paying for more rabbinical supervision. Therefore, KDOC has an even bigger interest in the outcome of the claims than the Aramark Defendants do.

KDOC cannot be added as a party to this case because KDOC cannot sue or be sued. *Sims v. Kan. Dep't of Corr.*, No. 18-1259-EFM, 2019 WL 4450671, at *4 (D. Kan. Sept. 17, 2019); *see also* Fed. R. Civ. P. 17(b). The head of KDOC, Secretary of Corrections Zmuda cannot be added as a party to this case because he is already a party. If Zmuda were not a party to this case, however, his significant official interest in the outcome of the case would require that

---

[7] *See United States v. Libretti*, 161 F.3d 18 (table opinion), 1998 WL 644265, at *4 (10th Cir. Sep. 9, 1998); *United States v. Chitwood*, 52 F.3d 338 (table opinion), 1995 WL 216900, at *2 (10th Cir. Apr. 12, 1995).

he be added to this case as a party through mandatory joinder. Fed. R. Civ. P. 19(a)(1)(B)(i). Further, if Zmuda were not a party to this case, he would be able to intervene in this case because of his significant official interest in the outcome. Fed. R. Civ. P. 24(a)(2), (b)(2)(B).

But McCoy insists that because Zmuda is already a party and only named on certain claims, that he anomalously lacks standing to address this Court regarding the other claims. To hold that Zmuda cannot express his interest in the case simply because he has been named as a party and only named on other claims would be quite the anomaly and would create quite the loophole: Just sue a government contractor related to an activity, name the relevant government officials as defendants, and then only list those government officials on minor claims in the case. Then the government cannot defend its interests on the other claims, according to McCoy's theory. What McCoy's standing argument essentially requests the Court to do here is to issue a gag order preventing the government from defending itself and its practices before this Court, leaving the Kansas taxpayer with no official advocate to prevent a potential explosion of expenses. That result would be manifestly absurd and unjust. The Court should instead find that Zmuda has standing to argue on behalf of his official interests even for claims on which he is not named. To the extent permissible, his arguments should be considered for other defendants.[8]

## V.   **Alternatively, McCoy fails to state the requisite personal participation of Defendant Zmuda.**

"Liability under § 1983 requires personal participation in the unlawful acts." *Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005). Liability is not authorized under a theory of respondeat superior. *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018). Rather, McCoy

---

[8] The Court has inherent authority to consider Zmuda's arguments with regard to other defendants. *Reece v. AES Corp.*, 638 F. App'x 755, 763 n.10 (10th Cir. 2016) (citing *McKinney v. Okla.*, 925 F.2d 363, 365 (10th Cir. 1991)).

must show an "affirmative link" between a defendant's actions and the alleged constitutional injury. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). To do so, McCoy must show: (1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind. *Id*. McCoy must also show this affirmative link for his RLUIPA claims.[9]

Here, McCoy has not plausibly alleged that Zmuda was personally involved in McCoy's alleged injury. McCoy alleges that he was harmed by policies and procedures that prevented him from receiving certain food items while housed in restrictive housing. (Doc. 24 at ¶¶ 74-75, pgs. 27-30.) McCoy points to only one particular policy, EDCF General Order (G.O.) 23-103, which was replaced with G.O. 05-106 on October 10, 2022. (Doc. 24 at 28; Exhibit K.)

But the Secretary of Corrections does not personally sign or approve facility G.O.'s. The EDCF warden signed G.O.'s 23-103 and 05-106 in 2010 and 2022, respectively. (Exhibit K at 1, 5-6.)[10] Zmuda has only been the Secretary of Corrections since 2019,[11] so he could not have signed or approved G.O. 23-103 in 2010. Under IMPP 01-127D, General Orders are issued by the warden and reviewed and approved by the KDOC Policy Analyst and other available staff, not by the Secretary himself.[12] So Zmuda would not have directly reviewed or approved G.O. 05-106 either. McCoy has not alleged or proven any facts to make an inference plausible that

---

[9] *Ciempa v. Jones*, 745 F. Supp. 2d 1171, 1200 (N.D. Okla. 2010); *see also Wilkinson v. Sec'y*, 622 F. App'x 805, 812 (11th Cir. 2015) (finding claims to be "cognizable" under RLUIPA because they "were predicated on a theory of direct liability rather than of vicarious liability").

[10] The Court may consider G.O. 23-103 at the dismissal stage because the Complaint references it and it is central to the claims. *See Gee*, 627 F.3d at 1186. It is also admissible under Fed. R. Evid. 901, especially 901(b)(4). *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170-71 (10th Cir. 2009).

[11] (Exhibit B.) The court can take judicial notice of when Secretary Zmuda took office – which can be found on KDOC's website – under Fed. R. Evid. 201. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

[12] (Exhibit L, 1-2 (§ I(A), (D)), 4 (§ III).) The Court can take judicial notice of IMPP 01-127D – which can be found on KDOC's website – under Fed. R. Evid. 201. *See O'Toole*, 499 F.3d at 1225. Or if reaching this issue on summary judgment, the Court can consider Exhibit C at ¶¶ 3-4.

Secretary Zmuda directly reviewed or approved G.O. 23-103 or G.O. 05-106 himself. So McCoy has not adequately alleged or proven personal participation by Secretary Zmuda, and the claim should be dismissed or, alternatively, Zmuda is entitled to summary judgment.

## VI.  Alternatively, to the extent McCoy claims policies at EDCF prevent him any access at all to the religious foods he requests, he failed to exhaust administrative remedies.

McCoy has admitted the ability to purchase many food items he requests, at least while in general population. (Doc. 24 at ¶¶ 67(1)-68(1) (Succoth), 70 (Shavuot), 73 (Yom Kippur).) To the extent the Court construes McCoy's claim regarding food on the Sabbath (Doc. 24 at 23-24; *see also* Doc. 24 at ¶¶ 57-61) or his claim regarding restrictive housing policies (Doc. 24 at 30; *see also* Doc. 24 at ¶¶ 74-75) as saying McCoy is prevented any access at all to the foods he requests, McCoy has not exhausted his administrative remedies. McCoy may have exhausted administrative remedies with regard to whether EDCF should provide him with additional foods on the Sabbath *"free of charge"* and with foods *from group-funded group meals "free of charge"* while in restrictive housing. (Exhibit A; Doc. 24 at 27-28; Doc. 24-1; *see also* Doc. 24 at 28-29 ("free of charge").) But McCoy has not exhausted administrative remedies with regard to whether EDCF would *allow him to purchase foods with his own funds*.

### A.  Exhaustion of administrative remedies is mandatory under the PLRA.

The PLRA requires an inmate to exhaust all available administrative remedies before bringing a § 1983 or RLUIPA claim about prison conditions. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 520 (2002) (§ 1983 claims); *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022) (RLUIPA claims). Failure to exhaust is an affirmative defense, and the defendant has the burden of proof. *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007). The issue of McCoy's failure to exhaust his available remedies prior to filing his lawsuit must be determined before addressing the merits of his suit. *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010).

KDOC's Grievance Procedure for Inmates is in K.A.R. 44-15-101 *et seq*. Here, McCoy's claims fall under this regulation because his Complaint involves a policy within the jurisdiction of EDCF or KDOC or the alleged actions of EDCF or KDOC employees. *See Lindsey v. Cook*, No. 19-3094-HLT, 2021 WL 483855, at *2 (D. Kan. Feb. 4, 2021) (citing K.A.R. § 44-15-101a(d)(1)). An inmate must take four steps to complete the process: (1) attempt an informal resolution; (2) submit a grievance to a unit team member; (3) appeal to the warden of the facility; and (4) appeal to the secretary of corrections. *Id.*; K.A.R. 44-15-101(b), (d), 44-15-102(a)-(c).

**B.  McCoy did not complete the grievance process on the appropriate subjects prior to filing suit.**

*1.  Additional foods on the Sabbath*

To the extent that the Court construes McCoy's claim regarding additional foods on the Sabbath as saying he was prevented any access at all to the religious foods he requests, McCoy did not exhaust that issue. According to the Complaint, McCoy submitted a grievance on January 21, 2021, which "addressed **not being served** meat and fish and other food items during the Sabbath." (Doc. 24 at 26-27 (emphasis added).) UTS Brewer responded on January 28, 2021, that the CRD "is **the meal program** for the religious groups that need to have a kosher meal." (Doc. 24 at 27 (emphasis added).) McCoy appealed to the warden and to the Secretary's office, who agreed with the lower responses. (Doc. 24 at 27; Doc. 24-1 at 2-4; Exhibit A at 7-10.) McCoy allegations show he wanted to be served the additional items as part of the meal program. And the evidence shows he did not offer to pay in his administrative filings. (Doc. 24-1 at 3, 5-7; Exhibit A at 1-5, 8-9.) McCoy did not properly exhaust the issue of purchasing religious foods for the Sabbath with his own funds, so that issue is not properly before this Court.

*2.  Restrictive housing policies*

To the extent that the Court construes McCoy's claim regarding restrictive housing

policies as saying he was prevented any access at all to the foods he requests, McCoy did not exhaust that issue. According to the Complaint, McCoy sent a Form 9 to the chaplain on August 5, 2022, in which McCoy "requested **to be provided** challah bread as well as to know what other food items were allowed for inmates in seg." (Doc. 24 at 27 (emphasis added).) The chaplain responded on August 17, 2022, that "offenders in seg **are not supplied** challah bread and grape juice," and McCoy filed a grievance that same day. (Doc. 24 at 28 (emphasis added).) The chaplain responded to the grievance on August 25, 2022, pointing out "that banquets and refreshments are only open to inmates who are part of [the] requesting organization and who are housed in general population." (Doc. 24 at 28.) McCoy appealed to the warden and to the Secretary's office, who agreed with the lower responses. (Doc. 24 at 28; Doc. 24-1 at 9; Exhibit A at 15-17.) McCoy does not allege that he offered to pay, but rather that he wanted "to be provided" with the additional items. And evidence shows that he did not offer to pay in his Form 9 (Exhibit A at 11) and this was given as a reason why his grievance was rejected (Doc. 24-1 at 11; Exhibit A at 14). McCoy did not properly exhaust the issue of purchasing religious foods with his own funds while in restrictive housing, so that issue is not properly before this Court.

VII.   **Alternatively, the Court should dismiss for failure to state a claim or grant summary judgment because qualified immunity applies when the alleged conduct did not violate clearly established law.**

The KDOC Defendants are entitled to qualified immunity because there was no clearly established law within this Circuit, or a robust consensus of cases outside of it, that their alleged actions violated clearly established law, particularized to the facts of this case. Specifically, McCoy has not shown any law that put the KDOC Defendants on notice that the CRD policy violated McCoy's federal rights. Because qualified immunity applies, it bars McCoy's claims.

At the time of the alleged actions, while it was clearly established that prison officials

must provide inmates kosher or halal foods under certain circumstances,[13] no binding precedent in this circuit clearly established that (1) failure to provide *specific* kosher foods or (2) failure to abide by an inmate's idiosyncratic views regarding kosher food preparation caused a substantial burden to religious exercise. And showing a substantial burden to religious exercise is a required element of RLUIPA claims and of Free Exercise Clause claims.[14] The Tenth Circuit has left open the question of whether providing halal meats (or kosher meats) is required under RLUIPA.[15] At least one court outside of the Tenth Circuit has found no violation of RLUIPA for failing to provide halal meats.[16] And the Tenth Circuit has not yet addressed the religiosity of idiosyncratic views by Muslims or Jews regarding food preparation requirements that deviate from both kosher and halal norms (as approved by religious leaders and not complained about by any other inmates).[17] The factual context here, as argued in the rest of this memorandum, bolsters the qualified immunity defense. *See Jones v. Manriquez*, 811 F. App'x 482, 489 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) ("the clearly-established-law analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'").

Further, although RLUIPA claims do not require discriminatory purpose, to establish a § 1983 claim for a Free Exercise violation and receive monetary damages (which are not

---

[13] *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002); *see also Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317 (10th Cir. 2010).

[14] RLUIPA claims and Free Exercise Clause claims share the same substantial burden standard. *Blair v. Raemisch*, 804 F. App'x 909, 917 (10th Cir. 2020); *Tenison v. Byrd*, 826 F. App'x 682, 690-91 (10th Cir. 2020).

[15] *Abdulhaseeb*, 600 F.3d at 1325-26 (Gorsuch, J., concurring) ("We thus have no opportunity to consider whether a prisoner who may eat ODOC's vegetarian diet but who is denied any access to halal-certified meats can state a RLUIPA claim.").

[16] *Boyd v. Lehman*, No. C05-0020, 2006 WL 1442201, at *10 (W.D. Wash. May 19, 2006).

[17] *See Abdulhaseeb*, 600 F.3d at 1324 (Gorsuch, J., concurring) (citation omitted) ("[T]he defendants in this case do not contest the religiosity or the sincerity of Mr. Abdulhaseeb's beliefs. Accordingly, we have no opportunity to decide when a prisoner's beliefs qualify as religious or when they are sincerely held.").

available under RLUIPA[18]), the Tenth Circuit has left open the question of whether the plaintiff must show discriminatory purpose,[19] which has not been shown here. To show discriminatory purpose, McCoy must show defendants "adopted and implemented the . . . policies at issue not for a neutral . . . reason but for the purpose of discriminating on account of . . . religion."[20] Even if a "discriminatory purpose" need not be shown, the law was not clearly established that anything less would result in a constitutional violation. McCoy has not alleged or established any facts showing a discriminatory purpose. In fact, he is precluded from alleging even the lower standard of conscious or intentional interference. *See McCoy I* (Doc. 190 at 14) ("[T]he [alleged] violations do not show that Defendants . . . exhibited a conscious or intentional interference with Plaintiff's free exercise of religion. No reasonable jury could conclude otherwise.").

Accordingly, no clearly established law would have put the KDOC Defendants on notice that their alleged actions were unlawful, especially in light of the factual context. They are entitled to qualified immunity and either dismissal or summary judgment in their favor.

## VIII. **Alternatively, the CRD policy did not violate McCoy's rights because it did not substantially burden any sincerely held religious beliefs and because any such burden was appropriately justified.**

### A. **The CRD policy does not impose a substantial burden on McCoy because it does not coerce McCoy into violating any religious beliefs.**

For an RLUIPA claim, the plaintiff "must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312

---

[18] *Sossamon v. Texas*, 563 U.S. 277, 293 (2011).

[19] *Ralston v. Cannon*, No. 19-1146, 2021 WL 3478634, at *5 to *6 (10th Cir. 2021) [hereinafter *Ralston II*] (citing *Ralston v. Cannon*, 884 F.3d 1060, 1063 n.3 (10th Cir. 2018) [hereinafter *Ralston I*]).

[20] *Ralston I*, 884 F.3d at 1063 n.3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

(10th Cir. 2010). Here, McCoy has failed to show all three elements. This motion contests two at this time: substantial burden and religiosity.

The Tenth Circuit has held that:

> a religious exercise is substantially burdened under 42 U.S.C. § 2000cc–1(a) when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice—an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief.

*Abdulhaseeb*, 600 F.3d at 1315.

Existing case law is unclear on whether providing kosher food in general falls under the second scenario or the third scenario.[21] And in a similar case to this one where a prisoner requested halal food to comport with his Islamic faith, the Tenth Circuit expressly did not address whether prisons must provide halal meats in addition to vegetarian halal food.[22] But in

---

[21] *See Abdulhaseeb*, 600 F.3d at 1316-17 ("ODOC's failure to provide a halal diet either prevents Mr. Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice."); *Williams v. Wilkinson*, 645 F. App'x at 702 ("the failure to provide Mr. Williams with a kosher diet will either prevent him from exercising his sincerely held religious belief or force him to make the Hobson's choice of eating a diet contrary to his beliefs or not eating at all"); *Beerheide*, 286 F.3d at 1189 (referring to forcing prisoners to pay a large percentage of the cost of kosher food as "a Hobson's choice rather than a true alternative"); *Chichakli v. Samuels*, No. CIV-15-687-D, 2017 WL 9250722, at *7 (W.D. Okla. Aug. 15, 2017) ("If, as Plaintiff alleges, the meals provided to him at the Grady County Jail were not kosher, Plaintiff faced a Hobson's choice"); *Smith v. Williams*, No. 20-cv-00841, 2021 WL 4947353, at *12 (D. Colo. Oct. 13, 2021) (likening failure to provide a halal diet to the Hobson's choice language in *Abdulhaseeb*). *But see Williams v. Wilkinson*, 645 F. App'x at 703 ("the prison's denial of Mr. Williams's religiously motivated request for a kosher-diet, whether or not shared by other Muslims, falls easily within Abdulhaseeb's second category—flatly prohibiting Mr. Williams from participating in an activity motivated by a sincerely held religious belief").
[22] *Abdulhaseeb*, 600 F.3d at 1325-26 (Gorsuch, J., concurring) ("We thus have no opportunity to consider whether a prisoner who may eat ODOC's vegetarian diet but who is denied any access to halal-certified meats can state a RLUIPA claim.").

cases not involving food, the case law is more clear: "RLUIPA requires governments to refrain from substantially burdening religion, *not to affirmatively subsidize religion.*" *Abdulhaseeb*, 600 F.3d at 1320 (emphasis added) (finding RLUIPA did not require a prison to pay for an inmate's Islamic books or to hire a full-time Muslim minister); *Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005) ("RLUIPA does not require a State to pay for an inmate's devotional accessories."); 42 U.S.C. § 2000cc-3(c) ("Nothing in this chapter shall create ... a right of . . . any person to receive government funding for a religious activity").

The best way to synthesize these cases is that a difficulty for religious exercise is not a substantial burden when the primary obstacle is the inmate's own funds *unless* the prison creates a Hobson's choice leading to effective coercion to violate religious beliefs. Under this synthesis, religious dietary restrictions fall under the third scenario (the Hobson's choice scenario). An inmate only has to make the Hobson's choice between eating spiritually unclean food and not eating at all when the food provided is spiritually unclean. A lack of kosher (or halal) meats, for example, would not render an inmate unable to eat without spiritually contaminating oneself, as the inmate would still be able to eat the other kosher (or halal) food provided. To the extent a Hobson's choice is not presented, the government need not affirmatively subsidize religion, so any additional kosher or halal foods an inmate wishes to consume should be purchased by the inmate with the inmate's own funds. To hold otherwise would be to require the government to foot the bill for "fine meat . . . choice wine, and other delicacies"[23] for inmates at taxpayer expense (and only for religious claimants, which could raise establishment clause concerns[24]).

---

[23] (Doc. 24 at ¶ 60.)

[24] This case does not involve circumstances such as exclusion on religious grounds from a generally available benefit program, such as in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017) or *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 793 (5th Cir. 2012), but rather seeks additional funding for certain religious claimants above and

    1.   *Failure to provide delicacies does not present a Hobson's choice.*

Here, McCoy asserts that the KDOC violates the law if it does not provide him "free of charge" (Doc. 24 at 28-29) with "fine meat, fish, choice wine, and other delicacies" weekly on the Sabbath (Doc. 24 at ¶¶ 57-60, pgs. 23-24), TV dinners with meat and fish on Succoth (Doc. 24 at ¶¶ 66-68(1)[25], pgs. 24-25), cheesecake on Shavuot (Doc. 24 at ¶¶ 67(2)-70, pg. 24), and smoked fish or lox for Yom Kippur (Doc. 24 at ¶¶ 71-73, pg. 25). As discussed above, McCoy did not properly exhaust the issue of whether he can purchase the requested additional foods with his own funds, so that issue is not properly before this Court. Additionally, for each of the holidays, McCoy admits that Jewish inmates can purchase the items with their own funds. (Doc. 24 at ¶¶ 67(1)-68(1) (Succoth), 70 (Shavuot), 73 (Yom Kippur).) The commissary menu includes kosher fish. (Exhibit D-3 at 26; Exhibit D at ¶ 6 (explaining Exhibit D-3).) Jewish inmates in general population at least occasionally can purchase kosher meats and grape juice with their own funds. (Doc. 24 at 67(1)-68(1); Exhibit A at 12-14; Doc. 24-1 at 10-11.) Inmates cannot purchase wine because it is contraband as an intoxicant and a security risk. (Exhibit E at ¶ 4.)

    2.   *When dietary rules change for a holiday, like for Passover, the appropriate food is provided.*

When dietary rules change for a holiday, like for Passover, when Jewish inmates cannot eat leavened bread, the appropriate food is provided by Aramark. (Doc. 24 at ¶¶ 62-65); *see also* Exodus 12:18-20; Deuteronomy 16:3-4.

    3.   *McCoy does not provide and explain any admissible evidence of EDCF kitchen practices, and even if he does, RLUIPA was not violated.*

To the extent McCoy addresses statewide policy in his claims, the Court has already

---

beyond that provided to nonreligious inmates.

[25] The Complaint includes duplicates of some paragraphs. This "68(1)" notation indicates the first paragraph 68.

ruled on that. (*See* section III(A) above.) To the extent McCoy addresses practices at EDCF in

his claims, McCoy has not provided and explained any admissible evidence of the practices

within the EDCF kitchen. (*See* section III(A) and footnote 3 above.) But alternatively, McCoy's

beliefs on these subjects would still not be subject to the protections of RLUIPA or the First

Amendment because they are not religious or the government actions are appropriately justified.

### B.   Many of McCoy's asserted beliefs are not religious in nature.

Although "few tasks that confront a court require more circumspection than that of

determining whether a particular set of ideas constitutes a religion within the meaning of the first

amendment," "when an individual invokes the first amendment to shield himself or herself from

otherwise legitimate state regulation, [courts] are required to make such uneasy differentiations."

*Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981). Although it "may present a most

delicate question," "to have the protection of the Religion Clauses, the claims must be rooted in

religious belief" rather than merely a "way of life." *Wisconsin v. Yoder*, 406 U.S. 205, 215-16

(1972) (emphasis added).

Similarly, although RLUIPA "shall be construed in favor of a broad protection of

*religious* exercise," 42 U.S.C. § 2000cc-3(g) (emphasis added), the RLUIPA (or RFRA[26])

plaintiff bears the burden to show "that his sincerely held beliefs are *religious* in nature, rather

than a philosophy or way of life." *Hale v. Fed. Bureau of Prisons*, 759 F. App'x 741, 746 (10th

Cir. 2019) (emphasis added) (citing *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir.

1996)). The Tenth Circuit applies a factor test to determine whether beliefs are religious in nature

– and therefore protected by federal law. *Hale*, 759 F. App'x at 746-49 (citing *Meyers*, 95 F.3d at

---

[26] The Religious Freedom Restoration Act (RFRA) is a sister statute to RLUIPA. *Holt v. Hobbs*,
574 U.S. 352, 356. "RLUIPA . . . allows prisoners to seek religious accommodations pursuant to
the same standard as set forth in RFRA." *Id.* at 358.

1482-84). Specifically, the Tenth Circuit looks at five factors in evaluating the religiosity of a belief system: ultimate ideas (whether it addresses fundamental questions about life, purpose, and death), metaphysical beliefs (whether it addresses a reality that transcends the physical and immediately apparent world), moral or ethical system (whether it prescribes a right way of living), comprehensiveness of beliefs (whether it provides the believer with answers to many, if not most, of the problems and concerns that confront humans), and accoutrements of religion (whether it exhibits external signs that resemble other religions). *Meyers*, 95 F.3d at 1483. The fifth factor, accoutrements of religion, has numerous subfactors, including the prescription of dietary or fasting rules. *Id.* at 1483-84.

Under this factor test, the Tenth Circuit has rejected RFRA protections for some claims to religious belief, such as when a man sought protections for marijuana use, claiming he was "the founder and Reverend of the Church of Marijuana," and when an inmate sought protections for his white-supremacist "Church of the Creator." *Id.* at 1479, 1484; *Hale*, 759 F. App'x at 743, 748. Here, hypothetically, if McCoy simply made up a new "church" and claimed that the prison must provide him with certain foods and must cook his food in a different way, those particular beliefs, on their own, would not satisfy the factor test. They relate only to one subfactor, "diet or fasting." In other words, McCoy's assertions in this case only appear to potentially merit protection under RLUIPA because he claims his beliefs are an interpretation of Judaism, and Judaism meets all five factors.

So the connection of McCoy's beliefs to Judaism is a central issue in this case. Although RLUIPA excludes consideration of whether "religious exercise" is "compelled by, or central to, a system of religious belief," the exercise must still be an exercise "of religion," which means a connection to a system of religious belief (such as Judaism) must still be shown. *See* 42 U.S.C.

§ 2000cc-5(7)(A). For example, if McCoy (or another inmate) claims tomorrow that his interpretation of kosher dietary rules requires him to eat ribeye steaks and caviar every day, surely such ad hoc beliefs would not be what Congress intended to protect with RLUIPA. (This hypothetical is ultimately not far removed from McCoy's actual request for "fine meats" and "delicacies" every week.) Rather, to be religious in nature, the beliefs must have a connection to the claimed system of religious beliefs.[27]

Certainly, the Court should not determine whether religious beliefs are ultimately true or false.[28] Further, some degree of varying opinions on what constitutes kosher food may exist within Judaism,[29] and it is not the courts' role to determine which of those opinions is correct and so to become "arbiters of scriptural interpretation."[30] But McCoy still bears a burden – albeit a low burden – of demonstrating that his beliefs are in fact an "interpretation" and therefore "religious." While the Court should not determine whether a belief is, in the Court's opinion, "unreasonable," or, in the opinion of other followers of the religion, even "illogical,"[31] the Court must still determine whether the belief is at least rationally connected to the protected system of

---

[27] *Tucker v. Collier*, 906 F.3d 295, 301 (5th Cir. 2018) (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)) ("Congress passed RFRA and RLUIPA to reclaim the compelling-interest test of *Yoder*"); *Yoder*, 406 U.S. at 215 ("to have the protection of the Religion Clauses, the claims must be rooted in religious belief"); *see also Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022) (emphasizing that the exercises of religion sought were "traditional forms of religious exercise" in finding a likelihood of success under RLUIPA).

[28] *United States v. Ballard*, 322 U.S. 78, 86-88 (1944) ("we conclude that the District Court ruled properly when it withheld from the jury all questions concerning the truth or falsity of the religious beliefs or doctrines of respondents").

[29] *See, e.g.,* Doc. 24-3 at 14-15 (ch. 38, ¶ 1) ("In some localities," "One authority holds," "this opinion is generally followed"), 18 (ch. 47, ¶ 1) ("according to the opinion of some authorities," "Other authorities are lenient"); *see also* Doc. 24 at ¶ 56; Doc. 19 at ¶ 1; Doc. 47-1 at ¶ 36.

[30] *Williams v. Wilkinson*, 645 F. App'x 692, 700 (10th Cir. 2016); *see also Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981).

[31] *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).

religious beliefs a plaintiff lays claim to. *See Yoder*, 406 U.S. at 215; *Africa*, 662 F.2d at 1031.

The plaintiff could show this by citing to a religious text.[32] He could cite to a religious authority.[33] He could perhaps reference his own experience with a religious group that so practiced.[34] Or for some matters a plaintiff could even rely on common knowledge about religious beliefs.[35] In other words, to be considered part of a religious system of belief, a religious view cannot simply be arbitrary but must bear at least a rational connection to that system of belief.[36]

Here, McCoy started practicing Judaism while in prison (Doc. 17-1 at 131 (¶ 5) (change to Judaism), 3-4 (location history)), so his experience with Judaism has always been limited to that which has been allowed for inmates. He cannot point to as evidence his own experiences exercising Judaism in a way contrary to prison policy as he has never been able to act contrary to

---

[32] *See Yoder*, 406 U.S. at 216 (finding Amish daily life and religious practice was "in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, 'be not conformed to this world'"); *Williams*, 645 F. App'x at 700, 703 (mentioning a quotation from the Qur'an provided by a Muslim inmate to support his possibly idiosyncratic belief that eating kosher food was a proper exercise of Islamic faith).

[33] *See Ramirez*, 142 S. Ct. at 1277 (discussing a pastor's statement that an activity was "a significant part of our faith tradition as Baptists" in finding a likelihood of success under RLUIPA); *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir. 1999) ("Plaintiff submitted evidence . . . that a vegetarian diet is highly recommended by the [Seventh Day Adventist] Church.").

[34] *See Yoder*, 406 U.S. at 207-09 (discussing how the plaintiffs who claimed Amish beliefs went to an Amish church and lived in an Amish community that practiced those beliefs).

[35] *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1140 n.15 (10th Cir. 2013) ("The assertion that life begins at conception is familiar in modern religious discourse, although of course not universally held. Moral culpability for enabling a third party's supposedly immoral act is likewise familiar."); Fed. R. Evid. 201(b)(1).

[36] Although some courts consider a lack of connection to the system of belief as evidence against sincerity when "filter[ing] out insincere requests," *see Ackerman v. Washington*, 16 F.4th 170, 181 (6th Cir. 2021), that effectively does away with the plaintiff's burden to show the religious nature of the plaintiff's beliefs, which is a required element under RLUIPA. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010); *see also Yoder*, 406 U.S. at 215; *Africa*, 662 F.2d at 1031. And the Tenth Circuit has not shied away from the religiosity element. *See Hale*, 759 F. App'x at 748 (granting summary judgment due to lack of beliefs of a religious nature).

those prison policies. McCoy has not suggested prison policies have changed so that he could have had such experiences. He does not mention any religious leaders that he learned the specific beliefs in question from.[37] And the intricacies of kosher dietary laws are not common knowledge (apart, perhaps, from not eating pork), so McCoy cannot appeal to common knowledge.

Although McCoy cites to the Code of Jewish Law (Kitzuk Shulhan Arukh) to support some of his beliefs, he fails to demonstrate the religious nature of many of his asserted beliefs.

### 1.  *McCoy's separate-kitchen rule*

McCoy cites a rule regarding the importance of covering pots and pans when cooking kosher food in proximity to non-kosher food (Doc. 19 at ¶¶ 5-6; Doc. 24-3 at 17, ¶ 20), but McCoy does not even allege (much less prove) that kosher food is cooked uncovered at EDCF. He says without further citation that this uncovered-pots rule is "the basis of the Jewish law that Kosher food and non-Kosher food cannot be prepared and cook[ed] in the same kitchen." (Doc. 19 at ¶ 6.) But the two rules are considerably different in impact, and McCoy does not cite any religious source for the much broader separate-kitchen rule he espouses.[38]

### 2.  *McCoy's no-cooking-by-non-Jews rule*

McCoy cites a rule stating that food that is cooked and "fit to be served at the table of a king" cannot be cooked by a non-Jew. (Doc. 3 at ¶ 6; Doc. 24-3 at 15, ¶ 6.) But McCoy appears to have invented a much broader rule saying that "a non-Jew may not cook **any** Kosher food

---

[37] *See McCoy I* (Doc. 190 at 6) ("Plaintiff has not offered testimony of a rabbi or an expert on Jewish dietary practices to support his claims that the processes utilized by Aramark violate Kosher dietary laws. Nor is Plaintiff himself a rabbi, and he has offered no evidence that he or anyone providing an affidavit on his behalf has rabbinical training.").

[38] It might be a different matter if McCoy cited to a broad principle and then explained how he believed that principle should be worked out. *See Yoder*, 406 U.S. at 216 (finding Amish daily life and religious practice was "in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, 'be not conformed to this world'"). But here, McCoy cites to specific rules of application, not to general, abstract rules of principle, and then attempts to alter those specific rules of application.

item." (Doc. 3 at ¶ 6 (emphasis added); *see also* Doc. 24 at 21.) The very passage he cites plainly

states that food that is not a "delicacy fit to be served at the table of a king" *can* be cooked by a

non-Jew. (Doc. 3 at ¶ 6; Doc. 24-3 at 15, ¶ 6.) McCoy does not explain how *any* of the food

served in the CRD is fit for a king's table, much less all of it.[39] McCoy does not cite any

religious source for the much broader no-cooking-by-non-Jews rule he espouses.

### 3.  McCoy's no-benefits-on-the-Sabbath rule

McCoy cites to a requirement that Jews, because they cannot work on the Sabbath, also

cannot have an agent work for them on the Sabbath (such as by hiring, delivering work, or

directing an employed servant). (Doc. 3 at ¶ 11; Doc. 24 at ¶ 58; *see* Doc. 24-3 at 20, ¶¶ 1-3.)

McCoy extends this rule considerably beyond a command that he should follow to broadly cover

any services that provide a benefit to him regardless of whether the worker is his agent. (*See*

Doc. 3 at ¶ 11; Doc. 24 at ¶ 58.) And so he implies that the rule applies to KDOC and Aramark

workers, whom he does not hire, direct, or deliver work to. McCoy does not cite any religious

source for the much broader no-benefits-on-the-Sabbath rule he espouses.

### 4.  McCoy's constant-rabbinic-supervision rule

McCoy cites to a requirement that non-Jews entrusted with kosher cookware either need

to have a Jew present or a Jew "going in and out." (Doc. 19 at ¶¶ 5-6; Doc. 24-3 at 17, ¶ 20.) But

McCoy does not believe that is sufficient, and says that the Jew must be a rabbi, and that the

rabbi cannot simply be present or "going in and out," but must be actively and directly

supervising the cooking the whole time. (Doc. 19 at ¶ 6; Doc. 24 at 21.) McCoy does not cite any

religious source for the much broader constant-rabbinic-supervision rule he espouses. Further,

the possibility of a rabbi going in and out is present in this case. (Doc. 18 at ¶ 2.)

---

[39] McCoy also does not suggest that all food in the CRD is cooked.

### 5. *McCoy's double-sealing rule*

McCoy cites to a requirement in certain circumstances to double-seal "wine, meat or a piece of fish" and to single-seal "boiled wine, wine-vinegar, bread or cheese," but he expands this well beyond the cited rule to require double-sealing all "kosher food or food item[s]." (Doc. 19 at ¶¶ 3-4; Doc. 24-3 at 17, ¶ 16-17; *see also* Doc. 24 at 21.) McCoy does not cite any religious source for the much broader double-sealing rule he espouses.

### 6. *McCoy's cookware rules*

McCoy blanketly cites to the general existence of a category of rules regarding cookware (and its cleaning, separation, and blessing). (Doc. 24 at ¶ 56; Doc. 3 at ¶ 4; Doc. 24-3 at 14). But McCoy does not identify which of these rules has been allegedly broken at EDCF. Instead, McCoy simply states that the cookware at EDCF has been contaminated. (Doc. 24 at 21-22.) The burden is on McCoy to show the religious nature of his purported rule by demonstrating a connection to Jewish cookware rules, not simply to say that Jewish law has cookware rules and to expect the Court to peruse and decipher pages of those rules to see if any of them apply.

**C. Any substantial burden on any sincerely held religious belief of McCoy's is justified by compelling government interests in meeting budgetary constraints, ensuring an orderly, simplified food service, and maintaining discipline.**

For RLUIPA's "compelling governmental interest" standard, "context matters" when appropriately balancing the government's interest. *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005). "Lawmakers supporting RLUIPA . . . anticipated that courts would apply [RLUIPA's] standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 723 (emphasis added). Further, although RLUIPA covers "any exercise of religion, whether or not compelled

by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), the need to balance government interests against religious practices may be greater for optional practices than for mandatory practices. *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012). With regard to food service specifically, the government has legitimate interests in: "simplified food service" and "staying within the prison's budget." *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003).

Here, providing meals to inmates constitutes a major cost to KDOC. In fiscal year 2022, KDOC spent over $17.3 million on meals for inmates.[40] Recently, in one month, in January 2023, KDOC spent nearly $1.4 million for almost 800,000 meals for inmates. (Exhibit H at ¶ 3.) Of that amount, over $270,000 was for about 155,000 meals for inmates in EDCF. (*Id.*) With such high numbers of meals, the price per meal makes a large difference in the overall cost. If KDOC serves about 800,000 meals per month, then that is 9.6 million meals per year. So a mere $1 increase in the cost per meal would cost KDOC $9.6 million dollars, or more than half of their fiscal year 2022 food service expenditures. Accordingly, the price per meal charged by Aramark to KDOC in January 2023 is made relatively low, at just $1.752 per meal. (*Id.*)[41]

The Court can take judicial notice of commonly known financial facts, *see Halfen v. United States*, 324 F.2d 52, 56 (10th Cir. 1963); Fed. R. Evid. 201(b)(1), and can rely on their own common sense when evaluating how the record applies to the *Turner* factors, *Beerheide v. Suthers*, 286 F.3d 1179, 1189, 1191 (10th Cir. 2002) (citing *Turner v. Safley*, 482 U.S. 78, 98 (1987)). Surely it is a matter of common knowledge beyond dispute – clear to any ordinary person who has ever purchased food – that "fine meats . . . choice wine, and other delicacies"

---

[40] KDOC, Annual Report: Fiscal Year 2022, 43, https://www.doc.ks.gov/publications/Reports/kdoc-fy2022-annual-report (last accessed Mar. 27, 2023).
[41] Any additional costs with regard to the CRD are accounted for in the general per-meal price charged by Aramark to KDOC.

would cost more than $1.75[2] per person. Surely it is another matter of common knowledge beyond dispute that building and staffing an entirely separate kitchen just to meet McCoy's unique food-service demands (*see* Doc. 24 at ¶ 77, pgs. 28-29; Doc. 24-1 at 6; Doc. 47-1 at ¶ 51) would be expensive as well.[42] Further, an EDCF official, in light of his training and experience, asserts that granting McCoy's requested accommodations would likely result in numerous inmates being jealous and requesting similar accommodations, and some inmates lashing out with bad behavior toward EDCF staff and other inmates. (Exhibit I at ¶ 3.)

Because KDOC has compelling government interests in managing costs and resources, as well as in maintaining order and discipline through a simplified food service, this Court should not require KDOC – at taxpayer expense – to build a separate kitchen for McCoy or to purchase "delicacies" for McCoy. KDOC already provides a separate cooking process and separate menu to provide kosher fare according to generally accepted kosher standards. *McCoy I* (Doc. 190 at 13); (Doc. 17-1 at 183-87; Doc. 18). The balancing of interests under RLUIPA, *see Cutter*, 544 U.S. at 723, tips in favor of KDOC's "simplified food service," *see Morton*, 343 F.3d at 218, with broader, good-faith accommodation of religious diets through the CRD rather than requiring expensive and burdensome accommodation of idiosyncratic requested diets. *See McCoy I* (Doc. 190 at 14) (holding that McCoy "is not entitled to 'TV dinners' from KDOC or Aramark").

**D. Alternatively, McCoy has failed to demonstrate a violation of his First Amendment rights under § 1983.**

If the RLUIPA claims fail, the § 1983 claims also fail.[43] But even if the RLUIPA claims

---

[42] Because "[q]ualified immunity protects officers from the burdens of pre-trial discovery," Thomas v. Kaven, 765 F.3d 1183, 1197 n.9 (10th Cir. 2014), it should protect the KDOC Defendants against the burden of formally procuring price quotes to prove these obvious facts.
[43] *Dorman v. Aronofsky*, 36 F.4th 1306, 1313 (11th Cir. 2022); *see also Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022) ("RLUIPA . . . . aim[s] to ensure greater protection for religious exercise than is available under the First Amendment.").

succeed, the § 1983 claims would still fail. First, McCoy fails to show conscious or intentional interference with his free exercise of religion as required for free exercise claims.[44] Further, a substantial burden on an inmate's free exercise rights by "restrictive prison regulations" can be "permissible if . . . reasonably related to legitimate penological interests, and . . . not an exaggerated response to such objectives." *Tenison v. Byrd*, 826 F. App'x 682, 691 (10th Cir. 2020) (quoting *Beard v. Banks*, 548 U.S. 521, 528 (2006)). In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court set forth four factors to consider in assessing reasonableness:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

*Tenison*, 826 F. App'x at 691 (citing *Wardell v. Duncan*, 470 F.3d 954, 960 (10th Cir. 2006)).

All four factors weigh in favor of the KDOC Defendants. Regarding the first factor, the CRD policy helps the prison keep an orderly, simplified food service and to stay within the budget.[45] Regarding the second factor, the CRD policy and the ability of inmates to purchase additional kosher foods with their own funds provide adequate access to kosher foods. McCoy may not consider the lack of delicacies in the CRD or having to pay for his own delicacies to be the best methods, but that does not undercut the challenged restrictions.[46] Regarding the third

---

[44] *See McCoy I* (Doc. 190 at 14) ("[T]he [alleged] violations do not show that Defendants . . . exhibited a conscious or intentional interference with [McCoy's] free exercise of religion. No reasonable jury could conclude otherwise."); *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (discussing the conscious or intentional interference standard). *See also* section VII above, discussing the higher "discriminatory purpose" standard that McCoy must also meet.
[45] *See Hammons v. Saffle*, 348 F.3d 1250, 1254-55 (10th Cir. 2003) ("maintaining prison order and safety"); *Twyman v. Crisp*, 584 F.2d 352, 359 (10th Cir. 1978) (cited approvingly by *Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir. 1996)) ("budgetary considerations"); *Morton*, 343 F.3d at 218 (3d Cir. 2003) ("simplified food service" and "staying within the prison's budget").
[46] *See Wardell*, 470 F.3d at 961-62.

factor, providing McCoy's requested accommodations would likely result in jealousy amongst other inmates, who would likely clamor for similar benefits, and some would act out with bad behaviors towards staff or other inmates. (Exhibit I at ¶ 3.) This would compromise order and discipline, further raise food costs, and further complicate food service. Regarding the fourth factor, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. Here, McCoy wants "delicacies" and a separate kitchen at taxpayer expense, which are not alternatives with only de minimis cost to valid penological interests.

All of the restrictions against which McCoy raises claims serve a legitimate penological interest, such as in having an orderly, simplified food service, staying within budgetary limits, and maintaining prison order generally. A reasonable officer could in good faith rely on these reasons to support the restrictions, especially in light of the lack of an unequivocal judicial holding in the Tenth Circuit holding any of these restrictions to be a violation. Accordingly, even if not granting summary judgment under RLUIPA, the Court should do so for the § 1983 claims.

## IX. McCoy's equal protection claim fails because the claimed discrimination on the basis of restrictive housing status is rationally related to a legitimate end.

A state actor may discriminate on the basis of a non-suspect classification if rationally related to some legitimate end. *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2021). Here, restrictive housing residents being excluded from group holiday activities for general population residents (Doc. 24 at 30; Exhibit A at 11-14) is rationally related to the whole point of restrictive housing: preventing violence, contraband, and the coordination of security threats. (Exhibit G at ¶¶ 3-7.) Therefore, the Court should dismiss or grant summary judgment on the equal protection claim.

**X.**   **Even if McCoy states a claim that survives summary judgment with regard to nominal damages, the Court should dismiss or grant summary judgment on some claims for relief.**

RLUIPA claims cannot be brought for monetary damages, *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), such as punitive damages. McCoy cannot receive punitive damages under § 1983 because he has not alleged or provided any evidence that any defendants acted with the required maliciousness, evil motive, or with reckless indifference to McCoy's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law.[47]

McCoy is no longer housed in restrictive housing (Doc. 59 at 5-6), so he cannot "demonstrate a good chance of being likewise injured by the defendant[s] in the future"[48] with regard to restrictive housing policies, and his requests for injunctive relief related to restrictive housing policies are therefore moot.[49]

## CONCLUSION

For the above reasons, the KDOC Defendants request that the Court dismiss McCoy's claims or, in the alternative, grant summary judgment against McCoy's claims.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for the KDOC Defendants*

---

[47] *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992).
[48] *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1224 (10th Cir. 2009).
[49] *See Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1211 (10th Cir. 2015).